ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FEB 26 2003

LUTHER D. THOMAS, Clerk

By: _____
Deputy Clerk

CLAUDE PATTERSON,                    )
                                     )
          Plaintiff,                 )
                                     )        Civil Action File No.:
v.                                   )        1:01-CV-1152-CC
                                     )
WORLD CHAMPIONSHIP                   )
WRESTLING, INC.,                     )        **Jury Trial Demanded**
TURNER SPORTS, INC., TURNER          )
ENTERTAINMENT GROUP, INC. and        )
TURNER BROADCASTING SYSTEM, INC.,    )
                                     )
          Defendants.                )
_____)


## PLAINTIFF PATTERSON'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Cary Ichter
Charles J. Gernazian
Michelle M. Rothenberg-Williams
**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center
Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020

89

## INTRODUCTION

Patterson has accumulated through the discovery process overwhelming evidence demonstrating that Defendants discriminated against him and other African-Americans. That evidence includes the following:

- Defendants' principal decision-makers routinely used racial slurs, such as the word "nigger," and made many racially offensive remarks, revealing a blatant racial bias against African American wrestlers;

- WCW has been historically a racist enterprise in which Caucasian decision-makers routinely discriminated against African-Americans without any guidelines or established criteria for promoting wrestlers and without any Turner Defendant charged with responsibility for protecting minority wrestlers from systemic discrimination;

- Compelling statistical evidence demonstrates that WCW's practices were racially discriminatory; and

- Additional evidence of race-based decision-making, racial stereotyping, and adverse treatment of black wrestlers.

Because of this overwhelming direct, statistical, and circumstantial evidence of WCW's pattern and practice of discrimination, a jury must be empanelled to decide: (1) whether Defendants engaged in a "pattern and practice" of race discrimination; and (2) whether Defendants can show that its adverse decisions regarding Patterson were not made in furtherance of those racially discriminatory practices.

Even if this Court does not find sufficient "pattern and practice" evidence, Patterson has established overwhelming direct, statistical, circumstantial, and evidence of illegal race based decision-making. Additionally, Patterson is entitled

to a jury trial as to his claims of age discrimination and
intentional infliction of emotional distress.

## BACKGROUND FACTS

### Professional Wrestling in a Nutshell

Professional wrestling is a staged event.  Storylines are
developed and written by a booking committee, which consists of
"bookers."  After a script is written, the bookers would tell an
agent how they wanted the match to proceed and how they wanted
it to end.  The agent then meets with the wrestlers and works
out the choreography of the match.

The events produced by WCW were sometimes arena-only events
("house shows"), but most WCW events were either weekly
television shows or monthly pay per view (PPV) events.  WCW's
weekly events were shown exclusively on stations affiliated with
Defendant TBS.

### Patterson' History With WCW

Patterson is an African-American who has been a
professional wrestler or otherwise involved in professional
wrestling for approximately 36 years.  During the 1970s and
1980s, before the professional wrestling industry was dominated
by WCW and WWF, two national franchises, Patterson was a
prominent regional wrestler, wrestling under the name
"Thunderbolt" Patterson.  WCW executive JJ Dillon testified that
when he broke into the business, Patterson "was a main event in

- 2 -

Charlotte, drew lots of money….He was a very charismatic guy."
Dillon depo., pp.206-07.

Since he was active as a wrestler, Patterson has sought
other opportunities for employment with WCW, as a booker, agent,
manager, or announcer.  Paterson testified that that he was
ready to take a job with WCW "in any capacity."  See Patterson
depo., pp. 98-9; lines 25-1.

Patterson began his search for a job with WCW in the early
1990s.  WCW had a pattern and practice of refusing employment
opportunities at the creative and executive levels of the
company to minorities.  Indeed, from the time it started first
doing business in the late 1980s through the time when it sold
most of its assets in 2001, **WCW never had a single black booker,
a single black agent, a single black department head or a single
black executive.**  See Bischoff depo., p. 103 (during his 10
years at WCW there was never a black executive); Goodly depo.,
pp. 32-3 (not aware of any minority to ever hold any executive
position with WCW); Morrison depo., p. 151 (WCW had no black
executives, agents or members of the creative team).

On various occasions, when he sought a position with the
WCW, various WCW employees have told Patterson that he would not
get a job because of WCW's discriminatory practices.  Jody
Hamilton, who ran the Power Plant, the WCW training facility
told Patterson, "You know they're not going to give you a job….

- 3 -

They don't have to fool with niggers like you...." See Patterson
depo., p. 30; lines 2-6.  Patterson testified that he was told
this just before the Power Plant closed.  Id.  The Power Plant
closed and moved in 1999 and finally closed when the company
shut its doors in 2001.

When in the 1994-1995 timeframe, Patterson sought a
position as an on-the-air talent as a manger of a wrestler, Eric
Bischoff, the head of WCW, told Patterson, "Need no more
managers.  You too old.  What can you do?  We don't need no
niggers." See Patterson depo., p. 76, 93.  When asked to confirm
that Bischoff actually used the word "nigger," Patterson
emphatically confirmed Bischoff's use of the word.  Id.  As is
seen herein at pages 10-11, that was not the first or the last
time witnesses have heard these kinds of racial slurs uttered by
Bischoff.

In or about September 1999, Patterson contacted Defendants'
offices to inquire about employment opportunities with WCW.  As
is reflected in Plaintiff's Exhibit 54, attached hereto at TAB
A, Katherine Davis, an administrative assistant with Bill
Busch's office at WCW, informed Mr. Busch of two calls she
received from Patterson "looking for a position with WCW."  Bill
Busch at the time was in charge of operations at WCW.  See Pl.
Ex. 54.

Mr. Busch forwarded the e-mail to JJ Dillon who returned

- 4 -

Patterson's call on October 16, 1999.  Dillon reported that
Patterson was "obviously looking for a position with WCW, and I
don't see anything for him at this time, though I told Patterson
I would discuss the matter with Bill Busch, which I have."  See
Pl. Ex. 54.  Apparently, Dillon's idea of discussing the matter
with Busch was to send a reply e-mail in which he told him that
he returned Patterson's call and told him WCW had nothing for
him.  Patterson has known Dillon for over 30 years, and
Patterson believes Dillon is a racist because he has often heard
Dillon use racial slurs.  See Patterson depo., p. 101.

Apparently, WCW has taken the position that Patterson was
not qualified for any job with WCW because he had no experience
writing and creating television programs.  See WCW brief, p. 14.
WCW has not explained why it is that no job—not as a writer,
booker, agent, manager, announcer or anything else—was
available.  With respect to the position of booker, Dillon
acknowledged to his knowledge that other members of the booking
committee had no experience in writing television programs,
including Glen Gilberti and Kevin Nash.  See Dillon depo., pp.
207-08.

When asked if there was anything in particular that
disqualified Patterson from holding a position as a booker,
Dillon testified as follows:

          No.  There was no specific reason why he was not

considered.  But again, if every talent that called an
said, you know, I want to be hired, you know, I'm a good
worker a workers as so and so or as good a performer as so
and so, if we had changes based on those phone calls and
those knee jerk decisions, I mean you can't run a business
like that.

See Dillon depo., p. 209.

Of course, Patterson was not "every talent."  He was
someone Dillon had known for over 30 years, and Patterson had
been trying to get a job as a booker with WCW for a decade.
Although there was nothing that disqualified him from
consideration—prior experience not being a prerequisite—
Patterson was never considered for a job.  Meanwhile, new
Caucasians regularly rotated in and out of positions on the
booking committee, most of them former or current wrestlers.
The only difference between them and Patterson was the color of
their skin.[1]

WCW's contention that "old time wrestler" were not
qualified to operate as bookers or agents is wholly inconsistent
with WCW's prior hiring practices.  Indeed, during the period
that Patterson sought a position as an agent or booker with WCW,

---

[1] A review of the transcripts of the depositions of Kevin
Sullivan, Arn Anderson, Vince Russo and Eric Bischoff will show
that people were regularly shuffled on and off the booking
committee.  Kevin Sullivan testified that there was never a
fixed number of slots or positions on the booking committee as
WCW maintained a "loose" process of filling booker positions.
See Sullivan depo., p. 33; see also, Ferrara depo., p. 31
(testifying that the booking committee was comprised of
"different people at different times").

- 6 -

the following persons worked as bookers, writers and agents at
WCW:  Eric Bischoff, Vince Russo, Randy Anderson, Kevin
Sullivan, Terry Taylor, Jimmy Hart, Dusty Rhodes, Terry Allen,
Arn Anderson, Ric Flair, Paul Orndorff, and wrestler Glen
Gilberti.  See Smith depo. at 131; Schiavone depo. at 16-24;
Sullivan depo. at 13-14.  Many of these Caucasian bookers were
former wrestlers who, similar to Patterson, been in the
wrestling business for 20 to 30 years and overlapped to some
extent with Patterson.  See Declaration of Claude Patterson, TAB
Z; see also, Tabs AA - HH.

When asked whether the former and active professional
wrestlers who were members of the booking committee had prior
experience as bookers, Eric Bischoff, the head of the booking
committee for much of the relevant time period, testified that
he did not know.  See Bischoff depo. at 168.  When asked if the
lack of experience would disqualify a candidate, Bischoff said,

"No.  It didn't factor into the decision to work with
them."  Id. at 169.  Apparently, Patterson was the only
candidate who was required to have experience.[2]

---

[2] Patterson was not the only black to make his interest in a
position on the booking committee known to Bischoff.  Teddy Long
also sought such a position.  When asked whether Mr. Long was
qualified for the position, Mr. Bischoff said, "I like Teddy.
We used to drink margaritas together every Friday night, but I
never really got the impression there was much there going on
creatively."  See Bischoff depo. at 243-44.  This is the process
by which WCW vetoed black applicants: Caucasian whimsy, mixed

WCW paid lip service to the concept of diversity.  WCW issued memos declaring itself to be interested in diversity.  See Bischoff depo. at 117; Pl. Ex. 83 at TAB B.  WCW even had mandatory diversity training.  The hypocrisy of WCW's diversity training was made evident upon the slightest investigation into the manner in which the "mandatory" aspects of the program were enforced—mandatory sign in sheets at each session.  Of course, for sign in sheets to mean anything, someone at some point has to read them.  Apparently, no one at WCW ever bothered to do so because Mr. Bischoff was shocked and embarrassed at his deposition when counsel pointed out to him that the sign in sheets included the following names: Mark Furman, Rodney King, Malcolm X, David Duke, Al Sharpton, The Reverend Jesse Jackson, Rush Limbaugh, Jimmy the Greek and Howard Cossell.  See Bischoff depo. at 119-20; Pl. Ex. 18 at TAB C.  Bischoff was forced to agree that this made a mockery of the diversity training.  Id. at 120.

WCW's refusal to maintain any diversity in the booking committee further illustrates that WCW officials intended to maintain their discriminatory practices even when put on notice of the exclusive nature of WCW.  For example, although Bischoff testified that it would have been "great" to have an African-

---

with tequila, add venom, no salt.  Small wonder there was never a black who held any position of influence at WCW in more than a decade.

American booker, Goodly did nothing to allow qualified African-Americans such as Patterson to become a booker.  Indeed, Timothy Goodly, Turner's Human Resource manager assigned to provide human resources assistance to WCW testified that he noticed a lack of diversity in the upper talent at WCW, (Goodly at 69-73), and suggested to Bischoff that WCW should get a "fresh set of eyes," such as Konan (Hispanic) or Booker T (African-American) on the Booking Committee, (Goodly at 89-91).

Furthermore, Dillon testified that there is nothing that disqualified Patterson from being a booker or an agent, just as there was nothing that disqualified other former performers like Randy Anderson, Kevin Sullivan, Terry Taylor, Jimmy Hart, Dusty Rhodes, Arn Anderson, Ric Flair, Paul Orndorff.  Nonetheless, after years of trying to get a job with WCW, still in 1999 and indeed throughout 2000 as well, WCW had nothing for Patterson — not because he was not qualified, but because he is black.

### WCW's Racially Hostile Environment

During the period in which Patterson was seeking employment with WCW, the atmosphere was rife with racial enmity.  The word "nigger" and other racial slurs were standard staples of the WCW lexicon from the executive ranks at TBS's offices to the trainers at the Power Plant, and everywhere in between.

Racism and the use of racial slurs were also prevalent in the upper echelons of WCW as well.  For example, it was well

- 9 -

known that Terry Taylor, a booker and the head booker at times,

regularly used the word "nigger" and other racial slurs in

referring to African-Americans, see Snakovsky depo., p. 75-77.

Taylor's racism and bias were widely known and well chronicled

in the discovery process:

- Stating to black wrestler Bobby Walker that "you're a
  nigger and you have no talent." Id. at 76.

- When informed that Walker had complained of Taylor's
  racial bias, stating that "I don't know if I'm a racist
  but I know that . . .[h]e's a nigger with no talent."
  Bayens depo., p. 19).

- Stating that Ernest Miller was "another nigger with no
  talent." Id. at 20

- When watching a match involving Ernest Miller and Sonny
  Onoo, stating "there's a nigger and a Jap.  Who's going
  to want to watch that?"  Bayens depo., p. 67; Miller
  depo., pp. 148-49.

- When a Caucasian was scheduled to replace an African-
  American, Taylor said, "don't worry about the niggers,
  I'll take care of that."  Williams depo., p. 110.

- On a very cold winter day, Terry Taylor stated that "you
  better turn on the air conditioner because you know those
  niggers can't take the cold."  Carr depo., p. 92, TAB I.

- When Tony Carr was going to participate in a WCW event in
  Montana, Taylor stated that "no one would believe there
  were niggers in Montana."  Id. at 139.

- Referencing a demographic survey conducted by a Turner
  Defendant, Taylor told Rocky Boulware, "Turner told us we
  don't need to use you all niggers."  Boulware depo., pp.
  71; 124-125, TAB H.

Similarly, other highly placed executives at WCW used the

word "nigger" and other racial slurs and epithets.  Eric

Bischoff asked Randall Anderson, "why are we pushing some of the

blacks and some of the niggers on our television show."  See

Anderson depo., p. 74-5.  Bischoff expressed these sentiments
because he did not believe that blacks would attend wrestling
events.  Bischoff told members of the WCW booking committee that
some blacks wouldn't buy a ticket to an event but would instead
stay at home and watch it on TV.  Therefore, according to
Bischoff, the booking committee should not worry about "pushing
a Black or a nigger." [3] Id. at 177.  During a wrestling event in
Atlanta, Bischoff cancelled all bouts involving black wrestlers,
dubbing the event "white night." See Smith depo., p. 57.

Virtually all of WCW's bookers and trainers used racial
slurs.  Bischoff repeatedly used the word "nigger" referring to
black wrestlers.  See Kearce depo., p. 42.  Arn Anderson used
the word "nigger" regularly.  See Anderson depo., p. 83-4.
Marcial Davis testified that at the Power Plant he would often
hear, "the 'N' word, or monkey or chimp or whatever…thing[s]
like those.  They would laugh." See Davis depo., p. 118.

These attitudes translated into a company dominated and
controlled exclusively by Caucasians.  Indeed, it was a "joke"
at WCW that the highest ranking black was "the choreographer for

---

[3] WCW retained the services of certain companies such as Market
Research Inc. to ascertain, among other things, the racial
demographics of WCW's viewing audiences. See Declaration of
George Grace, attached at TAB K.  Grace's company conducted an
online research survey for WCW asking, among other things, to
include their racial identity.  Similarly, Defendants conducted
a study through Nielson, which provided detailed findings
regarding the racial demographics of WCW's audiences.  See Pl.
Ex. No. 72, TAB G.

the NITRO girls," the WCW dance troupe.  See Williams depo., p.
146.

Racist attitudes accompanied by a monochromatic workforce
reinforced the denial of opportunities to black wrestlers.  One
of WCW's producers, Woody Kearce, testified, "A lot of the guys
on the booking committee were, you know, white guys...And they
just, I don't know, they felt different about putting Mexicans
or black people or Asians over."  See Kearce depo., p. 29.

The environment at WCW was so racially hostile and the
discrimination was so obvious to workers that Michelle Bayens, a
white Assistant Producer, offered this reflection: "when you
take a step back...it can definitely be said that [minority]
wrestlers were treated less favorably or they weren't promoted
because of the color of their skin."  See Bayens depo., p. 94.
Kearce, a producer reported: "there's a lot of lies thrown
around. There's a lot of bigotry thrown around. There's a lot of
racism thrown around. There's a lot of sexual harassment thrown
around."  See Kearce depo., pp. 27-28.

In October 1999, Vince Russo replaced Bischoff as head
booker or Creative Director. See Bischoff depo., pp., 114-15.
The appearance of Russo was a sign that the racism at WCW was
going to continue, if not intensify.  Immediately prior to being
hired by WCW, Russo expressed the belief that Asians and

Hispanics should not succeed at WCW. SEE Pl. Ex. 2, TAB F. Despite those racist comments, WCW hired Russo.

Once on board, Russo commiserated with other racists like Taylor. When, for example, Taylor opined that black wrestlers did work as hard as white wrestlers, Russo agreed, saying "they're not as good workers." See Snakovsky depo., p. 82. Williams reported that Russo routinely used words such as "nigger," assiduously avoiding interaction with African-Americans and refusing to even speaking to them. See Williams depo., pp. 97-98. Russo used racial slurs, including the word "nigger," when referring to black wrestlers. See Sullivan depo., pp. 55-56. Russo also called African-Americans "Moolions," which supposedly refers to a tribe from Africa that battled with Sicilians. Id. at 56. Russo regarded wrestling as a "white man sport," saying "that is why we don't have many black wrestlers." See Williams Affid. at ¶12, TAB E.

Patterson and other African American wrestlers never complained about the environment at WCW because he had been warned by one of the few black employees in the company not to "ruffle any feathers. Just try to do what you got to do to make it." Id. at 83. Patterson understood and believed that if any of the black wrestlers complained, "you would be out of there. Don't come back." Id. at 83. Put simply, "if you are causing problems, you're gone." Id. at 84.

- 13 -

## ARGUMENT AND CITATION OF AUTHORITY

### A. Summary Judgment standards

Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact," Cornelius v. Town of Highland Lake, 880 F.2d 348, 351 (11th Cir. 1989), or if reasonable minds could differ on the inferences arising from undisputed facts.  See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992).  In assessing the record, the Court may not weigh evidence or make credibility determinations. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 181 (11th Cir. 2001).  In sum, Rule 56 merely requires Patterson to present "sufficient evidence" in order to require a fact-finder to resolve the "parties' different versions of the truth at trial."  First Nat'l Bank v. City Serv. Co., 391 U.S. 253, 288-289 (1968).

### B. Patterson's race claims are not barred by the statute of limitations.

#### 1.  The Statute of Limitations Are Inapplicable Because WCW's Discriminatory Practice Was A Continuing Violation

Defendants' contend that any and all "events" that occurred prior to May 4, 1999, are barred by the applicable statute of limitations. (DB at 8).  This argument ignores, or simply disregards, Defendants systematic exclusion African-Americans from its decision-making process.  This court should not

- 14 -

countenance WCW's historical pattern and practice of discrimination, and it is not required to do so.  The doctrine of continuing violation was developed to prevent such an unjust result.[4]  See Alexander v. Local 496, 177 F.3d 394, 409 (6th Cir. 1999).

In Alexander, the plaintiff showed, among other things, that the defendants maintained an ongoing practice of excluding black applicants from the defendant union.  In rejecting the defendants' motion for summary judgment on statute of limitations grounds, the court declared:

> Local 496 has a despicable and egregious history of excluding African-Americans from membership.  We will not ignore this legacy of discrimination, paradigmatic of a continuing violation.  To do so would be inequitable and unjust.  Therefore, because the Defendants' actions constitute a constitute a continuing violation, the District Court correctly considered those actions which took place prior to the limitations period, as well as those that occurred within the limitations.

Id. at 409.

Similarly, WCW has an egregious and despicable history of racism.  As is indicated above, WCW has never had an African-American executive, department head, top decision-maker or

---

[4]  Indeed, Defendants seek to actually benefit from WCW's continuing violation by arguing that Patterson had no experience writing and creating wrestling television program. . . as it existed at WCW in 1999."  (Defendants' Brief, at 14).  If WCW had not engaged in a continuing and systematic exclusion of African-Americans such as Plaintiff, Plaintiff would have had sufficient experience as of 1999 to qualify for any position with WCW he had sought.

booker; WCW officials routinely called African-Americans "niggers"; and when faced with any racial complaints, WCW reluctantly promotes African Americans who did not complain to deflect the allegations.  (See Anderson Interview, TAB Y (revealing that during the time period in which African American wrestler Ranger Ross had filed a charge, a WCW official stated, "we've taken a black team and we've made them champion so that they wouldn't have any bitch from a racial point of view")). Thus, WCW not only discriminated against African-Americans, but reluctantly pushed African-American wrestlers as a cover up to the ongoing discrimination.

Although Defendants will undoubtedly argue that the continuing violation doctrine does not ordinarily apply in situations that involve a "failure to hire," see, e.g., EEOC v. Joe's Stone Crabs, Inc. 296 F.3d 1265, 1271-72 (11th Cir. 2002), such cases are inapposite here because WCW never conducted a formal application procedure in which it considered and rejected Patterson.  For example, as demonstrated in the district court's opinion in EEOC v. Joe's Stone Crabs, the applicants filled out a "written application," and then participated in an "interview."  EEOC v. Joe's Stone Crab, Inc. 969 F. Supp 727, 733 (S.D. Fla. 1997).  Under those circumstances, when such a formal application is rejected, the applicant is put on notice, with some finality, that she will not get the position.

- 16 -

In contrast, WCW maintained an ongoing and secretive discriminatory process by which Caucasian decision-makers merely chose Caucasians, without posting positions. Thus, WCW's conduct was an ongoing and systematic form of discrimination, and not an isolated case in which a plaintiff was plainly put on notice that he must assert a claim of discrimination. Cf. EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271-1272 (11th Cir. 2002) (noting that the statute of limitations applied based on "discrete, one-time employment events").

Accordingly, Patterson submits that the statute of limitations does not bar any of his claims because Defendants' conduct demonstrates "the continuation" of its ongoing violation of Section 1981, and therefore "extends" the "limitations period" to include all of the discrimination he suffered. Id.

    2.   Defendants Are Not Entitled to Summary Judgment even If This Court Does Not Apply The Continuing Violation Doctrine, Because Patterson was Denied Employment and or Contractual Positions during the Relevant Period.

Defendants' reliance on the statute of limitations is also misplaced because Patterson was denied **many** jobs and contractual opportunities for which he was well qualified, in October 1999, and throughout 2000, based on his race.

Patterson testified that he continued to try to get virtually any job at WCW up until 2001 and that he would have taken a job in any capacity at WCW. See Patterson depo. at 38,

- 17 -

98-99. Hence, Patterson is entitled to recover for each and every job that was denied him even if he was not provided with the opportunity to "apply" for such positions because of Defendants' discriminatory hiring practices.

Although Defendants disingenuously suggest that it had no jobs for Patterson, the record is replete with examples of many jobs for which Patterson was well qualified such as agents, bookers, managers, announcer, all jobs which were in abundance apparently when Caucasians were seeking positions with the company.[5]

It is not clear whether Defendants are arguing that Patterson cannot recover for the many jobs that were denied him (within the limitations period) because he did not "apply" for these jobs. Such an argument would not serve a proper basis for granting summary judgment. Although a plaintiff ordinarily must show that he applied for a job, this requirement is not necessary where a decision-maker "disseminates information about available positions through informal channels." Walker v.

_____

[5] Although Defendants imply that once Russo was hired, the structure and members of the Booking Committee was established (Defendants Brief, pp. 14-15), WCW had many changes in the composition of the booking committee after Russo was hired in October, 1999.  WCW announcer Schiavone testified that sometime after Russo arrived at WCW, Russo "stepped away" from his role in creating the televised events and then "came back" after a period of time in which he was not actively participating. (Schiavone at 8-9).  According to Schiavone, the booking committee was "a little disorganized" in Russo's absence. (Schiavone at 8-9).

Prudential Property & Casualty Ins. Co., 286 F.3d 1270, 1275
(11th Cir. 2002).  Thus, "when an employer uses such informal
methods, it has a duty to consider all those who might
reasonably be interested" in the available position.  Id.; see
also, Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133
(11th Cir. 1984).

In Carmichael, the court held that the district court erred
in finding "no indication" that plaintiff "applied for or that
he expressed a prior interest in the job."  The Court Of Appeals
held that the plaintiff "was not required to ask specifically
for that job" when he did not know about it and "where there was
no formal mechanism for expressing his interest."  Id.  The
court stated that because the defendant used no "formal
procedures for posting notice of available promotions or for
determining who would be offered the promotion," this procedure
could lead to "racial discrimination."  The court concluded: "in
these circumstances, [plaintiff] was not required to do more
than indicate as best he could that he would take any available
job."  Id. at 1132.

The courts have routinely rejected summary judgment where,
as here, the employer argues that the employee never actually
applied for a job where the employer does not post job
opportunities and does not provide establish uniform criteria

- 19 -

for job selection.  Harris v. Birmingham Bd. of Educ., 712 F.2d
1377, 1383-84 (11th Cir. 1983).

     In Harris, the Plaintiff was an African-American football
coach who was denied an opportunity at a particular school.  The
Defendant School Board argued that the Plaintiff was not given
the coaching job because he was "not interested in a head
football coaching position."  Id. at 1383.  In rejecting the
Board's position, the court stated:

> Title VII, Supreme Court precedent, and our holdings would
> be rendered a farce if a public employer, without
> notification of job opportunity procedures, without uniform
> criteria for determining qualifications, and with a totally
> subjective system of selection could rebut a prima facie
> case by a prospective employee of a protective class by
> showing that the employee never had the opportunity to
> learn of and apply for the job.

Id. at 1384.

     Furthermore, to the extent that WCW's decision-makers such
as Bischoff and Dillon and Russo routinely favored the
Caucasians with whom they interacted, Patterson, an African-
American, was not in the same social circles as WCW's exclusive
Caucasian decision-makers.  See Roberts v. Gadsden Memorial
Hosp., 1988 U.S. App. LEXIS 19507 at *14 (11th Cir. 1988) (the
"informal methods necessarily and intentionally favored those
who moved within his social circles - i.e., white people"); Cox
v. American Cast Iron Pipe Co., 784 F.2d 1546, 1551-52 (11th Cir.
1986) (the defendant maintained the discriminatory system

through word of mouth hiring – the system was entirely one of subjective evaluation); see also, Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) (noting that employer had a "duty" to consider a black employee for a position and the employer was "not entitled to assume that the employee was not interested" where the employee was prevented from receiving notice of "word of mouth" promotions).

These cases also provide support for the idea that Patterson should not be required to show there was a specific opening at a specific time he applied. As is indicated above, the booking committee did not have a fixed number of slots. When a position was filled, it was filled because there was someone the committee wanted to add, not because there was a vacancy. This kind of process is analogous to the situations in which jobs are not posted, preventing a claimant from applying. Where, as here, the number of positions on a committee is variable, to place upon a plaintiff the burden of showing there was an opening would create an insurmountable burden. By definition, a claimant could never make that showing.

Patterson has established specific evidence that in late 1999 and beyond, in addition to continuing to use writers and bookers, WCW continued to use and hire Caucasian managers, on-air wrestling talent, and agents all of which were denied Patterson.

During the limitations period, WCW used Jimmy Hart, Eric Bischoff, Ed Ferrara, Jeremy Borash, and John Riker("Ralphus") as on-air managers or on-air talent. See Borash ICA, TAB M; see also WCW Talent Database, TAB L. Similarly, after October or November 1999, WCW continued to use agents in the wrestling matches. See Bischoff depo. at 29; Ferrara depo. at 26.

Indeed, Patterson could have also worked as Russo's assistant, writing and creating shows. That position was occupied by Ed Ferrara, a Caucasian hired with Russo in or about October 1999, the same time Patterson was asking for a job. (Ferrara at 9-10).

Although Defendants will undoubtedly argue that Russo brought Ferrara because he had known him, a reasonable jury could also conclude that Russo's expressed bias against African-Americans, set forth above, precluded him from even considering Mr. Patterson for such a position. Thus, at the same time that Patterson continued to express his desire to perform practically in any role for WCW, WCW continued to spend money on Caucasians in roles such as on-air non-wrestling talent, managing, writing and scripting, booking, and all of the other many jobs which Patterson desired.

For example, Caucasian Jeremy Borash was hired on January 1, 2000, and although he did perform some work on the Internet,

he also worked as an announcer, and even worked on the Booking
Committee. (Schiavone at 18, 43, Tab M).

Lastly, Patterson shows that he was denied a job as a
booker even though WCW hired Caucasian Johnny Ace (another
former wrestler) to work in the booking committee at the "very
end of WCW, from around end of December 2000 beginning of
January 2001 to the end."  (Ferrara at 32).

Accordingly, even if this Court does not apply the
continuing violation doctrine, Patterson is entitled to a jury
trial as to all the positions denied him during the limitations
period, based on his race, as he has offered sufficient evidence
of discrimination.

### 3. Patterson has offered evidence of a pattern and practice of discrimination by Defendants.

The evidence described above gives rise to a question of
fact as to whether intentional discrimination was part of
Defendants' standard operating procedure.  Where, as here, a
plaintiff can demonstrate a pattern and practice of
discrimination, "a rebuttable presumption that each plaintiff
was a victim of discrimination obtains, and the burden shifts to
the employer to prove that each individual employment decision
was not made in furtherance of its illegal policy."  Hipp v.

Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir.

2001)(citation omitted).[6]

A plaintiff is allowed to prove pattern and practice

evidence of discrimination through statistical evidence, direct

evidence, as well as anecdotal evidence of the employer's intent

to treat a protected class unequally. See EEOC v. Joe's Stone

Crab, Inc., 220 F.3d 1263, 1286-1287 (11th Cir. 2000) (a

plaintiff can establish pattern and practice evidence through

"direct," "statistical," and "anecdotal evidence of the

employer's intent" to treat a protected class "unequally").

"An employer's discriminatory conduct results in a hostile

work environment when it is "so pervasive that it create[s] a

work environment abusive to employees because of their race,

gender, religion or national origin." Harris v. Forklift

Systems, Inc., 510 U.S. 17, 22 (1993).  This Court in Harman v.

Life University, Civil Action File No. 1:00-CV-3375-WBH

(December 3, 2002), held that the regular use of religious

---

[6]  Although "pattern and practice cases" are ordinarily brought
by EEOC or by class action plaintiffs, the courts have also
allowed plaintiffs in individual plaintiff cases to prove
discrimination through "pattern and practice evidence."  See Cox
v. American Cast Iron Pipe Co., 784 F.2d 1546, 1559 (11th Cir.
1986)(although pattern and practice cases usually involve class
actions, individual plaintiffs are entitled to proceed under
that theory because they had proven sex discrimination was "the
company's standard operating procedure").  See also Tye v.
Houston County Bd. of Educ., 681 F. Supp. 740, 745 (M.D. Ala.
1987) (plaintiff was entitled to presumption of discrimination
where she established evidence of pattern and practice of sex
discrimination).

slurs, jokes and epithets gave rise to "a religiously hostile work environment." See Harman Order, p. 24, attached at TAB O. In so finding, this Court identified 10 specific incidents of religious slurs, jokes and epithets over a period of approximately seven years. Id.

This Court was quite right in its findings in Harman.  The Eleventh Circuit quoted with favor the following language from Hunter v. Allis-Chalmers Corp., 797 F.2d 1417,1423 (7th Cir. 1986): "When [racial slurs] are so egregious, numerous and concentrated as to add up to a campaign of harassment" the employer is "culpable for failing to discover what is going on and to take remedial steps." Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991).  Because of the effect such slurs, and those who issue them, have on the work environment, the courts have also held that "the fact that many of the epithets were not directed at [the plaintiff] is not determinative" of whether a work atmosphere is polluted with racial discrimination.  Id. (quoting Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir. Cir. 1982)).

In this case, Patterson has identified dozens of slurs, epithets, and jokes, as well as other forms of discriminatory treatment in training, work assignments, advancement, pay, and terms and conditions of employment.  All of these poisoned the work environment with racial discrimination, and taken together,

- 25 -

they go well beyond what was reported in the <u>Harman</u> opinion.
Hence, the Court should reject Defendants' suggestion that the
evidence offered by Patterson is, as a matter of law,
insufficient to support a finding of hostile work environment.

**2.  Patterson has offered compelling evidence that WCW's decision to refuse him any employment opportunity was race-based.**

It is well settled that race-based decision-making is
illegal under Section 1981 and Title VII, regardless of the
intent, or racial animus, of the decision-makers. See <u>EEOC v.</u>
<u>Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1284 (11th Cir. 2000).
Where an individual plaintiff establishes direct evidence,
summary judgment is inappropriate.  See <u>Taylor v. Runyon</u>, 175
F.3d 861, 866 (11th Cir. 1999) (judgment as a matter of law is
not appropriate where non-movant presents direct evidence).

**a. Patterson has offered direct evidence of discrimination.**

Where an individual plaintiff establishes direct evidence,
summary judgment is inappropriate.  See <u>Taylor v. Runyon</u>, 175
F.3d 861, 866 (11th Cir. 1999) (judgment as a matter of law is
not appropriate where non-movant presents direct evidence).
Under Eleventh Circuit authority, statements reflecting a belief
that a racial minority "in general are simply not competent
enough to do a particular job would seem to be a classic example
of direct evidence." <u>Haynes v. WC Kaye and Co.</u>, 52 F.3d 938,

930-931 (11th Cir. 1995).  Such "statements--because of their

breadth-- may obviate the need for inferences about the

speaker's motivation for a wide category of employment

decisions, including hiring and promoting practices."  Burrell

v. Bd. of Trustees, 125 F.3d 1390, 1394 n.7 (11th Cir. 1997).[7]

Where, as here, there is uncontroverted evidence of racial

slurs being used by decision-makers, summary judgment is

inappropriate.  The court in EEOC v. Alton Packaging Corp., 901

F.2d 920, 924 n.6 (11th Cir. 1990), declared that "a racial slur

uttered by the person in charge of making employee

evaluations…constitute[s] direct evidence of discrimination

….such slurs constitute evidence of discriminatory motive

requiring the burden to shift to the defendant to prove by a

preponderance of the evidence that the defendant would not have

promoted [the plaintiff] absent the discriminatory motive.  Id.

at 924 (citing Miles v. M.N.C. Corp., 750 F.2d 867 (11th Cir.

1985)).[8]

---

[7] See also Haynes v. WC Kaye and Co., 52 F.3d 928, 930-31 (11th
Cir. 1995) (finding direct evidence where decision-maker stated
that "women were simply not tough enough" and that "it would
require a man to do the job").

[8] In Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999),
the Eleventh Circuit undertook an extensive analysis of the
cases in which the courts of this circuit had considered the
question of whether the plaintiff had offered direct evidence of
discrimination to clarify what the term "direct evidence" means.
The Wright court concluded, "the cases are more consistent with
a definition of 'direct evidence' as evidence from which a

In this case, whether disputed or not, there is abundant evidence of the pervasive use of racial slurs and offensive racial animus at the WCW.  The racist atmosphere, the racist attitudes and acts, and the segregation of the races at WCW--all of which Patterson directly experienced--constitute direct evidence of a fundamental belief that African-Americans, as a class, were not as suited for the wrestling business as were Caucasians.  All of this is direct evidence of discrimination.

## 2. Patterson has offered circumstantial evidence of discrimination.

If the Court were to find that the regular use of racial slurs and racist decision-making does not constitute direct evidence of discrimination, such evidence would, at minimum, be powerful circumstantial evidence so as to make summary judgment improper. See Damon v. Fleming Supermarkets of Florida, Inc. 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that although certain statements reflecting discriminatory animus toward older managers did not constitute direct evidence, it did constitute "probative circumstantial evidence of age discrimination").

Additionally, WCW's practice of allowing exclusively Caucasian decision-makers to use informal methods of promoting wrestlers further demonstrates WCW's pattern and practice of

---

reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." Id. at 1298.

race discrimination.  See, e.g., Robert's v. Gadsden Memorial Hospital, 1988 U.S. App. LEXIS 19507 at *14-15 (11th Cir. 1988) (defendant's informal methods of selection "necessarily and intentionally favored those who moved within his social circles--i.e., white people").  WCW's exclusive Caucasian decision-makers readily perpetuate the dominance of Caucasian wrestlers.

Although the Turner Defendants provided Human Resource managers to assist WCW, these managers did not have "any official duties as related to [wrestling] talent." See Goodly depo., p. 63.  Loretta Walker, Goodly's replacement, testified that she was not responsible for preventing discrimination against wrestlers because they were not deemed to be "employees." See Walker depo., pp. 12-13.  Indeed, no Turner or WCW employee who had even minimal training in equal opportunity or anti-discrimination laws took any responsibility for ensuring that the African-American wrestlers were being treated fairly, which is evidence of discrimination.  See Rowe, supra, at 359 (finding that Defendants' decision-making process violated Title VII, in part, because "there are no safeguards in the procedure designed to avert discriminatory practices").

In this case, the Court would have to believe that WCW has offered uncontroverted evidence that its personnel, after years of practices drenched in racial animus, afforded Patterson's request for consideration fair and unbiased consideration.

- 29 -

Surely, there is, at minimum, an issue of fact with regard to
that question.  Accordingly, only a jury can decide whether all
of the above-described evidence, when considered collectively,
demonstrates racial discrimination. See Hipp v. Liberty National
Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir. 2001) (the
proper method of adjudicating pattern and practice cases is to
submit a verdict form to the jury).

As the court in Costa v. Desert Palace, Inc. 299 F.3d 838
(9th Cir. 2002), explained, "The general rule bears repeating: in
proving a case, circumstantial evidence 'is weighed on the same
scale and laid before the jury in the same manner as direct
evidence.  In other words, 'circumstantial evidence is not
inherently less probative than direct evidence.'" Id. at 854.

### 3. **Patterson has offered statistical evidence of discrimination.**

Patterson has also submitted statistical evidence
demonstrating conclusively that WCW's practices were
discriminatory.  Patterson's expert Dr. David Rasmussen has
found compelling evidence of illegal discrimination at WCW.
Using appropriate benchmarks regarding the available applicant
pool, Dr. Rasmussen concluded that WCW's practices demonstrated
standard deviations "far beyond the standard of -2.00 standard
that indicates that chance accounts for the under-representation
of African-Americans at WCW." (Supplemental Expert Report at 5,

TAB N).  Dr. Rasmussen concluded that WCW had "statistically

significant under-representation of African-Americans."  Id.

    Dr. Rasmussen also did an analysis of the statistical

breakdown regarding African-Americans with paid contracts by

WCW.  Dr. Rasmussen similarly concludes that "this analysis

strongly suggest that African-Americans are significantly under-

represented among wrestlers at WCW."  Id. at 8.  His statistical

evidence is sufficient to establish a pattern and practice of

discrimination.[9]

    Statistical evidence is particularly important where a

Defendant relies on subjective evidence that is difficult to

rebut.  Statistical evidence combined with a highly subjective

decision making process is evidence that the subjective process

is being used as a pretext for intentional discrimination. See

Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972).

    In addition to establishing pattern and practice,

Patterson's statistical evidence further demonstrates pretext

and/or the additional inference of intentional discrimination.

See Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1361

(11th Cir. 2000) (replacement of 4 of 7 older managers is

---

[9]    Dr. Rasmussen concluded that: (1) there is at best a 1 in
1,000 chance that WCW is an equal opportunity employer given its
statistical hiring patterns; (2) using salary years as a
benchmark for evaluation, there is a 1 in 1,000,000 chance that
WCW's racially skewed hiring practices occurred by chance alone.
See Supplemental Report, p. 8.

circumstantial evidence of age discrimination); Teamsters v.

United States, 431 U.S. 324 (1977). ); Hopson v.

DaimlerChrysler, 306 F.3d 427, 437-38 (6th Cir. 2002) (where

significant statistics are coupled with "independent

circumstantial evidence of discrimination," the defendant is

"not entitled to summary judgment")  "Statistical disparities,

which are insufficient to demonstrate a pattern and practice of

discrimination, might still be relevant to making out a *prima*

*facie* case or proving pretext."  Washington v. Brown &

Williamson Tobacco Corp., 756 F.Supp. 1547, 1554 n.5 (N.D. Ga.

1991), *aff'd* 959 F.2d 1566 (11th Cir. 1992).

## D.    Defendants' reasons for refusing to consider to hire Patterson are pretext.

WCW's purported reasons for refusing to consider Patterson

for employment are plainly pretextual.  First, when in October

1999, Patterson sought work at WCW, he was denied an opportunity

because "he had no experience in writing and creating television

programs at any point."  See Defendants' Brief, p. 14.  WCW

decided to reject Patterson based upon his qualification, but no

one at WCW ever even bothered to interview Patterson to

determine what his qualifications were.  See Dillon depo. at

210.

Dillon admitted that two white wrestlers, Kevin Nash and

Glen Gilberti were made bookers, although as far as Dillon knew,

- 32 -

they had no previous experience. See Dillon depo. at 207-08.
Most of the other people—all whites—who were bookers with WCW
were former wrestlers.  Indeed, eight of the twelve bookers
identified herein (see infra p. _) have been in the wrestling
business for 20 to 30 years and overlapped to some extent with
Patterson.  See Patterson Affid., ¶¶ 2-7.  The only difference
between those individuals (Randy Anderson, Kevin Sullivan, Terry
Taylor, Jimmy Hart, Dusty Rhodes, Arn Anderson, Ric Flair, Paul
Orndorff) and Patterson is that Patterson is black.

One of those bookers, Randy Anderson testified as follows
about Patterson:

Q: Okay.  Are you familiar with Thunderbolt Patterson?

A: Yes, I am.

Q: What do you know about Thunderbolt Patterson?

A: I know he was a great wrestler in his time.  And he's
got very good knowledge of the business.  And they
mistreated him also.  They shoved him out the door on
account of his age and his color.

Q: Do you think that Mr. Patterson had the qualifications
and skills to be on the booking committee?

A: Yes, I do.

Q: Can you think of any reason other than race why Mr.
Patterson couldn't be on the booking committee?

A: No. I don't.

See Anderson depo. at 28-9.

These opinions regarding Patterson's qualifications carry as much evidentiary weight as the opinions offered by WCW.  As the court in Lyoch v. Anheuser-Busch Co., 139 F.3d 612 (8th Cir. 1998), explained: "[A] prima facie showing can be made through credible evidence that a plaintiff was qualified even if evidence was disputed by the employer, and…this burden may be met through the plaintiff's own testimony and that of co-workers who were in a position to know the plaintiff's qualifications." Id. at 615 (quoting Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir.), cert. denied, 118 S.Ct. 626 (1997)).

As is set forth above, the only reason Patterson did not have contemporary experience well into the late 1990s is that WCW did not hire blacks for any creative, executive or management positions—period.  Nonetheless, to the extent that Defendants use the fact that Patterson gained experience in wrestling many years prior to the late 90's, while simultaneously using this factor to justify its favorable treatment of Caucasians demonstrates pretext for discrimination.

For example, in support of its Motion for Summary Judgment as to Sonny Onoo, WCW contended that Caucasian Jimmy Hart was substantially more qualified than Mr. Onoo, among other things because "Jimmy Hart has been involved as an on-air manager in professional wrestling since the 1970's and has managed countless wrestlers . . ."  (DB Onoo at 7).  In other words,

- 34 -

Hart's experience that dates back to the 1970s was a plus for Hart.  Patterson experience that dated back to the 1970s was a negative for Patterson.

Moreover, a comparison of WCW's treatment of the Caucasian star wrestlers, who similarly wrestled in the seventies and eighties with WCW's mistreatment of Patterson further establishes WCW's discriminatory practice.

For example, WCW provided significant jobs and responsibilities to Paul Orndorff even though Patterson was denied these very jobs.  As set forth supra, Patterson was an extremely successful wrestler and a crowd favorite.  (See also, Tab HH indicating that Patterson was a "big star" in wrestling; and stating that "T-bolt" was a "top-notch superstar, leaving behind scores of satisfied fans wherever he performed").  In contrast, even though Patterson was even a bigger star than Caucasian Paul Orndorff, who also wrestled in the seventies and eighties (Tab EE), WCW made Orndorff booker and later manager of WCW's training facility, the Power Plant.  See Declaration of Claude Patterson at ¶ 5; Orndorff at 6, 11-12).

Indeed, WCW provided Orndorff these significant jobs that were denied Patterson even though Orndorff had left wrestling from approximately 1984 up until approximately 1989 in order to open a bowling center in Fayetteville where he lived.  (Orndorff at 4)

- 35 -

Similarly, the Court should note that key WCW Caucasian decision-makers such as Ole Anderson (Tab FF), Dusty Rhodes (Tab AA), Arn Anderson (Tab GG), Kevin Nash (Tab DD), Terry Taylor (Tab CC), and Ric Flair (Tab BB). all wrestled for ten, twenty, or thirty years; and some of these Caucasians even wrestled with and against Patterson in significant events. (See e.g., Tab FF) (noting Anderson's matches that involved Patterson in the late seventies and throughout the eighties); see also, Patterson Decl. at ¶¶ 2-7.

A jury must determine whether or not, given Defendants' inconsistencies as to a person's experience going back into the seventies, that Defendants' suggestions as to Patterson is merely a pretext for discrimination.

## C.  Patterson is entitled to recover for intentional infliction of emotional distress.

To recover for intentional infliction of emotional distress, Patterson must show intentional conduct that is extreme and outrageous has cause him severe emotion distress. See Hendrix v. Phillips, 207 Ga. App. 394, 428 S.E.2d 91 (1993). In an employment relationship, where one party enjoys control over another, the courts are more apt to find the existence of outrageous conduct.  See Bridges v. Winn-Dixie Atlanta, 176 Ga. App. 227, 335 S.E.2d 445 (1985).

Patterson seeks to recover against Defendants for their intentional infliction of emotional distress upon him. Patterson submits that the evidence submitted with this response is sufficient to create a jury issue as to the outrageousness of WCW's bookers and trainers' conduct.  Patterson submits that the racial discrimination and hostile environment he was submitted to go well "beyond the bounds of common decency."  See Coleman v. Housing Authority of Americus, 191 Ga. App. 166, 169, 381 S.E.2d 303 (1989) ("workplace is not a free zone" for causing emotional distress).  Accordingly, a jury should consider Patterson' claim.

## CONCLUSION

For the foregoing reasons, Patterson submits that Defendants' motion for summary judgment should be denied.

_____
Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:    (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiffs' Response to Defendants' Motion for Summary Judgment** by hand delivery of same addressed as follows:

        Eric Richardson
        Evan Pontz
        Troutman Sanders LLP
        Suite 5200, Bank of America Plaza
        600 Peachtree Street, N.E.
        Atlanta, Georgia   30308-22165

This 26th day of February, 2003.

        Charles J. Gernazian
        Georgia Bar No. 291703

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ORIGINAL
U.S.D.C. Atlanta

FEB 2b 2003

LUTHER D. THOMAS, Clerk
By: *Kleucher*
Deputy Clerk

| | |
|---|---|
| CLAUDE PATTERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WORLD CHAMPIONSHIP | ) |
| WRESTLING, INC., | ) |
| TURNER SPORTS, INC., TURNER | ) |
| ENTERTAINMENT GROUP, INC. and | ) |
| TURNER BROADCASTING SYSTEM, INC., | ) |
| | ) |
| Defendants. | ) |

Civil Action File No.
1:01-CV-1152-CC

**Jury Trial Demanded**

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Comes now Claude Patterson and respectfully submits (pursuant to Rule 56.1) his response to Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc. ("TSI") Turner Entertainment Group, Inc. ("TEG") and Turner Broadcasting System, Inc., ("TBS"), showing the Court the following:

1. Patterson does not dispute SMF No. 1.

2. Patterson disputes SMF No. 2. Although Defendant WCW designated wrestlers and other performers to be independent contractors, as a matter of law these workers were employees of WCW. Under the terms of the of the standard Independent

89

Contractor Agreements ("ICA") WCW entered into with virtually all of its contract talent, performers were not allowed to compete with WCW either during or after the term of their contracts.  Additionally, WCW's standard ICA forbids performers from doing **any kind of work** without the express permission of WCW.  This rule was reinforced by JJ Dillon on April 30, 1999, when he sent a memo to "All WCW Talent" regarding schedules "including personal appearances."  See Pl. Ex. 49, at Tab W; Morrison Dep. at 172.   In his memo, Mr. Dillon advised all wrestlers that "all requests for days 'off' must be requested in advance and approved by JJ Dillon."  Mr. Dillon also told the wrestlers that during time "off," wrestlers could not make personal appearances unless those appearances were first approved by WCW.  Under the policy announced by Mr. Dillon, if a wrestler was approached about a personal appearance, he would be required to refer the request to Mr. Dillon.  Mr. Dillon would decide whether to approve the appearance.  WCW would then collect the appearance fee, and the wrestler would be required to share the fee with WCW.   WCW exercises complete control over wrestlers' performances --- deciding every detail of every performance --- from the specific dates and times to the consequences for being late or missing a scheduled performance. Any failure to comply with this policy would be considered a breach of contract.

3.     Patterson does not dispute SMF No. 3.

4.     Patterson disputes SMF No. 4.  During its entire existence, WCW only made money during a brief period of time. According to John E. Kampfe, the Senior Vice President and Chief Accounting Officer for TBS, WCW lost millions of dollars on an annual basis "from the day Ted Turner bought it…up until roughly 1997, 1998 time frame."  See Kampfe Dep. at 14-15.  As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id. at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72.

5.     Patterson disputes SMF No. 5.  WCW never lost any of its own money because all of it losses were financed by its parent corporation Defendant Turner Broadcasting, Inc. ("TBS"). As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id. at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72-73.  During that period, TBS financed WCW's losses because having access to WCW programming allowed TBS's subsidiaries to "boast about its ratings" because the WCW program "was the highest rated cable show on television."  Id. at 42.  TBS financed WCW's losses for access to WCW programming.  Id. at 73-74.  WCW did not have to

- 3 -

worry about the cost of talent because TBS covered that cost, **and TBS never told WCW to cut its cost of talent.** Id. at 61.

WCW was involved in significant hiring during 1999 at the same time it made the decision not to offer Patterson a contract.  On March 31, 1999, Diana Myers reported to Dr. Harvey Schiller, the President of Turner Sports that WCW had just entered into new contracts with two new wrestlers (costing $895,000) and had given two wrestlers raises (costing $115,000), for a net talent cost increase of $1,010,000.  See Pl. Ex. 75; Tab P.  Following those increases in costs, WCW was "$1,858,000 **under budget** for 1999."  See Pl. Ex. 75; Tab P.  During May 1999, WCW added 13 new talents, gave two wrestlers raises, and terminated two contracts for a net increase in talent cost of $58,714. See Pl. Ex. 76; Tab Q).  In her May report, Myers reported to Schiller that "we are currently $100,000 **under budget** for 1999." See Pl. Ex. 76; Tab Q).

A memo from Myers to Bischoff and Bill Busch dated June 9, 1999, reported on New ICAs (Independent Contractor Agreements) and Trainees, listing thirty (30) new performers with WCW for the first six months of the year, representing an increase in payroll to new personnel of $2,709,514.  See Pl. Ex. 64; Tab R).

In August 1999, WCW added six white wrestlers, gave raises to two white wrestlers, and terminated six contracts, for a net payroll increase of $303,714. See Pl. Ex. 44 (019225), TAB S.

In October 1999, the same month Patterson was terminated, WCW added three white wrestlers and gave raises to three white wrestlers, adding another $966,714 to its payroll, while eliminating $1,943,000 in payroll costs by terminating 12 contracts.  Over 35 percent of that reduction came from terminating the contract of one of the two highest paid blacks in the WCW, Lash Huffman, who had been making $700,000 per year. See Pl. Ex. 44 (#019226), TAB S.

In November 1999, the month after it terminate Patterson, WCW added a white wrestler, Vito Lograsso ($120,000 per year and a $12,000 signing bonus), and a white female "valet," Stacy Keibler ($15,000 per year plus per event payments) and gave raises to two other wrestlers, one white and one of unknown racial identification.  See Pl. Ex. 44, TAB S.  Indeed, the evidence gathered by Patterson strongly suggests that WCW increased its payroll costs in every month, but one, in 1999.

WCW was also handing out raises to Caucasian wrestlers during 1999, although it significantly cut the aggregate amount of compensation paid to African American wrestlers during the same period.

Finally, Defendants offer no meaningful statistics to support their claim that WCW "began to produce fewer and fewer" events in 1999.  Accordingly, Plaintiff denies the assertion.

- 5 -

6.    Patterson disputes SMF No. 6.  As is indicated above,
WCW did not engage in any real or meaningful restructuring.
Patterson does not dispute that WCW sold certain of its assets
and ceased operations.

7.    Patterson does not dispute SMF No. 8.

8.    Patterson does not dispute SMF No. 9.

9.    Patterson disputes SMF No. 9, and Patterson denies
that the cited deposition testimony stands for the proposition
for which it is cited.

10.   Patterson disputes SMF No. 10 to the extent that
incorporates by reference SMF No. 9.  Patterson does not dispute
that he began a non-profit organization called Athletes
Supporting Kids.

11.   Patterson does not dispute SMF No. 11.

12.   Patterson does not dispute SMF No. 12.

13.   Patterson does not dispute SMF No. 13.

14.   Patterson disputes SMF No. 14.  During the course of
their telephone conversation, Patterson told Dillon that he
wanted a job as a booker.  See Patterson depo., pp. 99-100;
Dillon depo., p. 206.  Dillon told Patterson that WCW had
nothing for him.  See Pl. Ex. 54.

15.   Patterson does not dispute SMF No. 15.

16.   Patterson disputes SMF No. 16.  Dillon assumed that
Patterson had no experience in booking wrestling matches.

Dillon testified that "to my knowledge" Patterson had no experience.    See Dillon depo., p. 207; lines 2-3.  There is no evidence that Dillon did anything to investigate Patterson's experience.  Dillon simply rejected the possibility of having a black booker, as WCW had done throughout its entire existence.

17.  Patterson disputes SMF No. 17.  Dillon assumed that Patterson had no experience in booking wrestling matches, and that is what he told Bill Busch, his boss.  Dillon testified that Patterson had no experience "that I know of."  See Dillon depo., p. 211; line 8.  There is no evidence that Dillon did anything to investigate Patterson's experience.  Dillon simply rejected the possibility of having a black booker, as WCW had done throughout its entire existence.

18.  Patterson disputes SMF No. 18, and Patterson disputes that the testimony cited by Defendants supports the proposition for which it cited.

19.  Patterson disputes SMF No. 19.  There is no suggestion in the record that Patterson ever asked to "come in and take over the writing and creating of WCW's wrestling programs." Indeed, Patterson testified that he was ready to take a job "in any capacity."  See Patterson depo., pp. 98-9; lines 25-1.

20.  Patterson disputes SMF No. 20.  There is nothing in the record to suggest that Dillon's purpose in mentioning Patterson's call to Busch had anything to do with learning more

- 7 -

about "Patterson's background or experience."  To the contrary,
when Dillon talked to Busch about Paterson, he was providing
what little background information he had from his personal
knowledge.

21.  Patterson disputes SMF No. 21.  There is nothing in
the record to suggest that Dillon's purpose in mentioning
Patterson's call to Busch had anything to do with learning more
about "Patterson's background or experience."  Indeed, Dillon
acknowledged that he did not even bother to give Patterson an
interview, and he did not inquire about Patterson's background
with Patterson.  See Dillon depo., p. 210.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts** by hand delivery addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___26th___ day of February, 2003.

Charles J. Gernazian
Georgia Bar No. 291703

**ORIGINAL**

FEB 26 2003

Clerk
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAUDE PATTERSON,                        )
                                         )
        Plaintiff,                       )
                                         )    Civil Action File No.:
v.                                       )    1:01-CV-1152-CC
                                         )
WORLD CHAMPIONSHIP                       )
WRESTLING, INC.,                         )    **Jury Trial Demanded**
TURNER SPORTS, INC., TURNER              )
ENTERTAINMENT GROUP, INC. and            )
TURNER BROADCASTING SYSTEM, INC.,        )
                                         )
        Defendants.                      )
_____)

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED

Pursuant to Local Rule 56.1(b)(2), in response to Defendants' Motion for Summary Judgment, Plaintiff Claude Patterson, hereby files this Statement of Material Facts to Which There Exist Genuine Issues to be Tried, showing the Court the following:

## I.   DISPUTED FACTS REGARDING WCW'S HISTORY OF ITS TREATMENT OF AFRICAN-AMERICANS

1.

In 1993 or 1994, when baseball legend **Henry ("Hank") Aaron participated in a WCW** event, the existing WCW president, Bill

89

Watts, stated that he did not want "that nigger on my TV."
(Randall Anderson Dep. at 102.)

2.

Bill Watts was a very "bigoted individual" who used racial
slurs or racially derogatory language about "every other
sentence."  (Juster Dep. at 119.)

3.

Bill Watts referred to the compensation that he paid to
legendary African-American wrestler Junkyard dog as "slave
wages."  (Juster Dep. at 118.)

4.

Ole Anderson, a "Booker" who worked on WCW's "Booking
Committee," which determined the storylines for WCW wrestling
matches, told Thunderbolt Patterson, an African-American
wrestler, that the Turner and WCW officials did not really
consider him "as [a] person)"; "you are a nigger -- you will
never be a promoter like you want to be."  (Patterson Dep. at
42-43.)

5.

In the mid-nineties Black Jack Mulligan, a WCW trainer,
informed Bobby Walker that "the only reason you're here is
because they need color on the TV."  (Bobby Walker Dep. at 162-
163.)

-2-

6.

Timothy Goodly, the Turner Sports Human Resource manager who was assigned to provide Human Resource support to WCW, acknowledged that the fact that WCW only had Caucasians become world champions "might be considered a red flag" as to whether WCW's decision-making process was discriminatory. (Goodly Dep. at 95-97.)

## II. WCW'S MANAGEMENT WAS VIRTUALLY ALL CAUCASIAN

7.

With the exception of Valerie Ragsdale, WCW's Senior Webmaster from 1997 to 1999, and Pie Smith, a mid-level manager at WCW's merchandising warehouse, WCW did not have any African-American managers. (Goodly Dep. at 34, 37-39; Loretta Walker Dep. at 18, 49-50.)

8.

Although Tim Goodly identified Ms. Pamela Collins as an African-American mid-level manager, (Goodly Dep. at 38-39), WCW never actually provided Ms. Collins a management position, as she remained the call-center "coordinator." (Collins Aff. ¶¶ 3-4, Tab J; see also Plaintiffs' Ex. 5, Tab X.)

-3-

9.

Goodly acknowledged that the minority representation at WCW "was not, I guess, consistent with what I knew to be good HR practice." (Goodly Dep. at 49.)

III. **DISPUTED FACTS AS TO WHETHER TURNER SPORTS, TBS, TEG, and WCW MAINTAINED ANY POLICY OR PROCEDURE TO ENSURE THAT WCW DID NOT DISCRIMINATE AGAINST WRESTLERS**

10.

WCW did not have any policies or procedures to ensure that wrestlers were not discriminated against. (Ferrara Dep. at 52; Smith Dep. at 95; Loretta Walker Dep. at 21.)

11.

Ed Ferrara, a Booker, was not aware of any WCW official that had communicated that WCW needed not to discriminate against wrestlers. (Ferrara Dep. at 52-53.)

12.

Human Resource Manager Timothy Goodly was only concerned with WCW "employees" in fulfilling his job duties as Director of Human Resources for WCW; Goodly didn't have "any official duties as related to talent." (Goodly Dep. at 63.)

-4-

13.

As to the persons who were supposedly ensuring that WCW did not discriminate in its handling of contracts with wrestlers, Goodly testified that Eric Bischoff, WCW's President, was primarily responsible, but possibly Diana Meyers, WCW's attorney, and Bill Busch, a Vice President at WCW, as well. (Goodly Dep. at 65-67.)

14.

Loretta Walker, who replaced Timothy Goodly as the person responsible for providing human resource support to WCW, testified that she did not know who, if anybody, was responsible for ensuring that the wrestlers did not suffer discrimination. (Loretta Walker Dep. at 6-13.)

15.

Loretta Walker agreed that she did not have any duties with respect to the wrestlers because it was Turner's practice not to provide assurance that persons who were classified as independent contractors would be treated in a fair and non-discriminatory manner. (Loretta Walker Dep. at 12-13.)

16.

Loretta Walker did not believe that she had any duty to ensure that workers classified as independent contractors at

-5-

Turner Entertainment Group ("TEG") or Turner Studios were free from discrimination in the workplace. (Loretta Walker Dep. at 23, 73-74.)

17.

Although Loretta Walker testified that an "independent contractor" who had an issue regarding discrimination could have reported it to WCW's attorney, Diana Myers, Ms. Walker was not aware of any actions taken by Diana Myers to ensure that the persons performing on a contract basis at WCW were not discriminated against based on their race. (Loretta Walker Dep. at 74-75, 79.)

18.

Diana Myers stated that if an "independent contractor at WCW felt he was discriminated against, he should complain to J.J. Dillon." (Myers Dep. at 175.)

19.

Even though Goodly did not have an official role as to WCW wrestlers, he noticed a lack of diversity and therefore told Eric Bischoff, WCW's President, that WCW needed more "diverse talent." (Goodly Dep. at 69-70.)

-6-

20.

In response to Goodly's suggestions, Bischoff stated that

he was going to ensure that the talent pool at the Power Plant

would be diverse, but Goodly was not aware of any actions taken

to ensure that any minorities at the Power Plant actually

received exposure or meaningful opportunities to succeed.

(Goodly Dep. at 74-78.)

21.

Goodly admitted to Bobby Walker that he was "aware" of

WCW's discrimination, but he had a "job" too.   (Bobby Walker

Dep. at 254.)

## IV.   DISPUTED FACTS REGARDING WCW'S DECISION MAKERS USING RACIAL SLURS AND/OR DEMONSTRATING RACIAL BIAS

### A.   TERRY TAYLOR

#### 1.   Taylor's Role at WCW

22.

Terry Taylor worked on WCW's Booking Committee beginning in

1996; Taylor was also responsible for locating and recruiting

wrestling talent and for working in talent relations.   (Taylor

Dep. at 44.)

23.

Terry Taylor was also specifically involved in selecting

WCW wrestlers from the Power Plant; he "worked pretty close with

-7-

the Power Plant and the young guys" and frequently went to the
Power Plant to evaluate wrestlers.   (Lunde Dep. at 13-14.)

24.

Jody Hamilton, manager of the Power Plant, testified that
Terry Taylor was one of the principal persons who evaluated the
wrestling talent at the Power Plant.   (Hamilton Dep. at 29.)

25.

Terry Taylor was also responsible for working with some of
the wrestlers on their wrestling moves and techniques.   (Ferrara
Dep. at 51.)

**2.   Taylor's Statements and Remarks**

26.

Terry Taylor used the word "nigger" quite a bit."   (Randall
Anderson Dep. at 107.)

27.

Terry Taylor would say "that stupid nigger" when referring
to an African-American wrestler, and often used the word
"nigger" when talking to other WCW officials while traveling on
WCW business.   (Randall Anderson Dep. at 85, 172-173.)

28.

On one occasion, Terry Taylor stated that "there [wouldn't]
be any brothers on the show" because he did not want any
African-Americans to take the "limelight" from a Caucasian

-8-

wrestler, Hulk Hogan.   (Williams Aff. ¶ 39, Tab E; Williams Dep.
at 54-57).

29.

There were no African-Americans on the televised portion of
above-described WCW show.   (Id.)

30.

Terry Taylor stated "that damn Hardbody is a no good
nigger."   (Snakovsky Dep. at 108, 140; Snakovsky Aff. ¶ 18, Tab
D.)

31.

Terry Taylor frequently used racial slurs, including
"nigger" when referring to WCW wrestlers and while working on
the Booking Committee.   (Sullivan Dep. at 51.)

32.

Terry Taylor stated to Hardbody Norris, "why don't you take
your dumb ass and black self and get the hell out of here?"
(Snakovsky Dep. at 62.)

33.

Terry Taylor constantly used the word "nigger" whenever he
was talking about African-American people and African-American
wrestlers.   (Snakovsky Dep. at 75-77; Snakovsky Aff. at ¶ 4, Tab
D.)

-9-

34.

Michelle Bayens, an assistant producer to whom Terry Taylor once confided on a regular basis, testified that when Taylor informed her that Bobby Walker had called him a "racist," he stated, "I don't know if I'm a racist but I know that . . . [h]e's a nigger with no talent." (Bayens Dep. at 19.)

35.

Terry Taylor stated that neither Bobby Walker nor Hardbody Harris would make it in the wrestling profession because they were "black" and each was a "nigger" with "no talent." (Snakovsky Aff. ¶ 7, Tab D; Snakovsky Dep. at 76.)

36.

Terry Taylor told Rick Reeves, an African-American wrestler, "we've got enough of y'all boys already." (Reeves Dep. at 54-56.)

37.

Plaintiff Rick Reeves heard Terry Taylor use the word "nigger" in various conversations. (Reeves Dep. at 85.)

38.

Terry Taylor stated that black wrestlers "weren't much of a draw" in his opinion. (Bayens Dep. at 19, 62-63.)

-10-

39.

Terry Taylor stated that black persons had great physiques because they were genetically inclined or predisposed, but that he questioned their ability to wrestle. (Bayens Dep. at 21-22, 64-65.)

40.

Terry Taylor stated that Ernest Miller, an African-American wrestler, was "another nigger with no talent . . ." and joked about having called Ernest Miller a nigger to his face. (Bayens Dep. at 20.)

41.

Terry Taylor stated that black wrestlers "shouldn't be in our sport, they should be in basketball." (Snakovsky Dep. at 78.)

42.

Terry Taylor stated that "a lot of the black people wouldn't make it in the business because they are black as long as he had something to do with it." (Snakovsky Dep. at 78.)

43.

As to the African-American wrestler Elix Skipper, Terry Taylor once stated that "I don't care if this kid is good or not. He is a black kid. He ain't going nowhere in this business." (Snakovsky Dep. at 79.)

-11-

44.

On one occasion, when Hardbody Norris, an African-American wrestler, was performing at Disney World, Terry Taylor stated "he ain't never gonna make it in this business" and that he should go back to basketball or ultimate fighting, or whatever he was doing prior to wrestling. (Snakovsky Dep. at 82-83.)

45.

As to Bobby Walker, when Bobby Walker was jumping off the ropes, Taylor stated "that nigger, he's not good for jumping, so he should go play basketball too." (Snakovsky Dep. at 83-84.)

46.

Terry Taylor constantly reminded Ernest Miller that Miller only had a job because he was black, and that WCW did not market toward blacks because "we only have white fans and they're [going] to look at you as a nigger." (Miller Dep. at 66, 101; Hart Dep. at 70-71.)

47.

According to Snakovsky, a WCW performer, Terry Taylor also demonstrated bias against minorities by the "way he would talk to them and his actions towards them." (Snakovsky Dep. at 98.)

en

48.

Terry Taylor told African-American wrestler Booker T Huffman that the only reason Huffman was successful was because he was black.  (Goodley Dep. at 81-82.)

49.

When African-American wrestler Ernest Miller was not required to work on a particular occasion, Terry Taylor told him that "I know y'all like to take the day off."  (Miller Dep. at 60.)

50.

Terry Taylor stated that "blacks don't buy wrestling tickets."  (Williams Aff. ¶ 14, Tab E.)

51.

Terry Taylor called Ernest Miller a "nigger" on several occasions.  (Miller Dep. at 66, 99-101.)

52.

Moses Williams, who worked in WCW production, also heard Terry Taylor use the word "nigger" while Terry Taylor was in charge of the Booking Committee.  (Williams Dep. at 108-109.)

53.

On one occasion, when WCW's ring announcer, David Penzer, brought in a Caucasian wrestler to replace an African-American

wrestler, Terry Taylor told him:  "don't worry about the niggers, I'll take care of that."  (Williams Dep. at 110.)

54.

Terry Taylor openly stated to Vince Russo, the Creative Director at WCW, that wrestling fans were White and that "Blacks don't buy wrestling tickets."  (Williams Dep. at 111, 114-116; Williams Aff. ¶ 14, Tab E.)

55.

Terry Taylor did not observe African-American wrestlers in their matches.  (Williams Dep. at 113.)

56.

Terry Taylor went out of his way to provide opportunities for white wrestlers even when they did not have any talent, but he would not similarly create opportunities for African-Americans.  (Williams Dep. at 124-125.)

57.

Sharon Hill told Moses Williams that Terry Taylor had stated that Harrison Norris "ain't going to ever make it," and that Taylor called Harrison Norris "the dumb nigger."  (Williams Dep. at 140-141.)

58.

When an African-American wrestler would make a mistake, Terry Taylor would make comments such as "that stupid nigger,"

-14-

or "just different stuff like that."   (Randall Anderson Dep. at
111.)

59.

On a very cold winter day, Terry Taylor stated, "you'd
better turn on the air conditioner because you know those
niggers can't take the cold."   (Carr Dep. at 92-93, Tab I.)

60.

Terry Taylor once stated that a wrestling association for
Black wrestlers was a "big joke."   (Carr Dep. at 103, Tab I.)

61.

On one occasion, when African-American Tony Carr was going
to play a role as a fan in a show filmed for WCW in Montana,
Terry Taylor said Carr could not play the role "because no one
would believe there were niggers in Montana."   (Carr Dep. at
139, Tab I.)

62.

Apparently referencing a demographic survey that was done
by Turner, Terry Taylor stated that "Turner told us we don't
need to use you all niggers."   (Boulware Dep. at 71, 124-125,
Tab H.)

63.

Terry Taylor admitted to Vince Russo, the Creative Director
at WCW, that he had told Ernest Miller that the only reason why

-15-

WCW hired Miller was because Miller was black.   (Russo Dep. at 64.)

64.

When African-American wrestler William "Rocky" Boulware confronted Terry Taylor, and asked Taylor if a Caucasian wrestler got a contract instead of him because he was black, Taylor stated, "What do you think?  Yes, it's because you're black."   (Boulware Dep. at 101-102, Tab H.)

65.

When Rocky Boulware discussed pay differences between his salary and that of Caucasian wrestlers with Terry Taylor, Terry Taylor said that it was "the color of your skin, and you're not in the clique."   (Boulware Dep. at 122-124, Tab H.)

### 3.   Disputed Facts Regarding WCW's Knowledge Of Taylor's Racial Bias

66.

On March 1, 1998, Plaintiff Bobby Walker sent a letter to Eric Bischoff, the President of WCW, via certified mail, which stated that "Terry Taylor has made statements to me and others about how he felt about blacks" and that "I like I lost my job because of Terry Taylor's deep dislike for blacks."   (Bischoff Dep. at 122-23; Plaintiffs' Exhibit 10, Tab T.)

-16-

67.

On March 1, 1998, Mr. Walker sent a letter to Dr. Harvey Schiller, an executive at Turner Sports, regarding "racial discrimination," and informed Dr. Schiller that "I felt like I lost my job because of Terry Taylor's deep dislike for blacks." (Plaintiffs' Exhibit 15, Tab U.)

68.

Eric Bischoff acknowledges that he knew that Terry Taylor had remarked that the only reason Ernest Miller was hired was because he was black. (Bischoff Dep. at 39.)

69.

Eric Bischoff knew that Terry Taylor had a conflict with the African-American wrestling tag team, the Harlem Heat, and acknowledges that Taylor's actions or comments regarding the Harlem Heat were "racially offensive." (Bischoff Dep. at 41-42, 173.)

70.

Timothy Goodly, the Turner Manager assigned to address WCW's human resource issues, recalls a discussion with Eric Bischoff in which Bischoff informed Goodly that Terry Taylor had upset African-American wrestler Booker T by stating that "It [was] a good thing [he was] black." (Goodly Dep. at 81-82.)

-17-

71.

According to Timothy Goodly, the only discipline that
Bischoff took against Terry Taylor was in stating to Taylor that
the comments were inappropriate.  (Goodly Dep. at 83.)

72.

Taylor remained in the same position on the Booking
Committee after Bischoff purportedly reprimanded Taylor.
(Goodly Dep. at 83-85.)

73.

In 1999 Taylor left WCW for ten months, but returned to WCW
in or about November, 1999 (Taylor Dep. at 29, 37.)

**B.    ERIC BISCHOFF**

**1.    Bischoff's Role**

74.

Randall Anderson, who worked on the Booking Committee in
1996 and 1997, testified that Eric Bischoff had to approve all
decisions made by the Booking Committee.   (Randall Anderson Dep.
at 51-53.)

75.

Eric Bischoff was the ultimate decision maker as to the top
two or three matches on WCW's main events.   (Bischoff Dep. at
48.)

-18-

76.

At all times that Eric Bischoff was in charge of WCW, he was ultimately responsible for determining which WCW wrestler would become the world heavyweight champion. (Lunde Dep. at 67-68.)

## 2. Bischoff's Statements

77.

Eric Bischoff told members of the Booking Committee about a certain age group of Black persons who ostensibly would not watch WCW live events, and indicated that some Blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV. (Randall Anderson Dep. at 177.)

78.

In this context, Bischoff told the members of the Booking Committee that they shouldn't worry about "pushing a Black or a nigger." (Id.)

79.

Eric Bischoff asked, "so why are we pushing some of the blacks and some of the niggers on our television show?" (Randall Anderson Dep. at 74-75.)

80.

Teddy Long and Harold Hogue, both African-American wrestlers, told Bobby Walker that Bischoff had stated that

-19-

blacks would not pay to come to a Nitro event and "they'd rather watch it on TV."   (Bobby Walker Dep. at 178.)

### 81.

On one occasion, when African-American wrestler Hardbody Harrison dressed up in a 70's disco outfit and had a big afro, Eric Bischoff stated "that's too niggerish for my television" and "canned" the idea.   (Randall Anderson Dep. at 90, 177-178.)

### 82.

Eric Bischoff once stated that he "couldn't understand why [he was] putting all his money and TV time into a Black guy when they couldn't draw an arena house show."   (Randall Anderson Dep. at 199-200.)

### 83.

On one occasion, when Eric Bischoff saw an African-American on a TV monitor, he stated "we need to get that crack nigger off the TV."   (Randall Anderson Dep. at 76-77, 202.)

### 84.

An assistant producer testified that Eric Bischoff used the word "nigger" in relation to wrestlers on more than one occasion.   (Kearce Dep. at 42-43.)

### 85.

On one occasion, during a wrestling event at the Omni, Bischoff removed all African-American wrestlers from the

-20-

schedule and indicated that it was "white night." (Whatley Dep.
at 132-134, Tab V; Smith Dep. at 57; Bobby Walker Dep. at 177-
178.)

86.

When Eric Bischoff denied a contract to Africa-American
Rocky Boulware and Boulware asked J.J. Dillon, a trainer at the
Power Plant, the reason for the denial, Dillon indicated that it
was because Boulware was "Black." (Boulware Dep. at 135, Tab
H.)

87.

When Thunderbolt Patterson, an African-American wrestler,
tried to negotiate a contract with WCW through Eric Bischoff and
Bill Busch, Bischoff stated, "we ain't fooling with niggers."
(Patterson Dep. at 31.)

88.

When Thunderbolt Patterson wanted to work as a manager,
Bischoff told him they didn't need any more managers; Bischoff
also stated, "we don't need no niggers." (Patterson Dep. at 76,
93.)

## C.   VINCE RUSSO

89.

At or about the time that Vince Russo, WCW's Creative
Director, was hired for WCW, he expressed his belief that Asians

-21-

and Hispanics should not succeed at WCW.   (Plaintiffs' Exhibit

2, Tab B.)

90.

Despite Russo's racist comments, WCW hired/retained Russo

to work as its creative director on October 10, 1999.   (Russo

Dep. at 15.

91.

During the time that Vince Russo was the Creative Director,

he "had the last word" on booking decisions, who would win the

championships, and ultimately decided which wrestlers would

receive a "push" and television exposure and which wrestlers

would not.   (Juster Dep. at 83 -84, 86-87; Ferrara Dep. at 11-

14; Lunde Dep. at 67.)

92.

When Terry Taylor stated that the African-American

wrestlers were not as good workers as the White wrestlers, Vince

Russo agreed and said "they're not as good workers."   (Snakovsky

Dep. at 82.)

93.

Vince Russo used racial slurs, including the word "nigger"

when referring to wrestlers.   (Sullivan Dep. at 55-56; Williams

Dep. at 97-98; Kearce Dep. at 38.)

94.

According to Kevin Sullivan, a member of WCW's Booking
Committee, Russo also called African-Americans "Moolions," which
(according to Sullivan) refers to a tribe from Africa that
battled with Sicilians.  (Sullivan Dep. at 56.)

95.

Vince Russo indicated his racial bias by specifically
referring to African-Americans as the "blacks" or "the
brothers."  (Williams Dep. at 86-88.)

96.

Vince Russo "went out of his way not to do anything special
for Black wrestlers or non-White wrestlers" and focused his
attention on Caucasians.  (Williams Dep. at 89.)

97.

In one particular match, Vince Russo wanted Jeff Jarrett, a
Caucasian wrestler, to hit African-American wrestler Booker T
over the head, hit Booker T's wife and then put a noose around
Booker T, as if he were going to hang him.  (Williams Dep. at
92-93.)

98.

Vince Russo stated that "Whites" rule wrestling.  (Williams
Dep. at 94-96.)

-23-

99.

Vince Russo indicated that "Black folks don't buy wrestling tickets anyway, wrestling fans are White."   (Williams Dep. at 94-96.)

100.

In response to questions about the future of Booker T, an African-American wrestler, Russo stated, "if I say we're going to have a White champion, we'll have a White champion and you will know we'll have a Black champion when I say we're going to have one and not before then."   (Williams Dep. at 94-96.)

101.

Moses Williams, who worked on WCW's production team, personally observed that Vince Russo avoided interaction and conversation with African-Americans.   (Williams Dep. at 97-98.)

102.

Vince Russo *demonstrated his favoritism for Caucasians* by his body language and overall attitude; Russo would take the time to speak with Caucasian wrestlers, but would not similarly interact with wrestlers who were Spanish, Oriental, or Black. (Williams Dep. at 104.)

103.

Vince Russo also stated that wrestling was a "white man sport" and that this was "why we don't have many black wrestlers." (Williams Aff. ¶ 12, Tab E.)

104.

Vince Russo indicated that WCW was going to have a "white champion" because "that's the way I want it." (Williams Aff. ¶ 12, Tab E.)

## D.   JAMES MORRISON (J.J. DILLON)

105.

At some point, James Morrison (a/k/a J.J. Dillon) became the manager of Talent and one of the principal decision-makers of WCW Talent. (Dillon Dep. at 31; Hamilton Dep. at 39.)

106.

J.J. Dillon referred to Moses Williams as the "good nigger" because Moses Williams "didn't make waves." (Williams Dep. at 27.)

107.

Moses Williams was told that when Darrell Miller, an African-American, sued WCW, Dillon asked why Miller was going to sue the company and asked "why doesn't he be like that good nigger Moses." (Williams Dep. at 27.)

-25-

108.

J.J. Dillon stated that he thought that a country music western song that used the word "nigger" was a "great" song. (Whatley Dep. at 62-63, Tab V.)

109.

According to Pez Whatley, a WCW trainer, J.J. Dillon prevented African-Americans from advancing at WCW because J.J. Dillon was "as racist as they come." (Whatley Dep. at 62, Tab V.)

110.

Teddy Long, a WCW wrestler, informed Bobby Walker that he knew that J.J. Dillon "did not like black persons." (Bobby Walker Dep. at 168.)

111.

Thunderbolt Patterson, an African-American wrestler, considered J.J. Dillon racist based on Dillon's conduct over several years, including Dillon's use of racial slurs such as "niggers." (Patterson Dep. at 101.)

**E.    WCW Bookers**

112.

From 1995 through the end of WCW, the following persons worked as the primary Bookers and writers at WCW:   Kevin Sullivan, Terry Taylor, Jimmy Hart, Annette Yother, Ed Ferrara,

-26-

Dusty Rhodes, Terry Allen, Arn Anderson, Kevin Nash, Greg Gagne, Ric Flair, Paul Orndorff, and wrestler Glen Gilberti.  (Smith Dep. at 131; Yother Dep. at 13-16; Schiavone Dep. at 16-24; Sullivan Dep. at 13-14.)

113.

On one occasion, Arn Anderson and other WCW officials decided to have Rocky Boulware change his name to "Little Richard Marley . . . the nigger that was standing out in the yard;" they joked, "paint the nigger up."  (Boulware Dep. at 49-50, Tab H.)

114.

Kevin Sullivan routinely used racial slurs, including "nigger."  (Randall Anderson Dep. at 111; Kearce Dep. at 31-33.)

115.

Randall Anderson, who was a personal friend of Kevin Sullivan, Terry Taylor, Arn Anderson, and J.J. Dillon, testified:  "I'm just saying they said the racist remark.  And I know they didn't like blacks too much."  (Randall Anderson Dep. at 109-110.)

116.

According to Randall Anderson, Arn Anderson would not share a room with African-Americans.  (Randall Anderson Dep. at 111.)

-27-

117.

Arn Anderson called Teddy Long, an African-American wrestler, a "nigger".  (Randall Anderson Dep. at 83, 175; Bobby Walker Dep. at 211.)

118.

Arn Anderson regularly used the term "nigger".  (Randall Anderson Dep. at 83-84.)

119.

Both African-American and Caucasian wrestlers told Moses Williams that Arn Anderson did not care for Black wrestlers and that he had his Caucasian favorites.  (Williams Dep. at 252.)

120.

On one occasion, when Plaintiff Bobby Walker was walking past the room where the Bookers met to decide the roles of the wrestlers regarding upcoming matches (the "war room"), he heard one of the persons in the war room comment, "What nigger we got tonight?"  (Bobby Walker Dep. at 210-211.)

121.

One of WCW's producers testified:  "a lot of the guys on the booking committee were, you know, white guys . . . and they just, I don't know, they felt different about putting Mexicans or black people or Asians over."  (Kearce Dep. at 29.)

122.

Members of the Booking Committee "frequently" used racially derogatory language about people's race.   (Kearce Dep. at 41.)

123.

Arn Anderson stated "I ain't piling a bunch of niggers in my car or a bunch of Mexicans in my car."  (Randall Anderson Dep. 174.)

124.

Gary Juster, an executive at WCW, was sure he heard members of the Booking Committee use racial slurs:  "virtually every minority, gay person, anyone out of the mainstream was joked about because that's the culture of pro sports, pro entertainment type of locker room."  (Juster Dep. at 116.)

125.

According to Juster, "nothing was sacred" and people constantly joked "about just about everything . . .  even about women, believe it or not."  (Juster Dep. at 117.)

126.

**F.   WCW'S MANAGERS AT THE POWER PLANT**

    **1.   Jody Hamilton**

127.

According to Brenda Smith, assistant to the Power Plant Manager, Jody Hamilton, when Jody Hamilton spoke on the

-29-

telephone with WCW officials about wrestlers in the Power Plant,
he used words such as "jiggerboggie and lackey" to designate
which wrestlers were African-American.   (Smith Dep. at 19, 21,
122.)

128.

Brenda Smith believed that Jody Hamilton was racist based
upon the manner in which he treated Caucasian wrestlers as
compared to African-American wrestlers; Hamilton "picked on the
Afro-Americans more so than he did on the Caucasians, as he
pushed the Afro-Americans harder."   (Smith Dep. at 34.)

129.

Brenda Smith stated that when Hamilton saw an African-
American wrestler sitting or talking, he would make a statement
such as "you need to get up off your lazy behind and do
something," but he did not similarly address Caucasian
wrestlers.   (Smith Dep. at 34-35.)

130.

Brenda Smith stated that Jody Hamilton "would suggest the
Caucasians to the bookers more so than he would the Afro-
Americans."   (Smith Dep. at 35.)

-30-

131.

Based upon the conversations she overheard with Jody
Hamilton, Smith believed that his comments reflected racial bias
in the wrestling industry.  (Smith Dep. at 20.)

132.

Jody Hamilton told Thunderbolt Patterson that WCW officials
wanted to "keep all the niggers in place."  (Patterson Dep.at
30.)

133.

On one occasion, Hamilton arrived at the Power Plant after
an absence, and, upon observing that many of the new WCW
wrestling trainees were African-American, he responded "oh, a
different color"  and then indicated that this was not
"something [he] expected."  (Whatley Dep. at 95-96, Tab V.)

134.

Black Jack Mulligan, a WCW trainer, told Pez Whatley,
another WCW trainer, that Jody Hamilton had commented that there
were "too many people of different color" at the Power Plant and
discussed the color of the trainees.  (Whatley Dep. at 97, Tab
V.)

135.

While manager of the Power Plant, Jody Hamilton stated to Tony Carr, "I don't know who's blowing smoke up your ass they ain't hiring no niggers." (Carr Dep. at 55, Tab I.)

136.

On another occasion, Jody Hamilton indicated to Tony Carr that WCW was "not hiring any Blacks, you know." (Carr Dep. at 55, Tab I.)

137.

Jody Hamilton made the following comment to Tony Carr: "Martin Luther King started off this problem and that's why Black people are having so much trouble now. -- He started segregation. -- A lot of Black people got, you know, sucked up in it because they weren't smart enough to keep up with the White people, so it's bringing down the society." (Carr Dep. at 97, Tab I.)

138.

When African-American performer Rock Boulware was allowed to work as a referee, Hamilton "got mad" and stated to Boulware that "you know that no Black person go over me and become no referee." (Boulware Dep. at 59-61, Tab H.)

139.

According to Rocky Boulware, Jody Hamilton regularly used words such as "nigger, buckwheat, crackhead." (Boulware Dep. at 73, Tab H.)

140.

Jody Hamilton told Rocky Boulware that there was a survey that showed that Black people would not pay $100 or $200 for a ticket and that Turner had said "why use the Blacks? We don't need them." (Boulware Dep. at 150, Tab H.)

141.

Jody Hamilton told African-American wrestler Rick Reeves that "we got enough of your kind down here." (Reeves Dep. at 59.)

142.

Jody Hamilton told Thunderbolt Patterson: "they don't fool with no niggers that they got problems. You're a problem. They don't want you to influence the other blacks. You asked for your money, you asked for equal opportunity, and they hadn't given it to you." (Patterson Dep. at 117.)

-33-

### 2.   Paul Orndorff

143.

According to Randall Anderson, a member of the Booking Committee, Power Plant manager Paul Orndorff "hated blacks." (Anderson Dep. at 106-107.)

144.

Paul Orndorff used the word "nigger" while he was a wrestler at WCW.   (Randall Anderson Dep. at 170.)

145.

On one occasion, Paul Orndorff stated that "some of our black wrestlers are good . . . then you got some of the wrestlers that are niggers." (Hart Dep. at 117.)

146.

On one occasion, Paul Orndorff stated that the problem with America was that "niggers" were causing crimes and were responsible for "unemployment and rapes."  (Onoo Dep. at 254-255.)

147.

Paul Orndorff told African-American wrestler Tony Carr that WCW was not "hiring niggers." (Carr Dep. at 95, Tab I.)

148.

Paul Orndorff told Rocky Boulware that he had received information from Turner Sports that "black people don't buy

-34-

tickets; they don't use no niggers."   (Boulware Dep. at 72-73,
Tab H.)

149.

Paul Orndorff also used terms such as "nigger, buckwheat,
and crackhead" to refer to African-Americans.   (Boulware Dep. at
72-73, Tab H.)

## V.   DISPUTED FACTS AS TO WCW PROMOTING AFRICAN-AMERICANS AFTER PLAINTIFFS FILED SUIT REGARDING RACE DISCRIMINATION

150.

Although African-American Booker T became the champion on
June 9, 2000, Vince Russo and Terry Taylor indicated that WCW
made him the champion to respond to allegations of race
discrimination.   (Snakovsky Aff. ¶ 20, Tab D; see also Williams
Aff. ¶¶ 20-23, Tab E.)

151.

Terry Taylor told Vince Russo that "they've got this
discrimination against us -- we're going to have to do
something, you know give somebody the belt -- Booker T looked
really good and Booker T is a really great athlete . . . you
know, maybe this will get rid of some of the heat on us right
now."   (Snakovsky Dep. at 86-87, 99-100, 102.)

-35-

## VI.  ADDITIONAL DISPUTED FACTS

152.

Ed Ferrara, a Booker, testified about a presentation from a

marketing research firm to WCW, as follows:

    Q.    You understood them to say that basically there was
          going to be more black persons who were going to be
          watching it than there are going to actually be paying
          tickets to the events?

    A.    That's what I understood they were trying to get
          across, the facts they were trying to get across.

    (Ferrara Dep. at 59)


153.

WCW maintained lists that designated wrestlers based on

their race:  "while you have your babyface talent, of course --

You have your heels and you'd have girls.  Then Mexicans.  You'd

have blacks."  (Anderson Dep. at 95-97.)

154.

Terry Taylor, Arn Anderson, J.J. Dillon and Dusty Rhodes

all indicated to Rocky Boulware that "the Turner people

basically told them, when no Black people come to the show, they

didn't have to use no Black."  (Boulware Dep. at 96, 124-125,

Tab H.)

155.

Ms. Smith heard rumors that WCW officials believed Blacks "didn't pay for pay-per-views." (Smith Dep. at 58.)

156.

One of the principal bookers, Kevin Sullivan, testified that he was aware of the racial demographics of WCW's audience, which he believed was "predominantly white." (Sullivan Dep. at 23.)

157.

Many statements and rumors circulated throughout WCW that there were not enough "blacks" in the viewing audience and that African-Americans would not pay to see a wrestling event live. (Anderson Dep. at 184-185; Bobby Walker Dep. at 96-97.)

158.

Kevin Sullivan commented to Jimmy Hart that WCW had information that black fans were not going to pay for an arena seat. (Hart Dep. at 68-69.)

159.

Kevin Sullivan told Bobby Walker that WCW normally did not have "black on black" wrestling matches, i.e., a black wrestler opposing another black wrestler in the same match. (Bobby Walker Dep. at 80.)

-37-

160.

At times, Caucasian wrestlers indicated they did not want to wrestle with black wrestlers; for example, Lex Luger had a problem wrestling with African-American Junkyard Dog.   (Randall Anderson Dep. at 113.)

161.

One of WCW's Caucasian decision-makers, testified that a new white wrestler would have a better opportunity than a new black wrestler.   (Randall Anderson Dep. at 154-155.)

162.

Randall Anderson could not identify one African-American wrestler who came to WCW without experience and received intensive training similar to that provided to Caucasian wrestlers.   (Randall Anderson Dep. at 159-160.)

163.

WCW security manager Doug Dillinger told Rocky Boulware that refereeing dog matches was a thing that "the nigger do." (Boulware Dep. at 61-62, Tab H.)

164.

On different occasions, Terry Taylor, J.J. Dillon and other members of WCW management told Rocky Boulware that he was paid differently because of his race.   (Boulware Dep. at 127, Tab H.)

165.

On one occasion Terry Taylor and J.J. Dillon told Rocky Boulware not to bring his "White woman" around the matches. (Boulware Dep. at 138, Tab H.)

166.

When an African-American wrestler was in the ring at the WCW Power Plant, a Caucasian trainer stated that there was "soul food in the ring." (Carr Dep. at 92, Tab I.)

167.

On one occasion, in the presence of other individuals, David Crockett, a WCW Booker and executive, told Tony Carr to "get your Black ass back in there and tape those ropes." (Carr Dep. at 100, Tab I.)

168.

Randy Savage, a Booker and wrestler, told Pez Whatley that they were going to have changes in the Booking Committee, but that Whatley would not be selected and then "pointed to [Whatley's] skin." (Whatley Dep. at 135, Tab V.)

169.

WCW trainer Pez Whatley warned African-American wrestlers that they were not going to get an equal opportunity and that it was going to be twice as hard for them to succeed. (Whatley Dep. at 139-140, Tab V.)

170.

WCW trainer Pez Whatley concluded that African-American wrestlers had to be "twice as good as the White boys."  (Whatley Dep. at 140, Tab V.)

171.

On one occasion, wrestler Buddy Landell told Pez Whatley that "they ain't going to use you because you know what to do and they don't want no smart niggers working."  (Whatley Dep. at 153-154, Tab V.)

172.

On one occasion, WCW's ring announcer, David Penzer, indicated that WCW was not going to use Pez Whatley on a particular occasion because they already had "a token Black on TV."  (Whatley Dep. at 154-155, Tab V.)

173.

Pez Whatley, who worked in various jobs throughout WCW, stated that it was "not unusual for you to hear amongst the workplace, you know, the n-word or darkie."  (Whatley Dep. at 161, Tab V.)

174.

Pez Whatley testified that, as an African-American male, he had to be careful when interacting with Caucasian females to

make sure that Caucasian males did not perceive him to be trying
to entice the Caucasian females.  (Whatley Dep. at 161, Tab V.)

175.

On one occasion, Doug Dillinger, head a WCW security,
stated that he didn't want to "hear no more of that nigger
music."  (Whatley Dep. at 167, Tab V.)

176.

Pez Whatley stated that he heard Caucasian wrestlers Chris
Kanyon and Diamond Dallas Page use the term "nigger" when
referring to other wrestlers.  (Whatley Dep. at 174, Tab V.)

177.

On one occasion, Pez Whatley heard a Caucasian worker at
WCW state that "I had to wait behind a Darkie too."  (Whatley at
180-181, Tab V.)

178.

Assistant Producer Michelle Bayens, a Caucasian, stated
that "when you take a step back . . . it can definitely be said
that [minority] wrestlers were treated less favorably or they
weren't promoted because of the color of their skin."  (Bayens
Dep. at 94.)

179.

Some Caucasian wrestlers did not want to wrestle with African-Americans Craig Pittman and Ernest Miller.  (Randall Anderson Dep. at 115-116.)

180.

Production worker Moses Williams often observed the tryouts at the Power Plant, and stated that he bet against African-American trainees "because they were destined to fail" regardless of how good they were.  (Williams Dep. at 43-44.)

181.

WCW Caucasian trainer Mike Wenner did not "communicate well with Afro-Americans", treated Caucasian wrestlers differently, and did not give African-American wrestlers "the same respect that he would give the Caucasians" as he would work the African-Americans harder:  [the] "Caucasian would just stop, when the Afro-American had to do 100 more push-ups and more."  (Smith Dep. at 48-49.)

182.

Terry Taylor never said anything positive about any African-American wrestlers.  (Williams Dep. at 54-56.)

183.

WCW routinely trained and assisted Caucasian wrestlers in their development; for example, some Caucasian wrestlers would

-42-

receive round-the-clock personal training, and would receive necessary public exposure, but "I've never known of a Black wrestler they did that for."  (Randall Anderson Dep. at 181.)

184.

Caucasian wrestlers were allowed to practice their public speaking abilities by using a microphone at a CNN studio; African-American wrestlers were not provided with this additional microphone training.  (Randall Anderson Dep. at 182-183.)

185.

The wrestlers routinely used racially derogatory language. (Randall Anderson Dep. at 103.)

186.

Juster stated that he "probably" heard wrestlers use racial slurs because "it was an atmosphere where there was a lot of joking around about virtually everything . . .whether it was racial, ethnic, sexual preference, male/female, political.  It was a rowdy locker room type of atmosphere."  (Juster Dep. at 124-125.)

187.

Several wrestlers did not want to wrestle Hardbody Norris, in part, because he was black.  (Randall Anderson Dep. at 115.)

-43-

188.

According to one of WCW's producers, at WCW that "there's a lot of lies thrown around. -- There's a lot of bigotry thrown around. -- There's a lot of racism thrown around. -- There's a lot of sexual harassment thrown around."  (Kearce Dep. at 27-28.)

189.

WCW trainer Pez Whatley testified that African-American wrestlers were overlooked by WCW's Caucasian personnel and gave the following example:  Keith Mitchell, a Caucasian who worked on WCW's production team, and, Annette Yother, a Caucasian who worked on the Booking Committee, often overlooked big strong African-American wrestlers and preferred Caucasians, stating that they thought the Caucasians were "cute or had the long hair enough or they dyed their hair blonde."  (Whatley Dep. at 142-143, Tab V.)

190.

WCW selected many of the Caucasian wrestlers whom trainer Pez Whatley recommended for advancement, but never used any of the African-Americans he recommended in a main event.  (Whatley Dep. at 144, Tab V.)

191.

During a match, Willie Worthen, an African-American wrestler, was introduced as "Willie B" in reference to the famous gorilla at the Atlanta Zoo; when Mr. Worthen reported this to WCW trainers, "they just laughed about it." (Worthen Dep. at 101-102.)

192.

On one occasion, when Booker T. got a tremendous reaction from the crowd, a wrestler asked trainer Dwayne Bruce "do you think that it is because of his super tan? And Bruce responded, "it doesn't take a scientist to figure out everything." (Easterling Dep. at 72-73.)

193.

A cameraman warned Easterling that WCW was a "good ol boys" network and that if someone used the "n" word, he should just "let it slide" if he wanted to succeed. (Easterling Dep. at 76-77.)

194.

Rocky King stated that WCW was "not hiring no blacks." (Carr Dep. at 49, Tab I.)

195.

On one occasion, the manager of WCW's Security Department, Doug Dillinger, stated that "yes, I used the N-word and I will use it again." (Williams Aff. ¶ 38, Tab E; Williams Dep. at 132-133.)

196.

Doug Dillinger expressly stated that he would not have a "black" security person at WCW, and he never did employ an African-American. (Williams Dep. at 134-135.)

197.

When Tony Carr spoke with Doug Dillinger about becoming a security guard, Doug Dillinger informed Mr. Carr that he did not hire Blacks. (Carr Dep. at 111, Tab I.)

198.

Doug Dillinger never provided any merchandise or WCW paraphernalia to any African-American children. (Williams Dep. at 226-227.)

-46-

Respectfully submitted, this ___26th___ day of February, 2003.

Cary Ichter
Georgia Bar No.: 382515
Charles J. Gernazian
Georgia Bar No.: 291703
Michelle M. Rothenberg-Williams
Georgia Bar No.: 615680


**MEADOWS, ICHTER & BOWERS, P.C.**
14 Piedmont Center, Ste. 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020 (Telephone)
(404) 261-3656 (Facsimile)


Attorneys for Plaintiffs

-47-

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing
counsel to this action with the foregoing **PLAINTIFFS'**
**CONSOLIDATED STATEMENT OF MATERIAL FACTS TO WHICH THERE EXIST**
**GENUINE ISSUES TO BE TRIED** by hand delivery, addressed to the
following:

>Eric Richardson, Esq.
>Evan Pontz, Esq.
>Troutman Sanders LLP
>Suite 5200, Bank of America Plaza
>600 Peachtree Street, N.E.
>Atlanta, Georgia  30308-22165

This _26th_ day of February, 2003.

Charles J. Gernazian
Georgia Bar No.: 291703