ORIGINAL
U.S.D.C. Atlanta

FEB 26 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CLAUDE PATTERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action File No.: |
| | ) 1:01-CV-1152-CC |
| | ) |
| WORLD CHAMPIONSHIP | ) |
| WRESTLING, INC., | ) **Jury Trial Demanded** |
| TURNER SPORTS, INC., TURNER | ) |
| ENTERTAINMENT GROUP, INC. and | ) |
| TURNER BROADCASTING SYSTEM, INC., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S NOTICE OF FILING APPENDIX

Plaintiff, CLAUDE PATTERSON, hereby serves notice that he is filing herewith in the above-styled case an Appendix containing copies of relevant deposition testimony and exhibit documents in support of his Response To Defendants' Motion For Summary Judgment filed with this Court.

This 26th day of February, 2003.

_Charles Gernazian_
Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiff's Notice of Filing Appendix** by hand delivery addressed as follows:

> Eric Richardson
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This 26th day of February, 2003.

Charles J. Gernazian
Georgia Bar No. 291703

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAUDE PATTERSON,                    )
                                     )
        Plaintiff,                   )
                                     )        Civil Action File No.:
v.                                   )        1:01-CV-1152-CC
                                     )
WORLD CHAMPIONSHIP                   )
WRESTLING, INC.,                     )        **Jury Trial Demanded**
TURNER SPORTS, INC., TURNER          )
ENTERTAINMENT GROUP, INC. and        )
TURNER BROADCASTING SYSTEM, INC.,    )
                                     )
        Defendants.                  )
_____)

## APPENDIX OF EXHIBITS AND DEPOSITION EXCERPTS

A.    Plaintiffs' Exhibit No.  54

B.    Plaintiffs' Exhibit No. 83

C.    Plaintiffs' Exhibit No.  18

D.    Declaration of J.P. Snakovsky

E.    Declaration of Moses Williams

F.    Plaintiffs' Exhibit No.  2

G.    Plaintiffs' Exhibit No. 72

H.    Excerpts of Deposition Transcript of William Boulware

I.    Excerpts of Deposition Transcript of Tony Carr

J.    Declaration of Pamela Collins

K.    Declaration of George Grace

L.    WCW Talent Database

M.    ICA Borash

N.   Supplemental Report of Dr. David Rasmussen

O.   Harman Order For Service of Report and Recommendation; USDC, NDGA CAFN 1:00-CV-3375-WBH

P.   Plaintiffs' Exhibit No. 75

Q.   Plaintiffs' Exhibit No. 76

R.   Plaintiffs' Exhibit No. 64

S.   Plaintiffs' Exhibit No. 44

T.   Plaintiffs' Exhibit No. 10

U.   Plaintiffs' Exhibit No. 15

V.   Excerpts of Deposition Transcript of Pez Whatley

W.   Plaintiffs' Exhibit No. 49

X.   Plaintiffs' Exhibit No.  5

Y.   Olie Anderson Interview

Z.   Declaration of Claude Patterson

AA.  Dusty Rhodes (Virgil Runnels) Internet Pages

BB.  Ric Flair (Richard Fliehr) Internet Pages

CC.  Terry Taylor Internet Pages

DD.  Kevin Nash Internet Pages

EE.  Paul Orndorff Internet Pages

FF.  Ole Anderson Internet Pages

GG.  Arn Anderson Internet Pages

HH.  Black History Internet Pages



# EXHIBIT / ATTACHMENT

## _____A_____

(To be scanned in place of tab)

**From:** Dillon, JJ
**Sent:** Friday, October 15, 1999 5:15 PM
**To:** Busch, Bill
**Subject:** RE: msg. that came to HWS

I returned this call this morning at 10:00 AM.      I've known "Thunderbolt" for thirty years.      He is obviously looking for a position with WCW, and I don't see anything for him at this time, though I told Patterson that I would discuss the matter with Bill Busch, which I have.
Thanks.
"J.J."

——Original Message——
**From:** Busch, Bill
**Sent:** Tuesday, October 12, 1999 1:34 PM
**To:** Daves, Katherine
**Cc:** Dillon, JJ
**Subject:** RE: msg. that came to HWS

Thanks - I will have JJ follow-up on this.

Bill

——Original Message——
**From:** Daves, Katherine
**Sent:** Tuesday, October 12, 1999 1:13 PM
**To:** Busch, Bill
**Subject:** FW: msg. that came to HWS

This gentleman called today.  Wanted you to know I had previously listed his number as 404/763-3927 and it's actually 3937.  I explained there was an error in his number and that we would relay the message again. You may have tried him but not received an answer as it had the wrong number included.  I think he might be crazy, so you may not want to call him back, however in case you tried I wanted you to know the number was wrong that we gave you.    He doesn't seem to get that he needs to call your office and keeps asking for us to have Dr. Schiller call him back.

——Original Message——
**From:** Daves, Katherine
**Sent:** Tuesday, September 28, 1999 1:42 PM
**To:** Busch, Bill
**Subject:** msg. that came to HWS

Thunderbolt Patterson called from Athletes in Support of Kids.  Said he's calling regarding WCW and some suggestions on ratings.  Says he's a former wrestler.  I don't know how you want me to handle these calls since there are so many parties that have been checking with us about WCW issues.  I explained to him that Dr. Schiller had been forwarding the calls concerning WCW operations to you as you were head of the organization and reported to Dr. Schiller.  Most of the time people still insist they want to leave a message for HWS as well.  Should you feel someone should follow up with Patterson his number is 404/763-3937.

Thanks.



**PLAINTIFF'S EXHIBIT**

5 7

WCW 009232
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)



**A Time Warner Company**

A DIVISION OF TURNER SPORTS
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 603-3123

## MEMORANDUM

TO:         All Employees, Wrestling Talent and Independent Contractors

FROM:       Eric Bischoff

DATE:       January 7, 1999

RE:         Diversity Workshop

During the first quarter of 1999, World Championship Wrestling will launch an effort which is of critical importance. In conjunction with the Company's Equal Employment Opportunity Policy which prohibits all forms of discrimination and harassment in the workplace, the Company intends to educate each of its employees, wrestlers and independent contractors about the importance of diversity and respect for differences.

This effort is focused on bringing together all employees, wrestlers and independent contractors as a team of people who respect, trust, and appreciate each other as professionals. It's an effort which will help all of us to value each others' similarities as well as differences. It will help us value diversity.

Diversity is important to this organization for many reasons. It's important because we need to be innovative and encourage a variety of ideas and perspectives to help us see business situations in new ways. Diversity is important because our customer base has become very diverse - and if we don't understand our customers, we will miss opportunities and lag behind our competition. It is important because our employees are becoming more diverse, and we need to maintain our teamwork while at the same time encouraging a wide variety in people's backgrounds, viewpoints, and styles.

WCW has made a strong commitment to this effort. Every single employee, wrestler and independent contractor working on our shows will participate in a workshop on diversity. In this workshop you will learn about the trends in society which make diversity a reality. You will also learn ways to understand each other and work together more effectively.

In these changing times, we need to pull together as a team to ensure our success. I know I can count on you to do that by sharing the Company's belief in valuing all its employees. I look forward to working on this effort with each of you and raising the awareness level of all individuals associated with WCW. Thank you in advance for your commitment to this initiative.

101986.1

PLAINTIFF'S
EXHIBIT
83

CONFIDENTIAL

WCW 002730



# EXHIBIT / ATTACHMENT

## C

(To be scanned in place of tab)

WCW Diversity Training
6/12/99
Baltimore, MD

7:00 PM

1. Brian Adams
2. Steve Rei
3. Brian Knobs
4. Hulk Hogan
5. Kevin Nash
6. Scott Hall is at the Bar
7. [illegible]
8. [illegible signature]
9. [illegible]
10.
11. Hack Zukerman
12. [illegible]
13. Malcolm X
14. Dave Nike
15. A. Sharpton
16. Jesse Jackson
17. [illegible] Limbaugh
18. Jimmy the Greek
19. Howard Cosell
20. [illegible]



PLAINTIFF'S
EXHIBIT
18
3/19

CONFIDENTIAL
X 001561

# WCW Diversity Training
## 6/12/99
## Baltimore, MD

## 7:00 PM

1. Mickie Jay
2. Jerry Flynn
3. Michael Boilea
4. Curt Hennig
5. Mike Enos
6. _illegible_
7. _illegible_
8. Ross Forman
9. Randy Thornden
10. K. Bogg
11. Steve Borden
12. Rick Steiner
13. Scott Steiner
14. _illegible_
15. _illegible_
16. _illegible_
17. _illegible_
18. Stephanie "G. George"
19. Nora Greenwald
20.

CONFIDENTIAL
X 001566

WCW Diversity Training
6/12/99
Baltimore, MD

7:00 PM

1. _Hamett M. Stacowsh_ ?
2. _____
3. Elizabeth Hulett ?
4. Evil B. ?
5. _____
6. B. W. D. ?
7. Dusty Rhodes
8.
9.
10.
11.
12
13.
14.
15.
16.
17.
18.
19.
20.

CONFIDENTIA
X 001567



# EXHIBIT / ATTACHMENT

## D

(To be scanned in place of tab)

## DECLARATION OF JOHN SNAKOVSKY

STATE OF GEORGIA
COUNTY OF _____

John Snakovsky gives the following declaration under penalty of perjury and states as follows:

### 1. J.S.

I became a wrestler WCW in 1994.  My wrestling name and professional name is Johnny Boone.

### 2. J.S.

In 1999, I became a referee.  In my capacity as a wrestler, and then as a referee, I was in a position to personally observe many of the WCW officials, especially those who worked in the Booking Department.

### 3. J.S.

On numerous occasions, I heard Terry Taylor use offensive and negative words in describing minorities.  I heard him call Sonny Onoo a "Jap" on several occasions.  I also heard him refer to Sonny Onoo as a "Gook."

### 4. J.S.

I also heard Terry Taylor use the word "nigger" on many occasions.  In fact, he constantly used that word when referring to African-American wrestlers.

### 5. J.S.

I heard Terry Taylor call Ernest Miller ("The Cat") a "nigger."

### 6. J.S.

I also heard Terry Taylor call Harrison Norris ("Hard Body") a "nigger."

7. J.S.

On one occasion, I heard Terry Taylor state that neither
Bobby Walker nor Hard Body Norris would make it in the wrestling
profession because they were "black."

8. J.S.

Based on my observations of Mr. Taylor, including his use
of the words "nigger" and "gook" I believe that Taylor was
discriminating against non-Caucasians.

9. J.S.

For example, I recall that Terry Taylor often "pushed" a
Caucasian wrestler by the name of Joey Mags.  Upon information
and belief, Mr. Mags had many personal problems.  Joey Mags did
not possess many skills and abilities as a wrestling performer.
Nevertheless, I am personally aware that Terry Taylor "pushed"
Joey Mags over Ernest Miller.  Although Ernest Miller was a much
better athlete, better wrestler, and better performer, Terry
Taylor "pushed" Joey Mags over Ernest Miller.

10. J.S.

I also am aware that Terry Taylor pushed Joey Mags, but did
not push Hard Body Norris or Bobby Walker.

11. J.S.

I personally observed Terry Taylor treat Sonny Onoo
horribly.  Terry Taylor always referred to Sonny in a negative
and/or racist manner, and never provided Sonny with an
opportunity fully use his talents.

12. J.S.

Sonny played a very unique role at WCW.  Sonny was neither
a wrestler nor a referee, but worked as a manager/entertainer.
Sonny was extremely professional, very diligent, and always
demonstrated a thorough understanding and knowledge of the
wrestling industry.

13. J.S.

Based on my observations and experience, Sonny Onoo was a
much better entertainer and/or manager than Sherry Martil.

Similarly, he was much better than Tori Wilson.  As to each of
these individuals, Sonny demonstrated much better role-playing
and more professionalism.  He also demonstrated a greater degree
of wrestling expertise in his approach to wrestling events.

14.

Sonny Onoo was also a better manager/entertainer than
Colonel Parker.  I believe that Sony was better at involving the
crowd, and getting a crowd reaction to various staged events
than was Colonel Parker.  He also was more knowledgeable about
wrestling, and was a much harder worker than Colonel Parker.

15.

In addition to Terry Taylor, I heard many other WCW
officials use racist and/or negative words such as "nigger."  I
cannot recall with certainty the identity of the other
individuals, but I am confident that I heard these words from
WCW officials in addition to Terry Taylor.

16.

In the summer of 2000, I was working as a referee.  That
night, the WCW held a World Championship wrestling match.  The
match was scheduled between Booker T and Jeff Jarrett.  Based on
my recollection, Booker T was <u>not</u> "pencilled in" to win the
fight.  As those of us in the industry know, a particular
wrestler is scripted to prevail in a fight.  I believe that Jeff
Jarrett was scripted to win the world championship over Booker T
on that particular date.

17.

Before the actual wrestling match, I had heard Vince Russo
and Terry Taylor discussing a lawsuit filed by Hard Body Norris
and Bobby Walker.  I believe I also heard them refer to a
wrestler named Ice Train during this conversation.  All of these
individuals are African-American.

18.

During the conversation, I heard Terry Taylor and Vince
Russo state that these African-American wrestlers had sued WCW
for racial discrimination.  I recall Taylor saying, in reference
to Hard Body Norris, "that nigger Hard Body is no good."

19. J. S.

During the same conversation, I heard Vince Russo and Terry Taylor state that they would have to do something about the racial allegations against WCW.

20. J S.

Each of them indicated that they would have to do something to deflect racial allegations brought against WCW.  During the conversation, they made it clear that they were going to make an African-American the champion in order to make it appear that they were not discriminating against African-Americans. Terry Taylor indicated that by making Booker T, an African-American, the champion, it would "get them off of our backs."  In sum, they made it clear that they were concerned about racial allegations brought by Bobby Walker, Hard Body Norris, and other African-American wrestlers.  In order to make themselves appear not to be racist, they scripted Booker T, an African-American, to become the WCW champion in response to the lawsuit alleging racial discrimination.

I declare under penalty of perjury that the foregoing is true and correct.

John Snakovsky

April 5, 2002
Executed on (Date)



# EXHIBIT / ATTACHMENT

_____E_____

(To be scanned in place of tab)

## AFFIDAVIT OF MOSES WILLIAMS

STATE OF GEORGIA
COUNTY OF FULTON


Personally appeared before the undersigned officer, duly authorized to administer oaths, Moses Williams, who, upon having been first duly sworn, deposed on oath and states:

1.

I worked for World Championship Wrestling ("WCW") in various capacities. I was initially hired as a stage carpenter in October, 1991, and worked as a stage coordinator when my employment was severed by WCW in March, 2001.

2.

In addition to the work that I did at WCW, I have extensive experience in stage production, and have worked on many large events. Among other clients, I have worked with entertainment groups such as the Rolling Stones and Michael Jackson. I was also involved in Farm Aid.

3.

Throughout the approximate nine and one-half years of working with WCW, I was always a very loyal and dedicated employee. I was extremely courteous to all personnel, and treated everyone with respect. I was also very respectful of managers and officials at WCW.

4.

Even though I was always very dedicated to WCW, I observed many actions that demonstrated a racial or ethnic bias against anybody who was not a Caucasian. I myself, am African-American. Although some of the WCW officials were more overt about their racial biases than others, I believe that there were many actions and decisions that were made based on a racial or ethnic bias.

5.

Over the years, I observed certain WCW officials make
statements and take actions in order to protect the "good old
boy" establishment.  Unfortunately, the "good old boy"
establishment was exclusively Caucasian.  Also, in my
experience, the favoritism and better treatment given to
Caucasians over minorities was pervasive throughout WCW.

6.

During nine and a half years at WCW, WCW never had an
African-American work in Security in any capacity.  I even
recommended some qualified persons for Security, but they were
not hired.  The decision-maker, Mr. Doug Dillinger, expressly
stated that there would not be a black "security" person at WCW.
True to his word, there never was an African-American hired to
work in Security.  As I indicate further in this affidavit, Mr.
Dillinger made other statements showing his racial bias.

7.

Similarly, there was never an African-American hired to
work in Lighting at WCW.  The decision-maker was Frank Santoro.
Mr. Santoro overlooked many qualified African-Americans.  I
personally recommended several qualified African-Americans
directly to Mr. Santoro, but he did not hire an African-American
person for Lighting.

8.

Similarly, Mr. Santoro was also responsible for hiring
truck drivers for the WCW tractor-trailers.  In the years I was
with WCW, I only recall one African-American truck driver
(female).  She was involved in a minor incident, whereby she
collided with a painted post (or similar fixture) and did a
little damage to the truck.  The truck had been leased, and I
myself inspected the truck.  I did not see any significant
damage to the truck.  The woman was crying as she told me that
Frank Santoro fired her for the accident.  I did not feel this
was fair because I was aware of at least two Caucasian drivers
who were involved in much more serious accidents, but were not
fired.  One Caucasian driver was involved an accident in
Nashville, Tennessee, whereby he took out a whole street light
and the pole it was on.  There was damage to side of truck, and
the pole was destroyed.  The police even came and took a report.

As to the other Caucasian driver, in Indiana, the driver lost control of the truck and it effectively destroyed the truck and the trailer. But this Caucasian driver was not fired.

9.

WCW also never hired an African-American to work in Audio. Al Smith was the decision-maker for Audio. I submitted many highly qualified African-Americans for his consideration, but he never hired an African-American for Audio.

10.

The Production Manager was William Byrd. As Production Manager, Mr. Byrd was ultimately responsible for Staging, Lighting, Audio, and Trucking. He was the supervisor of Mr. Smith and Mr. Santoro. I am aware that Mr. Byrd often asked if a prospective employee was Jewish. If a prospective employee was Jewish, Mr. Byrd said to hire the individual. I felt that this bias was unfair because many minorities were not Jewish. I also recall a statement Mr. Byrd made about the child of another WCW employee, Steve Small, who married an African-American woman. Mr. Byrd stated, "Steve's kids will have problems in life because they are half black."

11.

Vince Russo often made statements demonstrating that he preferred Caucasian persons, especially Caucasian males, over other persons for WCW management and control. I heard Vince Russo often refer to people as "blacks," "Japs," "spics" or "wetbacks."

12.

I heard Vince Russo make statements suggesting that "whites" were in control at WCW. For example, I heard him say, "whites rule wrestling." I also heard him say that it was a white man's sport and that "is why we don't have many black wrestlers." I also heard him say I am running things the way that I want and we are going to have a "white champion" because that's the way I want it. Vince Russo made it clear that he did not want oriental persons, African-Americans, or Hispanics succeeding at WCW, much less gaining any position of management or control.

13.

Similarly, I heard Terry Taylor make statements demonstrating his racial and ethnic bias against persons who were not Caucasian.  Although he was somewhat careful around me, I have heard from other persons that he routinely used words such as "nigger."  I did, however, hear Terry Taylor express his desire to promote Caucasian wrestlers.  For example, I witnessed Mr. Taylor overtly "push" Caucasian wrestlers, but not "push" African-Americans.

14.

I also heard Terry Taylor make statements about his opinions of African-American fans.  I heard him say, "blacks don't buy wrestling tickets."

15.

In my experience, WCW officials such as Taylor and Russo treated Caucasians better than African-Americans, Hispanics, and Asian-Americans.  Based on my observation, non-Caucasians received a "B" treatment.  I use the term "B" treatment to indicate that minorities were not treated as favorably as Caucasians.

16.

I have personally observed WCW, through its employees and managers, treat minority wrestlers differently than Caucasian wrestlers.  For example, on numerous occasions, I observed WCW officials "push" a Caucasian wrestler over a non-Caucasian wrestler.  In wrestling terms, a wrestler is "pushed" when that wrestler is provided television exposure and/or is scripted to prevail in a particular match.  As it is well known in the industry, the WCW officials would write scripts as to which wrestler would prevail. On numerous occasions, I believe that the Caucasian wrestler was unnecessarily scripted to prevail over the African-American wrestler.

17.

For example, I recall a wrestling match between a wrestler named Stevie Ray (African-American), who was one of two members of the very successful Harlem Heat duo.  On that particular match, the Caucasian wrestler, David Flair, was scripted to prevail over Stevie Ray.  Although Stevie Ray had been extremely

successful in his participation with the Harlem Heat duo, and
although Stevie Ray was considered by myself and others a much
better athlete and performer than David Flair, David Flair was
scripted to prevail over Stevie Ray, nonetheless.  It is my
belief that this decision is one of the many times that
wrestling victories were scripted based on a racial bias.

18.

Similarly, David Flair was routinely scripted to prevail
over Ice Train (African-American) even though Ice Train was a
very strong and solidly built wrestler who was much bigger than
David Flair.  And on the one occasion when David was not
scripted to prevail, Ice Train effectively destroyed (and even
injured) David Flair.

19.

I also observed the treatment of an African-American
wrestler named "Hard Body" Norris.  I was told Hard Body was
referred to as a "dumb nigger."  I note that Hard Body was never
given any meaningful chance, and was never pushed.  Hard Body
was really badly treated.  A fan indicated that it seemed
puzzling that Hard Body was getting beaten so easily at WCW even
though he was winning the "Tough Man" Competition.  Another
"Tough Man" competitor, Tank Abbott (Caucasian) was pushed very
hard, and had great exposure.

20.

I recall another interesting event when a wrestler by the
name of Booker T was scheduled to wrestle Scott Steiner.  I
believe this was in the summer of 2000, and was a very big WCW
event.  Because it was a big event, I was very involved in the
stage production for that particular fight.

21.

I specifically recall everybody talking about the match,
and everyone stated that Scott Steiner (Caucasian) had been
scripted to win that match over Booker T (African-American).
Indeed, even during some of the stage preparations, it was a
known fact that Scott Steiner would be the world champion for
WCW by the end of the night.

22.

Even though Scott Steiner had been designated the world champion, I was informed before the match that there had been a change. I was informed that Booker T would become the champion instead of Scott Steiner. During my production work, I had my headsets on and I heard various conversations. During these conversations, I heard Vince Russo and Terry Taylor calling the shots. These two individuals made it known to the WCW workers that Booker T would be the champion that night, and not Scott Steiner.

23.

I was extremely surprised and taken back. In my experience, I had never witnessed a change of the designated winner so close before the match. Myself and many people all wondered what the reason was for the abrupt change in the scripted winner. We thought it was quite unusual, if not bizarre, to change the designated world champion on the day of the match. Even after the show, people were shocked at the abrupt change.

24.

I heard several WCW employees state that the reason for the abrupt change was a response to the racial allegations raised by wrestlers against WCW. These employees, recognizing that Booker T. was African-American, concluded that WCW officials such as Russo and Taylor made this move to conceal their racially discriminatory practices and to provide a defense to the lawsuits involving racial discrimination.

25.

Although I witnessed many discriminatory acts and statements, I did not personally raise any formal complaints. I am aware that another African-American, Pez Whatley, did vocalize his opposition to racially discriminatory practices that he perceived. I believe that Pez Whatley suffered retaliation for raising his concerns of racial issues and discrimination. For example, Pez Whatley was no longer pushed, was no longer involved in training as he had done before, and was essentially removed from wrestling and demoted to menial labor such as setting up the ring.

26.

In addition to discrimination against African-American wrestlers, I also believe that WCW has favored Caucasian wrestlers over Asian-American and Hispanic wrestlers.  I recall a particular group of Asian-American wrestlers known as the Young Dragons.  Although I felt that they had much to contribute to the wrestling entertainment, these individuals were never "pushed" or given any meaningful exposure.  I recall one match whereby the fans were overwhelmingly in favor of the Young Dragons over Three Count (all of whom were Caucasian).  Nevertheless, the Young Dragons were not pushed after this event, but WCW did continue to push Three Count.

27.

As to another individual Sonny Onoo, I believe that he was treated differently because he was not part of the "good old boys" network as I described earlier.  Sonny, an Asian-American, was never accepted and brought into the inner circle even though he was extremely knowledgeable about the wrestling industry, and was a very capable and hard working person.

28.

As to Sonny Onoo, I am now aware that Sonny Onoo was not a full time employee of WCW.  This surprises me because Sonny had an office, was listed on the extension list of WCW personnel, and contributed greatly to WCW.  In addition to serving in numerous capacities such as agent, entertainer, coordinator of talent, Sonny also translated for Hispanic and Asian wrestlers.

29.

Jimmy Hart's work was very similar to the work done by Sonny Onoo.  Similar to Sonny, he was responsible for recruiting and developing talent.  Although Jimmy didn't work as a translator, they essentially performed similar work.  Although I am not taking anything away from Jimmy Hart, I believe that Sonny was just as qualified (or even more so given his language skills) as Jimmy Hart.

30.

As to Asian-Americans, I also recall seeing a "Chinese menu," on the bulletin board at WCW.  This "Chinese menu" portrayed Chinese in a very negative manner.  This is one

example of the atmosphere at WCW, which tolerated and
perpetuated racial stereotypes and racial prejudices.

31.

As for me, I also believe that I was personally treated
differently because of my race when WCW hired Caucasians, and
paid them more compensation than I was receiving.

32.

As I indicated earlier, I have much experience in stage
production and am capable of performing every aspect of
preparing a stage event. At one point, I was working as the
prop master, carpenter, stage manager, and performing any and
all other work for WCW. Although I felt that I was being
overworked, and spread too thin, I did not complain and did what
was asked of me.

33.

I did become quite upset, however, when WCW hired
Caucasians to perform my tasks, but paid them even more than I
was making. For example, WCW hired Trevor George, Art Shipley,
and Scott Stevens (all of whom are Caucasian) to work on the
props. I believe that WCW paid each of these Caucasian
individuals more than what I was making even though they were
only doing one part of the job that I had done, and even though
they did not have nearly the extensive experience in stage
management and production. Similarly, WCW hired Ellis Edwards to
do the stunts and the props, and also paid him more than I was
making. Again, I was much more qualified for the type of work
than Mr. Edwards, but I believe WCW paid him more than I was
paid.

34.

I believe that the manner in which WCW handled this
situation, and paid the Caucasian workers more money than I was
making was racially biased.

35.

As I indicated earlier, I did not confront the WCW
officials with my complaints about discrimination. I heard from
several individuals that I was known as the "good nigger." I
was basically told that because I did not make any waves, called

the Caucasian officials "Sir" and "Mr.," and because I did everything that I was told, that I was considered "a good nigger."

36.

In addition to the racial discrimination against WCW wrestlers and employees, I also believe that WCW officials discriminated against wrestling fans based on race.

37.

I previously addressed Doug Dillinger.  I also add that, on numerous occasions, I observed Doug Dilinger, the chief of security, provide promotional gifts and souvenirs to Caucasian children, but did not treat African-American children the same.

38.

I was offended by Mr. Dillinger's flagrant favoritism towards Caucasian kids.  I made my best effort to treat all of the children the same, regardless of their race (although I did go out of my way to take care of any children with apparent handicaps).  As to Mr. Dillinger, I recall, during the O.J. Simpson trial stating that "yes I used the "N word," and I will use it again."  He then stated that it would not effect the way he would act in the work place, but I believe that his actions speak louder than his words.

39.

I recall Terry Taylor stating that they did not need to "worry about spies or brothers; they just need to get to the back of the line."  I believe that he was referring to African-Americans, and any person who would raise complaints about the treatment of African-Americans. He was indicating that they would be put at the back of other persons seeking advancement at WCW.

40.

As to Terry Taylor, I was told by another person that when WCW signed Hulk Hogan, that Terry Taylor stated that WCW was bringing in Hogan, and he didn't want any blacks on the show to take away from Hogan coming back into the limelight.  From my understanding, Taylor didn't want any black wrestlers to take away from his intended effect in bringing in Hogan.

I have read the above.  It is true and correct.

FURTHER THE AFFIANT SAYETH NOT.

_____
Moses Williams

Sworn to and Subscribed
Before me this **18th** day of
__February__, 2002.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 13, 2002



# EXHIBIT / ATTACHMENT

_____ F _____

(To be scanned in place of tab)



How can WingspanBank.com save me ? CLICK HERE



WCW · WWF · ECW · Indies · Int'l
## Miller Time

Home

WrestleManiacs

ScoopThis

Bombshells

Toys

Rankings

Photos

Audio

Schedules

Columns

Almanac

Forums

Chat

Store

WOW Mag

Email Us

**Federations**

WCW

WWF

ECW

Indies

Int'l

# Exclusive interview with WWF's head writer Vince Russo

September 30, 1999

## By Ben Miller
### WrestleLine/WrestleManiacs

PLAINTIFF'S EXHIBIT
#2

**BEN:** The people you closed the door on, I don't want to ask for names, have they ended up showing up on ECW or WCW, or do they end up staying on the fringe of the business for the same reason you didn't want them?

**RUSSO:** No, they wind up showing in ECW and WCW. I think that's why you have such chaos, especially in WCW's locker room. When there is a free agent out there, one of the first things we look at is that there is such peace and harmony and a family feeling in our locker room, if we bring this guy in, how is it going to affect that? If it's going to affect that in a negative way, we don't bring them in. These guys definitely get picked up in ECW and WCW. Like I said, I think that's part of the reason why you have so many problems in WCW.

**BEN:** Two guys that have been critical of you at various times are **Dave Meltzer** who obviously writes the *Wrestling Observer* and **Bruce**

**Mitchell**. Do you have any opinion on those guys?

**RUSSO:** Well yeah, it just really bothers me. First of all, you've got to understand something, I never in my life claimed to be a great journalist, because the way I write ... I don't try to write to impress people. I don't try to write in a style like look at me, I'm smarter than you. I try to write in a style that people ... the common guy - the wrestling fan will understand. That's how I try to write, and that's the most important thing to me - that I write in a way that our fan is going to understand. I am not above anybody, and another thing too, every one of my columns, even if it is pro-WWF, I write what I truly believe in my heart. Nobody tells me to write my column, if I write it positive, or negative, whatever the case may be, **Vince McMahon** lets it go, then I write about what I truly, truly feel. And I try to write the truth.

The thing that just bothers me, primarily about Dave Meltzer, I just feel he thinks he's better than everybody else. I think he tries to talk down on people like he knows everything, and the reality of the situation is that Dave Meltzer doesn't know shit. Because all Dave Meltzer's information is second hand information, and whoever is giving him that information is putting their little spin



Though there are some things Russo can't talk about, like the Owen Hart lawsuit, he believes in telling readers as much as possible. (WOW)

on it, and whereas you
know - me - I'm there! I
know what's going on. I'm behind the scenes. I
talk to these guys on a daily basis. I know
what's true. I know what's bullshit, and I tell the
reader as much as I possible can.

Of course there are some things I can't talk
about. I even mentioned to you like the Owen
situation - anything involving a lawsuit, I can't
talk about, you know. But it just really bothers
me when you have a guy who feels that he's
above it all, when the reality is he's getting the
information second hand, and some of it right,
and some of it is absolutely bullshit, and he
doesn't have a clue as to what's right and what's
bullshit. And that's what bothers me. They can
be as critical as they want to be, but I would
much rather have a job and be in a position
where I know what I'm talking about rather than
have to rely on gossip.

**BEN:** I see where you're coming from. Obviously
those guys have to know someone in the
company. If you ever found out that someone
was a mole for one of these newsletters or
something like that, would you get mad at
them?

**RUSSO:** I don't necessarily know if they do
know someone in the company, and the only
reason I say that is because on so many
occasions, the information is wrong. It's just flat
wrong. I remember one time Dave Meltzer had
something in there about me, a couple of years
ago, it was rumored that one of the WCW
wrestlers died in a car crash ... that black guy ...
that Pit guy ---

**BEN:** Oh yeah. **Craig "Pitbull" Pittman.**

**RUSSO:** Yeah, the next thing I know I'm reading in Meltzer's newsletter that Russo was on the phone spreading this rumor. Just stuff like that. I can't fathom that they know somebody on the inside with credibility, because as I said, yeah half of their stuff is right on the money, and the other half is totally bullshit.

**BEN:** I see where you're coming from, but wrestling is a business obviously, where in the past, more than in the present, it's tough to get the truth. In my defense, because I'm someone who reads those newsletters, you don't know where the truth is coming from. It's hard to tell sometimes.

**RUSSO:** I don't necessarily agree with you on that, because why is it tough to get the truth? If Dave Meltzer ever called me, or a **Wade Keller** ever called me, or if any of those guys ever called me, I'm going to tell them the truth, and I'm going to tell them what I know. I have nothing to hide. If they ask me a question, I'm going to tell them the answer to the question. But the difference is, if they ask you a question, and you honestly don't know the answer to it, then you're a liar. Like you asked me about the IPO. I honestly don't know anything about that, and quite frankly, I really don't care. My plate is so full with writing television, I don't know about that. But to a Meltzer or a Keller, if they ask me that same question, and I answer it the same way, well I'm lying, and they're not getting the truth from me.

**BEN:** I understand, but to the average fan, it's not like you can get the entire truth like on the some of the uglier side of the business, like with deaths and stuff like that. It's not like you can

go to WWF.com and create a detailed itinerary of what was at **Brian Pillman**'s bedside. So sometimes you have to go to outside sources to find the truth.

**RUSSO:** Right.

**BEN:** This is something I've always wanted to see in American professional wrestling, have you guys, the TV writing team, ever thought of having the title like All Japan Pro Wrestling where there's no gimmick matches, no run-ins, no count outs, it's just two guys in a wrestling match. And not every match to be like that, because I know how it can get boring and monotonous, but just one title ---

**RUSSO:** I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this - it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American, and I don't want to sound like a big bigot or a racist or anything like that, but I'm an American ... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

**BEN:** Yeah, I really like All Japan.

**RUSSO:** Which is cool, but the reality of it is, that's a small minority of our audience.

**BEN:** But I'm not talking so much about the fact

that you would have to use the guys from
Japan, I'm just saying, two guys who I think are
good wrestlers, maybe **D'Lo Brown** and **Jeff
Jarrett**, who maybe don't have the interview
skills or the charisma of a **Rock** or **Steve
Austin**, but if you put them out there in longer
matches where they could show their in ring
talent ---

**RUSSO:** What do you call a longer match?

**BEN:** I don't know, maybe 12 minutes?

**RUSSO:** There is no way on television ---

**BEN:** Not on television. I mean more PPV, and
on television it would 6-8 minutes. I don't think
matches on television outside of the main event
should go more than 8 minutes.

**RUSSO:** But the thing you don't understand is,
and I can tell you first hand, the way television
is, and how short the matches are on TV - what
we've done now basically is we've basically
trained the audience. It's crash TV. It's in and
out. What's the finish? Let's get to the next
thing.

**BEN:** Absolutely.

**RUSSO:** That's the way we've trained the fan,
and I've got to tell you, I don't know how many
PPVs you go to, but a couple of years ago when
I wasn't writing the PPVs, and we just really
started this trend with the way the business is
now, we would have 15, 20, 25 minute matches,
because it was the PPV, 5 minutes in, people
were sitting on their hands.

**BEN:** That's true -

**RUSSO:** The house was silent. The reason being, we've trained these people a certain way, and now that's why I'm writing the PPVs, because basically, the PPVs need to be written the same way as television, because that's what the fans expect.

**BEN:** That is true, but you have to recognize that WCW does a lot of short matches too, but when you go on their PPV and see a really good "wrestling match" where the workrate is high, with like ... I can remember **Raven** and **Saturn** v. **Malenko** and **Benoit** on PPV, and it went like 12 or 13 minutes and the crowd was hot the entire time. You don't think that type of thing would work in the WWF?

**RUSSO:** I think that's a rarity. I watch everything that I can. I've never watched Mexican or Japan, because I don't give a shit. I live here, that's all I care about. But one thing I got to tell you, I was watching ECW last week, **Van Dam** and who--?



Stone Cold Jersey!
· WWF Attitude Tee
· NWO Bucket Cap
· Sable Attitude Bear
· Hogan Flag
· Goldberg T-Shirt

**BEN:** I won't even go into that.

**RUSSO:** No, but who's the other guy?

**BEN: Jerry Lynn**.

**RUSSO:** Ok Jerry Lynn. Now I got to tell you something, seriously, I was sitting here really enjoying the hell out of the match, but it got to the point even with me where it was like, OK end this. The thing is, you've got to understand, in this day and age, there are so many things for people to do that their attention span is so

short. Why do you think when there is a
commercial people change the channel? You
know what I'm saying?

**BEN:** I agree, but are you saying that
something that I thought was just as incredible,
I don't know if you saw the last ECW PPV, but
**Mike Awesome** versus **Masato Tanaka** and
they went out there for a good 13-15 minutes
and they had what people would call a \*\*\*\* or a
\*\*\*\* ½ match, is that going to be obsolete in
the WWF? In that match where they basically
stayed around the ringside area, and there's a
clean finish - even though I know they used
table and chairs - but there is no in the crowd
brawling, is kind of thing going to become
obsolete in the WWF you think?

**RUSSO:** I don't want to say obsolete, but I don't
see it going back in that direction. The only
reason I tell you that, I'm at every show, I'm
there, you put Rock and Mick in that ring with
microphones, the people will sit there for a half
an hour and be entertained. You put a wrestling
in that ring for over ten minutes, they want to
know, let's get to the finish, and let's go on to
the next thing. And you gotta understand from a
writing point of view, I am not dictating to these
fans. I am basically in the arena every Monday
and Tuesday night, I am in the arena, I am
listening to the fans. All that I am trying to do
from a television-writing standpoint is give the
masses what they want. Now, I'm not saying
give the smart wrestling fan what they want, I'm
saying give the masses, and that's my job.

**BEN:** I see that, and I don't want to beleaguer
it, but some would argue that it's true, that
WWF fans mainly sit on their hands for matches
that go more than 10 minutes, but some would

argue that it's because the quality of the in-ring wrestling isn't as good. Don't you think that if you put two good wrestlers in the ring, and I know we had talked about the Van Dam - Lynn thing, but I don't consider Van Dam to be that great of a wrestler, I look more to the Masato Tanaka - Mike Awesome example. Don't you think if you put two good wrestlers in there, who had a match which could stir the fans emotions, that that would ... look at what happened with **Sting** and Benoit? I know they still got killed by Raw when Raw opened, but they kept a much larger percentage than they had been by starting off their show with interviews. Do you think there's any validity to that?

**RUSSO:** No. I think they kept a much bigger number than they did, because that was really a well-booked match where you couldn't call the outcome. Benoit isn't going to beat Sting in the middle of the ring, and Sting isn't going to beat Benoit, so what are they gonna do? That was the appeal to the match.

**BEN:** OK.

**RUSSO:** Don't get me wrong, I love to see a good wrestling match, but my job is ... I get paid to give the people what they want, and whether I agree or disagree with them is not my job. I'm not writing television to please Vince Russo. I'm writing television to please the masses, and like I say, when I go out in a crowd, and I see the response from a Mick - Rock promo, and response to a wrestling match, I know what they want to see. And again, it's not Vince Russo writing TV for Vince Russo, I'm just trying to give the people what they want.

## Part 1 · Part 2 · Part 3

**E-mail Ben Miller | Miller Time archive**

**WCW · WWF · ECW · Indies · Int'l**



Copyright © 1999 SportsLine USA, Inc. All rights reserved.

This website is not sponsored or endorsed by the WWF, WCW or ECW. This is not an official site.



# EXHIBIT / ATTACHMENT

## _____G_____

(To be scanned in place of tab)



# MEMORANDUM

**TO:** Brad Siegel
**FROM:** Meredith Young
**DATE:** December 14, 2000
**RE:** WCW Audience Composition
**CC:** Aaron Blitzstein, Gary Juster, Craig Leathers, Rob Garner, Sharon Sidello, Annette Yother,  Alan Sharp, Ken Leiker, Diana Myers, Kelley Komminsk, Kathy Shelley, Chelsea Reeves, Lisa Sturgis

Detailed below are audience composition figures for WCW's cable programming.  The percentages represent combined averages of NITRO and THUNDER produced during September, 2000.

Let me know if you have any questions or require further information.

| TERRITORIES | | EDUCATION | |
|---|---|---|---|
| Northeast | 25% | No College | 40% |
| East Central | 18% | Some College | 24% |
| West Central | 10% | 4+ years of College | 11% |
| Southeast | 26% | **OCCUPATION** | |
| Southwest | 11% | White Collar | 27% |
| Pacific | 9% | Blue Collar | 42% |
| **COUNTY SIZE** | | Not Working | 32% |
| A | 28% | **PRESENCE OF CHILDREN** | |
| B | 33% | Any less than 18 | 52% |
| C & D | 39% | Any less than 12 | 37% |
| **HOUSEHOLD SIZE** | | Any less than 6 | 17% |
| 1 Person | 11% | Children 6-11 | 26% |
| 2 Persons | 27% | Children 12-17 | 32% |
| 3+ Persons | 23% | **ADULTS** | **78%** |
| 4+ Persons | 39% | **FEMALES** | |
| **HOH AGE** | | 18+ | 26% |
| Less than 34 | 28% | 18-34 | 11% |
| 35-54 | 50% | 18-49 | 17% |
| 55-64 | 11% | 25-54 | 15% |
| 65+ | 11% | 55+ | 7% |
| **HOUSEHOLD INCOME** | | **MALES** | |
| $20K-$30K | 15% | 18+ | 52% |
| $30K-$40K | 10% | 18-34 | 21% |
| $40K-$60K | 24% | 18-49 | 38% |
| $60K+ | 20% | 25-54 | 35% |
| **RACE** | | 55+ | 11% |
| White | 79% | **NON-ADULTS** | |
| Non-White | 21% | Kids 2-11 | 12% |
| | | Teens 12-17 | 10% |

Source: Nielsen Media Research, PNFII 9/00



PLAINTIFF'S
EXHIBIT
72

WCW 019288
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## _____H_____

(To be scanned in place of tab)

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

WILLIAM BOULWARE, JR.,        )
4    et al.,                       )
                                   )
5            Plaintiffs,           )
                                   )
6       vs.                        )  CIVIL ACTION FILE
                                   )  NO. 1:01-CV-0915-CC
7    WORLD CHAMPIONSHIP WRESTLING, )
     INC.,                         )
8                                  )
             Defendant.            )
9                                  )

10

11

12
    ─────────────────────────────────────────────
13          DEPOSITION OF WILLIAM BOULWARE, JR.
                 NOVEMBER 16, 2001
14                  10:09 A.M.
    ─────────────────────────────────────────────
15

16

17

18

19

20

21

22

23

24

25          CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
                        404-237-1990
                        800-317-5773

Page 22

1  wrestlers.
2  Q   Do they tape it, or do they broadcast it
3  live?
4  A   Tape it. And then I get it -- I pay to get
5  it put on TV.
6  Q   Well, let me go back. Can you tell me the
7  name of some of the production companies, the
8  television companies you've used?
9  A   I use who I named. Lot of people I know
10  directly. I use a guy out of -- out of Griffin,
11  Georgia. His name is Murrill. I can't think of
12  Murrill's last name, but most of the people own a
13  little small company. You probably know --
14  Q   Do they provide all the equipment and all
15  the people to help?
16  A   Yes. No. No. They just come in and film
17  the show. I have most of my guys helping with setup,
18  and, you know, I could tape the show.
19  Q   Now, when you pay all these individuals do
20  you withhold Social Security and employment taxes on
21  them, or do you pay them as independent contractors?
22  A   I pay them independent contractors, but I
23  also -- I mean, I pay all -- I pay tax on them.
24  Q   So you withhold taxes on them?
25  A   No. I don't withhold taxes on them.

Page 23

1  Q   So they're responsible for paying their own
2  tax?
3  A   Right.
4  Q   Is that true for everybody that you pay?
5  A   Oh, yes. Yes. They sign a waiver saying
6  that they responsible for their own taxes.
7  Q   So everybody you hire through Boulware
8  Enterprises is an independent contractor --
9  A   Yes.
10  Q   -- of Boulware Enterprises?
11  A   Yes.
12  Q   Do you keep records on the different people
13  you hire?
14  A   Oh, yes.
15  Q   So you have all the pay records of everyone
16  you pay?
17  A   I got everything.
18  Q   Every -- every event you've ever had?
19  Everybody --
20        (Whereupon, a discussion ensued off the
21  record.)
22  BY MR. PONTZ:
23  Q   It's hard, Mr. Boulware. If you will just
24  -- and it's my fault as bad as you, when we got into
25  kind of a conversational back and forth. Normal

Page 24

1  people talk over each other a little bit because we
2  to pause after your answers, and if you try to just
3  to pause after your answers, and if you try to just
4  pause after my question and make sure I'm done.
5  A   Yes.
6  Q   Let me go back. So you think you have all
7  the records on all the shows that Boulware Enterprises
8  has ever put on?
9  A   Yes. I know between my wife and my
10  accountant, yes, they have them.
11  Q   What is your accountant's name?
12  A   James Brown.
13  Q   The same gentleman?
14  A   Yes.
15  Q   Do you know if he's a certified public
16  accountant?
17  A   Yes, he is.
18  Q   And does your wife work for Boulware
19  Enterprises, Inc.?
20  A   Yes. I guess.
21  Q   Does she get paid?
22  A   No.
23  Q   So she helps you, but she's not getting
24  paid?
25  A   I mean, we both don't get paid. We just run

Page 25

1  the company.
2  Q   You say you put the television shows that
3  you tape, the wrestling shows, on television?
4  A   Yes.
5  Q   Where have you had those put on television?
6  A   I just basically, I been running a little
7  small -- like in Columbus, Georgia, basically a little
8  cable station that I -- anywhere that I could get it
9  on.
10  Q   Do you know what cable station in Columbus,
11  Georgia?
12  A   Channel 16. I run that for two years.
13  Q   Do they pay you for that?
14  A   No, no. Pay them for that.
15  Q   Do you know where the Channel 16 -- is that
16  on cable?
17  A   It's -- it's on cable.
18  Q   Is it a public access station?
19  A   It's a little small station.
20  Q   Do you know the call letters or anything
21  like that?
22  A   No. I have to look it up.
23  Q   Who do you deal with when you deal with the
24  Channel 16?
25  A   Where I previously took my show off there,

Page 46

1    A   Yes.
2    Q   And how long were you with that group?
3    A   About six months.
4    Q   And did you continue wrestling through the
5    '80s?
6    A   Yes. All through the '80s.
7    Q   Were you just wrestling at that time, or
8    were you doing anything else in the wrestling
9    business?
10   A   Basically I was doing wrestling.
11   Q   When did you first make contact with WCW?
12   A   WCW -- it was not WCW then. It was -- I was
13   with NWA. When they -- when Turner Broadcasting
14   bought WCW from the Crockett family out of Charlotte,
15   North Carolina, I was already working with the
16   Crockett family. So when they bought them, I was one
17   of the first people that came over.
18   Q   What were you doing with the Crocketts?
19   A   Wrestling.
20   Q   So you were wrestler when then it was NWA?
21   A   I was. Yes. I was on one of the first
22   pay-per-view TV that they had.
23   Q   Did you wrestle under the name Rocky King?
24   A   Yes. I wrestled under the name Rocky King,
25   and I also wrestled under the name Little Richard

Page 47

1    Marley.
2    Q   M-A-R-L-E-Y?
3    A   Yes. Richard Marley. Yes. Marley, yes.
4    Q   And so were you still wrestling when the
5    company became WCW?
6    A   Yes.
7    Q   How many years did you  -- well, let me,
8    back up from that. Do you remember what year that
9    was?
10   A   If it was, like, the -- if I'm not
11   mistaken, it was, like, the first of the '90s.
12   When -- 1990s.
13   Q   First couple years in the '90s?
14   A   Yes. Like '91, if I'm not mistaken.
15   Q   And did you continue wrestling with WCW?
16   A   Yes.
17   Q   Were you ever signed to a contract?
18   A   No.
19   Q   You got paid each time you appeared?
20   A   Yes.
21   Q   Was it a set fee?
22   A   Well, in some cases. Back then, the thing
23   what they call they pay you by the match. Like, for
24   example, you get some money for your first match,
25   depending on where you wrestling. If I'm wrestling in

Page 48

1    the Omni, where you're going to have probably 18,000
2    people, your pay will go up. You wrestle in a little
3    place, say like a club in Georgia and you got 4,000
4    people, you get a little percentage of that.
5    Q   And this is the way most of the wrestlers
6    were paid?
7    A   Yes.
8    Q   They would be paid for each match?
9    A   Lot of white guys under contract at the
10   time. I remember they first started giving contracts
11   out when I was there. I remember some guys when they
12   first walked in the door.
13   Q   But there were a lot of white guys also like
14   you just getting paid by appearances?
15   A   Well, nothing but white guys.
16   Q   So most of the -- most of the white guys
17   were getting paid by appearances like you; right?
18   A   Yes. Some of them were, yes. Some of them
19   were.
20   Q   Do you know how much were you making at the
21   time for the different appearances? Do you recall?
22   A   It varied. Anywhere from like we would do
23   TV, morning TV at Turner Broadcasting, Channel 17 back
24   then. And you'd get like $75. 65, $75 and you would
25   go to a house show. It would be a place people pay to

Page 49

1    get in. It would go anywhere from $100 to, I'd make
2    up to $500 a night.
3    Q   And that's what a lot of the wrestlers were
4    making? Same amount of money?
5    A   Yes.
6    Q   And this was the early '90s?
7    A   Yes. Real early '90s, yes.
8    Q   And did you continue wrestling with WCW as
9    the years went on into the mid-'90s?
10   A   Yes.
11   Q   Were you still just wrestling in, let's say,
12   1994, 1995?
13   A   No. A couple of times I got -- I had a
14   couple altercations, and basically they just quit
15   using me.
16   Q   You had altercations?
17   A   Yes.
18   Q   Who did you have altercations with?
19   A   Well, a guy -- I was -- one time they call
20   -- they changed my name to Little Richard Marley,
21   painted me up, put paint on my face.
22   Q   What kind of paint?
23   A   Wall paint. There was a joke going around.
24   You know, they painted me up, like they say the nigger
25   that was standing out in the yard. And, you know, for

Page 50

1  me it hurt me, but I needed to work. There was only
2  -- it was only -- only player in town, so you had to
3  put up with it, so Michael one time called me nigger
4  in front of the boys.
5  Q   Who?
6  A   Michael Hayes.
7  Q   Is that another wrestler?
8  A   Yes. He's still working. Now he's working
9  for the Federation now.
10  Q   Mr. Boulware, hang on a second. Do you know
11  his real name?
12  A   Michael Hayes. Half of them I didn't deal
13  with them on, you know, personal.
14  Q   When was this?
15  A   It was, like, 1991 or '92.
16  Q   Whose idea was it to put paint on your face?
17  A   Arn Anderson. I never forget that. They
18  was setting in the office, and that they talking about
19  paint the nigger up, and it was a joke.
20  Q   Did you hear them say --
21  A   Yes.
22  Q   This was back in '90, '91?
23  A   Yes.
24  Q   Let's move forward then into the mid-'90s.
25  In '94, '95 were you still wrestling with WCW, or had

Page 51

1  you stopped wrestling by then?
2  A   I was in and out, because we had territory
3  back then. You had places like Florida Championship
4  Wrestling. You had Kansas City Champion where NWA and
5  World Championship Wrestling kind of like a
6  partnership because NWA was the signal name before WCW
7  came in, so they had all these places you could go
8  wrestle back then, so they might -- you know, I'd
9  get -- like I find the time, I think I went to Kansas
10  City and wrestled for a while.
11  Q   Was it a different organization?
12  A   Well, they still NWA. They was still NWA
13  partnership.
14  Q   But that wasn't WCW? You wrestled with NWA?
15  A   It was NWA was there before -- it was NWA
16  before it was WCW.
17  Q   I understand. But were you wrestling for
18  WCW, or were you wrestling for some other
19  organization?
20  A   I worked for a different organization also.
21  That's the question you asked.
22  Q   Other than wrestling services, did you ever
23  provide other services to WCW?
24  A   Yes, I did.
25  Q   What other services did you provide?

Page 52

1  A   I was -- I was in production.
2  Q   Let's go one at a time. Tell me when you
3  were in production with WCW?
4  A   I was in production from '90 -- I think
5  last of '96 until -- until -- until -- basically
6  until I left.
7  Q   When did you leave?
8  A   I really didn't -- never did leave. Never
9  left. I had a contract until the time they was
10  closed.
11  Q   What kind of work -- when you say you were
12  in production, what were you doing?
13  A   Ring crew. You know, ring.
14  Q   What were you doing on the ring crew?
15  A   Driving the ring back and forth to a city.
16  Q   Did you do that in 1996?
17  A   During '97-'98.
18  Q   Did you do it after 1998?
19  A   No.
20  Q   When you drove the truck, who did you drive
21  it with?
22  A   Oh, God.
23  Q   Do you remember any of the names of the
24  people?
25  A   Gordon Nelson.

Page 53

1  Q   Just Gordon Nelson?
2  A   Yes.
3  Q   And were you paid for each time you drove
4  the truck?
5  A   Yes. All -- well, I was an independent
6  contractor.
7  Q   Each time you drove the truck and provided
8  services, you'd receive a set amount of pay?
9  A   Yes. I was independent contractor, and the
10  white guy with me was an employee.
11  Q   Did you work every day doing truck driving?
12  A   Yes. I was home three or four times a
13  month.
14  Q   Three or four times a month you were home?
15  A   Yes.
16  Q   So the rest of the time you were on the
17  road?
18  A   Home.
19  Q   Did you sign a contract to do these
20  services?
21  A   No.
22  Q   But you were an independent contractor?
23  A   Yes. At that time.
24  Q   And you didn't drive the truck anytime after
25  '98?

Page 58

1   A    Every day. Well, once they let me become a
2   referee that I begged for so long, I did it every
3   night that I was at the show. They would let me --
4   they made a joke. They give me the dog matches.
5   Q    Let me back up. Who let you become a
6   referee?
7   A    Who let me become a referee? Well, it
8   started with, I asked Eric Bischoff, the president,
9   and he told me I wasn't qualified, and I told him I
10  was -- I was wrestling before he got in the business.
11  How could he tell me that I wasn't qualified?
12  Q    But you'd never refereed before?
13  A    Yes. I'd refereed plenty of times.
14  Q    With WCW?
15  A    No.
16  Q    Where did you referee?
17  A    Just different shows.
18  Q    Little small, local shows?
19  A    Yes. But it's the same thing. Once you
20  know how to do it, just like minor league baseball.
21  Play pros.
22  Q    Were those on live television?
23  A    Some of them was on TV.
24  Q    Were they on live TV?
25  A    No. Not live TV.

Page 59

1   Q    Were some of the WCW matches on live TV?
2   A    Yes.
3   Q    So Eric said he didn't think you were
4   qualified?
5   A    And I told him I thought he was being
6   racist, and he finally said, no.
7        I said, well, if you say no, you ain't
8   racist, they got shows in Disney.
9        He'd say, fine. Go stay away from me.
10  Q    So he let you go referee down there?
11  A    Yes.
12  Q    At the tapings in Universal Studios?
13  A    Yes.
14  Q    Did you ask anybody else to be a referee?
15  A    Yes. I begged Jody Hamilton.
16  Q    Did Jody select referees?
17  A    Jody was head of the referees.
18  Q    When was this?
19  A    The whole time until, basically, they --
20  about a year before they left.
21  Q    How do you know he was head of referees?
22  A    He wrote the schedule. You go in the
23  office, he hired referees. He told you who he's going
24  to hire and who going to work here and there.
25  Q    So you're saying he scheduled where the

Page 60

1   referee goes. How do you know he hired referees?
2   A    I know. I can tell.
3   Q    Did you see him hire referees?
4   A    He hired his son.
5   Q    Mr. Boulware, how do you know he made the
6   decision to hire the referees?
7   A    I seen him hire people.
8   Q    Did you see him hire people?
9   A    Like, for example, everyone that was
10  refereeing from where I left, came in after I started
11  wrestling. I saw guys, I could think, like, Nick
12  Patrick one of them, his son. I know all of them
13  names. I can't think of them now.
14  Q    Who else were the referees that were there
15  at the time?
16  A    Nick Patrick. I can't think of their names.
17  I can't think of the name, but I got picture with all
18  of them.
19  Q    You think Jody Hamilton hired them?
20  A    I know Jody Hamilton hired them.
21  Q    How do you know that?
22  A    Because I seen -- I mean --
23  Q    Did Jody ever say, I hired the referees?
24  A    Yes.
25  Q    When did he say that?

Page 61

1   A    He told me that several times. As a matter
2   of fact, he got mad when I -- he saw me refereeing on
3   TV, and he got mad, and I came to his school. He say,
4   you know that no black person go over me and become no
5   referee.
6        I told him what Eric Bischoff said. He
7   said, I don't give a hoot who told you. Then he cut
8   my booking down -- I had four booking a month that
9   time -- because Jody didn't like the -- the fact that
10  I became a referee.
11  Q    This was back in 1996?
12  A    No. This was 1997; '96-'97. I can't recall
13  the exact year.
14  Q    It was still in the '96, '98 time?
15  A    Yes.
16  Q    So you got opportunities to referee, and we
17  were trying to figure out how many times you think you
18  refereed in '96 or '97 or '98. Do you have some
19  estimate of how many times that was?
20  A    Well, I was at three to four shows a week,
21  and I referee all the dog matches.
22  Q    What do you mean by dog matches?
23  A    The dog matches, it's a match that they film
24  but they don't put on TV. And, quote, from Doug
25  Dellenger, who was the security guard, that is the job

Page 62

1  the nigger do. He said that to me.
2      Q    When did he say that to you?
3      A    He said that to me, I can't remember the
4  exact date, but I report -- I got it all written
5  down. I got a document all of it.
6      Q    Do you have those documents?
7      A    I got them. My mother got them. Yes. I
8  got a document. As a matter of fact, he stopped me
9  one time. I was out putting up the ring, and
10 Dellenger is head of security. I was putting up the
11 ring and stuff. We was coming in. He told people,
12 cut the music. I saw him walk to me. He said, you
13 know, he ain't having that nigger stuff around here.
14        I lay my head, and I said, Doug, I know
15 you a long time. Why would you say that in front of
16 white people? He just walked off.
17     Q    When was this?
18     A    I can't remember the year. It had to be
19 about '98.
20     Q    Where was it?
21     A    I can't remember the time. I got a
22 document.
23     Q    Was it in the arena?
24     A    It was in the arena, because as a matter of
25 fact, I called Time Warner at the time and told them

Page 63

1  exactly what he said to me.
2      Q    What arena was it?
3      A    I can't remember exactly. I got the
4  document.
5          MR. PONTZ: Mr. Breedlove, if I may, has
6  Mr. Boulware provided you with these document?
7          MR. BREEDLOVE: It's his deposition.
8          MR. PONTZ: I understand. I'd like to
9  ask you, if I could, has he provided you with the
10 documents he's talking about?
11         MR. BREEDLOVE: You've asked him about a
12 number of documents. I'll be more than happy to
13 discuss what he has provided me with if it's
14 properly --
15         MR. PONTZ: You filed some initial
16 disclosures in this case, and those require you to
17 provide at least a listing, if not a copy, of the
18 documents you think are relevant to your client's
19 claims.
20         MR. BREEDLOVE: Right.
21         MR. PONTZ: Do you think those documents
22 are relevant to your client's claims?
23         MR. BREEDLOVE: They're post -- they're
24 prediscovery, and the things that I have to supplement
25 the initial disclosures with versus the things that

Page 64

1  we've come up with subsequent to that submission of
2  those. Based upon what questions were asked in the
3  initial disclosures, I'm not sure they're covered by
4  what we have or what he gave me, but I'll check.
5          MR. PONTZ: Are --
6          MR. BREEDLOVE: We're not withholding
7  anything, is what I'm saying.
8          MR. PONTZ: I understand.
9          MR. BREEDLOVE: I've just never been
10 asked for all them.
11         MR. PONTZ: Are all your claims from
12 1990 forward? Excuse me, '99 forward?
13         MR. BREEDLOVE: Yes.
14         MR. PONTZ: He's not pursuing any claims
15 from pre1999?
16         MR. BREEDLOVE: No.
17 BY MR. PONTZ:
18     Q    Mr. Boulware, do you understand you're not
19 pursuing any claims pre1999?
20     A    No.
21     Q    You're not?
22     A    Wait a minute.
23     Q    You're not pursuing any claims for anything
24 that happened before 1999?
25     A    No. No. Everything happened --

Page 65

1      Q    Everything after '99?
2      A    Right. You asked me questions about stuff
3  that happened before.
4      Q    I'm just trying to make it clear. That's
5  fine. Okay. So we talked a little bit about
6  referees?
7      A    Yes.
8      Q    And you refereed, you said, in 1996 and 1997
9  and a little bit in 1998?
10     A    Yes, sir.
11     Q    What other services did you provide to WCW?
12 You talked about wrestling with them in the '90s for a
13 period of time. You talked about working on the ring
14 crew. You talked about refereeing with them. Did you
15 provide any other services to WCW?
16     A    Yes, I did.
17     Q    What else did you provide?
18     A    One of them was, I was involved in an
19 investigation.
20     Q    Other than that, did you provide any other
21 services to WCW? Is that a no?
22     A    A no. Not as far as I remember. But I
23 dealt with a lot of people through WCW since then.
24     Q    But you didn't provide any services to WCW?
25     A    They told me, don't do nothing.

Page 70

1  18 years in the career. You got to understand, most
2  of these guys we used to have a circle, and you see
3  these guys all the time. And like you might -- you
4  -- well, you at arena or not, you see them. You-all
5  go to the same places. I go to places looking for
6  talent. I see Nick Patrick. I'd see JJ Dillon. I'd
7  see Arn Anderson. I'd maybe see them once or twice a
8  week.
9  Q   My question, though, about the referees.
10  A   Yes.
11  Q   You'd remembered Nick Patrick's name, but
12  you said you couldn't remember the names of other
13  referees?
14  A   The name Nick Patrick -- give me a minute.
15  Q   Please?
16  A   I'll give it to you. Nick Patrick? It's
17  just too far. I mean, I know -- they right in front
18  of me, but I can't --
19  Q   Well, if you do remember, if you will just
20  let me know, or let your lawyer know if it's not
21  during the course of the day.
22  A   Okay.
23  Q   How do you know that -- you said a minute
24  ago that you thought they were employees. How do you
25  know they were employees?

Page 71

1  A   Well, Terry Taylor told me.
2  Q   What did Terry tell you?
3  A   Well, it was a guy came in by the name of
4  Chip Crockett. His family used to own the wrestling,
5  and we all -- Pez, myself, everybody was sitting there
6  and he became an employee.
7  Q   Was he a referee?
8  A   No. He was an employee. So I went to Terry
9  and, I'm saying, how did this guy, white, come on and
10  ain't had no experience in the business and become an
11  employee?
12  He said, to me, this is the way we
13  operate. Turner told us we don't need to use you-all
14  niggers. Just like that. Something about survey or
15  whatever.
16  And I kept saying, why?
17  He said, we got it from the big office.
18  They told us we don't have to use you-all.
19  And I asked Terry. I said, well, why?
20  He said, we make employee to people, white
21  people, not black people.
22  Q   When did he say this to you?
23  A   Terry told me this in -- I had this
24  conversation with a few of them in the last few months
25  before they closed.

Page 72

1  Q   Well, back up for a second. You had that
2  conversation with --
3  A   Terry Taylor --
4  Q   -- Terry Taylor. When was that?
5  A   That was, like, it had to have been in '98
6  or '99.
7  Q   Where did that happen?
8  A   At one of the arena.
9  Q   Was anybody else around?
10  A   No. Not at the time.
11  Q   And you said you've had a similar
12  conversation with other people?
13  A   Yes, I have.
14  Q   Who have you had that conversation with?
15  A   Well, I had a conversation with Arn
16  Anderson.
17  Q   When was this?
18  A   Shoot, probably -- about a month or two
19  months before you-all closed, before Turner closed. I
20  guess most of the guys was -- I thought they was
21  coming down off their bigotry they had been with us,
22  but they were mad at Turner because they figured they
23  had no job no more. I don't know what it was.
24  I run into JJ. I run into Paul Orndorff.
25  Paul called me about using the kid in my wrestling

Page 73

1  organization, and I replied to Paul, I said, why now
2  you-all want to work with me when I been trying to be
3  a referee, I been trying to put my company out there?
4  And Paul basically told me that they had
5  got some word from Turner Sports that black people
6  don't buy tickets; they don't use no niggers.
7  Q   Paul said that to you?
8  A   Yes. Paul said that to me. I was Paul
9  partner one time, so I been knowing him for over the
10  period of time, and the word nigger, buckwheat,
11  crackhead, you got to understand, was something they
12  used. I mean, it wasn't --
13  Q   When you say they, who are they?
14  A   Well, Jody Hamilton, JJ Dillon, Paul
15  Orndorff, Mike Wenners. All employees. Doug
16  Dellenger.
17  Q   Let me get back to your point. We'll talk
18  about that a little more, but let me get back to your
19  point. You said that you believed referees were
20  employees, and what I want to know is, what evidence
21  do you have --
22  A   Nick told me.
23  Q   -- that they were employees?
24  A   Me and Nick was going down the road one day,
25  and Nick, I would say, about, I need some insurance

Page 74

1   for my daughter.
2          And Nick said, *you don't have no*
3   *insurance?*
4          I said, well, could I have insurance?
5          He said, *well, you know, we all employee.*
6   *We got insurance.*
7   **Q     Who?**
8   **A**   Nick Patrick.  That was Jody Hamilton's
9   son.
10  **Q     Did he say who the "we" was?**
11  **A**   The "we," that's the referees.  That's what
12  he was saying to me.
13  **Q     Did he say referees?**
14  **A**   He said referees, we have insurance.
15  **Q     Did he say the referees have insurance?**
16  **A**   Yes.  He said he had insurance, and we all
17  have insurance.  I took that to be that he was talking
18  about the referees.
19  **Q     That's what you believed he was talking**
20  **about?**
21  **A**   Right.
22  **Q     But he didn't specifically say —**
23  **A**   He said he had insurance.
24  **Q     But he didn't say the referees have**
25  **insurance?**

Page 75

1   **A**   He said, I got insurance, and we have
2   insurance.  So the we, I took --
3   **Q     Is that all the evidence that supports your**
4   **belief that they were employees?**
5   **A**   Well, like I say, Chip Crockett, he was on
6   the production crew, and he had never did no
7   production, and he came right in and made insurance.
8   **Q     My question, though, Mr. Boulware, has to do**
9   **with referees, and you said Chip Crockett was not a**
10  **referee?**
11  **A**   No.  He wasn't.
12  **Q     So is the evidence that you believe the**
13  **referees were employees, that conversation you just**
14  **mentioned with Nick Patrick?**
15  **A**   Yes.  And lot more stuff that was going on
16  around the time.
17  **Q     What else?**
18  **A**   Like I just said, the Crockett, those
19  events.  Guy would sit at home and wouldn't get -- I
20  mean, didn't come to work and was getting paid.  I
21  mean, it was just -- it was a racist atmosphere.  You
22  got to be there to know about it.
23  **Q     Again, Mr. Boulware, you need to listen to**
24  **my question carefully.  What I'm asking you for is all**
25  **the evidence that you believe supports the statement**

Page 76

1   that you made that the referees were employees?  And
2   you told me about Nick Patrick.  You told me about
3   Chip Crockett.  Is there any other evidence that you
4   have that you believe supports your statement --
5   **A**   Yes.
6   **Q     -- that the referees were employees?**
7   **A**   *Some of the conversation I had with guys*
8   like Kevin Sullivan.
9   **Q     What conversation did you have with Kevin?**
10  **A**   Kevin basically told me that -- you want to
11  know what he told me, or just about the employee?
12  **Q     I want to know what he told you.**
13  **A**   Well, he told me basically I was getting
14  screwed.  He told me that I put in for the minor
15  league program, that they had two more white groups,
16  out of -- one out Nashville, one out of Ohio.  Gave
17  them $100,000 apiece and the truck and gave them rings
18  and stuff like that.
19  **Q     Why does that make you believe that the**
20  **referees were employees?**
21  **A**   Because they did everything else like that.
22  I mean, that was -- that was their policy, treating
23  blacks bad and whites -- I mean the good old boy
24  system.
25  **Q     So are you basically telling me the reason**

Page 77

1   you feel like the other referees were employees was
2   because there was discrimination going on?
3   **A**   And Nick told me.  Yes.  And then Arn
4   admitted -- well, Terry admitted to me that they was,
5   like, employees around there that had came on, white
6   guys, since I'd been there all them years and wasn't
7   no employee.
8   **Q     Not specifically referees?  Just other**
9   **people?**
10  **A**   Referee and other people.  Nick Patrick, for
11  example.  Because I asked him about -- I was a
12  production and referee, so the job was basically about
13  the same.  I mean, it was different, but everybody was
14  on that same -- it was employees, and, you know, you
15  be independent contractor.
16  **Q     Was Nick -- do you know, was he providing**
17  **any other services?**
18  **A**   No.  He didn't have to.  *His daddy was boss.*
19  **Q     Do you know what Nick Patrick did for WCW?**
20  **A**   Referee.
21  **Q     Do you know if he did anything else?**
22  **A**   Well, they made him -- also later on they
23  made him road agent.
24  **Q     So he was providing road agent services?**
25  **A**   Yes.  But wasn't no black road agent either.

Page 94

1  Q   Let me finish, please. I know it's hard. I
2  know it's hard. Did you approach WCW and say to the
3  WCW folks, I have a wrestling promotion, and I'd like
4  you to send your talent to wrestle with my promotion?
5  A   Yes.
6  Q   Who did you talk to about that?
7  A   Down the line --
8  Q   Give me one at a time?
9  A   You want Time Warner?
10  Q   At WCW?
11  A   JJ. I --
12  Q   When did you talk to JJ about it?
13  A   I talked to JJ on several occasions.
14  Q   Do you remember what years these were?
15  A   It was the last few months of the thing I
16  kept, because I just didn't want to sue this. I
17  wanted to come back to work, and you know --
18  Q   What did JJ say?
19  A   Well, he basically told me -- a couple times
20  he gave me the -- he'd talked to the big people, and
21  then he kind of, like he said to me a couple time that
22  they just -- they didn't want to fool with me.
23  Q   So JJ said that wasn't his decision to make?
24  A   Well, he said that he had to talk to the
25  other people at Turner. But he was in charge.

Page 95

1  Q   Who is the next person other than JJ that
2  you talked to?
3  A   Talked to Terry Taylor.
4  Q   What did you ask Terry about?
5  A   I asked -- I showed Terry what I had. We
6  sat down and ate lunch. I showed him about, you know,
7  the group of guys I'd put together. My ring. I was
8  insured. I show him my charity groups that I was
9  doing right here in Atlanta.
10  Q   And what did he indicate about --
11  A   He told me it was real good. He told me it
12  was real good.
13  Q   Did he say he was in a position to hire --
14  A   Yes.
15  Q   -- your company?
16  A   He told me yes, he was going to go to JJ.
17  He thought this was a great idea. Give it a little
18  time. I kept calling him back.
19  Q   Was this during the few months before WCW
20  closed down?
21  A   I talked to him, yes.
22  Q   Is that when you talked to him? That period
23  of time?
24  A   Yes. I talked to him over the period of
25  time for two years, the last one from '99 to probably

Page 96

1  I have records most of them, records of calling and
2  talking to them. Yes. I run into him all the time,
3  like we go to -- I go places and scout for talent,
4  and I would see Terry. I'd see Arn and guys like
5  that, and we knew each other.
6       We was sitting there talking, and at the
7  end they just basically -- would most of them
8  basically told me the truth. That they wouldn't --
9  when they call, that Turner told them they did a
10  survey, whatever, and black people weren't coming to
11  the matches, and they weren't using all the blacks.
12  Q   But you weren't talking about wrestling now.
13  You're talking about using wrestlers from WCW to --
14  A   I talked to all of them. All the wrestling
15  too. I still could wrestle.
16  Q   Is your claim on behalf of Boulware
17  Enterprises, just the claim that they didn't use you
18  and sign a contract with you to provide training and
19  wrestling opportunities?
20  A   Not only that. I was shut out. I was shut
21  out of the arena. I went to Channel 34 one time. I
22  got pay-per-view there too also, and a few small
23  wrestling organizations. I tried to get -- to buy a
24  spot on TV. They looked at my tape, and they came
25  back -- basically I sit there and told them that we

Page 97

1  got Turner stuff coming out here, legal problem with
2  Turner, like I haven't sued nobody. We can't deal
3  with you.
4  Q   Who told you that?
5  A   There are people at Hot Atlanta. That was,
6  like, a year, year and a half ago. I went to, like,
7  for example, Jody Hamilton to sell a lot of rings that
8  he got from WCW, and I try to buy rings and stuff, but
9  they triple the price on me.
10  Q   How do you know that?
11  A   Because I get people that bought rings.
12  Q   Like who?
13  A   I got a list of them. I got of list of
14  people that Jody had sold rings they had made, and if
15  you want to know the truth, they overcharged WCW for
16  the charge of the ring. They had to get the ring, and
17  they'll sell it to -- I mean, I had people -- several
18  people approach me about rings. I had went to shows
19  and seen people with WCW logos on the ring, and I
20  went, like, where you-all get that from?
21       Jody Hamilton.
22  Q   You have this list in your possession?
23  A   I got it somewhere. I don't know where. I
24  kept a lot of documents on all the stuff that went on.
25  Q   We need you to find that documentation.

Page 98

1  We're going to make a request of your attorney for the
2  appropriate documentation.
3      A   I got enough of it.
4      Q   Anything else that you believe that we
5  haven't talked about that you were discriminated
6  against on the basis of your race in placement with
7  WCW?
8      A   Yes. Oh, yes. Few things. You showed me
9  that policy there. I think if you look under there,
10 that they have a policy, no touch. You put your hands
11 on someone, you get fired. I had a guy by the name of
12 Steve Barry, who was the head of the production crew
13 for all the setup, walked up one day mad and pushed
14 me. I had four different witnesses. Nobody --
15 people that seen it. They walked to me and said, why
16 did he do that to you? And I called Turner. I called
17 Time Warner, everybody.
18     Q   When was this, Mr. Boulware?
19     A   It was, like, it was -- it was '90 -- it
20 was actually before '99, but I'm going to continue the
21 story. He pushed me, and I called everybody and made
22 a complaint about it. He was still working there to
23 the day they closed, but I saw this gentleman in the
24 year of -- I saw him a couple of times, but I saw him
25 one time at the Good Old Day. Good Old Day was a

Page 99

1  place we go, all WCW, talented young guy would go and
2  wrestle outside. They do it on Friday night.
3         So I run into Steve one time. I was
4  really mad at him. He called me to the side. He
5  apologized to me about it, and he said to me -- and I
6  asked him, I said, well, you know, my whole thing is,
7  why would they do that? They know this is against the
8  law.
9         He said, you know Buff slap the cameraman.
10 They don't do nothing to us for doing that to you-all.
11 He just walked off.
12     Q   And you said this incident with Mr. Barry
13 was before 1999?
14     A   No. No. He slapped me. He pushed me
15 before '99, but he told me in 2001 why he did it, and
16 wasn't nobody going to bother him about it.
17     Q   Why did he push you?
18     A   He said because nobody going to do nothing.
19 He was upset. Something happened to his family life,
20 and he just at the time, anybody ran into him, he
21 didn't care. He pushed me. I had evidence he did it,
22 and he made the statement to me about Buff slapping
23 the cameraman. He said, you see what they did to
24 Buff? They didn't do nothing to Buff. He slapped the
25 guy. Steve Barry said this.

Page 100

1         I went, like, what? It was unbelievable.
2      Q   Now I'm asking you -- again, I appreciate
3  you telling me about that, but again, what I was
4  asking you about is opportunities in placement that
5  you didn't get with WCW. Okay. You've told me about
6  a few of them. Are there any other opportunities for
7  placement that you believe you didn't get with WCW?
8      A   Yes. Yes.
9      Q   What would that be?
10     A   I still wrestle on a regular basis. I could
11 have wrestled. I apply for that job, but like I say,
12 referee; thousand dollar made in referee. Promotion.
13 The minor league program, the way I understood from
14 three of the bookers, that they pay three
15 organizations, miles away, $100,000 apiece, and that
16 100,000, I probably could have made a lot of money on
17 that. And I was ready in Atlanta, and I was an
18 employee.
19     Q   Mr. Boulware, let me ask you about that.
20 How do you know that? Who told you that?
21     A   I got it from the bookers.
22     Q   Who?
23     A   Terry told me. Kevin Sullivan told me. I
24 can name the list.
25     Q   Well, I'd ask you, if you would, Mr.

Page 101

1  Boulware, tell me who told you that, and I'm going to
2  ask you what they told you.
3      A   Okay. I will.
4      Q   Terry -- you said Terry Taylor?
5      A   Yes.
6      Q   What did Terry tell you?
7      A   Terry told me finally, after they gave one
8  of the guys, Birch Prentice -- I think he was in
9  Nashville.
10     Q   What was his name?
11     A   Birch Prentice.
12     Q   And who was Mr. Prentice?
13     A   Prentice was a guy that run organization
14 like I was running.
15     Q   Out of where?
16     A   Nashville.
17     Q   What did Terry tell you about Mr. Prentice?
18     A   He told me that Mr. Prentice was a friend of
19 his, and he said, I got to get a contract to him. No.
20 He talked to -- after he'd gave a contract. When I
21 called him up, I said, Terry, why? I said, I'm here.
22 Turner don't have to pay no money to fly nobody out.
23         And they always said, it's not our money;
24 it's their money. We don't care.
25         I asked him, I said, because I'm black?

Page 102

1    He asked me, what do you think? What do
2  you think? Yes, it's because you're black.
3    Q    So he didn't say that? You asked him if it
4  was because of your race, and he said, what do you
5  think?
6    A    Yes. Because you're black; what do you
7  think?
8    Q    Did Mr. Taylor say it was because you were
9  black?
10   A    Yes.
11   Q    When did he say that?
12   A    When did Terry tell me this? It was after
13 Birch got the minor league program.
14   Q    Do you remember when that was?
15   A    I can't tell you the exact date, but I can
16 look it up.
17   Q    You don't know whether Mr. Taylor made the
18 decision to sign that contract with Birch Prentice, do
19 you?
20   A    He said he did.
21   Q    But you don't actually know whether or not
22 he did?
23   A    I'm telling you what he said.
24   Q    I understand you say Mr. Taylor said he did,
25 but you don't actually know that? You weren't in the

Page 103

1  room? You didn't see him sign the contract?
2    A    Because more people told me.
3    Q    Who else told you that?
4    A    Kevin Sullivan.
5    Q    Told you what?
6    A    That Terry Taylor, they was discussing who
7  to give the minor league program to? And Birch
8  Prentice was an old friend of Terry Taylor, and Terry
9  stood up and say he'll say he'll vouch for him and,
10 you know, they should give him the money and the ring.
11   Q    Do you know how long Mr. Prentice had this
12 program?
13   A    I know a lot about Prentice, though.
14   Q    Answer my question. That's fine. Do you
15 know how long Mr. Prentice had this program?
16   A    No.
17   Q    Do you know how many people he'd trained in
18 this program or how many opportunities or how many
19 shows he had each year?
20   A    I know that a lot of stuff that he had
21 claimed that he had did, he hadn't did.
22   Q    Do you know what he told WCW about his
23 qualifications and his experiences and his background
24 and his skills? You don't know that, do you?
25   A    No. I know what I told him about mine. He

Page 104

1  didn't call me back and say yes or no or nothing.
2    Q    So you don't know what went into the
3  decision WCW made to give Mr. Prentice this contract?
4    A    No. But --
5    Q    That's fine. Now, was there another
6  organization besides Mr. Prentice's organization?
7    A    Yes. There was a guy in Cleveland, Ohio.
8  Cincinnati, Ohio.
9    Q    Where in Ohio?
10   A    Cincinnati, Ohio. And this guy name -- he
11 used to wrestle with me. His name is -- I can't think
12 of his name right now, but you have it on your record.
13 I'm pretty sure you do.
14   Q    You don't remember the name?
15   A    I got his name in my file, but I can't
16 remember right offhand.
17   Q    Do you know how long he'd had this wrestling
18 business?
19   A    No, I don't.
20   Q    And do you know anything about the wrestling
21 -- that business in terms of what his qualifications
22 were to run it or what he told WCW he was capable of
23 doing?
24   A    No. I have no --
25   Q    And you don't know exactly how much they

Page 105

1  paid him, do you?
2    A    I know what they told me.
3    Q    What did they tell you?
4    A    They give him $100,000.
5    Q    This was -- Terry told you that?
6    A    Terry told me that, and Kevin Sullivan told
7  me. It was a known fact when they put everything on
8  the Internet, once they do it.
9    Q    And other than what Terry Taylor told you
10 about who made the decisions, you don't have any other
11 evidence about who made these decisions to hire these
12 companies or do contracts with these companies, do
13 you?
14   A    No.
15   Q    Did anybody else besides Terry Taylor and
16 Kevin Sullivan tell you anything about these minor
17 league contract deals?
18   A    Yes. Paul Orndorff.
19   Q    What did Paul tell you?
20   A    Paul basically told me they gave Birch, I
21 think $100,000. They gave him a truck. And he was
22 kind of mad at him because he figured that they were
23 throwing away a lot of money because you got -- after
24 all, you got to fly guys up there. You got to get
25 guys there to the show where we had -- knowing that I

**Page 118**

1  make -- he would take his place, but the other guy
2  would come back and work again.
3    Q   Do you know what qualifications this company
4  here in Atlanta that was doing work with WCW had to
5  provide those services?
6    A   It wasn't better than mine, I guarantee you
7  that.
8    Q   Do you know what their qualifications were?
9    A   Just a little wrestling organization that --
10 just like mine, out there working, and it was white
11 also.
12   Q   Do you know what services they provided to
13 WCW?
14   A   All I know is that they took guys from the
15 training power plant and they used them on live shows,
16 same show -- type of show that I had.
17   Q   Do you know what else they might have done
18 with WCW?
19   A   No. I have no idea.
20   Q   And you don't know how much they got paid to
21 do that, do you?
22   A   No.
23   Q   And you don't know what the terms and
24 conditions of the deal was, do you?
25   A   I'm pretty sure the record would tell it,

**Page 119**

1  though.
2    Q   But you don't know that?
3    A   I don't know.
4    Q   And you don't know who made the decision to
5  pick them?
6    A   I just know what I was told. I have no way
7  of knowing -- I wasn't there when they say, here is
8  the job. I know they hired these people, and they
9  overlooked my company and my skills, over 20 years in
10 the business.
11   Q   As to this third company, you don't know
12 what that company's skills or background was in the
13 business, do you?
14   A   No.
15   Q   And you don't know what criteria they
16 weighed or considered in deciding to choose that
17 company, do you?
18   A   No. But what I do know is in all the past
19 stuff they went, picked their buddies and their white
20 counterparts and didn't hire anyone that was black. I
21 mean, it wasn't no black in the whole management for
22 WCW, period.
23   Q   And you don't know what other companies
24 sought to provide those kind of skills and training
25 for programs and live opportunities? You don't know

**Page 120**

1  what other companies provided those kinds of things to
2  WCW, or -- let me rephrase that. Let me take that
3  back. Do you know if there were other companies
4  besides those three who sought to work with WCW and
5  provide the same kind of programs?
6    A   I have no idea what record they would have
7  of who applied for a job.
8    Q   I'm not asking what records they have. You
9  don't know anybody else who might have applied for
10 those opportunities, do you?
11   A   I just know what they might have said. I
12 mean -- I don't know, no.
13   Q   There might have been other folks that were
14 turned down for those opportunities? There might have
15 been other companies that came and said, I want to
16 provide you minor league wrestling services and WCW
17 said no?
18   A   There ain't that many. You talk like it's a
19 thousand of them out there. It ain't that many. It's
20 very few. It's only two large wrestling company in
21 the country, and only a handful of wrestling minor
22 companies in the country that legitimate, people that
23 been in the business, that know the business. You
24 might have somebody just like, a paralegal, your
25 lawyers, that are different, you know. Just -- it

**Page 121**

1  just ain't that many people.
2    Q   Well, how many are there? Do you know?
3    A   I'd say ten at the most, probably.
4    Q   And so you know about ten or so?
5    A   I been in the business 21 years.
6    Q   You don't know if any of those other ten
7  that we haven't talked about came to WCW and said, I
8  want to provide services and WCW said, no thanks?
9    A   Well, they didn't tell me no thanks. They
10 just didn't call me.
11   Q   So you don't know?
12   A   I don't know.
13   Q   Talking about your claims of compensation
14 discrimination, pay discrimination, tell me what you
15 believe -- what evidence you have that you were paid
16 differently than others because of your race?
17   A   Okay. For example -- I'll use Terry Taylor,
18 for example. Me and Terry Taylor basically broke into
19 the business at the same time. He had no more
20 knowledge of the business than what I have. He
21 probably made 200, $300,000 for the last four or five
22 years, or more.
23     I could name a guy like Jimmy Hart, for
24 example. These guys I broke in the business with. I
25 wrestled with. When I refereed with, they just passed

Page 122

1  them over. They had young guys come like I mentioned
2  the guy, a distant friend. This kid come in, white
3  guy. I mean, basically couldn't even wrestle. They
4  made -- from wrestle, they know he was a booker. He
5  had no prior qualifications of that. I mean, I'd been
6  wrestling ten years before he even got in the
7  business.
8      Q   So, Mr. Boulware, is it your complaint that
9  you didn't get these job opportunities? It's not
10  really that you didn't get paid the same as them?
11  It's --
12     A   I didn't get the paid the same also.
13     Q   Because you weren't doing the job; right?
14  You said you couldn't get the job?
15     A   Well, for example, when I was ring -- the
16  ring guy, where they call ring boy, or ring guy, they
17  have a guy that was over here making $50,000.
18     Q   Who?
19     A   Gordon Nelson.
20     Q   Was Pez Whatley making $50,000?
21     A   Not at that time. Not at that time.
22     Q   Did he make $50,000 on the ring crew?  Do
23  you know?
24     A   I don't know exactly what he made, but he
25  got a raise after I complained so much to Time Warner

Page 123

1  and the Turner people, then they gave him --
2      Q   How do you know how much Mr. Nelson was
3  making?
4      A   He told me several times. We rode the truck
5  together. He laughed about it. He laughed about it.
6  He made a joke about it. It was out in your face. It
7  wasn't like they here behind your back and you hear
8  them whispering. They would say it to your face.
9  They have no problem with saying it.
10     Q   Other than Mr. Nelson telling you what he
11  made, do you have any other evidence as to what he --
12     A   Him, Klondike -- Bill Klondike, Chip
13  Crockett. I mean, the list go on.
14     Q   I need you to listen to my question, Mr.
15  Boulware. My question was, other than Mr. Nelson
16  telling you how much Mr. Nelson made, do you have any
17  other evidence how much Mr. Nelson was paid?
18     A   Yes.
19     Q   What's your evidence?
20     A   I have -- Terry told me. We talk about it
21  all the time.
22     Q   What did Terry tell you?
23     A   Terry basically told me -- I asked why my
24  pay different from theirs, and it always basically
25  come back, the color of your skin, and you're not in

Page 124

1  the clique.
2      Q   Did Terry Taylor say the reason you were
3  paid differently than Mr. Nelson was the color of your
4  skin?
5      A   Yes. He said that.
6      Q   Did he say those words?
7      A   He said that, oh, yes.
8      Q   What words did he use?
9      A   He use several different -- I talked to him
10  several different times.
11     Q   What do you remember him saying?
12     A   I remember him basically telling me -- do
13  you want me to use a good example?
14     Q   What I'd like you to do is tell me what he
15  said. Not basically what he said, but --
16     A   I can't remember the exact words he said.
17     Q   Tell me what you remember him saying.
18     A   I remember him telling me about that I knew
19  how -- what was going on. Why would I keep bothering
20  him, because things wasn't going to change. And I
21  asked him a couple times, why? And that when I --
22  finally everybody started telling me -- everybody,
23  meaning JJ, Dusty -- I even talked to Dusty about it
24  also. He was in management. That the Turner people
25  basically told them, when no black people come to the

Page 125

1  show, then they didn't have to use no black, period.
2  I don't know if it was true. I know they told me.
3      Q   This is Terry Taylor?
4      A   Terry. JJ told me the same thing. Arn
5  Anderson. The list go on. Each one of them sit down
6  basically when we was away from all the record and
7  stuff going on and look me in the eye and told me that
8  was the reason I wasn't getting no promotion and why I
9  wasn't going to be nothing but the worst job that they
10  could give me. And they basically told me that.
11     Q   What other evidence do you have that
12  supports your claim that you were paid differently
13  because of your race?
14     A   Well, okay. Chip Crockett back again. We
15  was in Philadelphia, and I had just received my
16  paycheck, and I had my check, and Chip telling me, he
17  said, well, I got direct deposit. Well, how you get
18  direct deposit? You're not no employee.
19         He said, oh, you didn't know? I'm an
20  employee, and I can get paid more than you. And even
21  I showed him my check. He said no, I got a guaranteed
22  salary. I don't get paid by the low end.
23         I'm, like, how can you do that and you
24  came here probably 16 years after I been in the
25  business?

Page 126

1   Q   What kind of job was Chip Crockett doing?
2   A   Ring crew.
3   Q   Was he driving the truck?
4   A   Yes.
5   Q   What else was he doing?
6   A   That's it.
7   Q   Do you know if he was doing anything else,
8   or that's all you saw him do?
9   A   That's all he was doing.
10  Q   Did you see him do anything else?
11  A   That's all he was doing.
12  Q   How do you know he wasn't doing anything
13  else?
14  A   Wasn't doing anything else. I hung around
15  with him.
16  Q   Every day?
17  A   Basically, every day. Because we was on the
18  road together most of the time.
19  Q   But he wasn't in your truck with you?
20  A   No, but we was all the time. He live at the
21  Ramada. I live in Riverdale. He call me for favors,
22  like pick him up -- he didn't have a car -- from the
23  airport.
24  Q   When you were on the road for three or four
25  days driving the truck, you wouldn't be around Chip

Page 127

1   Crockett?
2   A   Somehow, the crew always hook together.
3   Sometimes we do two shows. We do shows together,
4   like, for example, one show might be in some one part
5   of the Pennsylvania. We'd be in Pittsburgh. So when
6   they get through there, they come there. Now, and we
7   all meet there. I've seen them about -- I would say
8   once to three times a month, four times a month.
9   Q   Other than what you now told me about Chip
10  Crockett and what you told me about Gordon Nelson and
11  the statements that other people made about them, what
12  else do you believe supports your claim that you were
13  paid differently because of your race?
14  A   Because I was told by the management, Terry
15  Taylor, JJ Dillon, all of them, they told me.
16  Q   What role were you in when you were talking
17  with them about your pay? Was this when you were on
18  the ring crew?
19  A   That was on the ring crew. When I got off
20  the ring crew, I talked to them about coming back to
21  work.
22  Q   So that's not really a claim that you
23  weren't paid? That's a claim that they wouldn't bring
24  you back to work?
25  A   That was two claims, though. You asked me.

Page 128

1   Q   But you're not saying you were paid less
2   than somebody because you weren't actually working to
3   get paid; right?
4   A   Which time are you talking about?
5   Q   Well, you tell me.
6   A   I don't know. You ask me the question.
7   Q   It's your claim, Mr. Boulware. What I'm
8   asking you to tell me is why you believe you were paid
9   less because of your race? Tell me all the instances,
10  all the situations in which you believe you were paid
11  less because of your race and why you believe that?
12  A   Well, I believe that because I got it from
13  people that were credibility people, I assume at the
14  time, and they was in charge of WCW.
15  Q   And I'm asking you, Mr. Boulware, give me --
16  I'll give you an example. Okay? If I'm working and I
17  have a lawyer working next to me --
18  A   Yes.
19  Q   -- and I feel like we're doing the same work
20  and I feel like he's making a different amount of
21  money than me, then maybe I wonder why. Okay? Does
22  that make some sense to you?
23  A   Yes.
24  Q   Are there similar situations that you have
25  like that?

Page 129

1   A   I can't remember right now.
2   Q   You can't remember at all?
3   A   I can't remember right now.
4   Q   So is there anything else besides what we've
5   talked about already that supports your claims of
6   being paid differently?
7   A   I can't remember right now. It's a whole
8   bunch of stuff you asked me.
9   Q   I mean, that's what you're here for.
10  A   I'm sorry. I can't make my mind remember
11  stuff I can't.
12  Q   That's fine. And that's all I'm asking you
13  is everything you can tell me sitting here today.
14  A   I tell you the truth what I know, and if I
15  can't remember, I say I don't remember.
16  Q   So we've talked about everything that you
17  can remember that supports your claim for compensation
18  discrimination, pay discrimination?
19  A   Have we talked about everything?
20  Q   Is there anything you can think of that we
21  haven't talked about that supports your claim of --
22  A   Pay discrimination? Oh, yes. That I can
23  remember.
24  Q   That's a yes?
25  A   Yes. That I can remember.

Page 134

1    crew?
2       A    Well, I was -- Terry Taylor. I'm sorry.
3    Terry Taylor.
4       Q    How do you know Terry made that decision?
5       A    He told me.
6       Q    Did he tell you why he made that decision?
7       A    He just told me that the only job they'd let
8    me have.
9       Q    When did he tell you this?
10      A    That was '96, '97.
11      Q    Did you think about going to try to wrestle
12   someplace else?
13      A    Ain't nowhere to go.
14      Q    Did you call WWF?
15      A    WCW and WWF is -- is competitive.
16      Q    Right.
17      A    If they don't give you a chance to do
18   nothing here, ain't nobody else going to give you a
19   chance.
20      Q    Did you call WWF to ask?
21      A    No, not really.
22      Q    You didn't say, hey, I'm a wrestler here at
23   WCW; they're not letting me wrestle anymore; let me go
24   talk to somebody else about wrestling?
25      A    No. I kept staying where I was here. I

Page 135

1    been here all the time.
2       Q    But you could have left Atlanta or could
3    have left WCW and tried to get a job with WWF, right,
4    and you didn't?
5       A    No, I didn't.
6       Q    And then you talked about -- well, let me
7    make sure I got it right. Referee contract, who
8    denied you a contract as a referee?
9       A    Well, basically the whole wrestling office
10   people that were in promotion.
11      Q    Do you know who made the decision not to
12   make you a referee?
13      A    Well, I became a referee, but I didn't get
14   the pay, and the last time I talked to JJ about it,
15   and JJ -- actually I asked him about a contract. I
16   kept asking him every week about a contract. He
17   finally pulled me off and he told me, Eric Bischoff
18   wasn't going to give me a contract. I asked him why.
19           He said, because I'm black, but he told me
20   what he would do for me was give me $200 a night just
21   to keep quiet and stay out of his way.
22           And I told him, that still ain't fair.
23           He said, that's the only thing I can do
24   for you. Take it or leave it.
25      Q    Do you know how much the other referees were

Page 136

1    making a night?
2       A    A lot of them make a thousand dollars,
3    $1,500 a week.
4       Q    How do you know that?
5       A    I seen some of the checks.
6       Q    And they were making $1,000 a week?
7       A    A week. Right.
8       Q    How many nights a week were they working?
9       A    Three, four.
10      Q    And --
11      A    But they had a contract, and that's what was
12   different.
13      Q    Did you see any of the contracts?
14      A    I seen guys with contracts. Never did sit
15   down and read their contract.
16      Q    How do you know they had a contract?
17      A    I mean, I seen them. I mean, they would be
18   sitting around reading the contract before they sign
19   them. We'd be on the plane or something, or I'm in a
20   Marriott or something. You sit there like Nick. I
21   knew Nick 15, 18 years.
22      Q    Did Nick have a contract?
23      A    Yes. Nick had a contract.
24      Q    Did you see Nick's contract?
25      A    Yes.

Page 137

1       Q    Anybody else's contract you saw?
2       A    No. Just what guy told me they had, either
3    contract or a deal. Lot of times the deal was that
4    you guaranteed a certain amount of money, every week.
5       Q    Who told you that they had a deal? Anybody
6    else besides Nick or -- that you can remember?
7       A    Basically, everyone that was in the
8    business.
9       Q    And you can't remember who those folks were?
10      A    I mean, I can start naming peoples. I mean,
11   Terry. I saw him when he left and went to New York,
12   and he came back after all the racist stuff that was
13   made. He got a job there. I saw him there tell me
14   about contract. He told me he had a 90-day probation
15   period on it.
16      Q    But he wasn't a referee?
17      A    No.
18      Q    He was a booker. Are there any referees
19   that you can think of who had a contract?
20      A    Well, all of them had a contract.
21      Q    Can you tell me any of their names?
22      A    I can't remember the guy's name. I just
23   can't remember the name. I remember their faces.
24      Q    This was back in '96, '97 '98?
25      A    Yes. And if I'm not mistaken, what I was

Page 138

1 told by Terry Taylor and JJ, everybody there had a
2 contract, or agreement they'll make so much money each
3 week, and they all were white.
4    Q    This is what Terry Taylor told you?
5    A    Terry, JJ.
6    Q    Anybody else besides JJ or Terry tell you
7 this?
8    A    It was basically a known fact because we all
9 basically ate and slept together. I mean, you at the
10 same place. You're at the same time. You be there
11 all day long when you have a show, so you'd sit down
12 and talk to people.
13    Q    Is there anything else that you think was
14 discipline that was taken against you or discipline
15 that was done in discrimination because of your race?
16 Other than what we've already talked about?
17    A    Yes. Lots of stuff. Like, for example, my
18 wives are white. It was known fact, and they told
19 you, don't bring no white woman around the matches.
20    Q    Who told you that?
21    A    Terry Taylor told me that. JJ done told me
22 that. I mean, several people told me that.
23    Q    When was this?
24    A    I mean, told me my whole career.
25    Q    So this was all the way through 1998?

Page 139

1    A    Yes. All the way up. My wife and I are
2 married three years. We been together 18 years.
3 She's never been to a wrestling match, because she
4 knew if she goes to that match, I would have no job.
5 And I have had white female come up and talk to me,
6 and they'll call you off to the side and tell you, no.
7    Q    This was during the time you were at WCW?
8    A    Yes. Yes.
9    Q    Anything else that you believe was
10 discriminatory discipline? What else is there? Is
11 there anything else?
12    A    Well, by not even considering me for a job.
13 I mean, I got all the qualifications. I had never did
14 nothing. I have never, like I say, no discipline or
15 none of that. I had a clean record with them, and I
16 applied for a job through every phase of it, and then
17 you got -- I'm qualified for five or six different
18 things, and I've got 20 years' experience, and you
19 can't find nothing for me to do? That's hard to
20 believe.
21    Q    Anything else, Mr. Boulware, other than what
22 we've already talked about?
23    A    Not that I can -- not that I can think of
24 right now.
25    Q    You have a claim in your complaint that you

Page 140

1 were discriminated against in training. Is there
2 training that you believe you were supposed to receive
3 or should have received that you didn't get?
4    A    Training where? In what?
5    Q    Well, that's what I'm asking you. Is it --
6    A    You got to tell me what training you're
7 talking about. Training in wrestling?
8    Q    It's your complaint, Mr. Boulware. I'm
9 asking you, is there training you believe that you
10 didn't receive from WCW because of your race?
11    A    Training? Training I received? Training
12 that I received? I can't remember.
13    Q    You can't think of any instance where there
14 was some training that you think you should have
15 received but you didn't receive it because of your
16 race?
17    A    I don't remember.
18    Q    Now, you also have a complaint saying that
19 you were subjected to a hostile work environment at
20 WCW, and do you know what that means? What do you
21 think it means to be subjected to a hostile work
22 environment?
23    A    Well, you can't go to work and perform your
24 job the way you should be able to without someone
25 making racist crack about you. And I will use a

Page 141

1 couple example.
2    Q    Hang on a second. So this is the time
3 period when you were on the ring crew, or a referee,
4 or a wrestler with WCW? Is that what we're talking
5 about here?
6    A    Well, but that was the one time -- that was
7 the time when they did it to me in my face.
8    Q    When did somebody do it to you in your face?
9 Tell me about the instances. Give me one at a time if
10 there were more than one?
11    A    Well, I got a record of them.
12    Q    Tell me what you remember.
13    A    I remember standing in the parking lot in
14 1998. A lady just come in. She was a truck driver.
15 I had to buy new tennis shoes, and she walked up to me
16 in front of a bunch of people, fans, and I'll just
17 tell you, Turner employees. Bunch of Turner employee.
18 She said, what nigger did you chase down to get them
19 tennis shoes? I reported it, wrote it down, got a
20 record of it.
21    Q    Who was she?
22    A    Just -- it got so bad that people that were
23 just employed outside the wrestling thing would do it.
24 She was this truck driver employed by Turner Sports.
25    Q    Do you know her name?



# EXHIBIT / ATTACHMENT

## I

(To be scanned in place of tab)

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4

5    TONY BYRON CARR,                 )
                                      )
6            Plaintiff,               ) Civil Action File No.
     vs.                              ) 1-00-CV-1721 (CC)
7                                     )
     WORLD CHAMPIONSHIP WRESTLING,    )
8    INC., and TURNER SPORTS, INC.,   )
                                      )
9            Defendants.              )

10   ─────────────────────────────────────────────
               DEPOSITION OF TONY BYRON CARR
                     JANUARY 28, 2002
11                     10:00 a.m.

12   ─────────────────────────────────────────────

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN CLERK'S OFFICE

APR 23 2002

LUTHER ____ ____, Clerk
By _____
          Deputy Clerk

ORIGINAL

CERTIFIED COURT REPORTERS

Page 49

1          And I said, well, let me go put my outfit on, so I

2     put it on, and he looked at it and he shook his head.  He

3     was like, I hope you didn't spend too much money on that.  I

4     was like, what do you mean?  He's like, we can't use that.

5     And I was like, why not?

6          He said, well, it's not realistic, you know, and

7     like I said, that kind of hit me for a blow because also

8     they look for realistic characters now, but yet, you've got

9     this guy Glacier, he comes in the building and makes it

10    snow.

11         So I'm like, well, that's not very realistic, you

12    know.  That's what he told me.  And then later on Rocky King

13    told me that, you know, they weren't looking for no blacks.

14    That's what he said.

15    Q.   We'll get to that in a little bit.  So you tried a

16    genie outfit?

17    A.   Right.

18    Q.   And you said Terry didn't like it because he said

19    it was unrealistic?

20    A.   Right.  Jimmy Hart loved it, though.  Jimmy Hart

21    said, oh, that's good.  We can use that.  We can do that,

22    but Terry was the head booker and he shot it down.

23    Q.   Okay.  When was this?  Do you recall?

24    A.   I don't remember.

25    Q.   Do you remember it was early?

1    a truck driver.  First time he said, I don't know who's

2    blowing smoke up your ass, kid, but they ain't hiring no

3    niggers.

4         Q.   This is what Jody Hamilton said?

5         A.   This is what Jody Hamilton said.

6         Q.   When did he say that?

7         A.   He said it right before we left Carol Drive.  Then

8    we got up here, when he hired me back as a truck driver, you

9    know, I told him I still want to wrestle.  I still brought

10   my wrestling gear.  I still talked to the bookers.  Hey, you

11   know, if you all need somebody, I want to wrestle.  I didn't

12   come here to be a truck driver.  I want to wrestle.  So I

13   was trying to network any way I could to get back in, you

14   know, so --

15        Q.   Okay.  And how did that conversation go when you

16   talked to him about that?

17        A.   Well, that's when he said, he said -- this time he

18   cleaned up.  He said, we're not hiring any blacks, you know.

19        Q.   Did he refer to anyone in particular.

20        A.   No, he just said --

21        Q.   Did he give you a name as to who's making this

22   decision?

23        A.   He just said the higher-ups.

24        Q.   Okay.  But you don't know who actually made the

25   decision not to give you a wrestling contract?

1    A.   Well, I had been hearing the whole time that Jody

2    Hamilton was a racist.  His brother was in the Ku Klux Klan,

3    all this stuff here.  Jody would say certain things but I

4    didn't hear that stuff.  All I know, I wanted to be a

5    wrestler, you know.  I heard the stuff.  I didn't hear it.

6    I heard the jokes.  I heard the comments.

7    Q.   What kind of jokes or comments did you hear

8    personally?

9    A.   Okay.  Well, Sarge, if we call people -- he

10   referred to this Asian guy as -- who was in the ring,

11   playing the ring, wrestling around, he's like, there's soul

12   food and oriental food in the ring or something like that,

13   you know, stuff like that.

14   Q.   Okay.  What else do you remember hearing that you

15   thought was a racial comment?

16   A.   Taylor Terry would come by and say stuff like

17   there was a time when the air conditioner broke and he said,

18   well, you'd better turn the air conditioner on because you

19   know, these niggers, they can't take this cold weather.

20   Q.   Did you hear that?

21   A.   Yes.

22   Q.   When was this?

23   A.   This was -- can't remember the dates on it.

24   Q.   How long had you been at the Power Plant when that

25   occurred?

Page 93

1      A.    I'd been there for a long time.

2      Q.    Okay.  Can you give me an idea of when you thought

3    it was year-wise, what time of year it was?  Was it

4    summertime?

5      A.    It was cold, because it was real cold and nobody

6    wanted to do anything because it was cold down there.

7      Q.    So you think it was wintertime?

8      A.    I'm pretty sure it was wintertime.

9      Q.    You don't remember which year?

10     A.    I don't remember what year.

11     Q.    Okay.  You said some comments about Sarge and a

12    comment about Terry Taylor.  What else do you recall

13    occurring down at the Power Plant that you think was a

14    racial comment?

15     A.    Like I said, the comments were all, the whole --

16    even when I came back people were making comments.

17     Q.    Well, I need to know, Mr. Carr, what those

18    comments were, who said them.  I can't just have --

19     A.    Pick a time.  Pick a time.

20     Q.    You tell me.  I need to know everything that you

21    recall --

22     A.    Okay.

23     Q.     -- about comments and who said them and what they

24    said.

25     A.    Okay.  I'll get a little bit recent on you then.

Page 95

1      A.     Paul said they're not hiring any blacks.  This was

2   down at the new school, because what happened, went through

3   tryouts and Jody told me that -- made the comment or

4   whatever, but I hadn't talked to Paul Orndorff yet.

5      Q.     Okay.  So when was this conversation with Paul?

6      A.     This was sometime late '99.

7      Q.     Okay.  And what did he say to you?

8      A.     He said they ain't hiring no niggers.

9      Q.     And did he use the word "nigger"?

10     A.     Yes, he did.

11     Q.     Okay.  And do you know who he was referring to?

12     A.     Well, I was the only one in the room and I was

13  trying to get a job.

14     Q.     No, no.  When he said "they", do you know who he

15  meant by "they"?

16     A.     I assume he meant WCW.

17     Q.     But you don't know in particular who he --

18     A.     No.

19     Q.     Did Paul Orndorff ever say anything else that you

20  thought was racially discriminatory?

21     A.     No, I didn't see Paul a whole lot after that.

22     Q.     Tell me someone else that you believe down at the

23  Power Plant, said something that you believe was racially

24  discriminatory.

25     A.     Okay.  At the Power Plant.  Like I said, Jody

Page 97

1      Q.    Okay.

2      A.    You know, and then I didn't hear from him for a

3   while, and then about a month later he called me and asked

4   me if I wanted to get back on the ring truck, and I said

5   yes.

6      Q.    So he offered you a job on the ring crew?

7      A.    Yeah, you know.

8      Q.    Any other conversations with Jody Hamilton you

9   think were discriminatory?

10      A.    Okay.  All right.  What happened, on the days

11   where I was off, Jody would have me come down there and move

12   a lot of stuff, you know, rings, you know, just shift stuff

13   around in the new building here on Log Cabin.

14           I'd unload trucks by myself, move rails, and then

15   I come back and sit down, I take a lunch break or whatever,

16   and he had these stories and they start talking about the

17   problems with the black community.

18           He made this thing about Martin Luther King.  He

19   was like, well, Martin Luther King started all this problem

20   and that's why black people are having so much trouble now.

21   He started segregation and a lot of black people got, you

22   know, sucked up in it because they weren't smart enough to

23   keep up with the white people, so it's bringing down the

24   society.

25           That's the kind of comments he was making, you

1          Well, David Crockett, he was Jody's boss, he came

2    out there and he said, tape those ropes up.  We've got to

3    get it ready.  And I told him, it's going to take 45 minutes

4    to tape those ropes.

5          And he said, get your black ass in there and tape

6    those ropes, and there was people around, too.  Steve Smalls

7    was one of them.  He said, get your black ass back in there

8    and tape those ropes.

9          And I left after that and I went in the back.  I

10   mean, I was hot.  I was really hot after that.  This is in

11   front of -- you know, the whole crowd was there.  It was

12   right by the ringside.

13   Q.    Okay.

14   A.    You know, I mean, like I say, he just treated me

15   bad the whole time after that.

16         We had a show out in California, and the way they

17   did things, I mean, everybody walking around back stage.  If

18   you knew somebody, everybody came around back stage.  Just

19   if you know somebody.  I mean, it was ridiculous.  All the

20   people back stage shouldn't have been back there.

21         Well, I've got a friend that's a cop out in

22   California now and we was going out there and I wanted to

23   get him, you know, back stage to come back there while I was

24   working there, you know.

25         Now, just the night before everybody was back

Page 103

1    on the basis of your race and comments or jokes or things

2    like that?

3         A.    I mean, Terry Taylor would say stuff so much, I

4    just disregarded him.

5         Q.    What do you remember Terry saying?

6         A.    Well, he was referring to something about -- I had

7    a BWA shirt on right there at one of the shows.  That's

8    Rocky's company.

9         Q.    Okay.

10        A.    All right.  And I'm wearing the BWA shirt.  I

11   didn't even think about it.  I just had a T-shirt over it

12   because you wear anything when you get on the ring stuff,

13   and he said something about, wrestling for the Black

14   Wrestling Association.  That was the big joke.  He's like,

15   oh, you're working for the nigger company, you know.

16        Q.    Did he say those words?

17        A.    Yes.

18        Q.    How did you respond?

19        A.    Nothing.  I mean, Terry was the boss at the time.

20   You know, I could have went off, but I'm still, even though

21   I see the environment is messed up, I'm like, well, maybe if

22   I can get a foothold in there I can, like, get by.  I tried

23   to work around this.  I mean, I heard it a lot.

24        Q.    Okay.  Who else did you hear use words that you

25   found discriminatory?

Page 111

1        A.    Jamaica.  They could be to Canada, you know.

2        Q.    Okay.  And you said -- were there some weeks you

3   didn't work at all and then you said you were very busy in

4   the beginning, but did it get to the point where there were

5   some weeks --

6        A.    Well, towards the end when the company was

7   shutting down, like the last few months, you know, we didn't

8   work a whole lot then.  Like the last couple of months

9   there.

10            But at the same time, when I went back to work on

11   the ring, I even tried to work with security because

12   security was getting a lot of time on TV, too, and you know,

13   I approached Doug Dillinger several times and first he kept

14   giving me the runaround that -- first he'd say, well, you've

15   got to be a police officer or you've got to, you know, have

16   had some law enforcement experience.

17            I was like, well, I used to be in the Marine

18   Corps.  I had top secret clearance or whatever.  That

19   doesn't count, you know.  And I keep -- I said, Doug, let me

20   get out there.  Let me get some TV time.  You guys are

21   getting all the TV time and you're not even wrestlers, you

22   know, and at the end he said, you know, same thing, you

23   know, he'd say, you know we don't hire no blacks, just like

24   that.

25        Q.    Doug Dillinger said that?

Page 139

1          They wanted me to put a shirt -- Terry Taylor came

2   up with this idea, put a shirt on and put like, you know,

3   "Tank Abbott Sucks" or something like that on the shirt and

4   start something out of it.  I would sit in the audience like

5   a fan.

6          Well, that was earlier that day.  Later on that

7   day Terry came by and said, they ain't going to believe no

8   niggers are in Montana.  It's going to look like a plant.

9   He said, I'll pay, you know, but we're not going to use it.

10     Q.   Did he pay you for it?

11     A.   He paid me for it, but he said, you know, it was

12  because they ain't going to believe no nigger's in Montana.

13     Q.   Did he use those words?

14     A.   Yes.

15     Q.   You remember him saying that?

16     A.   Yes.  Like I said, Terry used it a lot.  It was

17  open forum, you know.

18     Q.   Did you ever say to him, Terry, don't use that

19  word?

20     A.   I mean, what are you going to tell him?  You see

21  how things work.  I mean, these guys can make you or break

22  you, you know.  What are you going to tell them, you know.

23     Q.   You never said Terry, look, I wish you wouldn't

24  call me that?

25     A.   No.  I just said, Terry, that was messed up and,



# EXHIBIT / ATTACHMENT



J

(To be scanned in place of tab)

## DECLARATION OF PAMELA COLLINS

STATE OF GEORGIA
COUNTY OF _Cobb_

Pamela Collins gives the following declaration under penalty of perjury and states as follows:

1.

I worked for World Championship Wrestling Organization ("WCW") in the call center. My official position was the call center coordinator.

2.

I recall WCW submitting a written request for each employee to write a job description. This description was later to be used for WCW's Employee Job Profiles.

3.

In filling out the questionnaire, I correctly indicated that I "supervised" four to six customer service representatives. Although I was actually supervising four to six customer service representatives, I was never made a supervisor at WCW.

4.

Until the time that WCW ceased operating, I continued to work as the call center coordinator. I was never paid as a supervisor, and was only paid for being the "call center coordinator."

5.

Throughout my employment with WCW, I often heard various rumors about discrimination. I could not help but notice that Caucasians dominated WCW, and we had few minorities. I became aware that there were specific complaints of discrimination filed by some of the wrestlers at WCW. I am certain that I was aware of these claims of discrimination before July 9, 2000.

6.

On July 9, 2000, Booker T was made the world champion. Because I routinely watched various videotapes of WCW's events, I watched the videotape of Booker T. I am confident that I was aware of the claims regarding discrimination prior to the time in which Booker T became champion.

7.

As I watched the numerous videotapes of the WCW wrestlers, I often wondered why there was not more diversity among the wrestlers. The successful wrestlers were predominately Caucasian. With the exception of Booker T and a few other wrestlers, WCW was dominated by successful Caucasian wrestlers.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Pamela Collins

_____
Executed on (Date)



# EXHIBIT / ATTACHMENT

## K

(To be scanned in place of tab)

## DECLARATION OF GEORGE GRACE

STATE OF GEORGIA
COUNTY OF _____

George Grace gives the following declaration under penalty of perjury and states as follows:

1.

I am over eighteen years of age and competent to give this testimony, which is based upon my personal knowledge.

2.

I am the President of Grace Market Research, Inc. ("Grace Market") and served in this position in March, 2000.

3.

In March, 2000, Grace Market conducted an online survey for World Championship Wrestling, Inc.

4.

In this survey, respondents were asked to rate a number of wrestling performers on a number of factors, including the familiarity and likeability. A true and correct copy of this survey is attached hereto as Exhibit "A."

5.

Respondents were also asked to provide some information about themselves, including their ethnicity. Specifically, Question No. 152 asked each respondent to provide his or her ethnicity. The survey provided the following options as possible responses to this question: (1) African/American/Black; (2) Asian; (3) Caucasian/White; (4) Hispanic/Latino; and (5) Other.

6.

According to the information provided by the respondents, the ethic make-up of the respondent group was as follows (percentages rounded to the nearest whole number):

| | |
|---|---|
| Base/ Total Number of Respondents | 1379 |
| Percentage of Total | 100% |
| African/American/Black: Total Number | 51 |
| Percentage of Total | 4% |
| Asian: Total Number | 32 |
| Percentage of Total | 2% |
| Caucasian/White: Total Number | 1173 |
| Percentage of Total | 85% |
| Hispanic/Latino: Total Number | 66 |
| Percentage of Total | 5% |
| Other: Total Number | 57 |
| Percentage of Total | 4% |

7.

This information was provided to WCW at some point during the spring or summer of 2000.

8.

Grace Market maintains this information on a database in electronic format.  The information is no longer maintained by Grace Market in hard-copy form.

I declare under penalty of perjury that the foregoing is true and correct.

_George Grace_
George Grace

_12 − 18 − 2002_
Executed on (Date)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

Asian An
Hispanic
Asian

Contract Summary

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

Page 1 of 18

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Abbott, David - Abbott, Tank**<br>Contract-Wrestler | 03/17/1999 | 03/16/2002 | 1 Year<br>Terms Mutual | **Year**<br>2<br>3 | **Salary**<br>$650,000.00<br>$650,000.00 | **Event**<br>All Events<br>All Events (2)<br>All TV events | | **Fee**<br>$0<br>$0<br>$0 | 0 | 0 | 365 |
| **Adams, Brian - Kronic - Brian Adams**<br>Contract-Wrestler | 01/19/2000 | 01/18/2002 | 1 Year<br>Terms Mutual | **Year**<br>1<br>2 | **Salary**<br>$175,000.00<br>$175,000.00 | **Event**<br>All Events | | **Fee**<br>$2,000 Over 100 days per contract year. | 6 | 30 | 100 |
| **Adams, Chiquita - Nitro Girl-Chiquita**<br>Contract-Nitro Girl | 01/17/2000 | 01/16/2001 | Like Duration | **Year**<br>1 | **Salary**<br>$15,000.00 | **Event**<br>Non-TV/PR<br>All TV events<br>Valet/Physical | | **Fee**<br>$250<br>$500<br>$500 | 1 | 30 | 365 |
| **Alfonso, Michael - Awesome, Mike**<br>Contract-Wrestler | 04/10/2000 | 04/09/2002 | No Rollover | **Year**<br>1<br>2 | **Salary**<br>$350,000.00<br>$350,000.00 | **Event**<br>House Nightly<br><br>PPV Bonus | | **Fee**<br>$2,000 Year 1 ($2,000 In Year 2 also)<br>$3,000 Year 1 ($4,500 In Year 2) | 3 | 30 | 0 |
| **An, Chae - Nitro Girl-Chae**<br>Contract-Nitro Girl | 10/26/1998 | 10/25/2001 | No Rollover | **Year**<br>2<br>3 | **Salary**<br>$52,000.00<br>$52,000.00 | **Event**<br>Valet/Physical | | **Fee**<br>$500 | 1 | 30 | 365 |
| **Aplanalp, Charles - Konnag**<br>Contract-Wrestler | 01/15/1999 | 01/14/2002 | 1 Year<br>Terms Mutual | **Year**<br>2<br>3 | **Salary**<br>$570,000.00<br>$620,000.00 | | | | 12 | 30 | 365 |
| **Bagwell, Marcus - Bagwell, Marcus**<br>Contract-Wrestler | 03/26/1998 | 03/25/2001 | No Rollover | **Year**<br>3 | **Salary**<br>$400,000.00 | | | | 3 | 30 | 365 |


PLAINTIFF'S EXHIBIT

CONFIDENTIAL
X 001526

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Bancale, Jennifer - Nitro Girl - Starr<br>Contract-Nitro Girl | 03/13/2000 | 03/12/2001 | Like Duration | **Year  Salary**<br>1  $15,000.00 | **Event  Fee**<br>Non-TV/PR  $250<br>All TV events  $500<br>Video/Physical  $500 | 1 | 30 | 365 |
| Beilin, Melissa - Nitro Girl-Spice<br>Contract-Nitro Girl | 10/26/1998 | 10/25/2001 | No Rollover | **Year  Salary**<br>2  $52,000.00<br>3  $52,000.00 | **Event  Fee**<br>Video/Physical  $500 | 1 | 30 | 365 |
| Benninghaus, Tom - Disorderly Conduct<br>Contract-Wrestler | 09/21/1999 | 09/20/2002 | Like Duration | **Year  Salary**<br>1  $60,000.00<br>2  $60,000.00<br>3  $60,000.00 | | 3 | 30 | 365 |
| Bigelow, Scott C. - Bigelow, Bam Bam<br>Contract-Wrestler | 07/06/1999 | 07/05/2002 | 1 Year Terms Mutual | **Year  Salary**<br>1  $400,000.00<br>2  $425,000.00<br>3  $450,000.00 | | 0 | 90 | 200 |
| Bollea, Michael Allen - Horace<br>Contract-Wrestler | 12/07/1998 | 12/06/2001 | 1 Year Terms | **Year  Salary**<br>2  $225,000.00<br>3  $250,000.00 | | 3 | 30 | 365 |
| Bollea, Terry G. - Hogan, Hulk<br>Contract-Wrestler<br>See contract | 05/29/1998 | 05/28/2002 | | | | 0 | 0 | 365 |
| Borden, Steven - Sting<br>Contract-Wrestler | 01/02/1999 | 01/01/2002 | No Rollover | **Year  Salary**<br>2  $1,500,000.00<br>3  $1,500,000.00 | **Event  Fee**<br>PPV Bonus  See contract<br>Signing Bonus  $100,000 | 0 | 0 | 175 |

CONFIDENTIAL
X 001527

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bozman-Sanchez, Vanessa - Nitro Girl-Tygress** Contract-Nitro Girl | 10/26/1998 | 10/25/2001 | No Rollover | **Year** 2 3 | **Salary** $52,000.00 $52,000.00 | **Event** Valet/Physical | **Fee** $500 | 1 | 30 | 365 |
| **Brenneman, William J. - Flynn, Jerry** Contract-Wrestler | 07/26/1999 | 07/25/2002 | Like Duration | **Year** 1 2 3 | **Salary** $150,000.00 $150,000.00 $150,000.00 | | | 3 | 30 | 365 |
| **Bruce, Dewayne - Power Plant-Sarge** Contract-Wrestler Merchandise Agreement Only. | 09/01/1999 | 08/31/2001 | | | | | | 0 | 0 | 365 |
| **Cain, Brad - Idol** Contract-Wrestler | 10/12/1995 | 10/11/2001 | 1 Year Terms | **Year** 2 3 | **Salary** $110,000.00 $120,000.00 | | | 3 | 30 | 365 |
| **Candito, Chris - Candido, Chris** Contract-Wrestler | 04/14/2000 | 04/13/2002 | Like Duration | **Year** 1 2 | **Salary** $104,000.00 $104,000.00 | **Event** All Events | **Fee** $500 No fee for PR days. | 3 | 90 | 0 |
| **Carlson, Lenny - Lane** Contract-Wrestler Contract was amended to increase pay effective 10/13/98. Pro-rated to shortened term. | 09/03/1998 | 09/02/2000 | 1 Year Terms | **Year** 3 | **Salary** $110,000.00 | | | 3 | 30 | 365 |
| **Castellanos Torres, Dionido - Psychosis** Contract-Wrestler | 10/06/1998 | 10/05/2000 | 1 Year Terms | **Year** 2 | **Salary** $180,000.00 | | | 3 | 30 | 365 |

CONFIDENTIAL
X 001528

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
### Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Clark, Emmett Bryan - Kronic - Bryan Clark<br>Contract-Wrestler | 01/01/2000 | 12/31/2001 | 1 Year<br>Terms Mutual | **Year Salary**<br>1 $175,000.00<br>2 $175,000.00 | **Event Fee**<br>All Events $2,000 Over 100 per year. | 0 | 30 | 100 |
| Cormier, Leonce - Burke, Leo<br>Other | 03/27/1998 | | | **Year Salary**<br>1 $26,071.43 | | 1 | 30 | 365 |
| Cornell, Richard A. - Cornell, Rick<br>Contract-Trainee | 05/19/1999 | 05/18/2002 | Like Duration | **Year Salary**<br>1 $33,800.00<br>2 $33,800.00<br>3 $33,800.00 | | 1 | 14 | 365 |
| Covell, Daniel C. - Daniels, Chris<br>Contract-Wrestler | 03/01/2000 | 02/28/2002 | Like Duration | **Year Salary**<br>1 $75,000.00<br>2 $75,000.00 | | 3 | 30 | 365 |
| Cuturello, Clave M. - Nitro Girl-Payton<br>Contract-Nitro Girl | 09/01/1999 | 08/31/2002 | Like Duration | **Year Salary**<br>1 $15,000.00<br>2 $15,000.00<br>3 $15,000.00 | **Event Fee**<br>Non-TV/PR $250<br>All TV events $500 | 1 | 30 | 365 |
| Dellinger, Doug - Security Director-Doug Dellinger<br>Contract-Other<br>Merch. Agreement Only | 11/01/1998 | 10/31/2000 | | | | 0 | 0 | 365 |
| Demott, William C./Bill - Captain Rection<br>Contract-Wrestler | 01/01/1999 | 12/31/2001 | 1 Year<br>Terms Mutual | **Year Salary**<br>2 $250,000.00<br>3 $250,000.00 | | 3 | 30 | 365 |

CONFIDENTIAL
X 001529

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Diaz-Mendoza, Raymundo - Villano V<br>Contract-Wrestler | 10/05/1999 | 10/05/2000 | 1 Year Terms | Year Salary<br>2 $100,000.00 | | 3 | 30 | 365 |
| Diaz-Mendoza, Tomas - Villano IV<br>Contract-Wrestler | 10/05/1998 | 10/05/2000 | 1 Year Terms | Year Salary<br>2 $100,000.00 | | 3 | 30 | 365 |
| Duggan, James E. - Duggan, Hacksaw Jim<br>Contract-Wrestler | 09/01/1999 | 08/31/2001 | No Rollover | Year Salary<br>1 $175,000.00<br>2 $175,000.00 | | 3 | 30 | 365 |
| Endres, Troy A. - Endres, Troy<br>Contract-Trainee | 04/03/2000 | 04/02/2002 | Like Duration | Year Salary<br>1 $31,200.00 | | 1 | 14 | 0 |
| Eudy, Sidney R. - Vicious, Sid<br>Contract-Wrestler | 08/09/1999 | 08/08/2002 | No Rollover | Year Salary<br>1 $800,000.00<br>2 $850,000.00<br>3 $900,000.00 | Event Fee<br>PPV Bonus $50,000 (Year 1)<br>Yr. 2 PPV Bonu $95,000 (Year 2)<br>Yr. 3 PPV Bonu $80,000 (Year 3) | 12 | 90 | 180 |
| Falkinburg, Kimberly Lynne - Kimberly<br>Contract-Wrestler | 02/02/2000 | 02/01/2002 | No Rollover | Year Salary<br>1 $200,000.00<br>2 $200,000.00 | Event Fee<br>All Events $1,500 Includes PR appearances. | 0 | 0 | 125 |
| Falkinburg, Page - Page, Diamond Dallas<br>Contract-Wrestler | 02/02/1999 | 02/01/2002 | No Rollover | Year Salary<br>1 $1,150,000.00<br>2 $1,250,000.00<br>3 $1,350,000.00 | Event Fee<br>Signing Bonus $150,000 | 0 | 0 | 150 |

CONFIDENTIAL
X 001530

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|
| Faqir, Rachid Daniel - Faqir, Danny Contract-Wrestler | 06/21/1999 | 06/20/2002 | Like Duration | Year 1 2 3 | Salary $75,000.00 $75,000.00 $75,000.00 | | | 3 | 30 | 365 |
| Farmer, Jeff - NWO Sting Contract-Wrestler | 06/18/1999 | 06/15/2000 | 1 Year Terms | Year 2 | Salary $150,000.00 | | | 3 | 30 | 365 |
| Fitita, Tonga - Meng Contract-Wrestler | 03/01/1999 | 07/31/2000 | New Deal Pending | Year 2 | Salary $180,000.00 | | | 3 | 30 | 365 |
| Finlay, David - Finlay, Fit Contract-Wrestler | 11/16/1998 | 11/15/2001 | 1 Year Terms | Year 2 3 | Salary $250,000.00 $250,000.00 | | | 3 | 30 | 365 |
| Flehr, David - Flair, David Contract-Wrestler | 11/29/1998 | 11/28/2001 | No Rollover | Year 1 2 | Salary $125,000.00 $150,000.00 | Event PPV Bonus | Fee $1,000 | 3 | 30 | 365 |
| Flehr, Richard - Flair, Ric Contract-Wrestler | 02/16/2000 | 02/15/2003 | No Rollover | Year 2 3 1 | Salary $500,000.00 $500,000.00 $500,000.00 | Event House Nightly All TV events PPV Bonus Performance Bo PR Appearance | Fee $4,000 $5,000 $12,500 $0  See contract. $0  See contract. | 0 | 0 | |

See contract for maximum days.

CONFIDENTIAL
X 001531

Case 1:01-cv-01152-CC   Document 90   Filed 02/26/0?   Page 84 of 346

# World Championship Wrestling
## Talent Database
### Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| **Ford, Christopher M./Chris - Crowbar**<br>Contract-Wrestler | 07/12/1999 | 07/11/2002 | Like Duration | Year  Salary<br>1  $75,000.00<br>2  $75,000.00<br>3  $75,000.00 | | 3 | 30 | 365 |
| **Frias-Gutierrez, Roberto - Los Fabulosos - El Dandy**<br>Contract-Wrestler | 10/06/1998 | 10/05/2000 | 1 Year Terms | Year  Salary<br>2  $100,000.00 | | 3 | 30 | 365 |
| **Fuller, Rick - Fuller, Rick**<br>Contract-Wrestler | 09/14/1998 | 09/13/2000 | 1 Year Terms | Year  Salary<br>2  $65,000.00 | | 3 | 30 | 365 |
| **Funk, Allen Eric - Funk, Allen**<br>Contract-Trainee | 04/19/1999 | 04/18/2000 | Like Duration (2 Terms) | Year  Salary<br>1  $31,200.00 | | 1 | 14 | 365 |
| **Funk, Terry - Funk, Terry**<br>Contract-Wrestler | 01/03/2000 | 07/04/2000 | No Rollover | | Event    Fee<br>All Events  $4,000<br>PPV Bonus  $4,000 | 0 | 0 | 365 |
| **Gilberti, Glenn - Disco Inferno**<br>Contract-Wrestler | 03/08/1999 | 03/07/2002 | Like Duration | Year  Salary<br>1  $300,000.00<br>2  $300,000.00<br>3  $350,000.00 | | 3 | 30 | 365 |
| **Goldberg, Bill - Goldberg**<br>Contract-Wrestler | 07/01/1999 | 09/30/2003 | No Rollover | Year  Salary<br>1  $2,500,000.00<br>2  $2,500,000.00<br>3  $2,500,000.00<br>4  $3,500,000.00 | Event    Fee<br>Signing Bonus  $0 | 0 | 0 | 175 |

See contract for PPV bonus.

CONFIDENTIAL
X 001532

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|
| Gonzales-Hernandez, Eduardo Anibal - Guerrera, Juventud<br>Contract-Wrestler | 10/05/1999 | 10/05/2000 | 1 Year Terms | Year<br>2 | Salary<br>$200,000.00 | | 3 | 30 | 365 |
| Gonzalez-Barron, Cesar - Los Fabulasos - Silver King<br>Contract-Wrestler | 10/05/1998 | 10/05/2000 | 1 Year Terms | Year<br>2 | Salary<br>$120,000.00 | | 3 | 30 | 365 |
| Greenwald, Nora - Mona<br>Contract-Wrestler | 09/05/1999 | 09/05/2001 | Like Duration | Year<br>1<br>2 | Salary<br>$105,000.00<br>$130,000.00 | | 3 | 30 | 365 |
| Gruner, Peter - Kidman, Billy<br>Contract-Wrestler<br><br>Year 4 salary pro-rated to shortened term. | 02/22/1999 | 08/21/2002 | No Rollover | Year<br>2<br>3<br>4 | Salary<br>$300,000.00<br>$325,000.00<br>$325,000.00 | | 12 | 90 | 365 |
| Guerrero, Salvador - Lieutenant Loco<br>Contract-Wrestler | 06/01/1998 | 05/31/2001 | 1 Year Terms | Year<br>2<br>3 | Salary<br>$165,000.00<br>$225,000.00 | | 3 | 30 | 365 |
| Gutierrez, Oscar - Mysterio, Rey Jr.<br>Contract-Wrestler | 01/01/1999 | 12/31/2001 | 1 Year<br>Terms Mutual | Year<br>2<br>3 | Salary<br>$400,000.00<br>$425,000.00 | | 0 | 0 | 180 |
| Hall, Emory - Hall<br>Contract-Wrestler | 04/01/1999 | 03/31/2001 | Like Duration | Year<br>1<br>2 | Salary<br>$85,000.00<br>$65,000.00 | | 3 | 30 | 365 |

CONFIDENTIAL
X 001533

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Haire, Sean - Sean Haire<br>Contract-Trainee | 11/08/1999 | 11/07/2001 | Like Duration | Year Salary<br>1 $31,200.00<br>2 $31,200.00 | | 1 | 14 | 365 |
| Hall, Scott - Hall, Scott<br>Contract-Wrestler | 01/01/1997 | 12/31/2001 | No Rollover | Year Salary<br>4 $1,450,000.00<br>5 $1,625,000.00 | | 0 | 0 | 180 |
| Hamilton, Jr., Joe - Referee-Nick Patrick<br>Contract-Referee | 08/03/1998 | 08/02/2000 | 1 Year Terms | Year Salary<br>2 $90,000.00 | | 3 | 30 | 365 |
| Harris, Donald - Harris Boys - Don<br>Contract-Wrestler | 10/25/1999 | 10/24/2001 | Like Duration | Year Salary<br>1 $130,000.00<br>2 $130,000.00 | Event Fee<br>All Events $1,500 Over 75 days Year 1. Over 100 days Year 2. | 3 | 30 | 75 |
| Harris, Ronald - Harris Boys - Ron<br>Contract-Wrestler | 10/25/1999 | 10/24/2001 | Like Duration | Year Salary<br>1 $130,000.00<br>2 $130,000.00 | Event Fee<br>All Events $1,500 Over 75 days Year 1. Over 100 days Year 2. | 3 | 30 | 75 |
| Hart, Bret - Hart, Bret<br>Contract-Wrestler | 12/01/1997 | 11/30/2002 | No Rollover | Year Salary<br>3 $2,500,000.00<br>4 $2,500,000.00<br>5 $2,500,000.00 | Event Fee<br>All Events $8,500 Over 125 days<br>Bonus $100,000 Reimbursement for disability up to $100k. | 0 | 0 | 180 |
| Hayashi, Kazuhiro - Jung Dragons - Kaz<br>Contract-Wrestler | 01/11/1999 | 07/19/2001 | 1 Year Terms | Year Salary<br>2 $100,000.00 | | 3 | 30 | 365 |

CONFIDENTIAL
X 001534

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Hayner, Michael - Artist formerly known as Prince Iaukea<br>Contract-Wrestler | 01/01/1999 | 12/31/2000 | 1 Year Terms | Salary<br>Year 2 $104,000.00 | | 3 | 30 | 365 |
| Helms, Gregory Shane - 3 Count (Shane)<br>Contract-Wrestler | 05/17/1999 | 12/31/2001 | Like Duration | Salary<br>Year 1 $45,000.00<br>Year 2 $75,000.00<br>Year 3 $75,000.00 | Event: All Events<br>Fee $1,000 Over 100 days from Jan. 1, 2000 forward. | 3 | 30 | 100 |
| Hennig, Curt - Hennig, Curt<br>Contract-Wrestler | 06/30/1997 | 06/29/2000 | No Rollover | Salary<br>Year 3 $425,000.00 | | 0 | 0 | 175 |
| Hodgkinson, Richard Ian - Vampiro<br>Contract-Wrestler | 11/16/1999 | 02/10/2003 | No Rollover | Salary<br>Year 1 $250,000.00<br>Year 2 $275,000.00<br>Year 3 $300,000.00 | Event: All Events Fee $1,300 (2/11/00-2/10/01 excludes PPVs); All Events (2) $1,500 (2/11/01-2/10/02 excludes PPVs); All Events (3) $1,600 (2/11/02-2/10/03 excludes PPVs); PPV Bonus $4,000 For all PPVs effective as of 2/11/00. | 3 | 30 | 365 |
| Hogue, Harold - Ice Train<br>Contract-Wrestler | 05/26/1999 | 05/25/2002 | Like Duration | Salary<br>Year 1 $150,000.00<br>Year 2 $200,000.00<br>Year 3 $250,000.00 | | 3 | 30 | 365 |

CONFIDENTIAL
X 001535

Case 1:01-cv-01152-CC   Document 90   Filed 02/26/02   Page 88 of 346

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Huffman, Booker T. - Booker T<br>Contract-Wrestler | 02/01/1999 | 01/31/2002 | Like Duration | Year<br>2<br>3 | Salary<br>$700,000.00<br>$150,000.00 | | | | 12 | 90 | 365 |
| Huffman, Lash - Harlem Heat - Stevie Ray<br>Contract-Wrestler | 02/01/2000 | 01/31/2003 | Like Duration | Year<br>1<br>2<br>3 | Salary<br>$240,000.00<br>$240,000.00<br>$240,000.00 | Event<br>All Events | | Fee<br>$2,000  Over 80 days. | 6 | 90 | 80 |
| Hugger, Jonathan - Johnny 'The Bull'<br>Contract-Wrestler | 12/16/1999 | 12/15/2001 | Like Duration | Year<br>1<br>2 | Salary<br>$75,000.00<br>$75,000.00 | Event<br>All Events | | Fee<br>$1,000  Over 100 days<br>per year. | 3 | 30 | 100 |
| Huleta, Elizabeth Ann - Elizabeth<br>Contract-Wrestler | 01/22/1997 | 01/21/2001 | R | Year<br>4 | Salary<br>$150,000.00 | | | | 3 | 30 | 365 |
| James, Robert Brad - BuzzKill<br>Contract-Wrestler | 09/03/1998 | 09/02/2000 | 1 Year Terms | Year<br>2 | Salary<br>$125,000.00 | | | | 3 | 30 | 365 |
| James, Scott - Armstrong, Scott<br>Contract-Wrestler | 05/01/1999 | 04/30/2001 | 1 Year Terms | Year<br>1 | Salary<br>$52,142.86 | | | | 3 | 30 | 365 |

CONFIDENTIAL
X 001536

Case 1:01-cv-01152-CC Document 90 Filed 02/26/02 Page 89 of 346

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Jarrett, Jeff - Jarrett, Jeff<br>Contract-Wrestler | 10/15/1999 | 10/17/2002 | No Rollover | Year  Salary<br>1  $275,000.00<br>2  $300,000.00<br>3  $325,000.00 | Event  Fee<br>All Events  $2,500 Over 115 days. Increases after 185 days.<br>All Events (2)  $3,000 Over 185 days. Must be approved by Jarrett.<br>PPV Bonus  $7,500<br>Signing Bonus  $30,000 | 12 | 30 | 115 |
| Jindrak, Mark Robert - Jindrak, Mark<br><br>Contract-Trainee | 04/19/1999 | 04/18/2000 | Like Duration (2 Terms) | Year  Salary<br>1  $39,000.00 | | 1 | 14 | 365 |
| Jones, Michael - Jones, Mike<br>Contract-Wrestler | 03/23/1999 | 03/22/2002 | 1 Year Terms | Year  Salary<br>2  $150,000.00<br>3  $175,000.00 | | 3 | 30 | 365 |
| Keragles, Evan - Keragles, Evan<br>Contract-Wrestler | 09/14/1998 | 12/31/2001 | Like Duration | Year  Salary<br>2  $85,000.00<br>3  $85,000.00 | Event  Fee<br>All Events  $1,000 Over 100 days. | 3 | 30 | 100 |

Increase 3/1/00. Pro-rated to shortened term.

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Keibler, Stacy - Ms. Hancock<br>Contract-Nitro Girl | 11/15/1999 | 11/14/2000 | Like Duration | Year  Salary<br>1  $15,000.00 | Event  Fee<br>Non-TV/PR  $250<br>All TV events  $500<br>Valet/Physical  $500 | 1 | 30 | 365 |
| Klucsarits, Chris - Kanyon<br>Contract-Wrestler | 04/24/1998 | 04/23/2001 | 1 Year Terms | Year  Salary<br>2  $240,000.00 | | 3 | 30 | 365 |






CONFIDENTIAL
X 001537

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| Laurin, Kristina - Meow, Leila<br>Contract-Other | 12/17/1998 | 12/18/2001 | Like Duration | **Year  Salary**<br>1  $26,000.00<br>2  $26,000.00 | **Event  Fee**<br>All Events  $500 | 1 | 30 | 365 |
| LeRoux, Mark - Corporal Cajun<br>Contract-Wrestler | 09/21/1999 | 06/20/2002 | Like Duration | **Year  Salary**<br>1  $75,000.00<br>2  $100,000.00<br>3  $150,000.00 | | 3 | 30 | 365 |
| Lo Grasso, Vito - Big Vito<br>Contract-Wrestler | 11/22/1999 | 11/21/2002 | Like Duration | **Year  Salary**<br>1  $120,000.00<br>2  $130,000.00<br>3  $130,000.00 | **Event  Fee**<br>Signing Bonus  $12,000  Due 15 days after contract execution.<br>PPV Bonus  $1,000  Regardless of number of days worked.<br>All Events  $1,250  Over 100 days. | 3 | 30 | 100 |
| Maclin, Carmel - Nitro Girl - Chameleon<br>Contract-Nitro Girl | 12/20/1999 | 12/19/2000 | Like Duration | **Year  Salary**<br>1  $15,000.00 | **Event  Fee**<br>TV Nightly  $500<br>Non-TV/PR  $250<br>Valet/Physical  $500 | 1 | 30 | 365 |
| Martin, Troy - "The Franchise" Shane Douglas<br>Contract-Wrestler | 04/10/2000 | 04/09/2002 | No Rollover | **Year  Salary**<br>1  $350,000.00<br>2  $375,000.00 | **Event  Fee**<br>House Nightly  $1,750  Year 1 ($2,000 in Year 2).<br>PPV Bonus  $2,500  Year 1 ($2,750 in Year 2). | 0 | 0 | 15 |

Max. 15 days PER MONTH.

CONFIDENTIAL
X 001538

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fee | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|
| McNeil, Shannon - Nitro Girl - Baby<br>Contract-Nitro Girl | 12/20/1999 | 12/19/2000 | Like Duration | Year Salary<br>1 $15,000.00 | Event Fee<br>All TV events $500<br>Non-TV/PR $250<br>Valet/Physical $500 | 1 | 30 | 365 |
| Micek-Blackman, Deborah - Medusa<br>Contract-Wrestler | 04/17/1999 | 04/16/2001 | Like Duration | Year Salary<br>1 $150,000.00<br>2 $150,000.00 | | 3 | 30 | 365 |
| Miller, Ernest - The Cat<br>Contract-Wrestler | 02/01/1999 | 01/31/2002 | 1 Year Terms | Year Salary<br>2 $400,000.00<br>3 $450,000.00 | | 0 | 0 | 365 |
| Moore, Shannon - 3 Count (Shannon)<br>Contract-Wrestler<br><br>Year 3 pro-rated to the shortened term. | 05/17/1999 | 12/31/2001 | Like Duration | Year Salary<br>1 $45,000.00<br>2 $75,000.00<br>3 $75,000.00 | Event Fee<br>All Events $1,000 Over 100 days, starting Jan. 1, 2000 forward. | 3 | 30 | 100 |
| Moran, Mike - Disorderly Conduct<br>Contract-Wrestler | 06/21/1999 | 06/20/2002 | Like Duration | Year Salary<br>1 $60,000.00<br>2 $60,000.00<br>3 $60,000.00 | | 3 | 30 | 365 |
| Nash, Kevin - Nash, Kevin<br>Contract-Wrestler | 01/01/1997 | 12/31/2001 | No Rollover | Year Salary<br>4 $1,450,000.00<br>5 $1,625,000.00 | Event Fee<br>Booking service $200,000 1/1/99-12/31/01 | 0 | 0 | 180 |

CONFIDENTIAL
X 001539

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|
| Palumbo, Charles R. - Palumbo, Charles<br>Contract-Trainee | 04/19/1999 | 04/18/2000 | Like Duration (2 Terms) | **Year**<br>1 | **Salary**<br>$39,000.00 | | | 1 | 14 | 365 |
| Plau, Allison - Nitro Girl - Syren<br>Contract-Nitro Girl | 04/24/2000 | 04/23/2001 | Like Duration | **Year**<br>1 | **Salary**<br>$15,000.00 | **Event**<br>All TV events<br>Non-TV/PR<br>Valet/Physical | **Fee**<br>$500<br>$250<br>$500 | 30 | 30 | 0 |
| Pfohl, Lawrence - The Total Package<br>Contract-Wrestler | 04/14/1999 | 04/13/2002 | No Rollover | **Year**<br>1<br>2<br>3 | **Salary**<br>$1,200,000.00<br>$1,400,000.00<br>$1,600,000.00 | **Event**<br>Signing Bonus | **Fee**<br>$250,000 | 0 | 0 | 175 |
| Rechsteiner, Robert - Steiner, Rick(Varsity Club)<br>Contract-Wrestler | 12/01/1998 | 11/30/2001 | No Rollover | **Year**<br>2<br>3 | **Salary**<br>$750,000.00<br>$750,000.00 | | | 0 | 0 | 180 |
| Rechsteiner, Scott - Steiner, Scott<br>Contract-Wrestler | 12/01/1998 | 11/30/2001 | No Rollover | **Year**<br>2<br>3 | **Salary**<br>$750,000.00<br>$750,000.00 | **Event**<br>Performance Bo | **Fee**<br>$90,000 For 1999 | 0 | 0 | 180 |
| Riser, John - Ralphus<br>Enhancement-Other | 05/01/2000 | 04/30/2001 | Like Duration | **Year**<br>1 | **Salary**<br>$78,000.00 | **Event**<br>All Events | **Fee**<br>$750 Salary is based on guarantee of 2 events per week. | 1 | 30 | 0 |

CONFIDENTIAL
X 001540

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|
| Roman, Sammy Lee - Kid Romeo<br>Contract-Trainee | 05/19/1999 | 05/18/2002 | Like Duration | Year<br>1<br>2<br>3 | Salary<br>$39,107.14<br>$39,107.14<br>$39,107.14 | | | 1 | 14 | 365 |
| Rotunda, Michael Lawrence - Wallstreet, Michael<br>Contract-Wrestler | 10/12/1998 | 10/11/2001 | 1 Year Terms | Year<br>2<br>3 | Salary<br>$165,000.00<br>$175,000.00 | | | 3 | 30 | 365 |
| Runnels, Dustin - Rhodes, Dustin<br>Contract-Wrestler | 08/02/1999 | 08/01/2002 | No Rollover | Year<br>1<br>2<br>3 | Salary<br>$500,000.00<br>$600,000.00<br>$700,000.00 | Event<br>Signing Bonus | Fee<br>$50,000 | 12 | 90 | 365 |
| Siahi, Sonny Ulelia - Siahi, Sonny<br>Contract-Trainee | 04/19/1999 | 04/18/2000 | Like Duration<br>(2 Terms) | Year<br>1 | Salary<br>$31,200.00 | | | 1 | 14 | 365 |
| Skipper, Elix - Skipper, Elix<br>Contract-Trainee | 04/19/1999 | 04/18/2000 | Like Duration<br>(2 Terms) | Year<br>1 | Salary<br>$39,000.00 | | | 1 | 14 | 365 |
| Smiley, Norman - Smiley, Norman<br>Contract-Wrestler | 10/06/1998 | 10/05/2000 | 1 Year Terms | Year<br>2 | Salary<br>$320,000.00 | | | 3 | 30 | 365 |
| Spruill, Shannon - Unger, Daffney<br>Contract-Other | 01/03/2000 | 03/31/2002 | No Rollover | Year<br>1<br>2 | Salary<br>$52,000.00<br>$75,000.00 | Event<br>All Events | Fee<br>$500 | 3 | 30 | 365 |

CONFIDENTIAL
X 001541

05/23/00 9:42 am

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | | Additional Event Fees | | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Slipich, Shawn - Sisstah, Shawn<br>Contract-Wrestler | 03/01/2000 | 02/29/2003 | No Rollover | Salary<br>Year<br>1 | Salary<br>$78,000.00 | Event<br>All Events | Fee<br>$500 | No fee for PR days. | 3 | 30 | 0 |
| Strauss, Jacobae - Jakes<br>Contract-Wrestler | 04/19/1999 | 02/28/2001 | No Rollover | Year<br>1<br>2 | Salary<br>$85,000.00<br>$100,000.00 | Event<br>Bonus | Fee<br>$5,000 | | 3 | 30 | 365 |
| Increase effective March 1, 2000. | | | | | | | | | | | |
| Sullivan, Shannah - Nitro Girl-Paisley<br>Contract-Nitro Girl | 05/01/2000 | 04/30/2002 | Like Duration | Year<br>1<br>2 | Salary<br>$52,000.00<br>$52,000.00 | Event<br>All Events | Fee<br>$500 | Exclusive of travel days. | 3 | 30 | 365 |
| Teele Ibarra, Adolfo - La Parka<br>Contract-Wrestler | 10/06/1998 | 10/05/2000 | 1 Year Terms | Year<br>2 | Salary<br>$180,000.00 | | | | 3 | 30 | 365 |
| Toombs, Roderick - Piper, Rowdy Roddy<br>Contract-Wrestler | 03/03/1999 | 03/02/2002 | No Rollover | Year<br>2<br>3 | Salary<br>$750,000.00<br>$900,000.00 | | | | 0 | 0 | 51 |
| Max: 6 pay per view, 45 other appearances. Must have 80 days notice. | | | | | | | | | | | |
| Torborg, Dale - The Demon<br>Contract-Wrestler | 10/05/1999 | 10/04/2002 | Like Duration | Year<br>1<br>2<br>3 | Salary<br>$75,000.00<br>$100,000.00<br>$125,000.00 | | | | 3 | 30 | 365 |
| For appearances as Demon character see contract. | | | | | | | | | | | |
| Tuite, Michael Jerry - The Wall<br>Contract-Wrestler | 09/16/1999 | 09/15/2001 | Like Duration | Year<br>1<br>2 | Salary<br>$75,000.00<br>$75,000.00 | | | | 3 | 30 | 365 |

CONFIDENTIAL
X 001542

# World Championship Wrestling
## Talent Database
## Contract Summary

| Real Name - Ring Name | Start Date | End Date | Rollover Clause | Annual Salary | Additional Event Fees | | Cycle Period (Months) | Days Notice | Max Days |
|---|---|---|---|---|---|---|---|---|---|
| Walker, Bobby - Walker, Hardwork Bobby | 01/01/1999 | 12/31/2000 | No Rollover | Year Salary | | | 0 | 0 | 365 |
| Contract-Wrestler | | | | 1 $100,000.00 | | | | | |
| | | | | 2 $100,000.00 | | | | | |
| Webb, Alicia - Symphony | 11/22/1999 | 11/21/2001 | Like Duration | Year Salary | Event Fee | | 3 | 30 | 365 |
| Contract-Other | | | | 1 $20,000.00 | All Events $500 | | | | |
| | | | | | PPV Nightly $1,000 | | | | |
| Wilson, Torrie - Wilson, Torrie | 12/06/1999 | 12/05/2001 | Like Duration | Year Salary | | | 3 | 30 | 125 |
| Contract-Other | | | | 1 $200,000.00 | | | | | |
| | | | | 2 $200,000.00 | | | | | |
| Wolf, Christine M./Christi - Asya | 09/14/1999 | 09/13/2001 | Like Duration | Year Salary | | | 3 | 30 | 365 |
| Contract-Wrestler | | | | 1 $75,000.00 | | | | | |
| | | | | 2 $75,000.00 | | | | | |
| Wright, Alex - Berlyn | 01/01/1999 | 12/31/2001 | No Rollover | Year Salary | | | 0 | 0 | 200 |
| Contract-Wrestler | | | | 1 $375,000.00 | | | | | |
| | | | | 2 $395,000.00 | | | | | |
| Yandisevitz, Brian - Knobs, Brian | 03/15/1999 | 03/14/2001 | No Rollover | Year Salary | | | 6 | 30 | 365 |
| Contract-Wrestler | | | | 2 $245,000.00 | | | | | |

CONFIDENTIAL
X 001543



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

BORASH, JEREMY

CONFIDENTIAL
WCW 042050



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

January 1, 2000

Mr. Jeremy Borash
6725 Nez Perce Drive
Chanhassen, MN 55317

Re: Independent Contractor Agreement

Dear Mr. Borash:

This letter will confirm the agreement between you ("Borash") and World Championship Wrestling, Inc., ("WCW") with respect to the performance of services for WCW. In consideration of the premises and the mutual covenants and agreements herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Services:** During the Term, Borash shall provide to WCW various creative and on-air services including but not limited to:

- Write a minimum of ~~four (4)~~ twenty (20) stories per month for wcw.com;
- Write a minimum of three (3) stories per month for *WCW Magazine*
- Hosting *WCW Live!* a minimum of five (5) nights per week
- Assisting in talent scheduling and recruitment for *WCW Live!*
- Co-Host the *Internet Insiders* Webcast before each WCW pay-per-view event
- Co-Host the post pay-per-view WCW internet webcast after each WCW pay-per-view event



Borash shall perform the foregoing services for WCW during the Term as well as such other services as reasonably requested by WCW (the "Services").

2. **Term and Territory:** The territory shall be the World. The term shall begin on January 1, 2000 and shall continue month to month until notice is served by either party. Either party may terminate this Agreement at anytime upon providing a minimum of sixty (60) days written notice to the non-terminating party. Upon termination by either party, WCW shall not be responsible to make any further compensation payments hereunder to Borash.

3. **Compensation:** During the Term of this Agreement, in exchange for the performance of Services by Borash hereunder, Borash shall receive compensation from WCW at the rate of ~~Five~~ Six Thousand Dollars ($~~5~~6,000) per month. All compensation hereunder shall be payable in equal installments on a bi-monthly schedule or on such schedule as WCW may implement from time to time.

4. **Home Base:** Minneapolis, MN

5. **Expenses:** Borash may employ personnel to assist in the performance of Services; however, any personnel employed by Borash shall be at his sole expense and such employees shall be his employees and not WCW employees. Any and all expenses incurred by Borash in performing the Services hereunder shall be his full responsibility *unless otherwise approved, in writing, by WCW.* Notwithstanding the foregoing, during the

*A Time Warner Company*

CONFIDENTIAL
WCW 042051

Page 4
Mr. Jeremy Borash

**15. Termination:** WCW will have the right to terminate this Agreement without liability or further obligation to Borash if Borash (i) fails to adequately or completely perform any of his duties or obligations hereunder, whether express or implied; (ii) fails to follow the direction of WCW officers; (iii) becomes incapacitated due to physical or mental injury or illness, in such a manner so as to render Borash, in WCW's sole reasonable opinion, incapable of properly performing the duties required of Borash hereunder; (iv) engages in conduct or activities involving moral turpitude materially damaging to the business or reputation of WCW; or (v) otherwise breaches any provision or representation of this Agreement and, if curable, such breach remains unremedied for a period of seven (7) days following Borash's receipt of written notice thereof. Borash acknowledges that the waiver by WCW of its rights with respect to any provision of this paragraph in one instance will not be deemed to constitute a waiver of its rights with respect to the same or a similar breach thereafter.

**16. Representations:** Borash represents and warrants to WCW that he (i) has the right to enter into this agreement and to perform the services to be performed by him hereunder; (ii) the performance by Borash of such services will not violate the terms of any other agreement with any other individual or entity either to which Borash is a party or by which he is bound; (iii) Borash has not accepted or agreed to accept and will not accept or agree to accept directly or indirectly from any individual or entity, other than WCW, any money, service or other valuable consideration for the inclusion of any material as a part of any of WCW's programs; (iv) Borash shall faithfully and industriously perform to the best of his ability and in accordance with WCW's direction and control all of the duties that may be required of and from him pursuant to this Agreement; and (v) Borash will comply with all policies of WCW and all applicable laws.

**17. Use of Name, Likeness, Biography:** In connection with the exercise of the rights granted to WCW hereunder, including without limitation any program rights granted to WCW pursuant to this Agreement, Borash agrees that WCW shall have the right to use Borash's professional name, likeness and biography for publicity purposes and for other purposes consistent with the rights granted hereunder.

**18. Use of Services:** Nothing herein shall be deemed to obligate WCW to use Borash's services and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein.

**19. General:** This Agreement, and the documents referenced herein, contain the entire agreement and understanding and shall supersede all prior agreements or understandings concerning the subject matter hereof between the parties hereto. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless confirmed in writing. This Agreement may not be modified or amended, except by a writing executed by both parties. No waiver by either party of any term or provision of this Agreement or of any default hereunder shall affect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement is the product of arm's-length negotiations between Borash and WCW. Borash expressly states that he has had the opportunity to seek and obtain consultation in connection with the negotiation and execution of this Agreement, and that he fully understands the rights and obligations set forth herein. In the construction and interpretation of this Agreement, no account shall be taken of which party requested or drafted any particular provision or provisions of this Agreement. Regardless of the place of execution hereof, this Agreement and all amendments hereto, shall be deemed to have been negotiated, made, entered into and fully performed in the State of Georgia. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Georgia applicable to contracts made, entered into and performed entirely therein, provides Services to WCW. This Agreement shall be governed by and construed exclusively in accordance with without giving effect to its conflict of laws provisions. Borash hereby (i) submits to the jurisdiction of the United States District Court for the Northern District of Georgia and of any Georgia state court sitting in Atlanta for the purposes of all legal proceedings arising out of or relating to this Agreement and (ii) irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such proceeding which is brought in such a court. Additionally, the parties hereto agree that the State of Georgia shall be the exclusive forum and situs for the resolution of any and all disputes, controversies or matters arising

CONFIDENTIAL

Page 5
Mr. Jeremy Borash

herefrom or related hereto. Borash's Home Base is identified solely for travel purposes and shall not affect the choice of law, jurisdiction or venue hereunder. The parties further agree, notwithstanding the consideration provided for herein, that because of the special, unique and extraordinary nature of the Services hereunder and of the rights and licenses which are the subject matter of this Agreement, WCW shall be entitled to injunctive and other equitable relief to prevent any material breach or material default by Borash hereunder, and such relief shall be without prejudice to any other rights or remedies of WCW as may be provided by law. Borash may not assign this Agreement, in whole or in part, without the prior written consent of WCW, and any attempted assignment not in accordance herewith shall be null and void and of no force or effect. This Agreement shall be binding on Borash and his successors and permitted assigns. Nothing herein shall be deemed to obligate WCW to use the services of Borash and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein. With respect to WCW's rights hereunder, WCW shall have the sole right and discretion to bring any and all claims including but not limited to infringement or unfair competition claims. The headings contained herein are for the convenience of the parties only and shall not be interpreted to limit or affect in any way the meaning of the language contained in this Agreement. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party. If any provision of this Agreement shall be held void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein. Upon the request of WCW, Borash agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement. Notwithstanding any termination of this Agreement, all provisions which, by their terms or reasonable interpretation thereof, sets forth obligations that extend beyond the termination of this Agreement hereof shall survive and remain in full force and effect.

If the foregoing is consistent with your understanding of our agreement with respect to the subject matter addressed herein, please so indicate by signing below and returning this original agreement to WCW.

Sincerely,

WORLD CHAMPIONSHIP WRESTLING, INC.

By: _____

Its: _VP WCW ENTERPRISES_

AGREED AND ACCEPTED:

Jeremy Borash

Social Security No.: 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

CONFIDENTIAL
WCW 042055

## PRODUCTION FACILITIES AGREEMENT

THIS PRODUCTION FACILITIES AGREEMENT ("Agreement") has been entered into and is effective as of this _____ day of December, 1999, by and between WORLD CHAMPIONSHIP WRESTLING, INC. ("WCW") and JEREMY BORASH ("Borash").

In consideration of the mutual promises, covenants and other good and valuable consideration contained herein, the receipt and sufficiency of which is hereby acknowledged, WCW and Borash agree as follows:

1. **Property and Equipment.**

a. Borash shall provide WCW with access to and use of Borash's facility known as the Borash Production Studio, located at 6725 Nez Perce Drive, Chanhassen, Minnesota 55137 ("Studio"). The access and use provided shall be sufficient to enable WCW to produce and conduct its daily WCW Live radio and internet broadcasts ("WCW Live").

b. Borash shall provide certain required equipment and personnel necessary for the broadcast of WCW Live. Such equipment and personnel shall include, but shall not be limited to: (i) five phone lines for callers and guests; (ii) one internet phone line; (iii) one emergency phone line; (iv) one Sure RE-20 microphone; (v) one Telos six line interface; (vi) one Telos phone control board; (vii) one computer automation system; (viii) two CD players; (ix) one mini-disc player/recorder; (x) one Macke sixteen channel mixing board; (xi) one call screener/assistant producer; (xii) two computers with internet connection; (xiii) one television with cable connection; (xiv) one on-call engineer for emergency purposes; and (xv) one back-up power supply for emergency purposes. **To the extent that Borash is supplying equipment under this Agreement, Borash represents that any and all equipment shall be Year 2000 compliant as specified in Exhibit A.**

2. **Term.** The Term of this Agreement shall begin on the date first set forth above and continue for one (1) year ("Term"), unless sooner terminated as hereinafter provided. WCW may, at its option, renew this Agreement for an additional one (1) year term by providing Borash with written notice before the expiration of the Term.

3. **Studio Use by Others.** During the term contemplated by this Agreement, Borash shall devote the required studio time and provide required personnel necessary for the fulfillment of all of his obligations hereunder. WCW acknowledges, however, that the use of the Studio and equipment shall be non-exclusive to it during the term. Notwithstanding such non-exclusivity, Borash expressly agrees and warrants that no other activities in which he may be involved during the term shall interfere with WCW's Studio use and that WCW shall at all times have first priority for the availability of the Studio as required for Borash's fulfillment of all of his obligations hereunder.

113448.01

CONFIDENTIAL
WCW 042056

**15.     Governing Law, Service of Process.** This Agreement shall be governed by the laws of the State of Georgia, and Borash acknowledges that any dispute arising hereunder must be brought in any federal or state court of competent jurisdiction in Fulton County, Georgia, and Borash consents to the jurisdiction thereof. Service of a summons and complaint concerning any matter or controversy arising from or with respect to this Agreement shall be effected by sending a copy of such summons and complaint by certified mail to the party to be served at the address for such party stated above.

**16.     Force Majeure.** Notwithstanding anything to the contrary which may be contained herein, in the event that the parties cannot perform their obligations and duties as provided herein due to force majeure, including, without limitation, earthquake, act of God, riot, national state of emergency and war, failure or breakdown of communications facilities not attributable to a party's actions or omissions, or due to any other similar or dissimilar occurrence beyond the control of the parties which makes it impossible or commercially impracticable (because of the passage of time caused by any of such occurrences) to carry out the purposes hereof, then neither party hereto will be obligated to perform hereunder during the continuance thereof. In such event, the parties will negotiate in good faith for an appropriate, equitable reduction in or refund of the consideration payable by WCW as provided herein.

**17.     Entire Understanding.** The provisions herein constitute the entire understanding between the parties hereto with respect to the subject matter hereof, and this Agreement shall supercede any other previous agreements between the parties related to the production facilities. No other agreements, or understandings, whether oral or written, shall be deemed to apply to the material produced by or on behalf of Borash hereunder or the parties' relative rights and obligations with respect thereto. Any additions to or changes in this Agreement shall be set forth in writing and signed by the parties.

**WORLD CHAMPIONSHIP**                          **JEREMY BORASH**
**WRESTLING, INC.**

By:_____                    By:_____

Title: VP WCW ENTERPRISES                        Title:_____

113448.02                                    4

CONFIDENTIAL
WCW 042059

## EXHIBIT A

### YEAR 2000

The equipment and property provided hereunder, including but not limited to any software, hardware or other technology developed, used or provided by Borash for use in connection with the broadcast of WCW Live and any other material provided by Borash to WCW under this Agreement, and all subsequent versions, releases, updates or revisions thereof developed or utilized by Borash during the term of this Agreement (collectively, the "Deliverables") at the time of and after delivery to WCW are and shall be "Date/Data Compliant." For these purposes, "Date/Data Compliant" shall mean that (1) the Deliverables are capable of performing all functions specified in this Agreement prior to December 31, 1999 and January 1, 2000 and following such dates with no diminution or change in performance, functionality, accuracy or otherwise; (2) WCW shall not experience program ending and/or invalid and/or incorrect results from Deliverables due to the anticipated occurrence, passage or existence of such dates or any date thereafter; (3) the Deliverables will accept date data from other systems and sources (whether in two digit or four digit format) and properly recognize, calculate, sort, store, output, sequence and otherwise process such data in a manner that eliminates any century ambiguity; (4) the Deliverables will include four digit date data formats, if applicable; and (5) the Deliverables will recognize and correctly process date data for February 29, 2000 and all subsequent leap years. If any Deliverables are found by WCW not to be Date/Data Compliant, notwithstanding any other remedy available to WCW for breach of this Agreement, at no additional charge to WCW, Borash shall immediately correct any such defect so as to enable the Deliverables to fully function in accordance with this Agreement.

113448.01

CONFIDENTIAL
WCW 042060



# EXHIBIT / ATTACHMENT

## N

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

SUPPLEMENTAL EXPERT REPORT FOR PLAINTIFFS
TESTIMONY OF DR. DAVID W. RASMUSSEN

This supplemental report uses more recent evidence on the

number of African-Americans attending wrestling tryouts

sponsored by WCW.  Additional testimony confirms the results

reported in my initial report, i.e., that the average estimate

of the availability of African-Americans for employment as

wrestlers is about 25 percent.  This report also uses more

complete data on the racial identification of wrestlers training

at the Power Plant and those actually employed as wrestlers.

The substantive conclusions reported in the original report are

not only confirmed, but the statistical evidence that African-Americans are under-represented as wrestlers is in fact stronger than previously reported.

The availability of African-Americans, the benchmark by which African-American representation is to be evaluated, was based on the personal impressions of five individuals familiar with try-outs held at the Power Plant. I have now received data on the impressions of three more persons whose estimates of African-American availability are included in this report.

The methodology used here is identical to that of the initial report. Seven individuals who have testified as to their impressions of the representation of African-Americans among persons at the try-outs are recorded in Table 1.[1] As is clear in the Table, four of these individuals provide an estimated range and three provide a specific figure. Estimates of the percent African-American range from 10 to 40 percent. Column 1 counts each estimate as an independent observation, so Hamilton, Norris, Snakovsky, and Walker, in effect, get two votes. The mean of these eleven estimates is 26.0 percent

---

[1] This information is given in depositions or by declaration, the date of which is following the person's name: D.E. Bruce (November 21, 2002); Joseph N. Hamilton (March 22, 2002); H. Norris (December 13, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); B. Walker (November 7,2002); and Moses Williams (May 28, 2002). Tony Byron Carr provided his impressions of African-American participation in a deposition (January 28, 2002) and his estimates were included in my original report. His estimates varied widely (from a low of 10 percent to approximately 40 percent), but upon further inspection it is not clear whether these estimates pertain to wrestling tryouts or training at the Power Plant. Given the uncertainty of his testimony, his estimates are not included in this summary report. However, including this estimate has virtually no effect on the benchmarks reported in Table 1 below.

TABLE I

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN AMERICAN | |
| | ESTIMATES | AVERAGE |
| --- | --- | --- |
| D. E. Bruce | 33 | 33 |
| J. N. Hamilton | | 12.5 |
| Low | 10 | |
| High | 15 | |
| H. Norris | | 35 |
| Low | 30 | |
| High | 40 | |
| J. Snakovsky | | 35 |
| Low | 30 | |
| High | 40 | |
| B. F. Smith | 12 | 12 |
| B. Walker | | 18 |
| Low | 16 | |
| High | 20 | |
| M. Williams | 40 | 40 |
| Mean | 26 | 26.5 |
| Median | 30 | 33 |
| Mode | 40 | 35 |

African-American, the median (the mid-point of the range of
estimates) is 30 percent, and the mode (the most frequent
estimate) is 40 percent.

As noted in the original report, one could reasonably
object to counting any individual's estimate twice, so column
two provides the mid-point of the ranges provided by Hamilton,
Norris, Snakovsky, and Walker. The resulting mean is 26.5

- 3 -

percent African-American, the median is 33 percent, and the mode is 35 percent.[2]

Another source of information about the availability of African-Americans as wrestlers was provided in a list that identifies the race of 82 individuals who were trainees at the Power Plant over the 1996-2000 period.  I have been informed that the most complete list of such persons, identified by whether they are African-American, is in the Declaration of Harrison Norris (dated December 13, 2002).  Of 82 persons being trained at the Power Plant, 14 (17.1 percent) are identified as being African-American.

Five benchmarks are used in the following statistical analysis.  The lowest is the 17.1 percent that represents the actual known African-American participation in the Power Plant. The others are from Table 1: the mean, median, and mode of column one (26, 30 and 40 percent respectively) and the mode of column 2 (35 percent).

As in the initial report, Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period.  First consider Table 2. The first column shows the number of contract wrestlers reported in the Declaration of H. Norris. Column two shows the

---

[2] Recall that even if collectively these approximations of applicant flow give an accurate picture of African-American representation at the Power Plant, this estimate of interest among qualified African-Americans could be biased downward due to the chilling effect that was described in the initial report.

various benchmarks, the percent African-American expected among these wrestlers. Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in the declaration of Harrison Norris, and column five reports the difference between the actual and expected numbers of African-Americans. The last column shows the number of standard deviations. Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

The first benchmark, African-American representation among trainees at the Power Plant, is 17.1 percent. WCW hired 227 persons during 1996-2000, and had they hired African-Americans at a rate of 17.1 percent the expected number of African-American hires would be 38.8. Instead, only 17 were hired; -5.26 standard deviations from the expected number of 38.8. This is statistically significant.

Subsequent benchmarks, as noted above, come from Table 1. The number of standard deviations range from -6.36 to -10.0, far beyond the standard of -2.00 standard that indicates that chance accounts for the under-representation of African-Americans at WCW. When the shortfall of African-American wrestlers is more than -6.00 standard deviations, as in row two of Table 2, this result is expected by chance in less than 1 chance out of

- 5 -

100,000.[3] The subsequent comparisons are even less likely to occur from an equal opportunity employer if the benchmarks reflect African- American availability and interest in a wrestling career.

TABLE 2

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
REPRESENTATION AMONG WRESTLERS (1996-2000)

A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 227 | 17.1 | 38.8 | 17 | -21.8 | -3.85 |
| 227 | 26.0 | 59.0 | 17 | -42.0 | -6.36 |
| 227 | 30.0 | 68.1 | 17 | -51.1 | -7.40 |
| 227 | 35.0 | 79.5 | 17 | -62.5 | -8.69 |
| 227 | 40.0 | 90.8 | 17 | -73.8 | -10.00 |

B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 231 | 17.1 | 39.5 | 20 | -19.5 | -3.41 |
| 231 | 26.0 | 60.1 | 20 | -40.1 | -6.01 |
| 231 | 30.0 | 69.3 | 20 | -49.3 | -7.08 |
| 231 | 35.0 | 80.9 | 20 | -60.9 | -8.39 |
| 231 | 40.0 | 92.4 | 20 | -72.4 | -9.72 |

Panel B of Table 2 is identical to Panel A except that the four disputed wrestlers are included in the analysis. Three of the disputed persons are African-American, so the total number of wrestlers rises to 231 and the actual number of African-Americans hired rises to 20. The results do not change: the number of standard deviations range from -3.41 to -9.72, once

---

[3] In Table 2 of the original report there was a typographical error in row two of Panel A. When the benchmark is 23.5 in that table, the number of standard deviations is -5.71, not -7.71 as originally reported.

again indicating statistically significant under-representation of African- Americans.  The number of African-American wrestlers will be 3.41 standard deviations below the expected number by chance alone about one time in 1,000.  Recall that -6.00 standard deviations will occur less than one chance in 100,000 cases.

As noted in the initial report, the analysis in Table 2 is flawed in that it considers the number of persons in Exhibit A but does not account for the actual frequency of employment.  As an illustration, suppose an employer hired two persons, a Caucasian and an African-American, over a 10-year period.  Using the method employed in Table 2, African-American representation would be 50 percent.  But suppose that the Caucasian worked in each of the 10 years and the African-American worked in only one.  By looking at African-American representation by salary years a very different picture emerges: instead of 50 percent, African-American representation is only 1 out of 11, or 9.1 percent.

Table 3 investigates African-American representation among WCW wrestlers using salary years as the unit of observations. Based on data used in the original report and the Norris Declaration, there are 680 cells in which a person is reported to have received a salary.  Of these cells, 51 (7.5 percent)

- 7 -

represent salaries earned by African-Americans.[4]  The benchmarks that measure African-American availability are identical to those in Table 2.  When the benchmark is 17.1 percent, the lowest in the table, the shortfall of African-American wrestlers is -6.65 standard deviations from the expected number.  As in Table 2, the number of standard deviations rises with the benchmark: when the benchmark is 40 percent, the shortfall is -17.30 standard deviations.  There is less than one chance in a million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 680 | 17.1 | 116.3 | 51 | - 65.3 | -6.65 |
| 680 | 26.0 | 176.8 | 51 | -125.8 | -11.00 |
| 680 | 30.0 | 204.0 | 51 | -153.0 | -12.80 |
| 680 | 35.0 | 238.0 | 51 | -187.0 | -15.03 |
| 680 | 40.0 | 272.0 | 51 | -221.0 | -17.30 |

This analysis strongly suggests that African-Americans are significantly under-represented among wrestlers at WCW.  Even when African-American representation at the Power Plant is used as the benchmark, African Americans are significantly under-represented.  Even the highest benchmark in Tables 2 and 3 may under estimate the true availability of qualified African-

---

[4] In the original report there were 681 total salary years, 51 of which were African-American.

- 8 -

Americans, as noted in the previous report, since it is possible that if WCW was a truly equal opportunity employer it would confront an applicant pool of interested and qualified persons that mirrored that of professional basketball or professional football.

*David W Rasmussen*

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This __3rd__ day of January, 2003.

*Charles Gernazian*

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
Telephone:   (404) 261-6020
Telecopy:     (404) 261-3656

- 9 -

## CERTIFICATE OF SERVICE

This is to certify that I have this date served

opposing counsel to this action with the foregoing

**Supplemental Expert Report for Plaintiffs' Testimony of**

**David W. Rasmussen** via hand delivery, addressed as follows:

> John J. Dalton
> James Lamberth
> Eric Richardson
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This __6th__ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

FILED IN CLERK'S OFFICE

DEC 03 2002

LUTHER ___ clerk

By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRUCE HARMAN, BERT
SILVERMAN, DONALD GUTSTEIN,
and DENNIS RALIN,

                Plaintiff,

    v.

LIFE UNIVERSITY,

                Defendant.

CIVIL ACTION FILE

NO. 1:00-CV-3375-WBH

## ORDER FOR SERVICE OF
## REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate

Judge made in this action in accordance with 28 U.S.C. § 636(b)(1) and this

Court's Local Rules LR 73 and LCrR 58.1. Let the same be filed and a copy,

together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if

any, to the report and recommendation within ten (10) days of the receipt of this

Order. Should objections be filed, they shall specify with particularity the alleged

error or errors made (including reference by page number to the transcript if

applicable) and shall be served upon the opposing party. The party filing

objections will be responsible for obtaining and filing the transcript of any

evidentiary hearing for review by the district court. If no objections are filed, the

AO 72A
(Rev.8/82)

53

report and recommendation may be adopted as the opinion and order of the district court and any appellate review of the factual findings will be limited to a plain error review. <u>United States v. Slay</u>, 714 F.2d 1093 (11th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1050, 104 S. Ct. 729, 79 L. Ed. 2d 189 (1984).

The clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

**SO ORDERED**, this 3rd day of DECEMBER, 2002.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

2

FILED IN CLERK

DEC 0 3 2002

LUTHER           Clerk
By: _____
         Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRUCE HARMAN, BERT
SILVERMAN, DONALD GUTSTEIN,
and DENNIS RALIN,

        Plaintiffs,

    v.

LIFE UNIVERSITY,

        Defendant.

CIVIL ACTION FILE

NO. 1:00-CV-3375-WBH

## REPORT AND RECOMMENDATION

Plaintiff Bruce Harman, Bert Silverman, Donald Gutstein, and Dennis Ralin

filed this employment discrimination action against Defendant Life University on

December 19, 2000. [Doc. 1]. All four (4) Plaintiffs contend that Defendant

violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.

§ 2000e, et seq., by discriminating against them in their employment and

subjecting them to a hostile work environment on the basis of their religion,

Jewish. [Doc. 1]. Plaintiffs Gutstein and Ralin also assert that Defendant

discriminated against them on the basis of their age, in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq., and Plaintiff

Harman alleges that he was terminated on the basis of his disability, in violation

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. [Id.].

Finally, Plaintiff Ralin asserts state law claims of breach of contract and tortious

interference with business relations, and Plaintiff Gutstein asserts a state law claim of slander per se.  [Id.].

Defendant Life University has filed a motion [Doc. 21] for summary judgment on all of Plaintiffs' claims pursuant to Rule 56(b) of the Federal Rules of Civil Procedure based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted by the parties.

## I.    Background Facts

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.  See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 21] for summary judgment.

Defendant Life University ("Life") is an institution of higher education located in Marietta, Georgia, which offers undergraduate, master's and doctor of

2

chiropractic programs.[1]  [Defendant's Statement of Material Facts ("DSMF") ¶ 1].
All Life programs are accredited by the Southern Association of College and
Schools ("SACS"), and Life's doctor of chiropractic program is also accredited by
the Council of Chiropractic Education ("CCE").  [DSMF ¶ 2].  Sid E. Williams is
Life's President and Founder.  [DSMF ¶ 5].  In this capacity, he has the final
authority on personnel decisions at Life University, including hiring, termination,
promotion, tenure, discipline, and policy development.  [Keith Asplin Dep. at 24-
26, 36, 40; Kim Williams Dep. at 46, 59-64, 118-25].  Williams' daughter, Kim
Williams, serves as presidential liaison[2] and reports directly to Sid Williams.  [Kim
Williams Dep. at 18, 32].  Keith Asplin, Vice President of Academic Affairs, testified
that Kim Williams frequently acts on behalf of the President.  Asplin stated, "She
now interviews all the faculty and approves their hiring . . . [, and] she signs for
[Sid Williams] in the hiring process."  [Asplin Dep. at 30].  Asplin also testified that
his role as Vice President was limited to making recommendations which had to
be accepted or approved by Sid Williams.  [Id. at 23-24].

---

[1]The facts as set forth herein pertain to the period of time relevant to the
claims of the parties.

[2]Kim Williams' title was changed to "assistant to the president for Executive
Administration" in or around 1999.  [Kim Williams Dep. at 32].

3

## A.   Plaintiff Bruce Harman

Plaintiff Bruce Harman, who is Jewish, received a doctor of chiropractic degree from Life in 1980 and was hired by Life in July of 1991. [DSMF ¶ 4]. At the time of Harman's hiring, Sid Williams and other Life officials knew that Harman had back problems and was receiving disability insurance benefits. [DSMF ¶ 5]. Plaintiff Harman was hired as a part-time adjunct professor in Chiropractic Sciences in the summer of 1991 and became a full-time assistant professor in September of 1991. [DSMF ¶ 4; Harman Dep. at 106]. Harman served as Director of Post Graduate Education from approximately October of 1992 to December of 1993. [Harman Dep. at 108-09]. He also served as Department Head for Chiropractic Technique from approximately April of 1997 to March of 1998. [Id. at 109]. Harman testified that he applied for tenure in January of 1997, but he was informed by Keith Asplin, Vice President of Academic Affairs, in June of 1999 that no action had been taken on his tenure application at that time. [Id. at 107].

In a letter dated May 25, 1995, Sid Williams wrote Plaintiff Harman a letter which stated the following:

> Dear B.J.: I called you at home but could not find you. I understand you had a little surgery. I conducted a D. E. one time four days after I broke every bone in my foot. You can sit in a chair and conduct class. I provided the leadership by doing the D. E. with a crushed foot; you can use a wheelchair if needed. Is this hard nosed or what? Jews don't have pain like ordinary people. Hope you are feeling

4

better. I know there is really nothing wrong with you! Love you, Baby!

[Defendant's Exhibit ("Def. Ex.") 59A]. Approximately a year later, on May 9, 1996, Sid Williams wrote another letter to Plaintiff Harman which read, in part:

Your most recent letter was received in Sarasota. I cannot imagine a New York Jew being disturbed by John Hopkins. I can imagine a New York Jew being irritated. Hopkins has done a great job on this project. The word is out that he is on the prowl and attendance by the faculty has gone from 17 absences last Tuesday to almost zero this week. . . .

[Def. Ex. 60]. Harman also received numerous letters from Williams throughout his employment with Life which were positive, supportive, and favorable. In many of those letters, Williams expressed gratitude toward Plaintiff Harman. [Harman Dep. at 260-64; Def. Exs. 36, 37, 44, 51, 66, 70].

Plaintiff Harman testified that during several assemblies and faculty meetings, Williams would refer to individuals as "New York Jews." [Harman Dep. at 159]. At his deposition, Harman was asked, "Tell me more specifically who he referred to as a New York Jew." In response, Harman testified:

He referred to Dr. Ron Schneltzer, who is a chiropractor from New York. He referred to Dr. Bob Rabin at one time as a southern redneck New York Jew. He made a remark about Dr. Michael Rappaport, saying that he is from Israel. I don't recall the exact terminology that he used. The doctor was talking about arms and a certain chiropractic technique, that Dr. [Mike] Rappaport has short arms but that because he is from Israel he doesn't need his arms to count the money, that he uses a calculator in his head.

5

[Harman Dep. at 159-60]. Harman believed that Williams made these comments in 1998 or 1999. [Id. at 161-62]. Plaintiff Harman also testified that around 1992 or 1993, he and Harvey Fish "would usually sit together in assemblies, and Dr. Williams would refer to [them] as his New York Jews." [Harman Dep. at 236-37].

In January of 1999, Harman requested a transfer to the clinic because of his back problems. Life granted Harman's request and assigned him to the clinic as a full-time faculty clinic doctor beginning in the spring of 1999. [DSMF ¶ 9]. Clinic faculty doctors oversee patient care, conduct case management reviews with students, teach classes in the clinic, and meet with advisees. [DSMF ¶ 10]. They also assess students' skill levels, determine whether students are making satisfactory progress toward completing clinical requirements, conduct competency evaluations, and, on a one-on-one basis, create a faculty model of chiropractic care for students. [Id.]. Harman worked as a full-time clinic doctor during the spring and summer quarters of 1999. [DSMF ¶ 13]. On September 24, 1999, six (6) months after he transferred to the clinic, Harman took twelve (12) weeks of leave under the Family and Medical Leave Act ("FMLA") because of his back problems. [DSMF ¶ 14]. Harman's request for FMLA leave was supported by a letter and certification dated September 24, 1999, from Alan Maloon, his neurologist, who certified that Harman was "unable to perform work of any kind because of a serious health condition." [Maloon Dep. at 31-33; Def. Ex. 141]. Maloon also

6

indicated that there were no accommodations that would enable him to perform the essential functions of his job at that time. [Maloon Dep. at 32; Def. Ex. 141].

While Harman was out of work on FMLA leave, he sold services and products for Now You Know, Inc., a chiropractic related business owned by his wife, Jacqueline Harman, and two (2) friends, Robert Braile and Steve Szabo. [Harman Dep. at 54, 60-64, 81]. Now You Know was started in September of 1998 and incorporated in July of 1999. [Harman Dep. at 54, 81]. Braile owns fifty (50) percent of Now You Know, Szabo owns twenty-five (25) percent, and Jacqueline Harman owns twenty-five (25) percent. [Harman Dep. at 81]. Plaintiff Harman testified that he spent approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know throughout his FMLA leave. [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. Harman took trips to Detroit in October of 1999, to Orlando and Davenport, Iowa in December of 1999, and to Las Vegas in January of 2000, while selling services for Now You Know. Plaintiff Harman testified that Now You Know paid for his trips, but he did not receive any compensation for selling the company's services. [Id.].

Toward the end of his FMLA leave, Harman informed Life that he could not return to his full-time position in the clinic at that time, and he asked Life to give him a part-time position, working two (2) days a week, six (6) hours a day, upon the expiration of his FMLA leave on January 4, 2000. [DSMF ¶ 23]. Harman

7

testified that his supervisor, Steven Mirtschink, told him that "there would be no part-time schedule available" for him and that he should direct any further communication to Deborah Pogrelis, Chief of Staff of Clinics. [Harman Dep. at 131-32, 275-76]. In a letter dated January 3, 2000, Pogrelis wrote Plaintiff Harman and informed him, "In response to your request of December 22, 1999 there is no possible accommodation available in the clinics. However, I will forward your request up my chain of command to Dr. [Ron] Kirk," Dean of the School of Chiropractic. [Def. Ex. 113]. Kirk wrote Plaintiff Harman a letter dated January 4, 2000, the day Harman's FMLA leave expired, which stated, "There are currently no part-time faculty positions available in the School of Chiropractic." [Def. Ex. 114; DSMF ¶ 27].

Three (3) weeks later, on January 25, 2000, Plaintiff Harman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). [DSMF ¶ 31]. Harman checked the boxes marked "religion," "retaliation," "disability," and "other." [Def. Ex. 117]. In an attachment to the charge, Harman wrote that he believed that Life University had discriminated against him on the basis of his disability, degenerative back disease, in violation of the Americans with Disabilities Act ("ADA"), and on the basis of his religion, Jewish. [Id.]. He also stated his belief that Life had violated the FMLA and that it had retaliated against

8

him for his "request for accommodation under the FMLA and the ADA." [Id.]. On March 1, 2000, Life terminated Harman's employment. [DSMF ¶ 29].

### B.    Plaintiff Bert Silverman

Plaintiff Bert Silverman, a Jewish male, interviewed for a job at Life University in November of 1996 with Sid Williams and several Life faculty members and administrators. [DSMF ¶ 36]. Silverman testified that, during this interview, Williams said that Silverman would like Life because there were many Jews there. [DSMF ¶ 37]. Silverman found Williams' comment offensive and insulting, but when Williams offered him an associate professor position in the Department of Biochemistry, Silverman accepted the position and began working for Life in December of 1996. [DSMF ¶ 39].

Silverman testified that he heard Sid Williams use the phrase "New York Jews . . . at least a dozen times from 1997 to 1999, referring to faculty, [and] to chiropractors who are not at Life. . . ." [Silverman Dep. at 104]. Silverman stated that Williams referred to Mike Rappaport as a "New York Jew with short arms . . . that Rappaport's short arms were okay to be used for running a calculator, running an adding machine, and counting his damn money." [Id. at 30]. Silverman also testified, "[W]hat I remember as a continuum, as a blur, is Sid referring to Bob Rabin as a New York Jew." [Id. at 104-05].

9

Samuel Demons, Chair of the Basic Sciences Division where Silverman worked, testified that in 1999, he was informed that he needed to reduce the number of faculty members in the division. [Demons Dep. at 57-59]. Ron Kirk, Dean of the School of Chiropractic, gave this instruction to Demons. [Id.]. Demons testified that he and Kirk met with other division chairs and department heads in the School of Chiropractic to discuss criteria which should be used in selecting which professors would be laid off. [Demons Dep. at 58-62, 98-99]. Factors considered were longevity, performance reviews by staff and students, negative disciplinary actions, loyalty, and educational background. [Id.]. Demons asked the department heads to recommend to him who should be terminated. [Id. at 62].

Demons testified that Tom Iha, the Chair of the Biochemistry Department at that time, initially recommended to Demons that Henry Zeidan, another faculty member in the department, be terminated. [Demons Dep. at 65]. Demons, however, stated that he rejected the selection of Zeidan because he was concerned that Iha was basing his recommendation on his personal animosity toward Zeidan. [Demons Dep. at 65, 69-80]. Demons determined that Silverman should be terminated instead. [Id. at 98-99]. Demons then submitted Silverman's name to Keith Asplin, Vice President of Academic Affairs, who then submitted the list of faculty recommended for termination to Williams for his approval. [DSMF ¶ 47].

10

Plaintiff Silverman's employment with Life University was terminated on September 30, 1999. [Asplin Dep. at 127-28; Silverman Dep. at 155]. On March 14, 2000, Silverman filed a charge of discrimination with the EEOC alleging that he was discriminated against on the basis of his religion and that he was subjected to a religiously hostile work environment. [DSMF ¶ 49; Def. Ex. 22].

### C.     Plaintiff Donald Gutstein

Plaintiff Donald Gutstein is a sixty-nine (69) year old Jewish male who first visited Life University in 1994 or 1995. [DSMF ¶ 55]. During this visit, Gutstein heard Sid Williams give a speech in which Williams referred to a group of people with whom Gutstein was sitting as "New York Jews." [Id.]. Gutstein testified that Williams also "made disparaging remarks about [Tom Oliver], that he looked like a faggot, and then made fun of his age." [Gutstein Dep. at 75].

Although Gutstein now says that he was offended, humiliated, demeaned and hurt by these comments, immediately after the visit, he wrote a letter to Williams and applied for a job. [DSMF ¶ 56]. The letter, dated April 16, 1995, read in pertinent part:

> I have heard about you, D.E. and Life College for years now. Experiencing, for myself, this trinity is something words cannot describe. I was thunderstruck, where had I been all these years. Being in Marietta felt like I had come home. I want to thank you all for what you are doing for all of us, not just for chiropractors, but for all people.

11

> Over the years, students of mine, have been telling me that I belonged at Life College. Now, I know they were right. It isn't just the college, it's your vision that is so exciting. What you are able to conceptualize and accomplish is mind boggling; it's never been done in such a grand scale before.
>
> I have been teaching for thirty five years and in continuous practice for thirty four years. Time does fly. I am enclosing a C.V. which tells you some of the things I have been doing all these years. It is by no means complete but is fairly representative of my career.
>
> If you feel that there is a place for me at Life College, I would love to talk with you about the possibilities.

[Def. Ex. 121]. In December of 1995, Life hired Gutstein as Chair of the Physiology Department. He was sixty-two (62) years old at the time. [DSMF ¶ 57].

On November 12, 1996, Life promoted Gutstein to Associate Academic Dean. [DSMF ¶ 58]. The following year, in December of 1997, Williams praised Gutstein's teaching: "You should have more, much more. You are a good teacher." [DSMF ¶ 59].

In August of 1998, after the resignation of his supervisor, Academic Dean Karen Martucci, Gutstein returned to full-time teaching in the Physiology Department. [DSMF ¶ 60]. Gutstein testified that he left the Office of Academic Affairs and returned to teaching because of his fear that he would be fired due to his association with Martucci. [Gutstein Dep. II at 4-5]. He believed that "Kim Williams [presidential liaison] despised Karen Martucci" and that "[t]here was a vendetta going on between then dean James Brown and Karen Martucci." [Id. at 5]. Gutstein further testified, "I also knew, because of remarks that were made by

12

Dr. Williams, that he considered that whole office to be problematic, and, therefore, I all of a sudden became one of the enemies because I was in that office, and so I was frightened that they might get rid of me as well." [Id.].

In the fall of 1999, Keith Asplin, at the direction of Williams, instituted an assessment of all faculty to make sure their credentials were in compliance with SACS and CCE criteria. [DSMF ¶ 61; Plaintiff's Response to ("Pla. Resp.") DSMF ¶ 61; Asplin Dep. at 154]. An initial evaluation by Kim Williams indicated that Gutstein did not have the requisite hours to teach physiology. [Asplin Dep. at 154-55]. Asplin testified, "When that decision was made I met with Sam Demons and said this doesn't make sense, I don't know how this was added up but I want a review of all the course work that [Gutstein] had taken, much of which was called nutrition. But in the analysis of those courses we viewed that many of them were specifically physiology, and when you credited those courses as physiology, . . . it was determined that he had enough course work to be teaching physiology." [Asplin Dep. at 155]. Asplin further testified that when the analysis of Gutstein's credentials was completed, he "attended a SACS meeting at which point SACS defined all professional programs as graduate level programs." [Id. at 155-56]. As a result, lead instructors in Basic Science courses in professional programs, such as Life's Doctor of Chiropractic program, would be required to hold a Ph.D. [Id.].

13

Under the newly-defined SACS requirement, teachers in all of the Basic Science courses in the School of Chiropractic, including anatomy, physiology, biochemistry, psychology, and nutrition, were required to have a Ph.D. [Asplin Dep. at 85-86]. Lab instructor positions, however, did not require a Ph.D. [Id.]. According to Asplin, Gutstein was not qualified to teach physiology after the SACS change in accreditation requirements, but he could teach some of the courses in the Doctor of Chiropractic curriculum. [Id. at 85-87]. Asplin testified, "For [Gutstein] to have been reassigned to a different course would have meant someone else had to be terminated, and that decision wasn't made." [Asplin Dep. at 157].

Florence Rigby, a faculty member in the Physiology Department, testified, "Dr. Demons made an attempt to find additional hours for [Gutstein] in other divisions and said the other division chairs were unwilling to provide anything." [Rigby Dep. at 23]. Rigby also testified, however, that Matt Williams, head of Clinical Sciences, stated in a curriculum meeting that "he would only employ [Gutstein] with direct orders from the higher administration." [Id.]. Wayne Menkus, head of the Physiology Department, testified that Demons informed him that the number of hours that Gutstein was scheduled to teach was not Demons' decision. [Menkus Dep. at 29]. Deborah Pogrelis, Chief of Staff of Clinics, testified that the CCE standards say that "any doctor that is appointed to a clinic faculty

14

position who is involved in supervising students delivering patient care must be licensed in the state where the institution is domiciled." [Pogrelis Dep. at 70]. Because Gutstein did not have the requisite Georgia chiropractic license and refused to obtain one, he was not permitted to teach in the School of Chiropractic. [DSMF ¶ 69; Pla. Resp. DSMF ¶ 69].

Gutstein testified that Sam Demons and Kim Williams told students that Gutstein was not qualified to teach when they asked Demons about the topic during a meeting on November 9, 1999. [DSMF ¶ 79; Gutstein Dep. II at 56]. The minutes of that meeting were posted by students on a student bulletin board. [Id.]. On January 11, 2000, Gutstein's hours were reduced from full-time to part-time. [DSMF ¶ 70; Pla. Resp. DSMF ¶ 70; Gutstein Dep. II at 115]. Gutstein filed a charge of discrimination with the EEOC on January 25, 2000. [DSMF ¶ 71; Pla. Resp. DSMF ¶ 71]. By the spring or summer of 2001, his hours had dwindled to zero, and his employment with Life ended. [DSMF ¶ 70; Pla. Resp. DSMF ¶ 70].

Plaintiff Gutstein contends that after a meeting which took place between 1996 and 1998, he heard Kim Williams mutter under her breath that Gutstein was an abrasive New York Jew. [Gutstein Dep. II at 12-13]. He also testified that he heard Sid Williams say, "The problem with him is he doesn't answer any questions. He answers questions by asking a question just like a Jew." [Id. at 63-64]. Gutstein did not know to whom Williams was referring. [Id.]. Plaintiff Gutstein

15

also testified about Williams' comment about Mike Rappaport being a New York Jew with short arms, about Williams' repeated references to "Bob Rabin as a New York Jew, a red neck New York Jew, a red neck New York Jew with white socks," and about Williams' numerous comments about "New York Jews" at orientations, assemblies and faculty meetings. [Id. at 12-13, 17, 30, 63-64]. Gutstein, however, was never singled out by Williams as Jewish. [DSMF ¶ 74].

Plaintiff Gutstein also contends that he heard numerous age-related comments. Although Sid Williams is five (5) years older than Gutstein, Gutstein testified that at least ten (10) times Williams referred to him as "old Gutstein," making comments like, "I keep old Dr. Gutstein here because he makes me look young by comparison." [Gutstein Dep. II at 18]. According to Gutstein, on at least six (6) occasions, Williams joked about the age of Tom Oliver at faculty meetings and assemblies and made comments about the age of Ron Roland, director of Life's senior adult program. [Id. at 18-21]. Gutstein testified that Williams also commented about the age of Edie Dahlhauser: "He was making remarks about her age at a student assembly, and from her age he went on to the number of children she had, then from the number of children she had he went on to remark that they looked so different that he had questions about who was their father, in effect calling them bastards." [Gutstein Dep. II at 19].

16

### D.    Plaintiff Dennis Ralin

Plaintiff Dennis Ralin, who is Jewish, holds a Ph.D. in zoology. [DSMF ¶ 80].
Life University hired Ralin as an associate professor in its Natural Sciences
Department in 1990.    [DSMF ¶ 81].    Life promoted Ralin to Chairman of
Undergraduate Admissions in 1991 or 1992 and to full professor in 1996. [DSMF
¶ 83].  Ralin was also promoted to Chairman of the Biology Department in 1997.
When the Biology, Physics and Chemistry Departments were consolidated into one
department, Natural Sciences, Ralin was named Department Chair. [DSMF ¶ 83].

Ralin testified that he heard Sid Williams refer to Williams' son-in-law as a
"Philadelphia Jew" at a faculty meeting in 1992 or 1993. [Ralin Dep. at 24-25].
At a meeting in April of 1998, Williams referred to Ralin as "Old Gray Beard" or
"Gray Beard" numerous times.  [Id. at 132-33].  Ralin also stated that he heard
Williams make comments during 1999 faculty meetings about Bob Rabin being a
"New York Jew" and about Mike Rappaport having short arms, "but long enough
to reach the cash register."  [Id. at 25-30].

In the fall of 1999, Keith Asplin, Vice President of Academic Affairs, notified
Mamie Ware, Dean of the School of Arts and Sciences, that he was moving Michael
Hoefer out of the Academic Affairs office and back to the Natural Sciences
Department.  [DSMF ¶ 84].  Asplin informed Ware that she needed to create a
schedule for Hoefer and noted that Hoefer's schedule might impact other faculty

17

members. [Ware Dep. at 58-53, 78]. Ware testified, "What Dr. Asplin asked me for was to make a schedule for Dr. Hoefer. I made a schedule for Dr. Hoefer. After I made a schedule for Dr. Hoefer, I did not have a schedule for Dr. Ralin. I informed Dr. Asplin that I did not have a teaching schedule for Dr. Ralin, and that's what I gave to Dr. Asplin." [Id. at 78]. Prior to this time, Ralin had been teaching biology courses in the undergraduate school, and Hoefer was only qualified to teach biology. [Ware Dep. at 79-80]. Ware also testified that while Asplin did not explicitly use Ralin's name, it was Asplin who made the decision to cut the teaching hours of Plaintiff Ralin instead of the hours of Scott Carpenter, a faculty member scheduled to teach biology, or Sandra Davidson, the Department Chair. [Ware Dep. at 81-84].

According to Ware, after she turned in the teaching schedule which did not include any classes for Plaintiff Ralin, Asplin sent a letter to Ralin informing him that his employment with Life was terminated. [Ware Dep. at 91-92]. Asplin originally sent Ralin a letter dated December 10, 1999, stating that his termination would be effective January 9, 2000. [Def. Ex. 91]. The letter served as Plaintiff Ralin's thirty (30) days' notice. [Id.]. According to Ralin, when he received the letter, he called Asplin on December 13, 1999, and Asplin asked him to come in to the office that day because Asplin had a plan that would be to Ralin's benefit. [Ralin Dep. at 68].

18

Ralin met with Asplin that day. [Ralin Dep. at 68-74]. He testified that during the meeting, "[Asplin] said that instead of working an additional 30 days, that they wanted me paid off immediately and would have a check ready for me this afternoon. They wanted me off campus immediately." [Ralin Dep. at 69]. When Ralin was asked to whom Asplin was referring when he used the term "they," Ralin testified that he assumed Asplin was talking about Sid and Kim Williams. [Ralin Dep. at 71-73]. Asplin also had told Ralin that "they will be in Florida next week," and Ralin knew that the Williamses "have a place in Florida." [Ralin Dep. at 73]. During the meeting, Asplin gave Ralin another letter, this one dated December 13, 1999, which provided that Ralin's termination was effective immediately. The letter also read, in part, "In lieu of thirty - (30) calendar days' notice, as provided in your Appointment letter, you will be paid thirty - (30) calendar days' salary." [Def. Ex. 92]. Ralin testified, "[Asplin] told me that he didn't know about this [Ralin's termination] until Thursday, which would have been the 9[th]" of December. [Ralin Dep. at 71-72].

Ware testified that she did not know why Ralin was terminated. [Ware Dep. at 76]. Ware recommended Ralin for a teaching position in the Cobb County School System. [DSMF ¶ 92]. Ralin taught as a substitute in the Marietta City Schools and, in August 2000, began working full-time for the Gilmer County School System at a salary of $57,000 per year, $15,000 more per year than his Life

19

salary. [DSMF ¶ 93]. On March 14, 2000, Plaintiff Ralin filed a charge of discrimination with the EEOC, contending that he had been discriminated against because of his religion, Judaism, and his age, fifty-five (55). [Def. Ex. 99]. He also asserted that he had been subjected to a religiously hostile work environment. [Id.].

Additional facts will be set forth below as they become necessary for discussion of Plaintiffs' claims.

## II.    Summary Judgment Standard

The court should grant a motion for summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The movant carries his burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Generally, "[t]he

AO 72A
(Rev.8/82)

mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

## III.    Discussion

All four (4) Plaintiffs, Bruce Harman, Bert Silverman, Donald Gutstein, and Dennis Ralin, contend that Defendant Life University subjected them to a hostile work environment on the basis of their religion, Jewish, in violation of Title VII. [Doc. 1 at 17-19]. In addition, Plaintiff Harman contends that he was terminated on the basis of his religion, in violation of Title VII, and on the basis of his disability, in violation of the ADA. [Id. at 15-17, 22-23]. Plaintiff Silverman argues that he was terminated on the basis of his religion. [Id. at 15-17]. Plaintiff Gutstein argues that he was demoted from full-time to part-time and eventually given no teaching hours on the basis of his religion and his age, in violation of Title VII and the ADEA respectively. [Id. at 15-17, 19-21]. He also asserts a state law claim of slander per se. [Id. at 27-29]. Plaintiff Ralin claims that he was terminated on the basis of his religion and his age, in violation of Title VII and the

21

AO 72A
(Rev.8/82)

ADEA, and he asserts state law claims of breach of contract and tortious interference with business relations. [Id. at 15-17, 19-21, 24-27].

## A.   Religiously Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In the present case, all of the Plaintiffs allege that they were discriminated against on the basis of their religion when they were subjected to a religiously hostile work environment while working at Life University. An employer's discriminatory conduct results in a hostile work environment when it is "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion or national origin." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). To establish a *prima facie* case of hostile work environment harassment based on religion, Plaintiffs must show the following: (1) they belong to a protected group; (2) they were subjected to unwelcome harassment; (3) the harassment was based upon their religion; (4) the harassment affected a term, condition or privilege of their employment; and (5) a basis for holding Defendant

22

2-CC   Document 90   Filed 02/26/0

liable.[3]  See Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982); Ellis

v. Wal-Mart Stores, Inc., 952 F. Supp. 1513, 1518 (M.D. Ala. 1996).  Because

Plaintiffs are Jewish and were subjected to unwelcome comments about their

religion, the only elements in question are the last two (2).  Like the majority of

cases, the most significant and most contested element in this case is the fourth

one: whether the conduct Plaintiffs complain of was severe enough to affect a term,

condition or privilege of their employment.

For harassment to be actionable under Title VII, it "must be both objectively

and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." Faragher v. City of

Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998).

In determining whether the complained of harassment was sufficiently hostile or

abusive to affect a term, condition or privilege of employment, courts are to look

at all the circumstances, including the frequency and severity of the conduct.  See

id.  Courts should also look at whether the conduct is "physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." Id.  The Supreme Court has made it clear

that Title VII is not a "general civility code." Oncale v. Sundowner Offshore

---

[3]In Defendant Life's summary judgment motion, the University addresses all
of the Plaintiffs' hostile work environment claims in a single discussion. [Doc. 21
at 36-40].  The court will do the same.

23

Services, Inc., 523 U.S. 75, 77-79, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d. 201 (1998).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment.  Faragher, 524 U.S. at 788, 118 S. Ct. at 2283 (citations omitted).

Plaintiffs allege that the following support their claim of a religiously hostile work environment: (1) comments made by Sid Williams in 1992 or 1993 during assemblies and faculty meetings in which he referred to Plaintiff Harman and Harvey Fish as "his New York Jews" and to Williams' son-in-law as a "Philadelphia Jew" [Harman Dep. at 236-37; Ralin Dep. at 24-25]; (2) Williams' letter to Plaintiff Harman in 1995 which stated, in part, "Jews don't have pain like ordinary people" [Def. Ex. 59A]; (3) a reference by Williams to a group of people as "New York Jews" in a speech made in 1994 or 1995 [DSMF ¶ 55]; (4) Williams' letter to Plaintiff Harman in 1996 stating, in part, "I can imagine a New York Jew being irritated" [Def. Ex. 60]; (5) Williams' statement to Plaintiff Silverman that he would like Life because there were so many Jews there [DSMF ¶ 37]; (6) Kim Williams muttering that Plaintiff Gutstein was an abrasive New York Jew after a meeting sometime between 1996 and 1998 [Gutstein Dep. II at 12-13]; (7) Sid Williams' statement within earshot of Gutstein that an unidentified person "answers questions by asking a question just like a Jew" [Gutstein Dep. II at 63-64]; (8) Williams stating in a 1999 faculty meeting that Michael Rappaport was a "New York Jew with short

24

arms" [Ralin Dep. at 25-30]; (9) Williams' use of "New York Jew" more than a dozen times from 1997 to 1999 when referring to Life faculty and chiropractors not at Life [Harman Dep. at 159-60; Silverman Dep. at 104-05]; and (10) Williams' repeated references to Bob Rabin as a "New York Jew" or "a red neck New York Jew" [Gutstein Dep. II at 12-13, 17, 30, 63-64].

The court finds that these incidents are sufficiently severe to allow Plaintiff's religiously hostile work environment claims to survive summary judgment. As noted *supra*, one of the factors that courts are to consider is the frequency of the conduct. See Faragher, 524 U.S. at 787, 118 S. Ct. at 2283. Here, the comments made predominantly by Sid Williams occurred with regularity. All four (4) Plaintiffs testified that Williams referred to people as New York Jews dozens of times during faculty meetings, assemblies and private meetings. The fact that so many of these references occurred in public caused Plaintiffs a great deal of humiliation, which is another factor that must be taken into account.   See Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).

Williams' statement in a letter to Harman that "Jews don't have pain like ordinary people" and his numerous references to "Bob Rabin as a New York Jew, a red neck New York Jew, [and] a red neck New York Jew with white socks" are offensive, anti-Semitic and, quite frankly, bizarre. [Gutstein Dep. II at 12-13, 17, 30, 63-64; Def. Ex. 59A].  His comment to Rappaport during a 1999 faculty

25

meeting, which all of the Plaintiffs attended, is particularly appalling.  Plaintiff Silverman testified that Williams called Rappaport a "New York Jew with short arms . . . that Rappaport's short arms were okay to be used for running a calculator, running an adding machine, and counting his damn money." [Silverman Dep. at 30].  Plaintiff Ralin described the same incident, saying, "Well, [Williams] was making fun of Dr. Rappaport's short arms, having arms disproportionately short, I understand, because he had polio or something when he was a kid or. . . . And he was making fun of his arms, he said, but long enough to reach the cash register." [Ralin Dep. at 27].  The court concludes that a jury could find that these comments and references, made over and over again, are more than just "simple teasing" and "offhand comments."  Faragher, 524 U.S. at 788, 118 S. Ct. at 2283. They certainly were not isolated. Id. By offering evidence showing that the religious harassment affected a term, condition or privilege of Plaintiffs' employment, they have satisfied the fourth *prima facie* element.

The final *prima facie* element requires Plaintiffs to show that there is a basis for holding Defendant liable.  In Harris v. Forklift Systems, Inc., *supra*, as the Supreme Court noted in Faragher, "the individual charged with creating the abusive atmosphere was the president of the corporate employer, who was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy."  Faragher, 524 U.S. at 789, 118 S. Ct. at

AO 72A
(Rev.8/82)

2284. For this reason, "standards for binding the employer were not in issue in Harris." Id. The same is true in the present case where the person making the harassing comments, Sid Williams, was Life University's President and Founder. Because there is no question that Williams held a position high enough in the University's hierarchy to impute his actions to the employer, Plaintiffs are able to establish the final *prima facie* element of their religiously hostile work environment claims. See id. at 789-90, 118 S. Ct. at 2284-85.

Defendant uses a paragraph to explain that "Plaintiffs did not complain or follow the procedures contained in Life's non-discrimination policies." [Doc. 21 at 39-40]. However, the University makes no argument as to how this is relevant to its summary judgment motion. Presumably, Defendant cites Plaintiffs' failure to complain as evidence that the University can assert the two (2) part affirmative defense established by the Faragher court. The two (2) elements are: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807, 118 S. Ct. at 2293. The court finds, however, that the Faragher affirmative defense is inapplicable in the present case and that Plaintiffs' alleged failure to complain about Williams is not relevant to their claims. As the Eleventh Circuit has noted, "[A]n employer can be held vicariously liable for

27

a supervisor's sexual[4] harassment . . . [when] the supervisor holds such a high position in the company that he could be considered the employer's 'alter ego.'" Dees v. Johnson Controls World Services, Inc., 168 F.3d 417, 421-22 (11th Cir. 1999). In those instances, the affirmative defense does not apply. Id. Sid Williams' position as President of Life is certainly high enough to be considered the University's alter ego.

For all these reasons, the court finds that Plaintiffs are able to establish a *prima facie* case of a religiously hostile work environment. Because the Faragher affirmative defense is inapplicable, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on this claim.

### B.    Religious Discrimination in Terminations and Demotion

All four (4) Plaintiffs contend that they were subjected to adverse employment actions on the basis of their religion in violation of Title VII. According to Plaintiffs, Defendant Life University demoted Gutstein and terminated the employment of Harman, Silverman and Ralin on the basis of Plaintiffs' religion, Jewish. [Doc. 1].

---

[4]Most of the cases discussing the issue of hostile work environment have involved claims of sexual harassment, but the same standards apply to harassment based on race, national origin, age and religion. See Deffenbaugh v. Wal-Mart Stores, Inc., 156 F.3d 581, 592-93 (5th Cir. 1998); Wright-Simmons v. The City of Oklahoma City, 115 F.3d 1264, 1270 (10th Cir. 1998); Fierro v. Saks Fifth Avenue, 13 F. Supp. 2d 481, 491 (S.D. N.Y. 1998).

28

In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against him.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The familiar McDonnell Douglas framework governs the allocation of burdens and order of presentation and proof, and they are as follows: (1) plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, plaintiff must have an opportunity to prove by a preponderance of the evidence that the *legitimate reason offered by* defendant was a pretext for discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973).

A plaintiff may establish a *prima facie* case of discrimination under Title VII by presenting direct evidence of discriminatory intent.  Alternatively, a plaintiff may establish a *prima facie* case through a variant of the circumstantial evidence test established in McDonnell Douglas.  In the present case, Plaintiff relies on

29

circumstantial evidence, rather than direct evidence, to establish a *prima facie* case; therefore, application of the McDonnell Douglas test is appropriate.[5]

A plaintiff can make out a *prima facie* case of disparate treatment by proving (1) that he was within a protected class; (2) that he suffered an adverse employment action; and (3) that a similarly situated employee not within his protected class was not subjected to the adverse employment action. See Burdine, 450 U.S. at 258, 101 S. Ct. at 1096; Krieg v. Paul Revere Life Ins. Co., 718 F.2d 998, 999 (11th Cir.1983). The alleged discriminatory action must be subjectively and objectively adverse. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Doe v. DeKalb County School District, 145 F.3d 1441 (11th Cir.

---

[5]Plaintiffs contend that they have direct evidence of religious discrimination because the comments made by Sid Williams produce an inference of discriminatory motive.  Quoting from Judge Tjoflat's opinion in Wright v. Southland Corporation, 187 F.3d 1287, 1293 (11th Cir. 1999), Plaintiffs write, "The courts have defined 'direct evidence' as that 'from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic.'" [Doc. 50 at 32]. The undersigned disagrees that this is the definition of direct evidence. As the court in Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1122 n. 11 (S.D. Ala. 2000), explained, "Judge Tjoflat's definition of direct evidence 'is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel joined that portion of the opinion.'" Id. (quoting Copley v. Bax Global, Inc., 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000)). The Ferrell court also noted that the Eleventh Circuit has refused to apply Judge Tjoflat's definition of direct evidence since his opinion was issued. Id. (citing Damon v. Fleming Supermarkets of Fla., 196 F.3d 1354, 1358-59 (11th Cir. 1999); Beaver v. Rayonier, Inc., 200 F.3d 723, 729-30 (11th Cir. 1999)). In the present case, Williams' comments are circumstantial evidence of discrimination, and the McDonnell Douglas burden shifting framework is applicable.

1998) (adopting an objective test to determine if an employment action is adverse). Moreover, the adversity must be material; that is, it must be more than "some de minimis inconvenience or alteration of responsibilities." DeKalb County School District, 145 F.3d at 1453.

In the present case, the first two (2) *prima facie* elements are satisfied because all four (4) Plaintiffs are Jewish and suffered adverse employment actions. Plaintiffs Silverman and Ralin were terminated, Plaintiff Harman was denied a part-time schedule before being terminated, and Plaintiff Gutstein's teaching hours were reduced from full-time to part-time and eventually to zero. [DSMF ¶¶ 29, 70; Def. Ex. 92; Asplin Dep. at 127-28]. Plaintiffs have also satisfied the final *prima facie* elements by showing that similarly situated non-Jewish employees were retained by Life University.

When Silverman was terminated from his employment in the Biochemistry Department in September of 1999, two (2) other instructors, Henry Zeidan and Bob Waterson, remained employed in the department. [Silverman Dep. at 189]. Neither Zeiden nor Waterson is Jewish. [Waterson Dep. at 8; Gutstein Aff. ¶ 21].

Ralin's teaching hours were cut around the end of November in the fall quarter of 1999, and he was terminated on December 13, 1999. [Def. Ex. 92; Ware Dep. at 78-86]. All of Ralin's courses in the Biology Department were awarded to Michael Hoefer, who is not Jewish. [Plaintiffs' Statement of Material Facts

31

("PSMF") ¶ 29; Ware Dep. at 48-51, 78-86]. Two (2) other biology teachers who are not Jewish, Scott Carpenter and Sandra Davidson, did not have any of their teaching hours given to Hoefer. [Ware Dep. at 81-84].

Harman was not awarded a part-time position, as he had requested, after he returned from his FMLA leave in January of 2000. [DSMF ¶¶ 23, 27]. However, Deborah Pogrelis, Chief of Staff of Clinics, acknowledged that at least one non-Jewish instructor, Ken Holewinski, worked a part-time schedule at the clinic during this same period of time. [Pogrelis Dep. at 40-49]. Plaintiff Harman contends that since the time he was terminated, two (2) other non-Jewish employees, Malon Harris and Mark Amos, worked part-time schedules at the clinic as well. [Harman Dep. at 144-51].

Gutstein's teaching hours were reduced because, according to Life, his lack of a Ph.D. made him unqualified to be a lead instructor in Basic Science courses. [Asplin Dep. at 85-86, 155-56]. Although Gutstein was qualified to teach lab courses, he was not offered any of these teaching hours. [Asplin Dep. at 157]. However, Robert Burger, a non-Jewish professor, who also did not have a Ph.D., was given hours teaching lab courses immediately after being notified that he could not continue as a lead instructor in the School of Chiropractic. [Burger Dep. at 6, 7, 13, 17-20]. This occurred in the spring of 2001, the same time Plaintiff Gutstein's hours dwindled to zero. [Id.; DSMF ¶ 70].

32

AO 72A
(Rev.8/82)

All four (4) Plaintiffs have established a *prima facie* case of religious discrimination. Thus, the burden of production shifts to Defendant Life University to articulate some legitimate, non-discriminatory reasons for the actions taken against Plaintiffs. See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Burdine, 450 U.S. at 254, 101 S. Ct. at 1094). To satisfy its burden of production, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. (quoting Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094). "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. at 257, 101 S. Ct. at 1096). The defendant's burden in the rebuttal stage is "exceedingly light." Walker v. NationsBank of Florida, 53 F.3d 1548, 1556 (11th Cir. 1995); Perrymen v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

Once the defendant satisfies its burden of producing a legitimate, non-discriminatory reason for the actions taken against the plaintiff, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106

33

AO 72A
(Rev.8/82)

F.3d at 1528 (quoting <u>Burdine</u>, 450 U.S. at 255 & n. 10, 101 S. Ct. at 1094-95 &
n. 10). The plaintiff then "has the opportunity to demonstrate that the defendant's
articulated reason for the adverse employment action is a mere pretext for
discrimination." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing
<u>McDonnell Douglas</u>, 411 U.S. at 804, 93 S. Ct. at 1825). Plaintiff's proof of pretext
merges with his "ultimate burden of showing that the defendant intentionally
discriminated against the plaintiff." <u>Id.</u> (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509
U.S. 502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)). This task is a
highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff
has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons
to permit a reasonable fact finder to conclude that the employer's proffered
'legitimate reasons were not what actually motivated its conduct.'" <u>Combs</u>, 106
F.3d at 1538 (quoting <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th
Cir. 1994)). The court's task is to "evaluate whether the plaintiff has demonstrated
'such weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons for its action that a
reasonable fact finder could find them unworthy of credence.'" <u>Id.</u> (quoting
<u>Sheridan v. E.I. DuPont De Nemours & Co.</u>, 100 F.3d 1061, 1072 (3rd Cir. 1996)
(en banc), <u>cert. denied</u>, 521 U.S. 1129, 117 S. Ct. 2532, 138 L. Ed. 2d 1031

34

(1997)).  "[A] plaintiff may not in all cases merely rest on the laurels of [his] *prima facie* case in the face of powerful justification evidence offered by the defendant." Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987).  Plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's proffered explanation is unworthy of credence.  See Miles v. M.N.C. Corp., 750 F.2d 867, 870-71 n.4 (11th Cir. 1985).

In the present case, Defendant Life University has satisfied its exceedingly light burden of producing legitimate, non-discriminatory reasons for the various adverse actions.  Plaintiffs respond by arguing that pretext can be shown with respect to all of Life's stated reasons.  Plaintiffs also argue that the discriminatory animus of Life's President Sid Williams (as revealed by his various comments and statements) is evidence that the stated reasons are not what actually motivated the decisions made by the University.  [Doc. 50 at 33, 35-40].  The court will examine Life's proffered reasons and the corresponding arguments of pretext offered by each Plaintiff.

### 1.   Plaintiff Silverman

Defendant Life contends that Bert Silverman was terminated due to the University's reduction-in-force ("RIF") and "because he had the least seniority of the three members of the Biochemistry Department."  [Doc. 21 at 33].  After

35

Silverman's termination in September of 1999, two (2) other instructors, Henry Zeidan and Bob Waterson, remained employed in the Biochemistry Department. [Silverman Dep. at 189].

Sam Demons, Chair of the Basic Sciences Division, wrote a letter in the fall of 1999 to Sid Williams which contained a recommendation from Demons that Plaintiff Silverman should be terminated.[6] [Def. Ex. 19]. Midway through the letter, after noting personal conflicts between Henry Zeidan and Thomas Iha, Demons wrote, "Seniority of Dr. Silverman and Dr. Zeidan was another consideration for me. Dr. Zeidan has been with Life for approximately ten years while Dr. Silverman had been here three to four years. The last hired in [sic] generally the first fired in most situations with all other factors being equal." [Def. Ex. 19]. Oddly, at his deposition, Demons was asked and testified to the following:

> Q. Have you ever heard of a policy at Life University that the last person hired is the first one to be released? . . . Is there such a policy, to your knowledge, at Life University that if cutbacks take place that the last person hired is the first person to be fired?
> A. I haven't heard of that policy.
> Q. Have you, yourself, ever stated that that was a policy at Life University?
> A. Not by itself, no.

[Demons Dep. at 56-57].

---

[6]Demons' letter was written in response to a letter from Thomas Iha, Head of the Biochemistry, Microbiology and Pathology Departments. Iha had written to express his opposition to the release of Silverman instead of Henry Zeidan. [Def. Ex. 18].

36

Keith Asplin, Vice President of Academic Affairs and the decisionmaker who

directed Life's deans to identify faculty members for termination, testified similarly:

> Q. Have you ever heard of a policy at Life University that the last
> that's hired is generally the first fired?
> A. No. I have had people use that phrase with me as being a norm
> in the workplace but not that that was a practice.

[Asplin Dep. at 135-36]. Asplin further testified that the sentence in Demons'

letter stating that the "last hired [is] generally the first fired" was an incorrect

statement of Life University policy. [Def. Ex. 19; Asplin Dep. at 136]. Nevertheless,

Defendant Life now claims that Plaintiff Silverman was selected for termination

because he was hired more recently than two (2) other biochemistry teachers.

And, although Asplin and Demons deny that Life has a "last hired/first fired"

policy, Defendant cites the deposition testimony of both Asplin and Demons in

support of its claim that Plaintiff Silverman was laid off because of a lack of

seniority. A reasonable jury could find this assertion dubious.

Further evidence supporting Plaintiff Silverman's claim of pretext is the fact

that seniority apparently played no part in the termination decisions of other Life

teachers. For example, as discussed *infra*, Plaintiff Ralin was selected for

termination over Scott Carpenter, a similarly situated teacher, even though Ralin

had been at Life longer than Carpenter. [Ware Dep. at 90]. A reasonable jury

could also find that Silverman's religion played a part in his termination given Sid

37

Williams' comments and statements regarding Jewish employees. This fact is significant because, as Asplin testified, Sid Williams made the final decision with respect to Silverman's termination. [Asplin Dep. at 129-30].

Given Williams' numerous discriminatory comments and the conflicting testimony about why Silverman was selected for termination over Zeidan and Waterson, the undersigned finds that a factfinder could conclude that Life's proffered reasons for terminating Silverman are pretexts for religious discrimination. It is, therefore, **RECOMMENDED** that *Defendant's summary judgment motion* [Doc. 21] be **DENIED** on Plaintiff Silverman's claim of religious discrimination in his termination.

### 2.    Plaintiff Ralin

Life University asserts that Plaintiff Dennis Ralin was laid off due to the RIF and "because he had poor student evaluations and complaints, had less seniority than [Michael] Hoefer and was not tenured as Hoefer was." [Doc. 21 at 33]. In support of this assertion, Defendant Life cites the deposition testimony of Mamie Ware, Dean of the School of Arts and Sciences. [Doc. 21 at 22-23, 33]. Ware testified that Keith Asplin instructed her to create a schedule for Michael Hoefer, who was moving out of the Academic Affairs office and into a position teaching biology. [Ware Dep. at 79-84]. Ware also testified that Asplin made the decision to cut the teaching hours of Plaintiff Ralin, who was also scheduled to teach

38

biology, instead of the hours of Scott Carpenter, another faculty member teaching biology. [Id.]. According to Ware, Asplin did not explicitly use Ralin's name, but Ware knew Asplin was referring to Ralin when he instructed her to cut the teaching hours of the person "in the past that may have gotten bad evaluations or had some student problems. . . ." [Ware Dep. at 81-82].

Plaintiffs argue that a reasonable jury could find that Defendant's proffered reasons are actually pretexts for religious discrimination, and the court finds this argument persuasive. Defendant cites Ware's deposition testimony in support of its stated reasons for terminating Plaintiff Ralin's employment. However, at her deposition, Ware made it clear that she did not know why Ralin was terminated, and, as far as she knew, Asplin was the individual "[w]ho made the decision that it would be Dr. Ralin's hours that were cut back for Dr. Hoefer as opposed to Dr. Carpenter or Dr. Davidson." [Ware Dep. at 76, 81, 90-92]. Ware testified that Asplin did not ask for her opinion about the issue. [Ware Dep. at 81]. Ware also stated that she even asked Asplin if she could take teaching hours away from multiple teachers rather than just from one, so that Ralin could remain employed. Asplin responded that she was to take hours away from just one person, and he implied that Plaintiff Ralin was that person. [Ware Dep. at 83]. Defendant Life does not cite, and the court cannot find, any testimony from Asplin explaining why he wanted Ralin terminated. While Asplin apparently had some involvement with

39

the decision, as noted *supra*, Sid Williams had final decisionmaking authority on personnel decisions at Life University, including hiring, firing, promotion, and tenure. [Asplin Dep. at 24-26, 36, 40].

Life contends that Ralin was terminated instead of Hoefer because of complaints made about Ralin by students and because he lacked seniority and tenure. Yet, the University fails to explain why Ralin was selected for termination over Scott Carpenter, another employee who taught biology. Carpenter's hours were not reduced and he was not terminated even though, like Plaintiff Ralin, he lacked tenure and also had been the subject of student complaints in the past. [Ware Dep. at 82-83, 89-90]. In addition, Plaintiff Ralin had been at Life University longer than Carpenter. [Id. at 90]. This casts doubt on Defendant's claim that seniority was a significant factor that the University considered when making termination decisions.

Based on these facts, the court finds that there is sufficient evidence to persuade a jury that Defendant's stated reasons are not what actually motivated the University's decision to terminate Ralin. Accordingly, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on Plaintiff Ralin's claim of religious discrimination in his termination.

40

### 3.   Plaintiff Harman

After Plaintiff Bruce Harman returned from his FMLA leave in January of 2000, he informed Life University that he was unable to return to his full-time position. He requested a part-time position, but the University denied this request. [DSMF ¶¶ 23, 27]. According to Life, "there were no other part-time positions available for which he was qualified" because of the RIF and his physical limitations. [Doc. 21 at 32].

Plaintiff Harman contends that this is a pretext for religious discrimination. Harman argues that other part-time "positions were actually available for the three (3) non-Jewish professors who requested them." [Doc. 50 at 38-39]. In support of this assertion, Harman cites the testimony of Deborah Pogrelis, Chief of Staff of Clinics. The court, however, finds that Plaintiff has not offered any evidence that a part-time schedule was available in the clinic system.

Plaintiff Harman testified that he was told by his supervisor, Steven Mirtschink, that no part-time schedules were available. [Harman Dep. at 131-32, 275-76]. He was also informed via letters from both Pogrelis and Ron Kirk, Dean of the School of Chiropractic, that there were no part-time positions available at that time. [Def. Exs. 113, 114; DSMF ¶ 27]. This explanation has consistently been offered by Defendant as the reason Plaintiff Harman's request for a part-time schedule was denied.

41

At her deposition, Pogrelis testified that she was only aware of one instructor, Ken Holewinski, who had ever worked a part-time schedule. She stated that Holewinski started working part-time at the clinic before January of 1999, when Pogrelis was appointed to her current position. [Pogrelis Dep. at 19-20, 40-49]. Pogrelis also testified that Holewinski was the only part-time clinical instructor from 1998 to 2002 and that there were never any openings for other part-time instructors. [Id.]. There is no evidence in the record which contradicts Pogrelis' testimony. Plaintiff Harman contends that two (2) other employees, Malon Harris and Mark Amos, also worked part-time schedules at the clinic. [Harman Dep. at 144-51]. But Plaintiff has offered nothing to support this claim other than his own hearsay-based testimony. Because Plaintiff Harman is unable to show that a part-time position was available in January of 2000, when Harman requested such a position, he had failed to show that Defendant's stated reason is unworthy of credence.

Defendant Life also asserts that Harman was not qualified for any other position at Life "[b]ecause of his fraudulent use of FMLA leave and his violation of Life's policy on outside employment. . . ."[7]   [Id. at 32-33].   Plaintiff Harman

---

[7]Plaintiff contends that "these are *post-hoc* explanations which Defendant now asserts for purposes of establishing a case." [Doc. 50 at 39]. Plaintiff then goes on to discuss the desired part-time clinic position again. However, as noted, Defendant asserts that these reasons explain why "Harman was not qualified for *any other position at Life*." [Doc. 21 at 33]. With respect to the part-time clinic

42

acknowledges that while he was out of work on FMLA leave, he traveled and sold services and products for a business owned by his wife and two (2) friends. [Harman Dep. at 54, 60-64, 81]. Nevertheless, Harman argues that he "did not violate the stated Life policy, which prohibits anyone from performing any outside work where 'remuneration is either expected or received' because he did not get paid for this work and did not expect to get paid." [Doc. 50 at 39]. The court finds this argument unpersuasive.

First, it is not clear that Plaintiff did not violate Life's policy. Plaintiff was working between fifteen (15) and twenty (20) hours per week selling services for a company partially owned by his wife. [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. It seems reasonable to interpret Harman's actions as working for remuneration. Moreover, even if Harman, while he was on FMLA leave, did not violate Life University's policy on performing outside work, this is immaterial to the pretext inquiry. "Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true." Sweeney v. Alabama Alcoholic Beverage Control Board, 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000). "An employer who fires an employee under the mistaken but honest impression

_____

faculty positions, the evidence establishes that the decisionmakers involved in Harman's request, such as Mirtschink, Pogrelis, and Kirk, consistently stated that Plaintiff was not offered such a position because there were none available. [Harman Dep. at 131-32, 275-76; Def. Exs. 113, 114; DSMF ¶ 27].

that the employee violated a work rule is not liable for discriminatory conduct." Damon, 196 F.3d at 1363 n. 3. Based on the evidence presented by Plaintiff, the court finds that a reasonable jury could not conclude that "the employer has not given an honest explanation of the employer's behavior."[8] Id.

Defendant Life has offered legitimate, nondiscriminatory reasons for not granting Plaintiff Harman's request for a part-time position, and Plaintiff has failed to show that these reasons are actually pretexts for discrimination. Accordingly, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Harman's claim of religious discrimination in his termination.

### 4.   Plaintiff Gutstein

Donald Gutstein's teaching hours were reduced, according to Defendant Life, due to the RIF and the fact that Gutstein was not qualified to be a lead instructor in Basic Sciences courses because of his lack of a Ph.D. [Doc. 21 at 33]. Life contends that after the faculty layoffs, there were no positions available for which Gutstein was qualified to teach. [Id.]. In addition, Life states, "Gutstein did not

---

[8]The court also notes that Plaintiff Harman's opinion about Defendant Life's interpretation of its own policy is irrelevant. As the Eleventh Circuit stated in Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984), "Title VII does not take away an employer's right to interpret its rules [and policies] as it chooses, and to make determinations as it sees fit under those rules [and policies]."

have and was not willing to obtain a Georgia chiropractic license, so he was not qualified to teach in the Chiropractic School." [Id.].

Plaintiff Gutstein contends that a reasonable jury could conclude that these stated reasons were not what actually motivated the decisionmakers' conduct. Plaintiff points out that although the University claims that no teaching positions were available for Gutstein, Wayne Menkus, Head of the Physiology Department, stated otherwise. Menkus testified:

> I had realized that Dr. Gutstein was a great teacher for the school . . . and I asked Dr. Mayne, do you have any part-timers that maybe we could get rid of, put them on the short list, giving Dr. Gutstein enough compliment of hours to keep him at full-time status? Dr. Mayne's response was positive. He did. He had two sections of what are called dry lab in Anatomy that would be a total of six hours, which could have been taught with the credentials because Dr. Mayne also reviewed Dr. Gutstein's college credits and agreed that he could teach it. So between ourselves as department heads, we agreed that what we would do between ourselves is give Dr. Gutstein these extra hours to help him remain at a full-time status.

[Menkus Dep. at 26-27].

On numerous occasions afterwards, Menkus informed Samuel Demons, Chair of the Basic Sciences Division, of the solution he had come up with to keep Gutstein at full-time. [Id. at 27-28]. Menkus described the third time he suggested his proposed solution to Demons: "At that point, Dr. Demons told me that I needed to tell Dr. Gutstein that this is his schedule, and he handed me the schedule. That schedule did not contain any of the hours that would have allowed

45

Dr. Gutstein to remain full time." [Menkus at 28-29]. When Menkus asked Demons why his proposal to allow Gutstein to teach lab courses had been rejected, Demons responded by saying, "[I]t's not my decision, it's not your decision." [Id. at 29]. Demons did not tell Menkus whose decision this was. [Id.]. Menkus testified that he and Demons met with Gutstein to give him his schedule:

> Dr. Gutstein looked at the schedule, noticed that, of course, he's no longer on full-time status, [and] made a comment about that. . . . And at that point I said, Dr. Demons, I just am asking one more time, what about the possibility of giving Don dry lab, an extra six hours, to keep him in full-time status. . . . Dr. Demons then looked at me and then looked at him, gave it to him and said, this is all I can do.

[Menkus Dep. at 30].

Florence Rigby, a faculty member in the Physiology Department who became department head in January of 2000, testified that when she spoke with Demons about giving Gutstein some hours available in the Biochemistry Department, Demons "said simply that he didn't think it would be a good idea." [Rigby Dep. at 30]. Bob Waterson, an instructor in the Biochemistry Department, testified that Demons made it "very clear that we're not to do any favors to help Dr. Gutstein out." [Waterson Dep. at 45]. Rigby also testified that Matt Williams, head of Clinical Sciences, stated in a curriculum meeting that "he would only employ [Gutstein] with direct orders from the higher administration." [Rigby Dep. at 23].[9]

---

[9]Plaintiff Gutstein cites the deposition testimony of Edie Dalhauser in support of his claim that "Kim Williams instructed Sam Demons, the chair of Basic

46

As noted *supra*, Asplin testified that although Gutstein was qualified to teach lab courses, he was not offered any of them. [Asplin Dep. at 157]. In the spring of 2001, when Gutstein's hours dwindled to zero, Robert Burger was given hours teaching lab courses immediately after being notified that he could not continue as a lead instructor in the School of Chiropractic because he, like Gutstein, did not have a Ph.D. Burger is not Jewish. [Burger Dep. at 6, 7, 13, 17-20; DSMF ¶ 70].

Given these facts, the court finds that a reasonable jury could conclude that Life's stated reasons for reducing Gutstein's hours were pretexts for discrimination. Defendant Life contends that there were no courses that Plaintiff Gutstein could teach, but testimony from faculty members reveals that teaching hours, at least in the form of lab courses, were available that Gutstein was qualified to teach. Moreover, a reasonable jury could conclude from the testimony discussed above that Demons received instructions from Sid Williams regarding the decision not to offer available teaching hours to Gutstein. In light of the comments regarding Gutstein's religion made by Sid Williams, the fact that Williams appears to have been involved in the decision lends further support to Gutstein's religious discrimination claim. Accordingly, the undersigned

---

Sciences, to cut Gutstein's hours until he quit." [Doc. 50 at 15]. The court will not consider this assertion because it is based solely on hearsay. Dalhauser stated repeatedly that this was a rumor and that she did not even know who told her about it. [Dahlhauser Dep. at 30-31, 37].

47

**RECOMMENDS** that Defendant Life University's summary judgment *motion* [Doc. 21] be **DENIED** on Plaintiff Gutstein's claim of religious discrimination with respect to the reduction of his hours and his eventual termination.

### C.     *Age Discrimination Claims Asserted by Ralin and Gutstein*

The court will next address the claim made by Plaintiffs Donald Gutstein and Dennis Ralin that Defendant Life University discriminated against them on the basis of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq. The ADEA provides in pertinent part:

> It shall be unlawful for an employer– (1) to fail or refuse to hire or to discharge *any individual* or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; . . .

29 U.S.C. § 623(a)(1).

Because Plaintiffs in the present case are relying on circumstantial evidence, *they must first establish a prima facie* case of age discrimination using a variant of the McDonnell Douglas framework applicable to the facts at hand. To establish a *prima facie* case of age discrimination, a plaintiff-employee must demonstrate (1) that he was in the age group protected by the ADEA, (2) that he was adversely affected by an employment decision, (3) that he was qualified for the position, and (4) he must produce sufficient evidence for a reasonable fact finder to conclude that the decision at issue was based on the employee's age. *See* O'Connor v.

48

Consolidated Coin Caterers Corp., 517 U.S. 308, 313, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996); Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990). A plaintiff may create an inference of age discrimination by showing that he was replaced by a younger employee. See O'Connor, 517 U.S. at 312-13, 116 S. Ct. at 1310.

The court finds that Plaintiffs Ralin and Gutstein are able to establish *prima facie* cases of age discrimination. Ralin was fifty-five (55) when he was terminated on December 13, 1999, and Gutstein was sixty-eight (68) when he was terminated in the spring of 2001, and both men were qualified for their positions. [Def. Ex. 92; Ralin Dep. at 11; Gutstein Dep. I at 5; DSMF ¶ 70]. Defendant argues that certain age-related comments made by Sid Williams, such as referring to Gutstein as "old Dr. Gutstein" and calling Ralin "old gray beard," *do not support a finding of age* discrimination. [Doc. 21 at 31-32; Doc. 51 at 13-14]. However, Defendant Life *does not address the fact that similarly situated younger teachers, such as Robert* Burger, David Spring, Michael Hoefer, Scott Carpenter, and Sandra Davidson, were retained after Ralin and Gutstein were terminated. [Doc. 50, Exs. B, D, E]. This is all that is necessary for Plaintiffs to establish *prima facie* cases of age discrimination.

Accordingly, the burden shifts to Defendant Life to produce legitimate, nondiscriminatory reasons for terminating the employment of Plaintiff Ralin and

49

Gutstein. Defendant's proffered reasons and Plaintiffs' arguments of pretext have been discussed at length *supra* with respect to their religious discrimination claims. Because the same arguments are made with respect to Ralin's and Gutstein's age discrimination claims, the court need not address them in full again. The court simply notes that Life contends that Ralin was terminated during the RIF because of student complaints and because he lacked seniority and tenure compared to Michael Hoefer, who was moving out of the Academic Affairs office and into a position teaching biology. However, Defendant Life does not explain why Plaintiff Ralin was selected for termination over Scott Carpenter, a less experienced biology teacher who, like Ralin, lacked tenure and had been the subject of student complaints in the past. [Ware Dep. at 82-83, 89-90].

As previously discussed, Gutstein, according to Life, was terminated because there were no courses available for him to teach. However, Wayne Menkus, Head of the Physiology Department, testified that teaching hours were available that Gutstein was qualified to teach. Menkus also testified that he suggested on numerous occasions that Gutstein be given enough hours to keep him full-time, but these suggestions were rejected. [Menkus Dep. at 26-30]. To summarize, Plaintiffs have offered evidence which would allow a factfinder to conclude that Life's stated reasons for terminating both Ralin and Gutstein are not what actually motivated its conduct.

50

The court finds that when this showing of pretext is coupled with the fact that Ralin and Gutstein are able to establish *prima facie* cases of age discrimination, a reasonable jury could conclude that Defendant Life discriminated against Plaintiffs on the basis of their age. As the Supreme Court recently stated, "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48, 120 S. Ct. 2097, 2108-09, 147 L. Ed. 2d 105 (2000) (citations omitted).

Because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on the claims asserted by Plaintiffs Ralin and Gutstein that they were terminated on the basis of their age. Reeves, 530 U.S. at 147, 120 S. Ct. at 2108.

**D.     Plaintiff Harman's Disability Claim**

Plaintiff Bruce Harman's next claim is one based on the Americans with Disabilities Act ("ADA"). Harman experiences low back problems which, he contends, forced him "to give up his chosen profession of practicing chiropractic and further prevents him from prolonged standing, bending, lifting objects over 10

51

pounds and squatting." [Doc. 50 at 42]. Harman argues that Defendant Life University discriminated against him on the basis of his back condition and "further failed to reasonably accommodate such condition by refusing to allow him to return to a part-time schedule after his FMLA expired. . . ." [Doc. 50 at 41]. To qualify for relief under the ADA, Plaintiff Harman must first establish a *prima facie* case of disability-based discrimination.

A plaintiff must show three (3) elements to make out a *prima facie* case: (1) that he has a disability; (2) that he is a qualified individual; and (3) that he was discriminated against because of the disability. See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 (11th Cir.), amended, 102 F.3d 1118 (11th Cir. 1996). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). An impairment is "substantially limiting" when the person claiming disability is either:

> [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

52

29 C.F.R. § 1630.2(j)(1). "Major [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

In the present case, Plaintiff Harman contends that his back condition qualifies as a disability because it "caused him difficulty in standing, bending and lifting within certain restrictions and prevented him from continuing as a chiropractor." [Doc. 50 at 43]. The court finds that this conclusory statement[10] does not come close to satisfying Plaintiff's burden. With respect to his non-work capabilities, Plaintiff has offered no evidence that any major life activity was affected in any significant way by his back problems. The undersigned does not deny that Plaintiff's back "caused him difficulty," as he contends, but this falls well short of the ADA standard for determining disability.

Harman testified that even when his back problems were at their worst, that is, when he was out of work on FMLA leave, he performed housework, washed clothes, did light cleaning and cooked. [Harman Dep. at 128-29]. During this same period of time, he worked approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know, a company partially owned by his wife, and traveled extensively to places like Detroit, Orlando, Las

---

[10]The court notes that this statement, along with many others offered by Plaintiff, includes no citation to the record. [Doc. 50 at 43].

53

Vegas, and Davenport, Iowa.  [Harman Dep. at 52-54, 59-64, 72-74, 78-82].
Morcover, there is no evidence that Plaintiff Harman has ever been severely
restricted in caring for himself or doing any other activity that is "of central
importance to people's daily lives." Toyota Motor Mfg., Ky., Inc. v. Williams, 534
U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) (In addressing plaintiff's claim
of disability with respect to performing manual tasks, the Court noted,
"[H]ousehold chores, bathing, and brushing one's teeth are among the types of
manual tasks of central importance to people's daily lives, and should have been
part of the assessment of whether respondent was substantially limited in
performing manual tasks.").

Plaintiff's claim regarding the effect his back condition had on his ability to
work is also unpersuasive.  For an impairment to substantially limit a person's
ability to work, it must significantly restrict "the ability to perform either a class
of jobs or a broad range of jobs in various classes as compared to the average
person having comparable training, skills and abilities." 29 C.F.R. 1630.2(j)(3)(I).
The "inability to perform a single, particular job does not constitute a substantial
limitation in the major life activity of working." Id.

In the present case, Plaintiff Harman has offered no evidence that his back
problems prevent or significantly restrict him from performing "either a class of
jobs or a broad range of jobs in various classes." Instead, the evidence indicates

54

that the number of jobs that Plaintiff is incapable of performing is extremely small. Dr. Alan Maloon, Plaintiff Harman's treating physician, testified that Plaintiff was only restricted from performing the job of a chiropractor adjusting patients "plus any job which involves bending, stooping, twisting or anything that involves lower back motion." [Maloon Dep. at 23-24, 43]. Although Harman contends that his back condition forced him "to give up his chosen profession of practicing chiropractic," this is irrelevant to the issue of disability. [Doc. 50 at 42]. As the Supreme Court has stated, "To be substantially limited in the major life activity of working, then, one must be precluded from *more than one type of job*, a specialized job, or *a particular job of choice*." Sutton v. United Air Lines, Inc., 527 U.S. 471, 492, 119 S. Ct. 2139, 2151, 144 L. Ed. 2d 450 (1999) (emphasis added). Because Plaintiff has failed to offer evidence showing that he is precluded from a *substantial* class of jobs, he has not satisfied this *prima facie* element of disability-based discrimination and summary judgment is, therefore, appropriate.

Plaintiff Harman makes a brief argument that he satisfies the first *prima facie* element based on the ADA's provision that having a disability includes "being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff argues, "[E]ven if [Plaintiff's] condition had not actually limited one or more of Harman's life activities, Defendant perceived him as suffering from such a disability." [Doc. 50 at 44-45]. This argument is meritless.

55

The Supreme Court has written, "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489, 119 S. Ct. at 2149-50. "[C]ourts have observed that the focus of these ADA provisions and regulations is on the impairment's effect upon the attitude of others. These provisions and regulations are intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." Gordon v. E.L. Hamm & Associates, Inc., 100 F.3d 907, 913 (11th Cir. 1996) (citations omitted). In the present case, Plaintiff argues that Defendant Life regarded him as disabled simply because the University was aware that Plaintiff had a bad back. Plaintiff cites the fact that Defendant granted him FMLA leave in 1999 and that Defendant knew that his back condition prevented him from working as a practicing chiropractor in the fall of 1999. This is simply insufficient.

In analyzing whether an employer mistakenly perceived an employee's impairment to be one that substantially limits a major life activity, "it is necessary first to determine whether an impairment, either actual or perceived, would constitute a disability under the ADA." Bray v. Nat'l Services Industries, Inc., 209

F. Supp. 2d 1343, 1350 (M.D. Ga. 2001). As discussed *supra*, Plaintiff Harman's back condition is not a disability. In addition, Harman has failed to produce evidence showing that Defendant Life mistakenly perceived that his back problems substantially limited a major life activity. Defendant Life only became aware of Plaintiff Harman's back condition because he informed Defendant of his limitations and his need to take FMLA leave. "Where a 'defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of a fact,' 'a finding that plaintiff was regarded as disabled and, therefore, [is] entitled to the protections of the ADA[,] is inappropriate.'" Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1230 (11th Cir. 1999) (quoting McCollough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1498 (N.D. Ga. 1996); Bute v. Schuller Int'l Inc., 998 F. Supp. 1473, 1477 (N.D.Ga.1998)). Because Plaintiff Harman has failed to offer any evidence that Defendant Life erroneously perceived his back impairment as a disabling condition, he is unable to satisfy this *prima facie* element and summary judgment is appropriate.

The court also notes that even if Plaintiff Harman were able to satisfy the first *prima facie* element, summary judgment would still be necessary because he has not offered evidence which would allow a reasonable jury to find that he is a "qualified individual," the second element necessary to establish a *prima facie* case of disability discrimination. The plaintiff bears the burden of proving that he is a

57

"qualified individual," which the ADA defines as a disabled person "who, with or without reasonable accommodation, can perform the essential functions" of his job. 42 U.S.C. § 12111(8). Plaintiff's treating physician, Dr. Maloon, certified that Harman was "unable to perform work of any kind because of a serious health condition" as of September 24, 1999. [Maloon Dep. at 31-33; Def. Ex. 141]. Dr. Maloon also indicated that there were no accommodations that would enable him to perform the essential functions of his job at that time. [Maloon Dep. at 32; Def. Ex. 141].

As noted *supra*, during the same period of time, however, Harman spent approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know. [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. Harman took trips to Detroit, Orlando, Las Vegas, and Davenport, Iowa while selling services for the company from October of 1999 to January of 2000. [Id.]. On November 12, 1999, while Harman was traveling and selling services for Now You Know, Dr. Maloon certified to an insurance company in support of a claim for disability benefits that Harman was unable to perform his job and that he was unable to work in another occupation. [Maloon Dep. at 35-36, Def. Ex. 142]. Defendant points this out, and Plaintiff Harman responds that "the relevant inquiry is not what Plaintiff's condition was in November 1999, but what his condition was in January 2000, when he requested to return to work." [Doc. 50 at 45-46].

58

The court finds this insufficient. Plaintiff does not explain why he and his physician informed both Life University and an insurance company that he was incapable of performing either his job or any other job in late 1999, yet he continued to work and travel for Now You Know throughout this time.[11] Moreover, in the statement to the insurance company completed in mid-November of 1999, Dr. Maloon noted that he sees Plaintiff every six (6) months, and he indicated that his opinion regarding Plaintiff's inability to perform any work due to Plaintiff's "permanent" condition was for at least six (6) months. [Maloon Dep., Def. Ex. 142]. Plaintiff bears the burden of offering an explanation for these inconsistencies, and he has failed to provide a sufficient one in the present case. See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 805-07, 119 S. Ct. 1597, 1603-04, 143 L. Ed. 2d 966 (1999). Thus, even if Plaintiff Harman could show that he has a disability as defined by the ADA, he still would not be able to establish a *prima facie* case of disability discrimination because he has offered no evidence that he is a "qualified individual."

For all these reasons, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Harman's claim that he was terminated on the basis of a disability.

---

[11]Plaintiff contends that he was not paid for his services for Now You Know, but this is irrelevant to the issue of Plaintiff's physical ability to work.

AO 72A
(Rev.8/82)

**E.    Plaintiff Gutstein's State Law Slander Claim**

The next claim the court will address is Plaintiff Donald Gutstein's claim of slander per se. Plaintiffs assert the following in their complaint: "In January 2000, LIFE, by and through one of their managerial employees, Kim Williams, began informing students and various faculty members that GUTSTEIN did not have the necessary credentials to teach at the university level." [Doc. 1 ¶ 166]. Gutstein contends that "such statements defame GUTSTEIN with respect to his business reputation . . . [and] constitute slander per se." [Id. ¶¶ 172-73].

The statements which the complaint refers to actually occurred on November 9, 1999. [Gutstein Dep. at 56-57, 105-06; Def. Ex. 5]. On that date, a meeting was held with Kim Williams and some Life University students. Williams allegedly stated that Gutstein was no longer qualified to teach physiology under the accreditation standards of the Council of Chiropractic Education ("CCE"). [Id.]. This statement was described in a student memo allegedly posted on a student bulletin board. [Id.].

Slander is defined as "[m]aking charges against another in reference to his trade . . . calculated to injure him therein" or "[u]ttering any disparaging words productive of special damage which flows naturally therefrom." O.C.G.A. § 51-5-

60

4(a)(3), (4).[12]   "To be actionable, a communication must be both false and malicious."  Speedway Grading Corp. v. Gardner, 206 Ga. App. 439, 441, 425 S.E.2d 676, 678 (1992).

Significant to the case at hand is the issue of timeliness with regard to Plaintiff bringing his slander claim. Georgia law provides, "Actions . . . for injuries to the reputation . . . shall be brought within one year after the right of action accrues. . . ."  O.C.G.A. § 9-3-33.  Defendant Life argues that Plaintiff Gutstein's slander claim is barred by the statute of limitations.  Because Williams made the statement on November 9, 1999, Plaintiff Gutstein was required to bring his slander claim before November 9, 2000.  He waited, however, until December 19, 2000, before bringing the instant cause of action.  [Doc. 1].  Therefore, Plaintiff Gutstein's slander claim is time-barred.

Plaintiff argues that the "slanderous statement was memorialized in a newsletter which remained posted on LIFE's campus outside the Academic Affairs office until January 2001.  Thus, the publication continued and Plaintiff was entitled to file this claim at any time until January 2002."  [Doc. 50 at 47].  Plaintiff is incorrect.  First, Plaintiff Gutstein has brought a slander claim based on the

_____

[12]Libel, on the other hand, is a "false and malicious defamation of another, expressed in print [or] writing . . . tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule" and published to another.  O.C.G.A. § 51-5-1.

61

statements made by Kim Williams. He has not brought a libel claim based on the newsletter published by a group of students. [Doc. 1]. Moreover, Georgia law is clear that "actions for injuries to the reputation, such as those asserted by the plaintiff in the instant case, must be brought within one year from the date of the alleged defamatory acts. . . ." Brewer v. Schacht, 235 Ga. App. 313, 317, 509 S.E.2d 378 (1998) (quoting Cunningham v. John J. Harte Assoc., 158 Ga. App. 774, 775, 282 S.E.2d 219 (1981)).[13] The only evidence before the court is that Kim Williams' statement regarding Gutstein's teaching qualifications occurred on November 9, 1999. [Gutstein Dep. at 56-57, 105-06; Def. Ex. 5]. Because Plaintiff Gutstein does not dispute this fact, his slander claim brought more than a year afterwards is untimely.    The undersigned, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on this claim.

### F.    Plaintiff Ralin's State Law Claims

Plaintiff Dennis Ralin asserted claims for breach of contract and tortious interference with business relations in the complaint. Defendant Life moved for summary judgment on both of these claims, and Plaintiff Ralin has not responded. Defendant's motion is therefore considered unopposed, pursuant to Local Rule

---

[13]This is the true even if the plaintiff did not have knowledge of the defamatory act at the time of its occurrence. Id.

AO 72A
(Rev.8/82)

7.1B, N.D. Ga, with respect to these two (2) claims.[14] See Magluta v. Samples, 162 F.3d 662, 664-65 (11th Cir. 1998) (granting a motion for failure to respond is within the discretion of the district judge); Southern Electronics Distributors, Inc. v. Air Express Intern. Corp. (USA), Inc., 994 F. Supp. 1472, 1475 (N.D. Ga. 1998) (granting motion as unopposed in accordance with local rule); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). Thus, summary judgment is appropriate on these claims.

In the alternative, the court finds that Plaintiff Ralin has abandoned these claims because Defendant sought summary judgment on them and Plaintiff did not oppose this relief in his response to the summary judgment motion. See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325-26 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp, 10 F.3d 1563, 1568 (11th Cir. 1994) (plaintiff's failure to either move for summary judgment on claim raised in complaint or to respond to defendant's summary judgment motion on same claim, allowed district court to properly treat

---

[14]This rule provides, in pertinent part, "Failure to file a response shall indicate that there is no opposition to the motion." L. R. 7.1B, N.D. Ga.

claim as abandoned); accord Federal Savings and Loan Insurance Corporation v. Haralson, 813 F.2d 370, 373 (11ᵗʰ Cir. 1987) (issues not properly briefed and argued before the court will be treated as abandoned).

The undersigned, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Ralin's claims for breach of contract and tortious interference with business relations.

### G.   Damages

Defendant Life moves for summary judgment on the issue of compensatory damages with respect to the termination claims asserted by Plaintiffs Harman, Silverman and Ralin. [Doc. 21 at 40-43]. One of Defendant's arguments is that Plaintiffs Harman and Silverman should not recover front and back pay or should at least be limited in the amount they recover, because they failed to mitigate damages.

Defendant is correct in noting that a plaintiff has a duty to mitigate damages. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-23, 95 S. Ct. 2362, 2371-74, 45 L. Ed. 2d 280 (1975). Title VII provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). "This is appropriate because the purpose of Title VII is to 'make whole' a victim of discrimination, not to provide a windfall." Sowers v. Kemira, Inc., 701 F.

64

Supp. 809, 826 (S.D. Ga. 1988). The Supreme Court has stated that a Title VII claimant must "use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 102 S. Ct. 3057, 3065-66, 73 L. Ed. 2d 721 (1982).

With respect to Plaintiff Harman, the court has already recommended that summary judgment be granted on his termination claims. Therefore, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 21] on Harman's claims for damages resulting from his termination be **DENIED AS MOOT**.

With respect to Plaintiff Silverman, Defendant Life contends that summary judgment should be granted on his claim for back and front pay because he failed to make a sufficient effort to find comparable employment. [Doc. 21 at 40]. Defendant argues, "The only job search Silverman has conducted since his termination is to review newspaper and internet advertisements for biochemistry teaching positions at Atlanta metropolitan colleges and universities. He has made no calls, written no letters, and made no applications, other than to the Fulton

65

County School system, the Cottage school, and a company called Cryolife." [Id.]. This is the extent of Defendant's argument.

Based on the lack of evidence presented Defendant, the court finds that there are genuine issues of material fact yet to be resolved on the challenge to Silverman's damages recovery if Defendant is found liable.    Defendant acknowledges that Silverman made some effort to find comparable employment, and a reasonable jury may conclude that Silverman satisfied his duty to mitigate his damages. Accordingly, the court **RECOMMENDS** that Defendant's motion for summary judgment be **DENIED** on Plaintiff Silverman's claim for front and back pay.

*Defendant Life* next argues that summary judgment should be awarded on Plaintiff Ralin's claim for front pay and back pay after he found employment which paid him more than his job with Life University. [Doc. 21 at 43]. The Eleventh Circuit has stated that any "monetary award of front pay [should be] calculated to terminate on the date a victim of discrimination attains an opportunity to move to his 'rightful place.'" Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1529 (11th Cir.1991) (citations omitted). Defendant writes, "When Ralin's employment with Life terminated on January 14, 2000, he was making $42,000.00 a year. Ralin went to work full-time for Gilmer County Schools in August 2000, at a salary of $57,000.00 a year." [Id.]. Defendant's argument is correct, and Plaintiff Ralin has

66

not responded to this argument.  See Coalition for the Abolition of Marijuana Prohibition, 219 F.3d at 1325-26; Magluta, 162 F.3d at 664-65.  Therefore, the undersigned **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED** on Plaintiff Ralin's claim of back and front pay after August of 2000, when he began working in a higher paying position.

## IV.   Conclusion

In summary, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on: (1) *Plaintiff Harman's Title VII claim of religious discrimination in his termination;* (2) Plaintiff Harman's ADA claim that he was terminated on the basis of a disability; (3) Plaintiff Gutstein's state law claim of slander; (4) Plaintiff Ralin's state law claims for breach of contract and tortious interference with business relations; and (5) Plaintiff Ralin's claim of back and front pay after August of 2000.

Because summary judgment is appropriate on Plaintiff Harman's termination claims, the undersigned also **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED AS MOOT** on Plaintiff Harman's claims for damages resulting from his termination.

The undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on: (1) the Title VII claims of a religiously hostile work environment asserted by all four (4) Plaintiffs; (2) Plaintiff Silverman's Title VII

67

claim of religious discrimination in his termination; (3) Plaintiff Ralin's Title VII claim of religious discrimination in his termination; (4) Plaintiff Gutstein's Title VII claim of religious discrimination with respect to the reduction of his hours and his eventual termination; (5) the ADEA claims asserted by Plaintiffs Ralin and Gutstein that they were terminated on the basis of their age; and (6) Plaintiff Silverman's claim for front and back pay.

**SO RECOMMENDED**, this 3rd day of DECEMBER, 2002.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

68



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**



**WORLD CHAMPIONSHIP WRESTLING**™

A Time Warner Company

# MEMO

TO:         Dr. Harvey Schiller

CC:         Eric Bischoff
            David Payne
            Matt Stroer
            Bill Busch

FROM:       Diana Myers

RE:         Talent Budget Summary

DATE:       March 31, 1999

---

The following is a synopsis of the Talent Contract Changes for March 1999. *The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.*

We added two (2) new talent:                          $895,000
(David Abbott, Brian Yandrisovitz)

We negotiated increased contracts for two (2) talent:   $115,000
(Glenn Gilbertti, Ron Reis)

Impact to WCW Total Talent Commitment (increase):   $1,010,000

With this increase and our variables, we are currently $1,858,000 under budget for 1999.



PLAINTIFF'S
EXHIBIT
75

WCW 019229
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 28, 1999

---

The following is a synopsis of the Talent Contract Changes for May 1999.  The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added thirteen (13) new talent:                    $457,600
(David Fliehr, Emory Hail, and eleven trainees)

We negotiated increased contracts for three (3) talent:    $51,714
(Jacobus Strauss, and two(2) former non-contract
talent Scott James and Steve James)

We terminated two (2) contracts:                      $450,000
(Steve McMichael, Kevin Wacholz)

With this increase and our variables, we are currently $100,000 under budget for 1999.

PLAINTIFF'S
EXHIBIT
76

A Time Warner Company

WCW 019227
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**



TO:       Eric Bischoff
          Bill Busch

FROM:     Diana Myers

DATE:     June 9, 1999

RE:       New ICAs and Trainees

| Name | Salary (1st year) |
| --- | --- |
| **Cornell, Richard** (trainee-referred by Kanyon) | **$ 26,000** |
| **Davis, Marcial** (trainee) | **$ 31,200** |
| **Durham, Michael** (Public Enemy) | **$170,000** |
| **Fliehr, David** (David Flair) | **$ 45,000** |
| **Forrester, Ryan** (trainee-referred by Kanyon) | **$ 20,800** |
| **Funk, Allen Eric** (trainee) | **$ 31,200** |
| **Gruner, Pete** (Billy Kidman) | **$300,000** (increase from $125,000) |
| **Hail, Emory** (Emory Hale) | **$ 85,000** |
| **Helms, Gregory Shane** (referred by Kanyon) | **$ 45,000** |
| **Hugger, Jon** (trainee) | **$ 15,600** |
| **James, Scott** (Scott Armstrong) | **$ 52,143** (increase from $31,286) |
| **James, Steve** (Steve Armstrong) | **$ 52,143** (increase from $31,286) |
| **Jindrak, Mark** Robert (trainee) | **$ 39,000** |
| **Jones, Allen** (trainee-referred by Kanyon) | **$ 20,800** |
| **Massengale, Jason** (trainee-referred by Kanyon) | **$ 20,800** |
| **Moore, Shannon** (referred by Kanyon) | **$ 45,000** |
| **Norris, Harrison** (trainee) | **$ 39,000** |
| **Palumbo, Charles** (trainee) | **$ 39,000** |
| **Petty, Ted** (Public Enemy) | **$170,000** |
| **Rodman, Dennis** | **$1,000,000** |
| **Roman, Sammy Lee** (trainee) | **$ 26,000** |
| **Sanders, Michael** (trainee) | **$ 31,200** |
| **Siaki, Sonny Uaita** (trainee) | **$ 31,200** |
| **Skipper, Elix** (trainee) | **$ 39,000** |
| **Strauss, Jacobus** (Jakes) | **$ 75,000** |
| **Thornton, Randy** (Swoll) | **$350,000** ($50k signing bonus) |
| **Tilton, Kevin** (trainee) | **$ 15,600** |
| **Wilson, Luther** (referred by Kanyon) | **$ 45,000** |
| **Yokley, Jay Brett** (trainee) | **$ 15,600** |
| **Yun, James** (trainee-referred by Kanyon) | **$ 20,800** |

PLAINTIFF'S EXHIBIT

*A Time Warner Company*

**WCW 018865
CONFIDENTIAL**



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

**Myers, Diana**

| | |
|---|---|
| From: | ...idson, Georgia |
| Sent: | Friday, December 03, 1999 1:57 PM |
| To: | Edwards, Don ; Prince, Greg; Lipscomb, Dee ; Davidson, Amy |
| Cc: | Busch, Bill ; Dillon, JJ ; Juster, Gary ; Myers, Diana |
| Subject: | Talent Summary |

*World Championship Wrestling*
*A Division of Turner Sports*
*One CNN Center*
*Box 105366*
*Atlanta, GA 30348-5366*

*CONFIDENTIAL*

The following is a synopsis of the Talent Contract Changes for *November 1999*:

We added **two (2) new talent:**
Vito Lograsso ($120,000 plus $12,000 signing bonus),
Stacy Keibler ($15,000 plus $250 for non-TV and $500 TV events)

We negotiated **increased contracts for two (2) talent:**
Tonga Fifita ($175,000 plus $1,500 per day over 100 and $300 per day wrestling in Japan),
David Fliehr ($125,000 and $1,000 for each PPV)

We are in the process of negotiating a **decreased contract for one (1) talent:**
Lash Huffman ($240,000 plus $2,000 for each day over 80)

We terminated **twenty-two (22) contracts:**
(Chris Adams, Brian Adams, Scott Antol, Brian Bernick, Adam Birch, Amy Crawford, James Gibson, Steve James, Rob Knapik, Ray Lloyd, Jeremy Lopez, Juan Banos, Sonny Onoo, Ron Reis, Dean Roll, Jeremiah Ross, Hector Segura, Jason Spence, Kenny Stasiowski, Dave Taylor, Barry Windham, Kendall Windham)

*Please treat this e-mail as you would any other confidential document.*

Thanks,
GA

**PLAINTIFF'S EXHIBIT**
44

*A Time Warner Company*

**WCW 019238
CONFIDENTIAL**

**MEMO**

TO:      Dr. Harvey Schiller

CC:      Bill Busch
         David Payne
         Matt Stroer
         JJ Dillon
         Greg Prince
         Dee Lipscomb
         Amy Davidson

FROM:    Diana Myers

RE:      Talent Budget Summary

DATE:    November 1, 1999

---

The following is a synopsis of the Talent Contract Changes for October 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

| | |
|---|---|
| We added *three* (3) new talent:<br>Donald Harris (200,000), Ronald Harris (200,000),<br>Jeff Jarrett (400,000) | $800,000 (estimate) |
| We negotiated increased contracts for three (3) talent:<br>(Perry Satullo, Dale Torborg, Jerry Tuite) | $166,714 |
| We negotiated *decreased* contracts for one (1) talent:<br>(Ian Hodgkinson) | $150,000 |
| We terminated twelve (12) contracts:<br>(Bryan Clark, Barry Darsow, Ryan Forrester,<br>Chad Fortune, James Fullington, Lash Huffman,<br>Mark Johnson, Ed Leslie, Robert Smedley,<br>Kevin Tilton, Eric Watts, James Yun, Johnny Green) | $1,943,000 |

With this decrease and our variables, we are currently $4.85 million over budget for 1999.

WCW 019226
CONFIDENTIAL



## MEMO

TO:          Dr. Harvey Schiller

CC:          Eric Bischoff
             David Payne
             Matt Stroer
             Bill Busch
             Greg Prince

FROM:        Diana Myers

RE:          Talent Budget Summary

DATE:        September 1, 1999

---

The following is a synopsis of the Talent Contract Changes for August 1999.  The back
up documentation in the form of the Talent Contract Summary has been forwarded
directly to Matt Stroer.

We added six (6) new talent:                          $830,000
Brian Bernick (45,000), James Gibson (45,000),
Jeremy Lopez (45,000), Charles Spencer III (45,000),
Ray Lloyd (150,000), Dustin Runnels (500,000)

We negotiated increased contracts for two (2) talent:  $270,000
(William Brenneman, Ian Hodgkinson)

We terminated six (6) contracts:
(Ted Petty, Michael Durham, Scott Levy,                $796,286
Denise Riffle, John Watson, Chase Tatum)

With this increase and our variables, we are currently $6.3 million over budget for 1999.

WCW 019225
CONFIDENTIAL



**World Championship Wrestling**
*A Division of Turner Sports*
*One CNN Center*
*Box 105366*
*Atlanta, GA 30348-5366*

## MEMO

TO:      Dr. Harvey Schiller

CC:      Bill Busch
         David Payne
         Matt Stroer
         JJ Dillon
         Greg Prince
         Dee Lipscomb
         Amy Davidson

FROM:    Diana Myers

RE:      Talent Budget Summary

DATE:    September 30, 1999

---

The following is a synopsis of the Talent Contract Changes for September 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added three (3) new talent:                    $170,000
Clare Cutrufello (15,000 plus 250-500 per event),
Ann-Marie Crooks (50,000), Nora Greenwald (105,000)

We terminated twenty-two (22) contracts:          $2,213,400
(Yoshihiro Asai, Scott Bednarski, Jose Carrera-Gomez,
Marcial Davis, Art Flores, Bret Hanmer, Kirt Hankton,
Theodore Harris, Greg Hunke, Percy Miller,
James Mitchell, Manuel Ortiz-Partida,
Randy Thornton, Robert Vick, Brett Yokley,
Barry Horowitz, Harrison Norris, Joe Dorgan,
Scott Chasser, Craig Mally, Scott Norton, Mike Enos)

With this decrease and our variables, we are currently $5.6 million over budget for 1999.

WCW 019222
CONFIDENTIAL



## MEMO

TO:        Brad Siegel

CC:        Greg Prince
           Don Edwards
           Amy Davidson
           Jennifer Carson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      October 31, 2000

---

The following is a synopsis of the Talent Contract Changes for October 2000.

We terminated three (3) contracts:
(Scott Hall, Anibal Gonzalez, Bret Hart)

We added three (3) contracts:
Lenita Erickson ($125,000 plus $500 per event)
Scott Oberholzer ($750 per week plus $300 per event)
Chris Harris ($750 per week plus $300 per event)

We negotiated an increase for one (1) contract:
Torrie Wilson ($1,600 for each day over 125 days per contract year)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $38.1 million ($1.935) under the forecasted amount of $40,035,000 .

WCW 019218
CONFIDENTIAL



World Championship Wrestling
A Division of Turner Sports
ONE CNN CENTER
Box 105366
Atlanta, GA 30348-5366

**MEMO**

TO:        Brad Siegel

CC:        Bill Busch
           Scott Wilkinson, Esq.
           Gary Juster
           JJ Dillon
           Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 1, 2000

---

The following is a synopsis of the Talent Contract Changes for February 2000.

We added one (1) new talent:   Daniel Covell ($75,000)

We negotiated increased contracts for three (3) talent:
(Evan Karagias, Shannon Moore, Shane Helms)

We terminated four (4) contracts:
(Mark Hildreth, Ann-Marie Crooks, Bobby Eaton, Troy Martin)

These changes have resulted in an increase in our current talent payroll to $40.2 million for 2000.  This is in comparison to our current forecast of $40.35 million.

WCW 019217
CONFIDENTIAL



Director of Legal
and Business Affairs
diana.myers@turner.com

*World Championship Wrestling*
*A Division of Turner Sports*
*ONE CNN CENTER*
*Box 105366*
*Atlanta, GA 30348-5366*

**MEMO**

TO:        Brad Siegel

CC:        Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 9, 2000

---

The following is a synopsis of the Talent Contract Changes for April 2000.

We added seven (7) new talent and one (1) wardrobe seamstress:
Mike Alfonso ($350,000 plus $2,000 for house shows and $3,000 for PPVs), Chris
Candito ($104,000 plus $500 per event), Troy Martin ($350,000 plus $1,750 for house
shows and $2,500 for PPVs), Shawn Stipich ($78,000 plus $500 per event), Troy Endres
(Trainee-$600 per week), Allison Pfau ($15,000 plus $250 for PR or non-TV events and
$500 for TV events), John Riker ($750 per event), Carol Pedigo (wardrobe-$1,000 per
month plus $250 per event)

We terminated two (2) contracts:
(Rob Kellum, Sione Vailahi)

We negotiated *increased* contracts for:
(Richard Fliehr, Kimberly Falkinburg, Ian Hodgkinson, Shannon Spruill, Sharmell
Sullivan, Vanessa Bozman)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $1,100,000
($41,450,000) over the forecasted amount of $40,350,000.

A Time Warner Company

**WCW 019215
CONFIDENTIAL**



*World Championship Wrestling*
*A Division of Turner Sports*
*ONE CNN CENTER*
*Box 105366*
*Atlanta, GA 30348-5366*

**MEMO**

TO: Brad Siegel

CC: Greg Prince
Don Edwards
Felicia McDade
Amy Davidson

FROM: Diana Myers

RE: Talent Budget Summary

DATE: June 13, 2000

---

The following is a synopsis of the Talent Contract Changes for May 2000.

We added one (1) new talent:
Lance Evers ($245,000 plus $750 per event)

We terminated six (6) contracts:
(Jacobus Strauss, Brad Cain, Sonny Siaki, Dionicio Castellanos, Brad James,
Clare Cutrufello)

We negotiated increased contracts for:
(Lenny Carlson, Jerry Tuite, Jeff Jarrett, Chris Ford, Norman Smiley, Vito LoGrasso,
Ron Harris, Don Harris, Chuck Palumbo)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $2.65
million ($43,000,000) over the forecasted amount of $40,035,000 .

WCW 019214
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



**BOBBY  HARDWORK  WALKER**
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:     ERIC BISHOFF
SUB.    Racial Discrimination
FROM:   Bobby Walker

MARCH 01,1998

DEAR SIR:

 In the past Terry Taylor has made statements to me and others how he felt about
blacks. Since he has had the top booking job, I have had nothing but problems. Ever
since I talked to Terry in Orlando Fl., about my future in WCW, the problem has
gotten worse. I feel like I lost my job because of Terry Taylor deep dislike for Blacks.
I have alwas tried to talk to you about any problems.  I want to know from you why
I lost my job? Please contact me at 770-716-6830.  I look forward to hearing from
you soon.  Thanks in advance for your assistance in this matter.


Bobby Walker.


CC: ERIC BISHOFF



PLAINTIFF'S
EXHIBIT

WCW 009452
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



## BOBBY  HARDWORK  WALKER
**BOBBY Walker**
**Professional Wrestler**

59 Gleneagles Dr.
Fayetteville, GA.

———

Telephone 770-716-6830

**TO:**     DR.  HAVEY SCHILLER
**SUB.**     Racial Discrimination
**FROM:**   Bobby Walker

**MARCH 01,1998**

**DEAR SIR:**

I know that you are a very busy man. Could you Please arrange a meeting with
me, to talk about this problem. In the past Terry Taylor has made statements to me
and others how he felt about blacks. Since he has had the top booking job, I have
had nothing but problems. Every since I talked to Terry in Orlando Fl., about my
future in WCW, the problem has gotten wrost. I feel like I lost my job because of
Terry Taylor deep dislike for Blacks.  I want to know why I lost my job? Please
contact me at 770-716-6830.  I look forward to hearing from you soon.  Thanks in
advance for your assistance in this matter.

Bobby Walker.

**CC: DR. HAVEY SCHILLER**



PLAINTIFF'S
EXHIBIT
15
3/19

P00593



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

PEZAVAN WHATLEY,              )
4                              )
          Plaintiff,           )
5                              )
     vs.                       ) CIVIL ACTION FILE
6                              ) NO. 1:01-CV-0916-CC
WORLD CHAMPIONSHIP WRESTLING, )
7   INC.,                      )
                               )
8          Defendant.          )

9

10

11   _____

12              DEPOSITION OF PEZAVAN WHATLEY
                   NOVEMBER 14, 2001
13                    10:09 A.M.

14   _____

15

16

17

18

19

20

21

22

23

24

25          CERTIFIED COURT REPORTERS

he Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
404-237-1990

1   conversation, that he would confer with JJ Dillon.

2   Q   What was Mr. Bush's race?

3   A   White.

4   Q   And what was Mr. Goodley's race?

5   A   Black.

6   Q   Do you know what happened after that meeting

7   with Mr. Bush?

8   A   Yes --  only guesswork, but --  what

9   happened, but --

10  Q   What do you believe happened?

11  A   We talked to Mr. JJ Dillon, who stopped all

12  of the black people from being  -- moving up in

13  positions, and I was stuck.

14  Q   Why do you believe that?

15  A   Because Mr. JJ Dillon is as racist as they

16  come.

17  Q   Why do you believe that?

18  A   Because I've known Mr. Dillon for the

19  longest time.

20  Q   What has he done to make you believe he's

21  racist?

22  A   Well, I worked with him at a time when we

23  were in a bathroom listening to country and western

24  music, and the country and western music involved a

25  song and the word "nigger."  He thought that was

1    great.

2        Q        Anything other than that?

3        A        Mr. JJ Dillon worked with me at times, with

4    Mr. James Crockett, and we were also given positions

5    to move up, but every time that I had to participate

6    in -- me, myself had to participate in any activity in

7    which I was under Mr. Dillon's hand -- it was always

8    racist, nigger.

9        Q        Let me back up for a minute.  When was this

10   incident with you and Mr. Dillon and country western

11   music in the bathroom?  Do you recall when that was?

12       A        That was in the '80s.

13       Q        In the '80s?

14       A        Yes.

15       Q        And you just said as far as working in

16   positions involving Mr. Dillon, it was always racist?

17       A        With me.

18       Q        What did he do?  Did he say anything racist?

19       A        He just stopped your opportunity to go

20   forward on your position.

21       Q        What evidence, Mr. Whatley, do you have that

22   JJ Dillon was responsible for stopping you from going

23   to any position?

24       A        I think he gave the talk to him.  He got --

25       Q        I don't want to know, Mr. Whatley  -- I want

1   assisting with Keith on editing and passing out

2   papers.

3       Q      Do you know who made the decision to let

4   them do this work as assistant booker?

5       A      No, I don't.  I don't know.  I could only

6   speculate.  I don't know for sure.

7       Q      Now, you talked about earlier who you talked

8   with in terms of wanting to be a booker?

9       A      Yes.

10      Q      You mentioned Mr. Hamilton.  We talked about

11  that.

12      A      Yes.

13      Q      You mentioned Tim Goodley --

14      A      Yes.

15      Q      -- and a meeting that you had with Tim.  Was

16  that the only time you talked with Mr. Goodley about

17  being a booker?

18      A      No.

19      Q      Were there other times?

20      A      Yes.

21      Q      What did you say to Mr. Goodley?  Those --

22      A      Same thing I told him at the beginning.

23      Q      Which --

24      A      That we have --  we have and --  we have not

25  had any black bookers in the main events of the major

1    Mr. Bruce were assigned trips in which that he could

2    make it back in time for his family or just one or two

3    days at different times.  But because of the fact that

4    my availability of being able to drive, after my

5    first-proven shot that I could drive a truck -- look

6    how this case is going --  that I could drive --  that

7    I could go then to be trusted to drive their truck and

8    their equipment from one designated point to another.

9         Q       Anything beyond what you've just told me as

10   far as the assignments of trucks that you believe was

11   discriminatory, or is that everything?

12        A       Yes.

13        Q       That's everything, or there's more?

14        A       No.  I mean, there's more.

15        Q       What else is there?  Please tell me.

16        A       In our --  Mr. Hamilton, part of his job was

17   to go at the television --  with the television, when

18   the television went out and --  at the beginning, and

19   our assignment was to take the people that applied to

20   --  that wanted to be wrestlers, into the training

21   facility both at Jonesboro and at Carroll Drive, and

22   at this time there was a man employed also with us,

23   because of Mr. Hamilton's absence sometimes, was

24   Blackjack Mulligan, and during the time we accepted as

25   trainers the people that applied into our jobs, and

1    when Mr. Hamilton arrived back and he first saw the

2    new recruits, his first comment was, oh, a different

3    color.

4         Q    All right.   When was this?

5         A    When we were in the training facility in

6    Jonesboro.

7         Q    So this is before you moved to Carroll

8    Drive?

9         A    Before we moved to Carroll Drive.

10        Q    Do you know what he was referring to?

11        A    Yes.

12        Q    What was he referring to?

13        A    Before there was never any --  maybe one,

14   two Afro-Americans or nonCaucasian people there.   The

15   applications that we received when he was there,

16   happened to include more than that, and which we

17   accepted, and they were in the facility when he came

18   and turned the corner.   This was not something that he

19   expected.

20        Q    Did he do anything about it other than to

21   say the comment that you just said?

22        A    What was done a little later is that they

23   were trimming the fat, multimillions of dollars.   They

24   were trimming the fat by cutting four of the black

25   guys that were down there and let two of the white

1    guys go, because the white guys were not talented.

2    The black guys were very, very, very talented, and

3    they said we had too many down there. Too many, I

4    mean too many people of different color.

5        Q    Did someone say that to you?

6        A    We knew it, and they said it.

7        Q    Who said that?

8        A    Mr. Mulligan told us as a repeat of what Mr.

9    Hamilton had said.

10       Q    So in other words, Mr. Mulligan told you

11   that Mr. Hamilton had said something about the color

12   of the trainees?

13       A    Mr. Hamilton had spoken about the color of

14   the trainees before that period of time, but this

15   particular instance, what we're speaking of, that's

16   the way it went.

17       Q    Do you remember who it was who was cut?

18       A    Troy Hamilton. I can't remember his tag

19   team partner. Very, very highly talented young man.

20   Mr. -- I can't remember his name. I can't remember

21   his name. Very well built, muscular bodybuilding

22   phenomena that was in town that wanted to become a

23   wrestler. And other individuals, I can't remember

24   their names, but they made it very difficult for them

25   to stay at the facility and still wrestle.

Page 101

1    A      It was as -- it was true for us to train

2    everybody really hard, but the emphasis was exactly on

3    the -- on the black individuals that they knew that

4    they could really pound on at the same time as you

5    would be -- white individuals would be given a

6    routine, whereas the black was to be given the

7    routine.

8           Now, if a white individual doing the

9    routine faltered, slumbered, could not get it done, he

10   was given extra opportunity to get hisself together so

11   that he could be able to -- to keep going on.  If a

12   black individual stumbled, faltered, or -- he didn't

13   want to be there; he had a bad attitude; they couldn't

14   teach him; he couldn't learn it.

15   Q      Who was in control of this?  Wasn't it the

16   trainers who were in control of this, including

17   yourself?

18   A      Including myself.

19   Q      So you took part in the process of what

20   you're claiming?

21   A      My process was that you were wrong.  He can

22   do this.  They're great talents sitting right here.

23   Q      Mr. Whatley, let me interrupt you, because I

24   want you to try to make yourself clear.  I'll let you

25   finish, but I don't understand what it is you're

Page 132

1    wrestle, which would provide me with more money.

2         Q      Who told you that?

3         A      From Mr. Sullivan himself.

4         Q      He came to you and told you that?

5         A      Yes.

6         Q      Did he tell Mr. Bruce and Mr. Wenner that

7    too?

8         A      No.  Mr. Sullivan told me.

9         Q      Just you?

10        A      Whether he told Mr. Bruce and Mr. Wenner, I

11   can't remember, but I know what he told me.

12        Q      So he came to you and said, I'm going to

13   give you more chances to wrestle?

14        A      Now you're going to get chances to wrestle.

15   He and Mr. Mike Graham both, who were in the booking

16   position and assisted booking.

17        Q      Why is that discriminatory discipline?

18        A      Well, because of the fact that they --  that

19   Mr. Bischoff -- during this period of time we wrestled

20   in a place called Atlanta, Georgia, the Omni, and Mr.

21   Bischoff showed expressively his desire about

22   discrimination, because he took not only myself but

23   every black off the card, and he was quoted as saying,

24   this is white night.

25        Q      When was this?

1      A      In the Omni, when Mr. Shuler was in charge

2   and at our first big Omni show.

3      Q      Who else did he take off the card, according

4   to you, besides you?  Who else?

5      A      Jacqueline -- the female, Jacqueline, who

6   was Mr. Sullivan's walk-in.

7      Q      His valet?

8      A      His valet.  The Harlem Heat, Harold Hogue.

9   That was all, because that -- that wasn't any other

10  blacks on the card.  Any other blacks on the card that

11  had been wrestling previously.

12     Q      Did Mr. Bischoff make this comment to you?

13     A      Mr. Bischoff made that comment to Mr.

14  Sullivan.

15     Q      Were you there when he made that comment?

16     A      No.

17     Q      How did you hear about that comment?

18     A      Mr. Sullivan came out and told us why we

19  weren't going to be able to work.

20     Q      What did he say?

21     A      He said that this is going to be -- he took

22  off Jacqueline.  He took off the Heat.  He took off

23  Harold Hogue.  He took off any other persons except

24  for the -- what he wanted, and he told us, just

25  before he left, told us, turned around and say, Eric,



1    said this is white night.  In Atlanta, Georgia.

2        Q      Any other discipline beyond that, Mr.

3    Whatley?

4        A      That's all of them that I can remember right

5    now, sir.

6        Q      Is there anything you think that would help

7    you remember other instances?

8        A      I'm trying to, but that's all I can

9    remember.

10       Q      Why don't you take a minute and see if you

11   can remember anything more?

12       A      I spoke up to Mr. -- Mr. Randy Savage, who

13   was one of the prominent wrestlers at the time, about

14   having the opportunity to wrestle and to book, to be

15   the booker at that time, who was Kevin Sullivan.  I

16   mean, Kevin Nash.  Who at that time, Mr. Savage was

17   one of the few people that knew the --  about

18   qualifications of being the booker and that --  and

19   that I had them.

20              He spoke to him about him -- about doing

21   it, and at that time Mr. Nash could have done it if he

22   wanted to.  And he did not do it, and when Mr. Savage

23   came back to tell me the reason why he did not do it,

24   he included the fact that they were making some

25   changes.  But also he said, but the real changes, you

1    know.  And we both pointed, and we parted.

2        Q     This was what Mr. Savage said to you?

3        A     Mr. Randy Savage.  When we discussed

4    wrestling and booking as one of the things that I

5    could continue doing on that job.  Oftentimes headline

6    wrestlers go to the booker and the -- and express,

7    this guy can do it.  This guy can do it.  Randy Savage

8    was a guy highly respected.  His opinion was highly

9    noted.  He done a lot in the business, and so -- even

10   more so than the guy that held the position in the

11   job.

12            And so when Mr. Savage came back, it was

13   told to me because they're going to make some changes,

14   but also in the conversation, we knew that changes

15   that were being made had nothing to do with my

16   request.  Changes was that they didn't want me in

17   there and that I was black.

18       Q     He didn't say that, but that's what you

19   understood him to be saying?

20       A     Well, he pointed to skin.

21       Q     Did he say that's what Mr. Nash said, or did

22   he say that's what he believed was going on?

23       A     He told me what Mr. Nash said about the

24   changes and that there were going to be those changes

25   made.  I can't remember verbatim, word for word.

1     A     Right now.

2          MR. PONTZ:  Well, I'm going to reserve

3  the right to reopen this deposition when Mr. Whatley

4  decides he can remember some other stuff, but I'm

5  taking him at his word that that's everything he knows

6  about.

7  BY MR. PONTZ:

8     Q    Mr. Whatley, you also indicated in your

9  complaint that you believe you were subjected to a

10  racially hostile work environment?

11     A    Yes.

12     Q    What do you think made your work environment

13  racially hostile?  What things happened at the

14  workplace that you think made it racially hostile?

15  Other than what we've talked about?  You don't need to

16  repeat the things we've talked about, although you can

17  point them out to me if you want.

18     A    I found it necessary to try to advance

19  knowledge or equip young black wrestlers on some of

20  the things that they were going to be facing when they

21  got into the business.  Not only was that

22  objectionable from Mr. Hamilton's point of view, but

23  it was objectionable to the assistant booker's point

24  of view, objectionable to the booker's point of view,

25  and objectionable to Mr. Bischoff's point of view.



1    Q    Well, what was racially harassing about

2    that?

3    A    Well, they would rather for those kids not

4    to know those things than to be told those things.

5    They would not -- they would rather for them not to

6    know that they weren't going to get an equal

7    opportunity and that they were going to be twice as

8    good as the white boys even to be able to look at, and

9    they didn't want them to know that even though they

10    could be twice as good as the white boys and wrestle

11    and have talent, charisma, talking and everything,

12    they still weren't going to be given the chance, even

13    though they colored it like you were going to be --

14    like they was going to give an equal opportunity to

15    them all.  Me being in that business and knowing that

16    before, knew that they were lying.

17    Q    Mr. Whatley, what I'm really asking you is,

18    what happened in your workplace -- what happened to

19    you in your efforts to do your work and provide your

20    services that you believe was racially hostile and  --

21    A    Okay.

22    Q    -- affected your ability to perform your

23    job?

24    A    During the time the four -- when they made

25    the cutbacks, when they made the cutbacks on the four

1      A      Well, being a man of the experience that I

2    had, Mr. Hamilton first of all, who was in full

3    knowledge that I was a fully capable and able person

4    to be able to do not only my job but the job that he

5    was doing and to be booker.  Well, Mr. Hamilton made

6    no effort whatsoever to promote the fact that he had

7    an individual that could help with the company

8    overall.  Mr. Hamilton rather kept his mouth shut so

9    that no fur is fluffing.

10     Q      Anything else that Mr. Hamilton did that you

11   believe made a hostile work environment for you?

12     A      The fact that when we were in Carroll Drive

13   and wrestling, we would point out the different

14   individuals who working with them day by day, that

15   were really coming along real fine.  Well, Mr.

16   Hamilton came out there, and he would look under the

17   surmise of whatever period of time he was out there;

18   an hour, two hours, or whatever, and then come back

19   and make a decision on which ones he thought that was

20   good or bad, you know.

21            And oftentimes -- oftentimes nonCaucasian

22   or off-white or African people were -- were given

23   positions of --  he could stay down there and train

24   more, but it's always a little this that was wrong or

25   a little that, that was wrong.  Everybody had

Page 143

1   something wrong.  You know, so it should not be just

2   one group that should have been -- that should have

3   been identified as having something wrong.

4           They just whenever the administration

5   didn't want an extra black in there, they make up a

6   reason.  He don't come on time.  Some didn't come at

7   all, you know, and still were welcome back.  Also,

8   which was -- this is -- the terrible thing is that

9   they would bring down Keith and that young lady that I

10  can't remember her name to look at the talent, who had

11  no idea what's going on.

12          And myself, especially myself, who were

13  capable of doing a lot of things for the young men,

14  our opinions were swept under the rug.  I mean, when I

15  mean our opinions, I mean my opinion on who could be

16  doing -- like you could have a black man down there,

17  six-eight, 325 pounds, undeniably, undeniably money

18  walking, and because they would bring individuals down

19  there that had no idea about what was going on or what

20  the training, all they do is looked and thought he was

21  cute or had the hair long enough or they dyed their

22  hair blond.  They had enough steroids stuck in their

23  ass that they was the ones that would be chosen over

24  individuals with talent.

25      Q    Anything -- I'm sorry.  Go ahead.

PREMIER REPORTING

1    A    No.  Go ahead.

2    Q    No.  Finish what you're saying, please.

3    A    That was it.  That was it.

4    Q    Anything else that you think was done that

5    made your work environment a racially hostile work

6    environment?  Besides what you've already told me?

7    A    When I chose an individual that was -- that

8    was talented enough to go around and -- and

9    especially, you know, when I chose a black individual

10   that was good enough to be talented, useful, could

11   draw money, that was like a mark against him.

12   Q    Did you ever choose any white individuals

13   that you thought were good?

14   A    I tried to be fair.

15   Q    And what happened to the white guys that you

16   chose that were --

17   A    Quite a lot of them were chosen.

18   Q    And none of the black guys you pushed were

19   chosen?

20   A    No black guy that I endorsed was ever used

21   on a WCW main event on the assistant basis.

22   Q    Who were some of the African-American

23   trainees you endorsed?

24   A    Like, Mr. Bobby Walker is an individual I --

25   now, Mr. Bobby Walker had a talent that no other

Page 161

1   hold you on the sideline, especially me, because they

2   didn't want you to -- to display the guy giving

3   talent that you could do what was actually being

4   required of you to do.

5       Q     Anything else that you believe supports your

6   claim for a hostile work environment on the basis of

7   race?

8       A     Okay.

9       Q     What else?

10       A     Because of the fact that you -- I wrestled

11   in several -- I mean, I participated in several

12   different jobs in the WCW organization, it was not

13   unusual for you to hear amongst the work place, you

14   know, the N-word, or darky, or if you went and was

15   sitting down beside another employee that was an

16   individual that was there and the employee happened to

17   be a white female, better make sure that you were not

18   sitting down there for enticement of the white female.

19   Other white males who were always looking at that,

20   would come over and sit beside you.

21           If I was in a conversation with another

22   black individual, or another couple other black

23   individuals, it was not unusual for Terry Taylor,

24   Diamond Dallas Page to come over with a joke. Hey,

25   not more than two or three black guys in a -- at one

Page 167

1    incidents with some lighting employees, is there

2    anything else?

3        A    Well, also in security, Doug Dellenger, who

4    was head of security from start to beginning, came up

5    and told one black individual they were playing the

6    music over the loudspeaker and turned it off and said,

7    we don't want to hear no more of that nigger music.

8    And when the individual turned around and got mad, he

9    said, I don't know what you got mad; we could say that

10   to Pez and it'll be all right.

11       Q    Were you there when that happened, Mr.

12   Whatley?

13       A    No.  I was just told about that after it

14   happened.

15       Q    Who told you about that?

16       A    The people that it was told to.

17       Q    Who?  Who?  Names?

18       A    The wrestle --  was Mr. William Boulware was

19   told, and he reported it to the human resources

20   department.

21       Q    How do you know he reported it to the human

22   resources department?

23       A    Because we went down there when he went down

24   there and told.

25       Q    Were you there when he went and told them?

1      Q      Did they ever say that to you?  Did you ever

2   hear them say that?

3      A      No.  Only time that I heard them say it is

4   when they thought I wasn't there.

5      Q      That's what I'm asking you, Mr. Whatley.

6   Were there times that you heard Diamond Dallas Page or

7   Chris Kanyon use the N-word about you?

8      A      When they was in dressing rooms and were

9   leaving the dressing room or coming out of the

10  dressing room and you're making suggestions about,

11  well, what can be happening in the ring, you would

12  hear them when you left saying, what that nigger

13  talking about?

14     Q      Who would you hear say that?  Chris Kanyon

15  and Diamond Dallas Page?

16     A      Different ones like that.

17     Q      Anybody else you can think of?

18     A      Not right off the bat.

19     Q      When did that happen?

20     A      During the  '98-'99 --  it continued to

21  happen all the way through, but most --  most of the

22  time, '98 and '99 sessions during the wrestling.

23     Q      And these were wrestlers who were making

24  these statements?

25     A      They were wrestlers, yes.

1    or come get security and say, hey, there's a guy in

2    the ladies' room?

3         A    Not to my knowledge.

4         Q    That's fine.  Any instance that we haven't

5    talked about -- Mr. Whatley, any instance we haven't

6    talked about involving the use of the word "nigger"?

7         A    Only things that I could say is what I was

8    told after somebody said that it was said.  The

9    earshot of hearing it or up in front of your face,

10   hearing it, had been limited to just several

11   occasions.

12        Q    The ones we talked about?

13        A    Yes.

14        Q    Did anyone ever call you darky?  That was a

15   word you used a few minutes ago.

16        A    I heard the word "darky," but that was, you

17   know -- the word darky on the crew, with the people

18   that you worked with, and that because of the fact

19   that -- like I said before, that I wouldn't take

20   second citizenship to, like, for instance, a guy that

21   was -- I can't remember his name.  He was one of the

22   ones in charge of lighting.  Used in reference.  Used

23   it in reference to me, because of the fact that we

24   were all moving out our stuff at the same time.

25              He wanted us to stop doing our job so that

Page 181

```
 1    he can complete the --  completely let the --  the

 2    lights down.  But because of the fact that we were on

 3    the move and they wanted economically to use the

 4    locals to do all the things, they were trying to get

 5    us out first, so therefore he was disgusted in the

 6    fact that he had to wait, and now it's --  I had to

 7    wait behind a darky too.

 8        Q     Do you remember his name?

 9        A     I can't remember --  I tried not to remember

10    his name, but I knew that he was one of the men that

11    was in charge of when the lights went up and went

12    down, and  --

13        Q     Did he work for the arena, or did he work

14    for WCW?

15        A     WCW.

16        Q     So he was a lighting employee of WCW?

17        A     WCW.

18        Q     Did you complain about that?

19        A     Oh, yes.

20        Q     Who did you complain to?  Do you recall?

21        A     Oh, yes.  Every instance that we did, that

22    we called, you know, I knew exactly that the person

23    that you can go to in the instance was human resources

24    department.

25        Q     Do you know if human resources department
```



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

To: ALL WCW TALENT

From: J.J. DILLON

Date: APRIL 30, 1999

CC: Eric Bischoff
Bill Busch
Diana Myers
Alan Sharp

Subject: TALENT SCHEDULES, INCLUDING PERSONAL APPEARANCES

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

We have had several recent situations where talent were needed on short notice for WCW business ("house show" substitution, personal appearance, etc.) only to be informed by the individual talent that they had made a previous commitment not approved by WCW (movie project, charity appearance, autograph session, etc.) that caused a conflict.   In order to avoid a reoccurrence of these situations from this point forward, please be advised that all requests for days "OFF" must be requested in advance and approved by J.J. Dillon.   If you are planning a vacation, wanting to attend the wedding of a friend or planning to attend a school reunion, etc., you must request the time off in advance. THIS INCLUDES ANY AND ALL PERSONAL APPEARANCES (INCLUDING AUTOGRAPH SESSIONS), WHETHER FOR CHARITY OR INVOLVING AN APPEARANCE FEE.

Talent Relations has been given approval on a trial basis to authorize personal appearances for talent that involve payment to talent of a fee payable from a source outside our company.      These personal appearances will only be considered "Authorized Appearances" if they are scheduled through WCW.      The talent involved and WCW will share any fee involved, with the majority of any appearance fee going to the talent that makes the appearance.      All of these non WCW related personal appearances will be voluntary (therefore not regarded as a workday if there are limitations in the WCW talent contract) and subject to the approval of the talent. Appearance fees are usually determined by the fair market value, and if approached, WCW will attempt to get a fair appearance fee, which is subject to the approval of the talent.    If you are approached concerning an appearance, please have the party contact J.J. Dillon to comply with our appearance approval process.    This usually involves a contract for the appearance, which assures the validity of the request.    All appearance fees are received in advance by WCW, which assures the talent will be paid in accordance with the agreement.    ALL APPEARANCES NOT CLEARED BY WCW WILL BE REGARDED AS "UNAUTHORIZED" AND YOUR PARTICIPATION IN AN "UNAUTHORIZED APPEARANCE" COULD BE INTERPRETED AS A BREACH OF YOUR CONTRACT.

This represents a great opportunity for an added revenue stream for WCW talent.    This should continue beyond a trial basis, if we all work within the system.      If you have any questions or comments, please call J.J. Dillon at (404) 603-3832.      Thank you.



PLAINTIFF'S
EXHIBIT

49

WCW 010262
CONFIDENTIAL



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

*Revised March 28, 2000*



## IV. Employee Job Profiles



PLAINTIFF'S
EXHIBIT

CONFIDENTIAL

*Revised March 28, 2000*

## VICE PRESIDENT

Title: <u>Executive Vice President</u>
Department: <u>General Administration</u>
Extension: 3-1087

Name: **Cobb, Rita**
Title: <u>Executive Assistant</u>
Department: <u>General Administration</u>
Extension: 3-5200
I assist the Executive Vice President of WCW. I manage his calendar, coordinate meetings, and arrange travel and all other general administrative duties. People can come to me if they need help locating or getting a message to the Executive Vice President.

Name: **Chandler, Galen**
Title: <u>Manager Live Programming</u>
Department: <u>General Administration</u>
Extension: 3-1076

CONFIDENTIAL

# STRATEGIC PLANNING

*Revised March 28, 2000*

Name: **Edwards, Don**
Title: Director of Strategic Planning
Department: Strategic Planning
Extension: 3-3631
I am responsible for business planning and analysis group including preparing annual revenue budgets, monthly forecasts, and strategic long-range plans for various WCW networks. I participate in the development of the strategic direction of the division- identifying and analyzing issues of strategic significance. I analyze the impact of market trends on current and projected network distribution and profitability. I provide financial and analytical consultation support to the WCW sales and marketing teams as well as executive management. I prepare financial analyses of contractual terms and sales proposals to be used in deal negotiations. I develop and maintain client specific models to be used in long-range forecasting. I also perform general ad-hoc business/financial projects including analyzing new business concepts and developing pro formas as needed.

Name: **Reid, Octavia**
Title: Administration Assistant of Strategic Planning
Department: Strategic Planning
Extension: 3-1016
I assist the Director (Don Edwards) and other department managers of the WCW Strategic Planning Group. I manage schedules, calendars, and answer incoming calls. I am the contact for all departmental supplies and maintenance, and I perform all other administrative duties as requested.

Name: **Holman, Eric**
Title: Manager of Strategic Planning
Department: Administration- Strategic Planning
Extension: 3-3624
I am responsible for the financial analysis for TV production areas of WCW. I also deal with financial and/or business strategy projects related to new business opportunities or current operational issues. People can come to me for help with WCW business strategy and financial issues. I am not responsible for accounting issues for WCW.

Name: **McDade, Felicia**
Title: Senior Financial Manager
Department: Strategic Planning
Extension: 3-1073
I am responsible for strategic planning which incorporates the budget for WCW and budget distribution for each department. People can come to me for help with finance and planning.

Name: **Wormsby, Greg**
Title: Financial Analyst
Department: Strategic Planning
Extension: 3-5223
I am responsible for assisting the merchandise and magazine departments with monthly reporting of financial activity, forecasting the impact of projects on the department bottom line, audit of procedures and policy for compliance. I do Audit project work for Bill Busch and Don Edwards as needed. I am a liaison between accounting and assigned departments. People can come to me for help with inventory related information (stock levels, sales, comps, per caps, etc.), magazine invoice information and financial monthly reports. It is often mistaken that I am responsible for purchase orders, comp/merchandise requests and invoice coding.

CONFIDENTIAL

*Revised March 28, 2000*

# FACILITY

Name: **Feagle, Karen**
Title: Office Manager
Department: General Administration
Extension: 3-1012
I am responsible for the WCW Log Cabin facility; which includes construction, outside grounds and any internal office needs.  I can help with office space, construction questions, new hire/office moves, mailroom issues, heat/air questions or concerns, office parties and phone issues.  I am not responsible for Human Resource issues such as benefits.

Name: **Williams, Allison**
Title: Office Coordinator
Department: General Administrator
Extension: 3-1033
I am responsible for new hire and office move coordination, request for services, stationary orders, new construction, mailroom issues, furniture needs, party planning, miscellaneous office projects and backup for Karen Feagle. People can come to me if they need help with services or repairs (ex: artwork, lights, heat/air problems, plumbing), stationary orders (business cards, letterhead, or notepads), plant issues, office depot questions, etc.  My duties are often confused with those of Juliet Cuthbert-Borders, such as toner orders and vending machine refunds.

Name: **Cuthbert-Borders, Juliet**
Title: Office Assistant
Department: General Administration
Extension: 3-1072
I am responsible for pagers, cell phones, housekeeping, ID badges, keys, security card readers, telephone/detail master lists, break-room, copiers, fax machines, parking lot and landscaping, Airborne/Fed Ex supplies, and land-line phone extensions and problems.  My duties are often confused with those of Allison Williams, such as heating and air.

Name: **Richardson, Kinnette**
Title: Receptionist
Department: General Administration
Extension: 3-1075
I answer incoming calls via the WCW switchboard and I greet and assist WCW guests and visitors.  I also provide assistance to employees with MLQ/CS packages, conference room bookings, timesheets, and CNN parking access.  People can come to me if they need help with locating a person, a package or a room, etc.

CONFIDENTIAL

*Revised March 28, 2000*

# LEGAL

**Name: Myers, Diane**
Title: Director of Legal and Business Affairs
Department: Legal
Extension: 3-1010
My job responsibilities include drafting and reviewing all contracts, the negotiation of legal issues in contracts, and the management of talent contracts and related issues.   I oversee the Worker's Compensation Department, manage Intellectual Property and answer general legal questions.  People can come to for help with general legal issues and contract drafting on review.  It is often mistaken that I am responsible for negotiating business deals.

**Name: Wilkinson, Scott**
Title: Senior Counsel
Department: Legal
Extension: 3-3160
I provide legal counsel on all issues for all departments within WCW.  People can come to me for help with talent contracts/releases, sponsorship contracts, independent contractor agreements and appearance contracts.  I can assist with clip license agreements, employment issues, litigation, music rights, ad copy reviews, licensing/merchandise legal issues, CAA/business development (movies) and parody/copyright/trademark issues for on-air production.

**Name: Garwood, Andrea**
Title: Paralegal
Department: Legal
Extension: 3-2559
I draft customized form agreements- such as clip license agreements, music license agreements, trademark license agreements and merchandise license agreements.  I handle all trademark and piracy issues.  I register domain names for WCW and manage the litigation files.  People can come to me for help with clip license agreements, registration of domain names, trademark and piracy issues, or if Scott and Diana are unavailable.  It is often mistaken that I am responsible for talent contracts or talent related issues (Georgia Davidson).

**Name: Davidson, Georgia**
Title: Talent Business Manager
Department: Legal
Extension: 3-3626
I am responsible for contracts for wrestlers, contract files, immigration issues for talent and drug testing.  I can help with talent issues.  It is often mistaken that I work with TV Syndication (Susan Bowling).

**Name: Henderson, Debbie**
Title: Risk Management Coordinator
Department: Legal
Extension: 3-3118
I handle all of the Workers' Compensation Claims for WCW.  I take care of the medical information, doctor's appointments, and insurance related information for work related injuries.  I can help with any work-related injury or questions regarding them.  I am not responsible for travel or personal medical needs.

CONFIDENTIAL

*Revised March 28, 2000*

# ARENA BOOKING

Name: **Juster, Gary**
Title: VP Wrestling Operations
Department: Arena Booking
Extension: 3-5217
I am responsible for booking, scheduling, and routing (overall planning) of the WCW Event Schedule. I work with Awesome Promotions regarding the promotion of WCW live events. I work with arena managers and their professional association (IAAM) re: WCW's position in the industry. People can come to for help with any matter concerning arenas- this could include move-in issues, contract terms, union issues, ticketing matters and routing concerns. It is often mistaken that I am responsible for certain production issues, wrestler appearances, ring crew and catering.

Name: **Ellis, Keila**
Title: Arena Assistant
Department: Arena Booking
Extension: 3-5215
I am responsible for comp ticket requests and television promotions. I am the assistant to Gary Juster, Vice President of Wrestling Operations. I am also an Awesome Promotions contact person. People can come to me if they need help with tickets or anything concerning the Arena department.

Name: **Burnham, Chip**
Title: Director of Arena Operations
Department: Arena Booking
Extension: 3-5225
I am responsible for the booking of WCW events at all U.S and Canada arenas. I oversee WCW compliance with state athletic commissions. I am also responsible for event coordination of WCW arena shows. People can come to me for any questions regarding arena events.

Name: **Barry, Laci**
Title: Events Booking Assistant
Department: Arena Booking
Extension: 3-5218
I am responsible for processing contracts. I am the main contact for arenas. I work with athletic commissions and I coordinate IAAM conferences. I can help with athletic commissions and arena information. I am not responsible for tickets.

CONFIDENTIAL

# MERCHANDISE

*Revised March 28, 2000*

**Name: Komminsk, Kelley**
Title: <u>Director of Merchandising</u>
Department: <u>Merchandise</u>
Extension: 3-5221
I develop all products that are sold in arenas, via catalog, direct response and over the internet.  My department handles premiums, comps and corporate logo requests for other internal departments.  We also work on promotional products for sponsored programs including lotteries, Slim-Jim, and licensed tie-ins.  It is often mistaken that I am responsible for licensing (products sold in retail stores) which is handled by Casey Collins, charity donations which are handled by Brett McLain, and fulfillment which is handled by Leslie Cameron.

**Name: Johns, Cindy**
Title: <u>Administrative Assistant</u>
Department: <u>Merchandise</u>
Extension: 3-5220
I assist Kelly Komminsk in answering phones, fax, fed-ex, file, vending relations, coding, copying, filing invoices, follow up on late payments of invoices, receiving reports summary, etc.  I order merchandise for catalog, arena, internet- analyze reports/order accordingly.  I set up new products in mass, Excel Quick-books- maintain master product list.  I maintain photo library of current images of wrestlers for artwork.  I maintain disk library of catalog images/internet images, process comp forms, catalog photoshoots, and line ups- type for inserts into programs for arena sales and order supplies via internet.  People can come to me for any of the above mentioned.  If I do not handle it, I will direct them to the proper individual.  I do not handle personal purchases of WCW merchandise i.e. people who want to purchase a T-shirt for themselves or relatives.

**Name: Jennings, Monica**
Title: <u>Merchandise Coordinator</u>
Department: <u>Merchandise</u>
Extension: 3-5222
I am responsible for any special merchandise promotions for all departments.  (Ex: Premiums for PPV such as T-shirts, stuffed animals, mugs, screen savers etc).  I handle all changes, updates, etc. on our wcwgear.com site.  I order corporate merchandise for all departments within WCW.  I proof all catalogs for mail-outs/submit corrections to proper people.  I do a special sales flyer & a four-page merchandise spread in the WCW magazine.  I give the weekly update of merchandise commercials we would like to air.  I also provide the number of times the commercial will air and which product we would like to advertise.

Title: <u>Warehouse Supervisor</u>
Department: <u>Merchandising</u>
Extension: 3-1026
I maintain inventory control over catalog and arena merchandise.  I supervise the staff responsible for filling and shipping catalog orders.  I fill and pull requests for goods to be shipped to arena events and I make sure the warehouse procedures are adhered to.  I can help with moving items/merchandise to their departments, CSR item inquiries (catalog descriptions, measurements, etc.), getting goods shipped to their locations, and office comp orders.

**Name: Smith, Pie**
Title: <u>Inventory Control</u>
Department: <u>Merchandise</u>
Extension: 3-5239
I receive all merchandise into department count for accuracy for merchandise to be stored in warehouse.  I ship merchandise to arenas, and count and receive merchandise from arenas.  People can come to me for help with anything concerning merchandise, supplies, fed-ex, packaging, security and morale of the warehouse staff.  It is often mistaken that I am responsible for Call Center merchandise.

CONFIDENTIAL

*Revised March 28, 2000*

Names: **Avery-Neal, Catherine** (3-5239)
        **Clifton, Robert** (3-1070)
        **Nichols, William** (3-5239)
        **Jensen, Ralph** (3-1070)
Title: Warehouse Clerk
Department: Merchandise
Warehouse Clerks are responsible for fulfilling catalog merchandise orders: shipping, receiving, and pulling. They can process office comp orders and merchandise returns. They can also Fed Ex domestic, international, and Priority mail orders; and they order the supplies for Catalog use (boxes and Paks for Fed Ex and Priority mail). People can come to Warehouse Clerks if they need help with anything regarding Catalog merchandising and orders.

CONFIDENTIAL

*Revised March 28, 2000*

# CALL CENTER

Name: **Cameron, Leslie**
Title: Senior Catalog Operations Fulfillment Manager
Department: Merchandise and Catalog
Extension: 3-5219
I oversee the catalog operation; which includes Call Center, Warehouse for arena and catalog, and MACS software maintenance.  I am responsible for all catalog and arena merchandise in and out of the warehouse.  People can come to me for help with MACS software, catalog promotions or questions, merchandise shipments, lottery fulfillment, catalog system data extracts, and catalog reports.

Name: **Collins, Pamela**
Title: Call Center Coordinator
Department: Merchandising
Extension: 3-1026
I supervise four to six customer service representatives.  This includes motivating, developing their skills and encouraging them to achieve their highest potential through effective communication, assigning job responsibilities, controlling employee conflict and treating employees fairly and consistently.  Additional responsibilities include ensuring production jobs are run in a timely manner for our catalog business, responding to customer calls, running and analyzing the call center phone and production reports, offering suggestions on improving productivity, quality and morale for the call center operation- plus any additional assigned duties as needed.  People can come to for help with placing personal merchandise orders, or if a fed-ex catalog order is returned undeliverable- any misdirected customer service orders or complaints.

Names: **Bonhomme, Kadija** (3-1026)
        **McAdoo, Frank** (3-1026)
        **Hester, Frankesha** (3-1093)
Titles: Call Center Rep
Department: Call Center
The call center reps are responsible for calls pertaining to WCW merchandise orders.  They deal with customer service questions concerning previously made orders.

CONFIDENTIAL

*Revised March 28, 2000*

# INTERNATIONAL DEVELOPMENT

Name: **Sidello, Sharon**
Title: <u>VP International Development</u>
Department: <u>International Development</u>
Extension: 3-4054
I direct the strategic presence of WCW internationally via distribution television shows, setting up live tours, coordinating PR, marketing and promotions, and interfacing with worldwide licensees. People can come to me for help with any matters relating to WCW business outside of the US.

Name: **Johnson, Taisheka**
Title: <u>Administrative Assistant</u>
Department: <u>International Development</u>
Extension: 3-2577
I am responsible for all our international affiliate requests, such as marketing materials and Dubs, are filled and shipped out. I also have typical responsibilities such as filing, faxing, and typing letters and e-mails. My job is to be a productive support for the Vice President and Coordinator of the department. People can come to me if they would like to know the international companies we distribute the shows to. I also I have the knowledge of our international tours, such as talent list and itineraries. I am not responsible for tickets for international shows.

Name: **Sherman, Emily**
Title: <u>International Coordinator</u>
Department: <u>International Development</u>
Extension: 3-1014
I am responsible for all international affairs: productions of international shows, international production orders, international public relations and coordinating tours, etc. People can come to me for help with any international issues, but calls should not be forwarded to me just because the person has an accent.

Name: **Pearl, Lisa**
Title: <u>Photo Editor</u>
Department: <u>Photo (Transition)</u>
Extension: 3-3172
I am responsible for determining and re-vamping the "look" of WCW photography. I assign and direct photographers. I work closely with all departments to strategically plan and execute photographic campaigns to support WCW. I create promotional awareness of WCW through conceptual imagery. I manage the editing, cataloging and researching of photography for all internal departments and outside requests. I provide creative directions, production and consulting services regarding photography. It is often mistaken that I am responsible for logos or autograph sheets.

Name: **Franklin, Rene**
Title: <u>Administrative Assistant</u>
Department: <u>Photo (Transition)</u>
Extension: 3-1049
I am a liaison with PR, Merchandising, Licensing, Internet, Magazine, Production and all other divisions within WCW (such as photographers, clients, and external vendors). I make travel arrangements. I receive and return portfolios. I process and distribute expense reports, contracts and other documents. I coordinate FedEx and departmental shipping. I can assist people with the administrative needs regarding photography. It is often mistaken that I am responsible for locating film within the library.

CONFIDENTIAL

*Revised March 28, 2000*

## SYNDICATION AND AD SALES

Name: **Garner, Rob**
Title: <u>VP Ad Sales/Syndication</u>
Department: <u>Advertising Sales and Syndication</u>
Extension: 3-3629
I report to Bill Busch. I am responsible for all ad sales in WCW television network stations and for the selling of WCW Worldwide Wrestling program to over the air broadcast stations in all markets. I interface with Turner Broadcasting Sales in New York for ad sales and Telepictures for the selling of the Worldwide program. I break new advertisers and promotional programs into WCW's vast brand extension programs. People can come to for help with promotional advertising related questions or leads pertaining to WCW, questions regarding WCW television stations or advertisers, and WCW advertising target strategy. It is often mistaken that I am responsible for the buying of ad schedules to promote WCW arena events.

Name: **Bowling, Susan**
Title: <u>Syndication Coordinator</u>
Department: <u>Domestic Syndication</u>
Extension: 3-3630
I support the VP of Syndication and Advertising Sales for WCW (Rob Garner) and aid in the execution of duties associated with that position. I maintain and update the syndication database and process the daily Nielsen reports. I function as "customer service support" to our TBS and Telepictures sales office in New York, Chicago, Los Angeles and Detroit and supply them with merchandise, show videotapes and event tickets. People can come to for help with obtaining information regarding clearance reports, ad buys and sweeps amounts, station start and end dates, etc. It is often mistaken that I am responsible for handling PPV customer service issued and billing.

Name: **Wofford, Darrell**
Title: <u>Traffic Coordinator</u>
Department: <u>Syndication and Ad Sales</u>
Extension: 3-3636
I am responsible for the acquisition and organization of commercial spots, and commercial related materials that are to be included in all WCW programming. This includes, but is not limited to the creative elements for billboards, Vignettes, special sponsorships, promotional considerations and standard commercial spots. I prepare and issue reports listing all items of a commercial or promotional nature to be included in each week's WCW programming. I also prepare and issue the formats for the syndicated program. In addition, I maintain a database of current local stations that carry the WCW program and issue reports for the Shipping Department detailing those destinations and the items to be shipped, plus the paperwork necessary to complete the shipping process. This also includes an accurate accounting of our international clients and the programming they have contracted for. Additionally, I am responsible for overseeing the completion of the PAL Conversion of International programming and directing those dubs to the proper clients. People can come to for help with any of the above, particularly formats for WCW. It is often mistaken that I am responsible for parking.

CONFIDENTIAL

*Revised March 28, 2000*

# RESEARCH

Name: **Williams, Matt**
Title: Senior Research Manager
Department: Research
Extension: 3-1015
I am responsible for consumer marketing research.  People can come to for help with questions regarding WCW's consumer markets.

Name: **Young, Meredith**
Title: Research Analyst
Department: Research
Extension: 3-1029
I am responsible for research concerning WCW ratings.

CONFIDENTIAL

# PPV/MARKETING

*Revised March 28, 2000*

Name: **Shelley, Kathleen**
Title: Senior Business Manager
Department: Pay Per View
Extension: 3-1042
I manage the account coordinator staff in garnering increased marketing participation from our cable affiliates. I am the main liaison for promotion with our distributors and between the TVKO affiliate relations staff and the WCW staff. I also participate in cable industry conventions, meetings, and functions. People can come to me for help with PPV department questions or cable affiliate information.

Name: **Menlen-Wilson, Markie**
Title: Pay Per View Account Coordinator
Department: Pay Per View
Extension: 3-1013
I build and maintain relationships with cable affiliates. I also facilitate marketing and promotional projects for the Pay Per Views each month. I can help with Pay Per View issues. I am not responsible for merchandise.

Name: **Samson, Mike**
Title: Account Coordinator
Department: PPV/ Marketing
Extension: 3-1068
I am responsible for soliciting as much PPV marketing/promotional participation as possible in local markets and I coordinate different aspects of affiliate's marketing/promotional tactics. People can come to me for help with issues concerning the marketing and promotion of our PPV's in local markets (particularly in the West) or with general PPV questions.

Name: **Thurmond, Jenna**
Title: Marketing Coordinator
Department: Pay Per View
Extension: 3-1043
I coordinate print and media advertising for Pay Per View. People can come to me for help with PPV logos and deadlines regarding PPV marketing.

Name: **Koelbel, Kathryn**
Title: Manager Data Base/Marketing
Department: PPV/Marketing
Extension: 3-1046

Name: **Dumbauld, Susan**
Title: Temp
Department: Pay Per View
Extension: 3-1045
I am responsible for the radio, generic, event specific spots and infomercials for cable affiliates on a monthly basis; as well as ticket distribution in the PPV department for each event. I coordinate and update the 1-800-Affiliate Hotline, handle marketing reimbursements, check requests and distribution for each PPV event. I also coordinate the hospitality suites for various PPV"S, distribute promotional T-shirts and assist in the upcoming promotions with satellite. I can help with questions relating to the PPV department, checks issued for PPV events, information on cable or satellite and inquiries on the upcoming PPV events.

CONFIDENTIAL

# LICENSING

Revised March 28, 2000

Name: **Collins, Casey**
Title: Director of Licensing
Department: Licensing
Extension: 3-2554

I manage the day to day operation of WCW's Licensing Program. I review and approve all licensing deals that are submitted by LCI. I assist LCI's sales force with selling the WCW license to potential licensees. I provide licensees with any and all information that they need. I approve all artwork and product samples. I am also responsible for the WCW Nitro Grill, WCW Lottery, WCW Master Card Program and WCW Nascar Program (if we race in 2000). I work with retailers to ensure WCW Licensees the best possible shelf space. I educate WCW Licensees and Retailers about WCW. I track and review all royalty reports. I work with talent to obtain voice. Photos, filming of commercials, etc. for Licensees. I work hand in hand with Pace Motorsports on the creation of the new USHRA/WCW Monster Machines license (monster trucks). People can come to me for help with licensing and Motorsports questions, or licensed product samples. It is often mistaken that I am responsible for the merchandise department, or State License Contracts for our wrestlers to perform in various states.

Name: **Reeves, Chelsea**
Title: Licensing Manager
Department: Licensing
Extension: 3-2555

I am responsible for the day to day management of the Licensing Program which includes: communicating with potential and existing licensees, handling the daily needs of our licensees and/or LCI our licensing Agency and the receiving of deal memos. I am responsible for the review and approval of all artwork and submitted product samples so as to insure the integrity of the WCW property. In addition, will assist in the development and design of any and all new logos. I respond to various inquiries and provide information on an as needed basis to internal and external parties for the WCW property. I do the Draft Merchandising Licensing Agreements for all licensees and incorporate any needed changes for the WCW motorsport properties. I help coordinate details on special projects for the WCW property. I manage the following projects: WCW Lottery (currently 6 States), WCW's monthly QVC show, variety of Trade Shows, annual Licensee Summit, WCW Master Card program. I maintain a database of all WCW Licensees, as well as preparing a monthly status report for the Director of Licensing. I work with WCW talent & WCW Production Department to obtain voices, photos, filming of commercials, etc. for Licensees. I also assist the Director with educating and updating retailers and licensees about WCW and help to ensure that retailers provide WCW with prime retail space in all departments.

Name: **Messner, Kristen**
Title: Licensing Coordinator
Department: Licensing
Extension: 3-3130

I am responsible for the Nitro Grill, the Fan Club, and Cyberaction Virtual Trading Cards. I also assist with all licenses on projects, travel for appearances and product needs. People can come to for help with the Nitro Grill, the Fan Club, the Cyberaction Cards, and licensing related questions or assistance on the road. It is often mistaken that I am responsible for all Kimberly Ware's prior duties or that I am Casey Collins' assistant.

Name: **Gillen, Flossie**
Title: Licensing Assistant
Department: Licensing
Extension: 3-2548

I provide daily assistance to the Director of Licensing (Casey Collins). My duties include scheduling appointments, arranging travel, screening phone calls, filling, faxing, writing memos and fed-exing. I open mail and packages, and circulate artwork approvals. I maintain and update files, licensee lists and licensing status report . I keep up and update the photo library and send artwork to our licensing agency as needed. I forward all bootleg tips to our investigator. I also maintain the sample room and forward new licensed samples to talent as they are received.

*Revised March 28, 2000*

Name: **Sturgis, Lisa**
Title: Motorsports Manager
Department: Licensing
Extension: 3-2556
I manage all aspects of WCW's motorsports program: Nascar, Busch and Winston Cup teams, and Monster Trucks. This includes operations, appearances and licensing ventures. People can come to me to proof and edit copy, as a former editor of WCW Magazine I am always happy to help.

CONFIDENTIAL

*Revised March 28, 2000*

## NEW MEDIA

Title: VP WCW Enterprises
Department: New Media
Extension: 3-1040

Name: **Thomas, Brooke**
Title: Administrative Assistant
Department: Enterprises
Extension: 3-1041
I provide administrative support to the VP of Enterprises and departmental invoices and secondary support to other areas that fall under Enterprises. I also coordinate hospitality suites for PPV and other special events. People can come to for help in scheduling appointments, invoices (paid and unpaid) for the Enterprises Department, and if they need to contact members of the department. It is often mistaken that I am responsible for PPV tape (radio and TV) distribution and PPV tickets.

Name: **Brent, Cameron**
Title: Home Video & Special Projects Administrator
Department: WCW Enterprises
Extension: 3-1044
I am responsible for WCW Home Videos, WCW Hotline and *Ring Side Rap* (monthly newsletter sent to media, licensees and cable operators. It is often mistaken that I work for the Legal Department.

CONFIDENTIAL

# INTERNET

Revised March 28, 2000

Name: **Hulmes, Gary**
Title: Senior Webmaster
Department: Internet
Extension: 3-2562
I am the chief technical person, and sometimes editorial, for WCW.com. I am responsible for in office and remote operations, day to day operations, presentation of content, and I am a liaison to Turner Online Technical Group. People can come to me for help with the website: operations, advertising, content, etc.

Name: **Haynes, Timothy**
Title: Webmaster
Department: Internet
Extension: 3-2564
I am responsible for the daily updating of WCW websites, including new content development. I produce live internet broadcasts. I develop new relationships with agencies and vendors to keep WCW at the forefront of new technology. I also maintain a positive relationship with wrestling fans on the internet. It is often mistaken that I am responsible for finding/scanning photos for other departments.

Name: **Nowitzky, Jennifer**
Title: Internet Coordinator
Department: Internet
Extension: 3-2561
I am the content editor for the website. I am responsible for the PR/Marketing/Promotions/etc. for the site in terms of updating appearances or events. And I concern myself with almost anything related to the Nitro Girls site. People can come to for assistance pertaining to the website other than technical questions. It is often mistaken that I am responsible for scanning in pictures, sending pictures/logos to freelancers/press for other departments, and technical questions.

Name: **Sites, Brian**
Title: Internet Video Coordinator
Department: Internet
Extension: 3-3115
I am responsible for maintaining and creating multimedia content for WCW.com. I also do the daily updating of WCW websites including new content development. People can come to me for help with internet related issues, such as promotion and development. It is often mistaken that I am responsible for scanning photos for other departments.

CONFIDENTIAL
X 000682

*Revised March 28, 2000*

# PUBLIC RELATIONS

**Name: Sharp, Alan**
Title: Director of Public Relations
Department: Public Relations
Extension: 3-2550
I direct and handle all media coverage involving WCW events, talent and products. I communicate WCW positions and policies to media outlets that further the company's image. I coordinate activities that relate to charitable or community service projects. People can come to me for help with media and/or charities. It is often mistaken that I am responsible for promotions.

**Name: Seeman, Donna**
Title: Junior Publicist
Department: Public Relations
Extension: 3-2551
*I publicize all WCW events that occur Tuesday through Friday, which includes all WCW Thunder and WCW Saturday night tapings. I travel to Nitro, Thunder and PPV events to handle media activity. I creatively produce wrestler bios, press releases and pitch letters; and I also work on other special projects for WCW. People can come to me for help with wrestler/talent bios and press releases, information about upcoming special projects, and if they have media questions or need a contact at a WCW event. I am not responsible for promotional pictures (color).*

**Name: Glast, Jason**
Title: Publicist
Department: Public Relations
Extension: 3-2553
I am responsible for Goldberg's publicity and publicity for Nitro and Pay Per Views. People can come to me if they need help with Goldberg, Nitro, PPV's or general publicity or media relation's questions. I am not responsible for promotional appearances at on sales or meet-and-greet appearances at shows.

**Name: McLain, Brett**
Title: Temp- Public Relation's Assistant
Department: Public Relations
Extension: 3-3827
I arrange wish meetings for sick/dying children with Make-a-Wish, Kids Wish Network, etc. I fulfill charitable requests for auctions and donations. I maintain, submit and send out dub, ticket and media credential requests for the PR department. I maintain merchandise closet and send out merchandise for PR department. I maintain black-and-white promotional pictures (storage, requests for more, and disbursement). I send out press kits to media and assist the PR department in general. I can help with black-and-white promotional pictures, press kits, media credentials and charitable donations. I am not responsible for color promotional pictures and I cannot supply WCW employees, friends and families with autographed pictures or merchandise.

CONFIDENTIAL

*Revised March 28, 2000*

## WCW MAGAZINE

Name: **Leiker, Ken**
Title: Publisher/Editor-in-Chief
Department: WCW Magazine
Extension: 3-3171
I manage the business and technical aspects of WCW Magazine: printer, pre-press, subscription, subscription fulfillment, newsstand contractors, and advertising sales. I also guide the editorial direction and look of the magazine. I can provide help with obtaining data and photos that have been published in the magazine.

Name: **Leson, Elliot**
Title: *Print Production Coordinator*
Department: WCW Magazine
Extension: 3-3177
I am responsible for trafficking and managing all editorial, advertising and insert materials for the magazine. I am the magazine's liaison between the pre-press facility and the printer. I am proficient with desktop publishing software; including Adobe Photoshop, Adobe Illustrator, Quark Express and Microsoft Word. I also have knowledge of imposition software, web offset printing, digital and analog pre-press, and production planning. I can help with questions concerning magazine editorials, advertising, insert materials and photographs. I do not work with the photo department.

Name: **Bell, Amy**
Title: Administrative Assistant
Department: Magazine
Extension: 3-3174
I assist the publisher (Ken Leiker). I also write and edit articles for the magazine, interview talent for articles, read the letters to the editor, oversee the processing of magazine invoices, assist clients and subscribers with problems and questions. I serve as magazine advertising coordinator and I serve as a liaison between the magazine and other WCW departments. I can help with the magazine by giving clients a complimentary subscription, coordinating ads, finding back-issues, getting magazine copies, or questions about the magazine's invoices. I cannot get pictures or merchandise for clients or employees, and I am not responsible for fan's questions about the shows.

Name: **Schlottman, Jim**
Title: Art Director
Department: WCW Magazine
Extension: 3-3173
I am responsible for the design of WCW Magazine and all related materials. I direct photoshoots of talent for the magazine and I approve/select all photography for publication. I can help with any design or creative related questions, photography, logos, illustration, pre-press or printing. I am not responsible for editorial content in the magazine and art used in merchandising.

Name: **Murphy, Joe**
Title: Photo Editor
Department: Magazine
Extension: 3-3175
I am responsible for coordinating all photo shoots for the magazine, editing all film from events and shoots, and selecting art for the magazine (working on layouts and choices with the art director). I also am responsible for all photo related tasks that require photo labs and I license images to other wrestling magazines. People can come to me for help if they have questions concerning photography or if they want to obtain photographs from the magazine. It is often mistaken that I am responsible for all photo needs (PR, Licensing, Merchandising, etc.).

Name: **Boain, Graham**
Title: Associate Editor
Department: WCW Magazine
Extension: 3-3716

CONFIDENTIAL
X 000605

*Revised March 28, 2000*

I am responsible for edit copy for WCW Magazine, writing stories and producing story ideas. People can come to me if they need help identifying wrestlers, if they have questions on stories or if they want to propose story ideas. I am not the photo editor of the magazine.

Name: **Eck, Kevin**
Title: Editor
Department: WCW Magazine
Extension: 3-3178
My job responsibilities include writing, editing and helping plan the editorial content of WCW Magazine. People can come to me with questions concerning the editorial content, or any general questions regarding WCW story lines or history.

CONFIDENTIAL
X 000686

## PROMOTIONS

*Revised March 28, 2000*

Name: **Hunt, Tom**
Title: Director of Promotions
Department: Promotions
Extension: 3-2574
I am responsible for effectively concepting and executing WCW promotions that will reinforce the brand and key initiatives. I maximize communication with AD sales and licensed promotion sales to help them drive incremental revenue to Turner and WCW. I create promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air. I fully concept and develop customized Fantasy Prize Promotions (with maximum lead-time) to AD sales and licensed promotion sales to fit client's needs. I work with legal dept. to research promotional concepts and feasibility. I clear all concepts, spots, prizes etc. I develop promotion presentations/documents/one-sheets to Sales. I work with Creative Services to develop presentation boards for client pitches. I oversee project managers who communicate and liaise with client on all levels of promotional activity, including identifying and securing necessary client materials, production timeline, approvals, contracts, etc. I oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc. I work closely with Ad Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time. I set up and manage entry mechanism for on-air contest, i.e. 800#, PO boxes, on-line and off channel entry. I create local extensions to WCW's national on-air promotions. I develop customized prizes to award contest winners and/or secure prizes from client (when appropriate). I manage the fulfillment and distribution of prizes. I handle travel for winners when necessary. I maintain and manage budget that pertains to Promotion projects. I provide recap packages of promotions/contest to internal divisions and client. And I also provide all necessary information pertaining to promotions to be included in sales collateral materials.

Name: **Stern, Suzanne**
Title: Promotions Manager
Department: Promotions
Extension: 3-2549

Name: **Wengerd, Andrew**
Title: Promotions Coordinator
Department: Promotions
Extension: 3-2563
I promote WCW through talent appearances, talent status, sponsor/contract fulfillment, and I work with outside clientele to establish promotional opportunities. People can come to me for help with promotional ideas and requests. It is often mistaken that I am responsible for Public Relations duties.

Name: **Woodyard, Amy**
Title: Promotions Assistant
Department: Promotions
Extension: 3-3820
I am responsible for wrestler appearances. I arrange travel for the talent and stay in contact with the sponsors so I can arrange and set up the appearance itinerary. I work with PPV sponsors to make sure all stipulations in the contract between PPV sponsors and WCW are executed. I also help Andrew Wengerd with on-sale appearances; which includes arranging travel for talent, typing up an itinerary and traveling to the on-sale location with the talent. People can come to for help with talent appearances or on-sale appearances, talent pictures or autograph sheets, and sponsors of WCW PPV's. It is often mistaken that I am responsible for public relations.

Name: **Sokol-Stewart, Marlene**
Title: Promotion Appearance Coordinator
Department: Promotions
Extension: 3-4077
I am the initial contact for all talent appearances. Basically, all departments that request for talent appearances, paid or otherwise, come to me first. I then contact talent and confirm they can do the event. I either execute the appearance myself, or turn it over to the specific department for them to

CONFIDENTIAL

*Revised March 28, 2000*

execute. I also update all appearance calendars, talent appearance data base and escort talent on many of the appearances. People can come to me for help with questions about the talent and whether they can do an appearance. It is often mistaken that I am responsible for other promotions that employees are working on.

CONFIDENTIAL

# ACCOUNTING

Revised March 28, 2000

Name: **Prince, Greg**
Title: Controller, CPA
Department: Accounting
Extension: 3-3148

Name: **Henry, Jennifer**
Title: Accounting Manager
Department: Accounting
Extension: 3-3150
I manage the accounting staff for monthly, quarterly and annual reporting. I am the company liaison for payroll, human resource and Turner Group Services. People can come to for help with anything accounting related. It is often mistaken that I am responsible for licensing accounting (Jennifer Hudson). I also do not actually do the payroll; I am just the middleman.

Name: **Lipscomb, Dee**
Title: Financial Analyst
Department: Accounting
Extension: 3-3153
I work on special accounting and financial projects, and I have some budgeting and forecasting responsibilities for WCW. I am not responsible for Wrestling Operations, payroll, accounts payable or other routine accounting functions.

Name: **Gerlach, Tom**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3154
I am responsible for production and magazine accounting, recording arena settlement information, tracking project information and creating invoices. I am also responsible for monthly closing, wire transfers and foreign checks. People can come to more for help with creating an invoice, arena settlement information, general accounting questions or if they need help with project set up.

Name: **Williams, Jimmy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3155
I assist in tracking Pay Per View carrier payments to WCW. I report, track and identify various property, plant, and equipment issues for 6010 (WCW-Arenas) and 6020 (WCW-Call Center/Mail Order). I serve as a tax liaison for Ernst & Young and local accounting group. I perform accounting related inventory functions for 6010, assist with 6020 inventory, and identify inventory obsolescence exposure for both. I support 6020/MACS (Merchandising and Catalog System) accounting functions. I analyze fixed asset and depreciation expenses. I perform month-end close, quarterly, and year-end close functions pertaining to previous mentioned responsibilities, reconcile accounts previously mentioned, and code monthly cash receipts. I can help with fixed assets, cash coding and inventory issues. I am not solely responsible for making deposits- Klippel, invoicing- Gerlach, or 6020 (Mail Order) Accounts Payable- Viberg.

Name: **Barlow, Celia**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3151
I am responsible for all aspects of Accounts Payable (Vendor Invoices); which includes coding invoices, allocating department and General Ledger code, and preparing coding ticket for Turner Group Services. I also am responsible for new vendor and independent contractor set-up; which includes contacting new vendors, sending W-9's, facilitating Independent Contractor Checklist for Human Resources and preparing new vendor forms for Turner Group Services. I can help with procedures for getting an invoice paid and for setting up a new vendor. I am not responsible for expense reports, credit applications for new vendors, or finding out the status of payment on an invoice (call 8-1200 or 1-800-646-7683 option 4).

CONFIDENTIAL
X 000689

*Revised March 28, 2000*

Name: **Carson-Hudson, Jennifer**
Title: Staff Accountant III
Department: Accounting
Extension: 3-3158
I am responsible for royalty accounting- calculating and distributing the royalties entitled to the talent, wrestler payroll- review function of wrestler payroll, and closing- reporting the revenue for the 900 telephone number, TMC, Syndicate, Ad Buys and Sweeps. People can come to me for help with talent royalty issues. It is often mistaken that I am responsible for Accounts Payable.

Name: **Klippel, Melissa**
Title: Staff Accountant I
Department: Accounting
Extension: 3-1025
I am responsible for expense reports, helping with closing and assisting Denise Velgouse with Sales and Use Taxes. Currently, people can come to me for help with expense reports. I am not responsible for Accounts Payable.

Name: **Velgouse, Denise**
Title: Tax Manager
Department: Accounting
Extension: 3-1007
I handle most tax and business license related matters (local, state, federal, international), other than income tax which is handled by E&Y downtown. These matters include compliance, audit defense and registrations. I have regular contact with taxing authorities, as well as arenas in which we perform, to ensure that proper procedures are being utilized. I can help with just about any tax matter (except income) or I can help through contacts and research. I do not handle wrestler's licensing matters and athletic commission taxes; they are concerns of the Arenas Department.

Name: **Viberg, Erik**
Title: Staff Accountant
Department: Accounting
Extension: 3-3156
I am responsible for inter-company accounts for 6010 and 6020, Accounts Payable for 6020 and MACS (Merchandising and Catalog System) Close.

Name: **Davidson, Amy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3152
I am responsible for talent payroll (independent contractors), talent expenses and various other accounting duties, such as month end, quarter end, and year-end functions. I can help with talent paychecks and talent expense reports. I am not responsible for employee payroll.

Name: **Gladney, Allison**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3149
My job responsibilities are accounts payable and expense reports. People can come to me if they need help with expense reports.

CONFIDENTIAL
X 000690

*Revised March 28, 2000*

# ON-AIR PRODUCTION

**Name: Leathers, Craig**
Title: VP/Executive Producer
Department: On-Air Production
Extension: 3-3823
As Vice President of the company, I oversee special projects such as the Warner Brothers movie "Ready to Rumble", outside music sources (TommyBoy Music), internet ventures (WCW Power Site), and any other projects that fall outside the realm of everyday WCW programming. People can come to me for help with any aspects of live television or post production.

**Name: Sparks, Gail**
Title: Administrative Assistant
Department: On-Air Production
Extension: 3-1036
My job responsibilities are to handle the day to day administrative duties for the Vice President- Craig Leathers. It is my responsibility to ensure that he has the most current and accurate information available to him daily, to keep up with his calendar and email, as well as answer his phone. I also handle production issues to include music, outside talent hires (extras), etc. People can come to me if they need help with reaching the Vice President, getting on his schedule, or obtaining information regarding production. I am not responsible for items related to the programming department.

**Name: Yother, Annette**
Title: Director of Programming
Department: On-Air Production
Extension: 3-3825
I work with the Creative Members/Writers in developing, gathering, and compiling program elements and information. I am the liaison between WCW & Network Operation/Programming for TNT & TBS. I also take the Program elements and oversee the creation of a workable program script and format. I oversee all distribution of the information to Production and other necessary WCW departments. People can come to for questions concerning program elements.

**Name: Turner, Wendy**
Title: Programming Information Assistant
Department: Programming
Extension: 3-3826
I am responsible for Format Production and distribution on show days. I put all show formats on the WCW shared computer databases. I send out all show information regarding what can be promoted and announced. I also give the announce team any announcements to be read on air. I can help people with where to find the specific show formats, and with what matches have been releases for the PPV's or other shows. I can assist with research of a specific match, person, first appearance or other general information regarding a wrestler. You can ask me about the specific spelling or some biographical information regarding a specific wrestler. It is often mistaken that I am responsible for anything related to talent issues- travel, talent lists, parking lists, booking sheets, etc.

**Name: Parent, Angela**
Title: *Program Information Assistant*
Department: Programming
Extension: 3-3836
I am responsible for show information distribution from week to week (Nitro/Thunder/Saturday Night). I also am responsible for preparation of shot sheets for the shows, and I am involved in the approval process for props, extras and shoots for Nitro, Thunder and Saturday Night. People can come to for help with show content information, prop information, logged shows and anything associated with programming of Nitro, Thunder and Saturday Night. It is often mistaken that I am responsible for providing copies of past Nitro, Thunder, Saturday Night, and World Wide VHS copies for viewing.

CONFIDENTIAL

# CREATIVE SERVICES

*Revised March 28, 2000*

Name: **Mussari, Lorry**
Title: Creative Services Manager
Department: Creative services
Extension: 3-2552
I produce commercials, sales reels, or any video/audio needs that any department has a use for- this includes pre-production through post-production stages. I also manage and oversee all projects done by others in my department and freelance producers. People can come to me for help with their requests for raw footage, spots, sales reels, conference reels, audio bites, commercials, etc. If you need to have a commercial produced for a new product, event or promotion, we will produce the spot from writing to final post-production stages. It is often mistaken that I am responsible for merchandise just because I produce merchandise spots.

Name: **Velazco, Kris**
Title: Production Assistant
Department: Creative Services
Extension: 3-2542
I assist producers for Creative Services in every aspect of the pre-production, production and post-production. I make sure each producers has every piece of information, footage, or duty taken care of so as to make their time more beneficial to the creative services department of WCW. People can come to me if they need help assembling footage for companies that deals with WCW. I research and log footage that could become useful for future projects and share that information with all of production, as well as assisting on shoots in everything from catering to props. I am not responsible for producing.

Name: **Dovjak, Diane**
Title: Producer
Department: Creative Services
Extension: 3-4093
I produce whatever project I am assigned within Creative Services (T-shirt promo, PSA, PPV home video, infomercials, pre-game show, etc.). People can come to me with help on a Creative Service issue. It has been wrongly assumed that I am responsible for producing any and all PPV/home video projects. People also think that I am still involved with WCW Worldwide, but I have not been since September 99.

Name: **Juvinall, Nate**
Title: Production Assistant
Department: Creative Services
Extension: 3-4080
It is my responsibility to help the producers form a high quality product. This can mean working on projects independently from start to finish, or helping the producer research the footage, make location scouts, log tapes, etc. People can come to for help with anything in Creative Services, or if we are working on something for them they can come to me if they can't locate their producer. It is often mistaken that I am responsible for dubs. I no longer work in the tape room.

CONFIDENTIAL
X 000692

## PRODUCTION

*Revised March 28, 2000*

Name: **Tony Shiavone**
Title: Announcer/Supervising Producer
Department: Production
Extension: 3-4100

Name: **Mitchell, Keith**
Title: Supervising Producer
Department: Production
Extension: 3-4097
I am the supervising producer for all live programs produced by WCW including Nitro, Thunder, PPV's and international programs. I am the interim supervisor of the creative service personnel. People can come to me for help with live program/international programming/creative services questions.

Names: **Bissell, Kip** (3-4091)
      **Pruitt, Neal** (3-4099)
      **Johnson, Christine** (3-4094)
Title: Senior Producer
Department: Production
NP-I Produce video packages that are between :30 and 3:00 that help develop new wrestling characters and recap story lines to entice viewers to watch our television product. People can come to for help with finding out where you might find a video package that I have produced. It is often mistaken that I am responsible for the library. Although I have been at WCW for a long time, I am not able to physically put my hands on a lot of the videos or raw footage that I have been involved with in the past.

Name: **Douglas, Jason**
Title: Feature Producer
Department: WCW Production
Extension: 3-4092
I am responsible for Pay Per View graphics, packages and PPV show production. I can help with PPV graphics, PPV music and feature packages.

Name: **Kearce, Woody**
Title: Saturday Night Producer
Department: Production
Extension: 3-4095

Name: **Larson, Chris**
Title: International Producer
Department: Production
Extension: 3-4096
I am the producer of the syndicated Worldwide show. I also assist the supervising producer in overseeing the international program production currently being done by the associate producer-Michele Bayens. I can help people with questions concerning the Worldwide show or the international shows (Int'l Worldwide and Int'l Nitro).

Name: **Bayens, Michelle**
Title: Associate Producer
Department: Production
Extension: 3-4090

Name: **Chochol, Michael**
Title: Production Assistant
Department: Production
Extension: 3-5230
My primary job responsibilities include, but are not limited to- all Pre/Post/Live production involving the PPV. My duties include producing monitor walls, assisting the producer and producing packages. I help

CONFIDENTIAL
X 000692

*Revised March 28, 2000*

with digitizing of elements during the sessions. I assist with the building of the Op reels for each PPV. I coordinate tapes for our projects. My Live production duties include, but are not limited to- Truck AP. When we are on the road I produce b/roll and still packages. I also assist during the live pre-tapes by acting as a liaison between the producer and talent. I also do a lot of music selecting each month for our individual packages, and log shows and file music cue sheets. I am involved with Live Field Production when available. People can come to for help with Field Production work, assistance with video involving wrestlers, producing and general production work.

Name: **Marshall, Darryl**
Title: Production Assistant
Department: Production
Extension: 3-4098

Name: **Bill Hartley**
Title: *Saturday Night Production Assistant*
Department: Production
Extension: 3-2544
I help Woody Kearce with all aspects of pre-production, production and post-production. I help organize and coordinate Traffic sessions so that all the WCW shows have their billboards, promotional considerations, graphics and merchandising spots. At the Sat. night taping I help round up talent, take notes for editing purposes, and help Woody whenever possible. People can come to me for questions or comments concerning Traffic sessions, Saturday Nights or information dealing with wrestler appearances.

CONFIDENTIAL
X 000694

**PRODUCTION (TECH)**

*Revised March 28, 2000*

**Name: Shaw, Robin**
Title: Director of Post Production Facilities
Department: Production (Tech)
Extension: 3-4075

The WCW Production department is responsible for an array of things regarding our product. Within the production department I am responsible for the following areas and employees:

*Duplication:* This area is responsible for making dubs of our shows. Currently we have a list of clients that require copies of our shows. We have a variety of international clients that air our show in their country. We have licensees that use our shows as models to create games and toys for WCW. There are cable affiliates that help promote our shows. When wrestlers make public appearances on other television shows and require highlight footage or clips they call the Duplication department. And of course, the duplication department works with Producers to insure they have the right footage in order to build their promos, spots and feature packages.

*Maintenance Engineers:* We have two maintenance engineers on staff to keep the technical operations of the duplication machines running efficiently and properly. When the machines fail, it causes us to lose a great deal of revenue. Also, the maintenance engineers help WCW remain on the cutting edge of technology by researching new equipment

*WCW Studio Operations:* WCW has a studio in which we shoot leads for our shows, wrestler interviews, and product shots such as t-shirts and photo shoots. We also have the capabilities to do a shoot in the studio and feed it to the remote site in order to air it as part of the live telecast.

*WCW Library:* WCW has its own library which consist of over 19,000 videotapes which includes show masters, camera originals, graphics, music, and highlight packages. This is a huge asset for WCW. We have two Tape Librarians that keep track of the footage so we can use it more effectively.

*Shipping & Recycle:* We ship our product all over the globe, domestically and internationally. Our Production shipper handles all videotape shipments that leave Log Cabin and will trace packages if they are misrouted. Additionally, since we use over $200,000 of videotape per year, we recycle our stock for multiple use.

*Music:* I oversee the Music Coordinator to insure that the music WCW uses on all of its telecasts is reported correctly. Any misrepresentation of the music usage could lead to severe penalties for WCW.

*Scheduling:* WCW used to have its own production edit suites; however, our equipment was relocated to the new Turner Studios technical building. When Producers have edit suites needs we must schedule edit time through Turner Studios. I oversee this as well to insure the Producers have what they need to do their promo.

There are 12 employees divided amongst the above mentioned areas. I manage each and am responsible for the entire facility operations and logistics. I should be able to answer questions pertaining to the 2nd floor of Log Cabin.

**Name: Hinton, Todd**
Title: Maintenance Engineer
Department: Production
Extension: 34071

I am responsible for maintaining and overseeing all technical aspects of the production facility. I also maintain and administrate the house RF system. People can come to for help with any technical problems in the production area or any issue with the house RF system. It is often mistaken that I am a member of the computer department.

**Name: Tinsley, Bill**
Title: Senior Camera Operator
Department: Production (Tech)
Extension: 3-4083

**Name: Rogers, Kemper**
Title: Senior Editor/Producer
Department: Production (Tech)
Extension: 3-4074

CONFIDENTIAL
X 000695

*Revised March 28, 2000*

Name: **Edwards, Joel**
Title: Editor
Department: Production (Tech)
Extension: 3-4082

Name: **Arbon, Ed**
Title: Senior Videotape Operator
Department: Operations
Extension: 3-4065
I am responsible for compiling an Archives File of all past WCW Shows in our library. I also assist in Tape Room Operations. People can come to me for help with past match information and information about past or current wrestlers. It is often mistaken that I am responsible for commercial traffic and production dub requests.

Name: **Bonds, Cliff**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4067
I am responsible for duplicate and offline edit tapes of shows for syndication and international, and requests as provided by the supervisor. People should go to the supervisor of Post Production for requests and information. It is often mistaken that I am responsible for research.

Name: **Davis, Jonathan**
Title: Tape Operator
Department: Post Production
Extension: 3-4068
I am responsible for prepping and executing the dubbing of standing orders as well as performing dubbing, off-line editing and other duties of per-need orders (production dub requests). Other duties include degaussing and maintaining recycled tape stock, black and coding new stock for editors and producers, rolling tape for audio or video and audio studio sessions. Also, quality checking my work (either spot checking or 100% Q.C.) to watch for audio/video drop out, time base corrector "hits", tape damage (creasing, etc.), and spelling and continuity errors. People can come to for help with setting up viewing rooms for remote viewing, finding sources, getting stock (usually recycled), creating/printing labels, technical questions/advise about how to set up a job, etc.

Name: **Green, Elliot**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4070

Name: **McKay, Stephen**
Title: Tape Operator
Department: Production
Extension: 3-4072
I work as part of a team to maintain weekly standard workbooks (Nitro, Thunder, International dubs. etc.) and non-standard work books, such as production dub request and special projects. People can come to me for help with anything.

Name: **Delaine, Christopher**
Title: Edit Assistant
Department: WCW Productions
Extension: 3-4079
I accompany Nitro and Thunder Field Production crew and provide Avid services for producers in the field. I also provide Avid services for WCW motorsports and any other Producer or WCW client, as needed. I can help with building promos and packages, dubbing and logging, repairs to finished spots, digitizing and Avid maintenance.

CONFIDENTIAL
X 000696

Revised March 28, 2000

Name: **Bresler, Robert (Breeze)**
Title: Tape Librarian
Department: Production (Tech)
Extension: 3-4066
It is my responsibility to keep track of and distribute the show tapes, spot reels and features/packages that are generated on a weekly basis; as well as, maintain and categorize the substantial archival video/audiotape library. People can come to for help with locating and confirming the existence of the tapes for viewing or duplication purposes if Robin Shaw has given approval. It is often mistaken that I am responsible for having knowledge of the participants, outcome, and event date of every match ever wrestled in the entire history of WCW.

Name: **Miller, Darrell**
Title: Videotape Librarian
Department: Post Production
Extension: 3-4078
I assist all employees with footage tapes of all our PPV shows, TV tapings, and promotional appearances of our wrestlers. I then ship the tapes to our international and domestic clients. On Wednesdays I stage manage for our weekly taping of Worldwide and I order the Raw Stock (VHS, 1", beta, etc.) for our company.

CONFIDENTIAL
X 000697

*Revised March 28, 2000*

# REMOTE PRODUCTION

Name: **Crockett, David**
Title: Vice President Production
Department: Production
Extension: 3-3627
I supervise the coordination and hiring of television crews. I oversee the acquisition of technical support equipment and staff. This includes lighting, audio, pyro, security, rings, scenic and catering. I also manage the Production Travel Department. People can come to me for help with ENG Production, live remote production, arena/location sight coordination, special effects, event management, on sight coordination of phones and uplink, and catering. It is often mistaken that I am responsible for the Travel Department and Arena Booking.

Name: **Nordahl, Linda**
Title: Production Office Coordinator
Department: Remote Production
Extension: 3-3628

Name: **Atkinson, Joyce**
Title: Director of TV Production
Department: Remote Production
Extension: 3-3634
My job responsibilities are to apply direction and supervise a group of people coordinating the technical production for all live and taped events. This would include hiring the mobile units for the telecast, hiring the best qualified crew members, overseeing the travel issues for the technical crew, renting equipment, timesheets, production invoices, etc. I work on the day to day operations and needs of the vendors, crew members, co-workers, etc. I keep an open line of communication to all aspects of production. People can come to me for help with Remote Production, production work that is done off site.

Name: **Barrett, Steve**
Title: Production Manager
Department: WCW Production
Extension: 3-3632
I oversee the arena production for Nitro/Thunder/PPV's and Saturday Night shows. This includes lighting, audio, staging, transportation, catering, crew and all other logistics that go into live and taped television shows.

Name: **Small, Steve** (3-3637)
Title: Arena Production Manager
Department: Remote Production
Extension: 3-3637
I am responsible for every element of a televised wrestling show in a remote location i.e. taking an empty arena, filling it for our show, turning it over to the director and producer, and then removing it. People can come to me for help with building problems, logistics, personnel problems between departments or local stagehands, safety issues, and audience issues. I am not responsible for Publicity, Promotions or Comp tickets.

Names: **Blackwell, Katrina** (3-3625)
     **Piccolo, Jason** (3-3639)
     **Holscher, Ragan** (3-3117)
     **Dailey, Daniel** (3-3116)
Title: Production Coordinator
Department: Remote Production
Production Coordinators are responsible for various duties such as finding cost-effective flights for the crews, arranging taxi service, and assembling information in production books for each show. People can come to them for help with questions concerning logistics (what crew is booked, flight schedules, cab services, etc.).

CONFIDENTIAL
X 000698

*Revised March 28, 2000*

Name: **Callloway, Kerri**
Title: Site Coordinator
Department: Production
Extension: 3-3126
I perform show advances at arenas throughout the country, establish seat kits needed for production use, and compile arena info/photos/diagrams for use by the Production Managers, TV Crew, Promoters and Website. I distribute database information and arena diagrams to the Production department and establish positive public relations with arenas. I can help with arena information, diagrams, photos and contacts. I am not responsible for promotional duties such as advertising.

Name: **Hamilton, Joseph**
Title: Director of Ring Transportation
Department: Production
Extension: 3-1031
I am responsible for building new rings, maintaining current rings, and ordering parts, materials and equipment for all rings. I schedule and route all the ring crews and their trucks. People can come to for help with anything pertaining to wrestling, wrestling rings or ring transportation.

CONFIDENTIAL
X 000606

# POWER PLANT

*Revised March 28, 2000*

Name: **Orndorff, Paul**
Title: Training Center Staffing
Department: Power Plant
Extension: 3-3831

Name: **Smith, Brenda**
Title: Training Center Coordinator
Department: Power Plant
Extension: 3-1030

I assist Paul Orndorff with daily office procedures, such as directing phone calls to proper persons, etc. I update incoming calls in reference to new trainees. I update waivers of liability for trainees. I issue waivers for WCW power plant full-time employees. I open mail, sort videotapes for viewing of new applicants. I request tapes for our present contract staff to view past matches. I make sure all talent in the ring signs a liability waiver. I direct traffic to Paul Orndorff's office by appointment. I keep our front office clear of employees who want to view the talent during training hours. Advise Power Plant staff of all office information. Prepare sign-in sheet for 10-12 Power Plant students. I file, order supplies, and I check the gym before departing each evening. People can come to me if with question concerning the Power Plant or appointments, workman's compensation questions, vendor questions due to non-payment, and all past and present try-out questions from 1994-July 1998. I am not responsible for admitting guests to the Power Plant. Or if employees leave their ID badge and mistakenly think I am supposed to use the entrance buzzer for admitting and departing. The WCW Ring Crew is not a part of the Power Plant and vendors constantly call for accounts payable.

Names: **Young, Danny** (3-1032)
    **Bruce, Dewayne "Sarge"** (3-2570)
    **Wenner, Mike** (3-1071)
Title: Trainer
Department: Power Plant

CONFIDENTIAL
X 000700

# TALENT MANAGEMENT

*Revised March 28, 2000*

**Name: Dillon, JJ**
Title: <u>Director of Talent Management</u>
Department: <u>Talent Management</u>
Extension: 3-3832
I am responsible for most talent management issues; which include some contract negotiations, overseeing the talent booking process, overseeing the talent travel process and being involved in the coordination of talent appearances. People can come to me for help with anything involving WCW talent.

**Name: Bartlett, Dee**
Title: <u>Administrative Assistant</u>
Department: <u>Talent Management</u>
Extension: 3-3835
*I am responsible for secretarial duties for JJ, tracking all talent for all departments, and updating talent contact information. I fill out/track expense reports for all talent, and I track payroll/accounting issues for talent, department, vendors and other employees. I arrange delivery of correspondence/packages for talent, set-up yearly physicals for talent and track licensing status for the talent. I assist in the creation of our talent database, order office supplies for the department, and I am a liaison between staff on the road and those here. I troubleshoot office equipment for the department, assist with publishing booking sheets and updates/TV lists and updates/travel issues. I also assist in communications with Spanish speaking talent. I am not responsible for publishing the booking sheets and TV lists (Bowden).*

**Name: Engle, Janie**
Title: <u>Talent Relations Manager</u>
Department: <u>Talent Relations/Wrestling Operations</u>
Extension: 3-3822
Talent Travel- I oversee the booking and booking agents travel, hotels, rental cars, limos, charter planes, etc. I work with the Talent Travel Department. Talent Database- I maintain all input of information for database including number of days worked at all events, PR appearances, absences, injuries, address/contact information, Farm System tracking, Productivity Reports, and travel information. Wardrobe management- I oversee travel schedule and supplies. I am also a contact for the new Japan Pro Wrestling- coordinating meetings and bookings, and dealing with travel requests regarding talent and management. People can come to for help with talent travel or database. It is often mistaken that I am responsible for booking information and the VP's schedule.

**Name: Bowden, David**
Title: <u>Talent Management Coordinator</u>
Department: <u>Talent Management</u>
Extension: 3-2540
*I help coordinate the creation of the House show lineup including talent, referees and agents, and I manage distribution and upkeep of the House show booking sheets and information. I manage weekly Nitro, Thunder, Sat. Night and PPV talent list acting as a link between creative team and other departments within company. I provide the creative team with updated talent information and availability with regards to injury status, approved days off, etc. I also provide the creative team with ratings information. I provide an on site resource of Nitro, Thunder and PPV shows available to creative team and talent for a range of duties. I manage weekly tracking/accounting of talent with creation and implementation of sign in sheets with security to processing of information to accounting. I also manage tracking of talent. I coordinate a wide range of special projects and assignments with the talent management department. People can come to me for information regarding talent, in particular with bookings and accounting. It is often mistaken that I am working with the travel department and programming.*

**Name: Taylor, Terry**
Title: <u>Director of Live Events</u>
Department: <u>Booking & Talent Relations</u>
*Extension: 3-3630*

CONFIDENTIAL
X 000701

*Revised March 28, 2000*

I am responsible for booking all house shows or live events; which is done six weeks ahead of time so Awesome Promotions and our publicity department can properly promote said events. The nature of our industry dictates constant monitoring because of changing story lines and unforeseen injuries. I am also an agent at Nitro and Thunder events, choreographing matches and ensuring the segments correspond with the writers' vision. Therefore, I need to make sure the talent understands and appreciates what is expected of them. I am also a member of the booking committee that writes all television shows and PPV's, developing story lines and characters. At a lesser degree I try to help find, groom and sign new talent. People can come to me for help with training, character issues or story line development. It is often mistaken that I am responsible for hiring/firing talent, the final say on booking decisions, or talent travel arrangements.

Names: **Russo, Vince** (3-2566)
  **Ferrara, Ed** (3-2567)
  **Banks, Bill** (3-1088)
Title: Writer
Department: Talent Management
BB-I am responsible for TV writing (on the road) under Vince Russo. I also head up the internet department supplying creative direction for wcw.com. People can come to me for help with creative direction/story lines for WCW, or anything to do with our internet site. It is often mistaken that I am responsible for ad sales for WCW.

Name: **Gary, Alto**
Title: Nitro Girl Manager
Department: Talent Management
Extension: 3-2565
I arrange travel for Nitro Girls to TV shows and performances. I choreograph and arrange dance routines, book Nitro Girls for WCW Promos, design and purchase costumes, and hire or fire Nitro Girls. I provide DJ and truck with music, and I edit the music. I also consult with celebrity placement services to book Nitro Girls for paid appearances. People can come to for help with locating or booking a Nitro Girl. It is often mistaken that I am responsible for all female talent.

CONFIDENTIAL

*Revised March 28, 2000*

# TALENT TRAVEL

Name: **Bowen, Elena**
Title: Talent Travel Coordinator
Department: Talent Travel
Extension: 3-3824
I coordinate all the talent travel arrangements for TV shows, house shows, personal appearances and doctor appointments. I am responsible for all talent related travel emergencies after-hours and on weekends. I can help with arranging any travel for talent of finding out what talent is where at what time. I am not responsible for knowing what talent is supposed to be doing at the events and I do not always know the reason for travel.

Names: **Theys, Noreen** (3-3828)
           **Gray, Pamela** (3-3121)
Title: WTP Travel Agent
Department: Talent Travel

CONFIDENTIAL

# PRODUCTION TRAVEL

*Revised March 28, 2000*

Name: **Davis, Penny**
Title: Travel Coordinator
Department: Production and Office Travel
Extension: 3-1035
I book all travel for office personnel, oversee the Production Travel Department, book all hotels for televised events, and I am on-call for emergencies after-hours. I can help with travel needs, hotels and rental cars. It is often mistaken that I am responsible for talent travel.

Names: **Hill-Atkins, Julie** (3-3119)
      **Perry, Cynthia** (3-3128)
      **Cox, Randy** (3-3120)
Title: WTP Lead Agent
Department: Production Travel

Name: **Ndiaye, Falla**
Title: WTP Ticket Processor
Department: Production Travel
Extension: 3-3140

CONFIDENTIAL
X 000764

# TECHNICAL SUPPORT

*Revised March 28, 2000*

Name: **Upshaw, Doug**
Title: Technology Coordinator
Department: General Administration
Extension: 3-1011
My job responsibilities include network administrator/manager, desktop computer support manager, and computer specification and acquisition.  People can come to me if they need help with network and e-mail account management, desktop computer support, requests for computers and/or peripherals (with department head approval), computer related project support (new server or equipment specification and integration), office moves (computer and phone/fax only) and telephone moves or number changes.  It is often mistaken that I am responsible for malfunctioning copy machines, power outages, furniture moves, cable TV and VCR hookups.

Name: **Edwards, Jimmy**
Title: Technology Analyst
Department: General Administration
Extension: 3-1074
I am responsible for setting up new desktop computers, printers and phones.  I also am responsible for trouble shooting computer, printers and phones.  I can help with computer, printer and phone related issues.  I am not responsible for copiers and fax machines.

CONFIDENTIAL



The purpose of this form is to assist New Hires in becoming acquainted with the mission of WCW and the distribution of work within the company. After each employee completes the forms they will be combined in a handbook that is to be given to each New Hire. This is necessary so those new employees are better informed of the various positions we have and what each department is responsible for at WCW. This is also a means to better inform existing employees of the work allocation and to identify where changes need to be made. Job descriptions and employee titles will undoubtedly change, so the handbook will be regularly updated. Please complete the form in detail and accuracy.

Name: <u>Suzanne Stern</u>

Title: <u>Senior Promotions Manager</u>

Department: <u>Promotions</u>

Reports to: <u>Director of Promotions, Tom Hunt</u>

**Job Description**
Responsible for effectively executing WCW promotions that will reinforce the brand and key initiatives. Maximize communication with Ad Sales and Licensed Promotion Sales to help them drive incremental revenue to Turner and WCW.

• Work with Director of Promotions on the ideation of promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air.
• Fully concept and develop customized Fantasy Prize Promotions (with maximum lead time). Provide and customize these Fantasy Prize Promotions to Ad Sales and Licensed Promotion Sales to fit client's needs.
• Work with Legal Department to research promotional concepts and feasibility. Clear all concepts from any FCC violations before concept is presented externally.
• Work with Research Department to coordinate focus groups (when necessary) to test concepts, spots, prizes etc.
• Develop promotion presentations/documents/one-sheets to Sales. Work with Creative Services to develop presentation boards for client pitches
• Communicate and act as client liaison on all levels of promotion activity, including identifying and securing necessary client materials, production timeline, approvals, contracts etc.
• Oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc.
• Work closely with Ad Sales, Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time
• Set up and manage entry mechanisms for on-air contests, i.e. 800#, PO Boxes, on-line and off channel entry
• Work with Director of PPV Marketing on any local extensions to WCW's national on-air promotions

CONFIDENTIAL
X-000706

• Develop customized prizes to award contest winners and/or secure prizes from client (when appropriate).   Manage the fulfillment and distribution of prizes.  Handle travel for winners when necessary.

• Maintain and manage budget that pertains to Promotion projects.  Intercompany bill Ad Sales for sales-driven promotion expenses.

• Provide recap packages of promotions/contests to internal divisions and client.

• Provide all necessary information pertaining to promotions to be included in sales collateral materials.

People can come to me if they need help with...

• Anything that is advertising/promotions related.

It is often mistaken that I am responsible for...

• Media buys to promote WCW shows.

CONFIDENTIAL



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## INTERVIEW OF OLIE ANDERSON



AUG 12 1992

This is the interview of Olie Anderson taken at the law offices of Bentley & Bentley by Randall Bentley and Ronald J. Freeman at 9:55 a.m. on January 23, 1992.

Q: For the record, could you please state your full name.

A: Olie Anderson.

Q: Could you please give your name that you were given at birth.

A: Allen Robert Rogalsky.

Q: What are you commonly known as in the Atlanta area?

A: Olie Anderson.

Q. Can you please give us your business address and your residential address.

A: The residential address is 1660 Rock Springs Lane, Woodstock, Georgia.

Q: Zip code?

A: 30188

Q: And your residential address?

A: That is the residential address.

Q: For the record, could you please tell us a little bit about your educational background?

A: High school, four years of college, no degree.

Q: Where did you attend high school?  City and State.

A: St. Paul, Minnesota.

Q: And where did you attend college?

A: University of Colorado, University of Minnesota and St. Cloud State University.

Q: After you left college, what did you do then?

A: Served in the Army.

Q: How many years were you in the Army?

WCW 102065

A:   Two years, nine months, 1 day.

Q:   Were you recruited for the Army or did you volunteer?

A:   Drafted and then volunteered, September, 1964.

Q:   Did you serve during any war time?

A:   During Viet Nam.  Viet Nam started then.

Q:   Did you in fact serve in Viet Nam?

A:   No, I did not.  I was in Germany.

Q:   What is the highest rank that you attained while in the service?

A:   E-4.

Q:   What branch of the service were you in?

A:   Army.

Q:   Which level was it, infantry, quartermaster?

A:   I was a clerk personnel specialist.

Q:   Now upon leaving the Army, what did you do?

A:   I went into professional wrestling.

Q:   How did you first become involved with professional wrestling?

A:   I was approached by a couple of people involved in professional wrestling in Chicago, where I was later stationed while I was still serving in the Army and was told that they would consider making an offer for me to get into professional wrestling. One was Vern Gagne, the other was Dick the Bruiser.

Q:   Did you eventually become involved in professional wrestling?

A:   In September of 1967 I started professional wrestling in Minneapolis.

Q:   Now, kind of chronologically walk us through your history of professional wrestling up in Minneapolis up until the time you arrived in Atlanta, Georgia.

A:   I wrestled in Minneapolis for approximately 6 months.  In April of 1968 I went to Canada for a very short time.  In

June of 1968 I went to North Carolina - my first NWA.   NWA
at that time was recognized as being the largest sanctioned
body of wrestling.   I wrestled in North Carolina until
September of 1970.   I was injured and was out of wrestling
for approximately a year.   I came back into wrestling in the
summer of 1971 by wrestling for the NWA again in Florida.   I
stayed there until January of 1972 and was asked to come
back to the Carolinas.   I stayed in the Carolinas until
1974.   I went to Florida and then came back to...or went to
Georgia in about April of 1974.   I wrestled again off and on
in Georgia and Florida, or Georgia and Carolina I should
say, and then came to the Carolinas...I mean Georgia, in
1976 in September or October of that year as a wrestler and
for the first time in a management position as a booker and
stayed like that through December of 1979.   I got out of
wrestling for approximately 5 or 6 months and was asked to
come back in the manager and wrestling capacity in May of
1980, again in Georgia, and then became a booker in the
Carolinas in 1981.....I think around March of 1981....and a
few months after that became the booker for both Georgia and
Carolina until approximately June of 1982, when I became the
booker of Georgia exclusively until 1985, when I sold out my
position in wrestling and essentially retired.

Q:   Since being the exclusive booker here in Georgia in 1985,
     have you maintained any other managerial or wrestling
     positions with the WCW or the NWA?

A:   In 1989 I was hired by WCW at that time to be a road agent
     and later in 1990....May of 1990.....I was asked to be
     placed in the position of being the booker until November of
     1990.

Q:   Now while at the times when you were in a booker or manager
     position with the NWA or the WCW, were there any other black
     managers employed with the NWA or the WCW?

A:   No.   By managers again, you mean by administrative?

Q:   Administrative.

A:   No.

Q:   Throughout your entire tenure here in Georgia....or
     throughout your entire tenure with the NWA, have you ever
     known them to employ a black booker?

A:

Q:   You were telling me about Ernie Ladd, can you give me  the
     dates and what position you understood Mr. Ladd to hold.

A:    Well, Ernie was, I think, helping Bill Watts in booking the
      areas of Mississippi, Louisiana, Arkansas.  I believe it was
      probably in the early '80's......'81, '82, something like
      that.

Q:    Do you know what Ernie Ladd's title was at that time?

A:    I couldn't honestly say that he had a title, and I wouldn't
      say that he.....I don't know that he necessarily received
      any compensation for that job either.

Q:    Was he wrestling during that time period?

A:    Yeah, I think so.

Q:    Now Bill Watts, was he a white male?

A:    Yeah.

Q:    Is he a white male?

A:    Yes.........still is.

Q:    With the exception of Ernie Ladd, have you ever known any
      black to hold a booker or any other administrative position
      in the NWA or WCW?

A:    No, I don't think there has any time where a black has held
      a particular position as booker where he received any
      compensation for that particular situation.

Q:    Was it your understanding that white males that held those
      positions were paid salaries or other types of benefits?

A:    Yes.

Q:    Now, during the time that you were a booker exclusively here
      in Georgia, can you tell me approximately how many black
      wrestlers that you had either under a written contract or an
      oral contract to wrestle?

A:    Personally had?

Q:    That you personally had.

A:    When I was doing the booking and when I owned a portion of
      Georgia Championship Wrestling I used, I think, every black
      wrestler that existed.  What are we looking for at this
      point....names?

Q:    No....just.

A:    Everybody that was there.

WCW 102068

Q:   Okay.  Were you ever questioned by your superiors concerning your frequent use of black wrestlers?

A:   Prior to my coming to WCW I would say probably not.

Q:   And when you came to WCW.....tell me about the people that took over at WCW and what type of questions they raised concerning your hiring practices of black wrestlers.

A:   When I got to the WCW I was working for a man by the name of Jim Heard.  Jim Heard at one point I think just made a comment as to why or what favors I might have owed wrestlers that I had.  At that time I was trying to bring in Thunderbolt Patterson.  I had brought in Junkyard Dog, Ranger Ross.........there were conversations I think about Abdullah the Butcher and several other people, and I think....the best I can remember is that Heard asked me what allegiance or what favors or whatever that I owed these people.  I tried to work out things for instance with Thunderbolt Patterson because I thought he would be a way to encourage people to come to wrestling matches, particularly blacks, because we went to a lot of cities that had black populations....and had some things set up for Thunderbolt Patterson too which would have been economically sound....and the WCW wouldn't do it.

Q:   Had you ever experienced those types of problems prior to your coming on board with the WCW?

A:   No.

Q:   Okay, Olie, start describing to me the time when Ted Turner bought out the NWA.....and what your understanding of the name change...and what your position was with the WCW.

A:   My understanding is that Turner bought out Jim Crockett Promotions.  Jim Crockett Promotions at the time was a member of the NWA....and I didn't have any association to do with that until a year later....September of 1989.....in the capacity of a road agent, which was basically nothing.....going to the towns and watching over the matches and the wrestlers.  During that time there was....

Q:   What was your understanding of your duty as a road agent.....as it relates to the wrestlers?

A:   Well, primarily to see that they were there....to watch the matches.  That would be basically it.

Q:   So you just watched the matches.....made sure the wrestlers showed up?

A:   Yeah, there were some things going to the televisions and things like that.  I also sat in on different meetings that

WCW 102069

they had.....talking about what they were going to do, programs they were going to have and talent that they were using, that type of thing.

Q: As a road agent, did you have anything to do with who would be wrestling that night?

A: At that point, no.

Q: Did you have anything to do with who....could you enter into a contract with a wrestler to come to work for the WCW?

A: No.

Q: Okay, what position held that responsibility?

A: Well, that would have been up to the booker and primarily to the guy that was the vice president of WCW working for Turner, and that would have been Jim Heard.

Q: Who was the booker when you came on board as the road agent?

A: They had several...they had a booking committee.....I was a part of that committee, supposedly.....and then there were several of the wrestlers as well.....as well as at least one announcer.  There were maybe 8 or 9 people who were in this so called booking committee who decided what they were going to do.

Q: Were there any black wrestlers or black people on that booking committee that you knew about?

A: No.

Q: Were there any blacks in management with the WCW during that time period?

A: Administratively, no.

Q: Do you recall how many black wrestlers were involved with the WCW during the time that you came on board as a road agent?

A: I think there were four.  Ranger Ross, Teddy Long, Butch Reed and Ron Simmons come to mind as the only ones that were there.

Q: Now out of the four that you just named, do you know how many had contracts with WCW?

A: I think that they all did, although I'm not sure.  I thought they might have all had contracts.  I never saw them.

Q: Now, you were a road agent for how long?

**A:** Until May of '91.

**Q:** And what happened in May of '91?

**A:** In May of '91 they apparently thought they....being Heard and the organization.....Turner decided that they weren't doing well enough for....things needed to be changed......and I was asked by Jim Heard if he and I could get along and that he would recommend me and like to have me take over the job as booker.

**Q:** Now tell me from your own personal observation what was going on as far as the revenue that WCW was able to generate based on the attendance at the matches?

**A:** Well, things hadn't hit the bottom yet, although they felt that they were at the bottom, and because of the fact that they weren't doing the money that they wanted to do, they decided that there had to be a change. The houses were probably....well significantly less than they had been in the '70's and the early '80's, and they were concerned about it and they thought that a change was needed, and that was when I was asked to become the booker.

**Q:** Now, what cities were you'all servicing around May of '91?

**A:** Everywhere in the country.

**Q:** Did a lot of these cities have a majority black population?

**A:** Yes.

**Q:** Can you tell me in your opinion what was the percentage of attendance at the matches?

**A:** Blacks to whites?

**Q:** Blacks to whites.

**A:** Well, I think in cities like Atlanta, Chicago, Baltimore, Philadelphia were....I personally have wrestled before and have booked before and have seen the crowds well enough to have an idea. I would say that while I was with WCW there were virtually no blacks that came to the wrestling matches. The Atlanta area used to be...I would guess 30 to 40% blacks ten years ago in attendance. Columbus, Georgia would easily have been 40% blacks. Augusta auditorium would have had that same type of figure. WCW might have lost total attendance in terms of the total number of people that were going, but the black attendance dropped off to a point where I think I would hazard a guess as to percentage. It would be easier to say there just were no blacks that were coming to the wrestling matches.

WCW 102071

Q:   By this time, how many years of experience had you had in
     the wrestling industry?

A:   Starting in 1967 and this was in 1989, 1990.

Q:   Now during the time that there were a lot of blacks in
     attendance at wrestling matches, were there also a lot of
     black wrestlers?

A:   Yes, more so than there are now or that where were when I
     came to WCW.

Q:   Did you attribute the decrease of black attendance to any
     particular fact that was going on in '90 or '91 when you
     were a road agent and booker with WCW?

A:   Yeah, I thought definitely that....

Q:   What did you attribute it to?

A:   The fact that we didn't have the blacks that were wrestling.

Q:   Did you present that idea to anyone?

A:   Yes I did.  I presented it to the committee at various
     times, and when I became the booker, that idea was presented
     to my boss at that time, Jim Heard.

Q:   When you presented it to the committee, what type of
     response did you get?

A:   The committee, I think, was basically ruled by Jim Heard, so
     I was kind of......nobody had an opinion.....unless it was
     voiced by Jim Heard.....and then they would mimic that
     opinion, I think.

Q:   Did you eventually go to Jim Heard and get his opinion?

A:   Yeah, I think his comment as I mentioned was something like
     "what favors do you owe that would make you want to have
     these people or have this guy or that guy wrestle."  My
     answer was "I don't owe this person anything, and I don't
     owe anybody any favors.  I'm just looking at it from the
     standpoint of trying to be able to draw a crowd and bring
     spectators into the buildings; and I think for that we need
     to have blacks as well as the whites in order to do that."

Q:   Once you assumed the role of booker, did you begin to sign
     more blacks?

A:   Yeah, the first guys I tried to get were.....the first one I
     brought in was Junkyard Dog.

**Q:** Okay, did you enter into a contract with Junkyard Dog?

**A:** I can't say that we've made a contract. There was a verbal agreement with Junkyard Dog for sure. Whether there was a contract, I don't know.

**Q:** Do you remember what the salary was?

**A:** I believe it was around $400 or $450 per event, and of that sum I think it was $100 that was to be withheld until the end of the month, at which time he would then be paid that sum.

**Q:** Was there a certain number of events that he was to participate in per month?

**A:** No. That was pretty much up to me, but I booked him regularly.....I booked him as much as I could.

**Q:** So in '91 the first person you remember...

**A:** May of '90.

**Q:** May of '90, the first person you remember entering into a contract with was Junkyard Dog, and it was based on the events........he was being paid a certain salary based on the number of events that he participated in.

**A:** Yeah.......based on a per event situation.

**Q:** Per event situation. Were there any other black wrestlers that you entered into that same type of agreement with.

**A:** No. I ran into a lot of flack when I brought in Junkyard Dog.

**Q:** What kind of flack did you run into?

**A:** Well, as I've said, what favors did I owe? What past deals might there be between he and I? There was just a lot of heat, as I would call it, to have Junkyard Dog, because nobody seemed to want to have him there. The reasons were because he was overweight, because he was fat, because he was undependable. They didn't know if he was going to show up and that type of thing.

**Q:** Were there any overweight white wrestlers that were on contract?

**A:** I don't know.

**Q:** Can you think of anyone that was proportionately the same size as Junkyard Dog that happened to be a white wrestler that was wrestling during this time period?

WCW 102073

Patterson is in the same situation, having drawn sell-out crowds in all parts of the country, particularly here in the southeast.  A guy like Tony Abbus....the same exact situation....sell-out crowds.  A guy like Abdullah the Butcher....the same type of situation....sell-out crowds.  Ernie Ladd.....sell-out crowds.  I've seen these people sell the buildings out because I either was with them or worked with them or I was booking them.  Conversely, if I look at Sid Vicious....I don't believe there has been one sell-out....well, in fact there hasn't been a sell-out crowd in years.....so I guess he couldn't have been responsible for a sell-out crowd, because there hasn't been any.  Lex Luger is the same way.  Lex Luger is paid a high salary, but there is never any evidence anywhere to show that he's ever drawn any money.

Q:  Now, during the time that you were the booker, was the policy of WCW to pay black wrestlers a lower salary than what they were paying white wrestlers?

A:  Yeah, I don't think there is any question.  I think that I offered, for instance in JYD's case....I offered him several hundred dollars per event less than I would have offered a white person, and did do that.  In the case of JYD I think offered him $450 an event, $100 to be withheld to be paid later on at the end of the month, and approximately a month later or so I hired a guy by the name of Stan Hanson, who was white, and paid him $600, because I knew it was going to be difficult for the black man to argue about it...for JYD to argue about it.  He was kind of between a rock and a hard spot and pretty much had to take what we'd offered, where Stan Hanson was in a better position to argue about his wages and said I'll go for $600.  If I would have suggested $450 he would have just thrown it back in my face.  In fact, now I'm remembering Paul _____ I think offered him something like $400/$450.  He wouldn't take it.....he said no.....and I think we upped his to $600.  Thunderbolt Patterson, when I started him I paid him $100 because I felt that there was so much heat and so much flack from hiring anybody who was black.  When I suggested Tony Atlas everybody just kind of farted at it and decided that they didn't want Tony Atlas, and I don't know whether they thought I was gonna flood the place with blacks or what, but my intention was simply to be able to draw money, that's all, and business.  I didn't care about it.  I wasn't pro black, white, green....I just wanted to try to draw money, and the only way I knew how to do it was the way that it had been successful for years and year and years and years, and that is to have blacks on the card to draw not only blacks, because that wasn't the idea exclusively to draw blacks, it was a black that could perform to the point where he would draw blacks as well as whites.

Q:  Now how long did you say in a booker position with WCW?

A:

Q: You were talking about...they had raised some concerns concerning JYD's dependability....do you have an opinion as to Junkyard Dog's dependability?

A: Well, the time that he worked for me off and on during the years prior to my being with WCW there was never a problem. He always was on time, and he always showed up. I had no reason to question whether or not he would make it.

Q: Did he work with you while you were with the WCW?

A: Well, I hired him. That's when he first came to work for WCW.

Q: Were there any wrestlers that you were having problems with concerning their dependability?

A: Yeah, a lot of them.

Q: Can you tell me....can you give me the names of a couple of them and the types of problems that you had with them?

A: We had two wrestlers that were chronically a problem....one in particular by the name of Lex Luger, who was making....my understanding was he was making $500,000 a year....and he was always a problem. He was always late. I talked to him several different times about his being tardy because it raised problems in the buildings and required that in some cases we give money back. We had to inform the spectators that he wasn't there, and I told him that unless he showed up we had no way of knowing if he intended to be there later or if something had happened where he couldn't be there....so he needed to be there on time. At the very least, on occasion, he needed to give us a phone call. If he couldn't be there on time he needed to give us a phone call and say he was running a little bit late. Well, he never thought that that was important, and I thought that was kind of funny.....well, difficult to deal with because I wouldn't do business that way. They were so concerned about JYD, and I never had a problem with JYD, and for the period of time that I was there, to my knowledge there was never a problem with JYD. And yet the guys that they had problems with, Lex Luger, Sid Vicious and a few others.....nothing was done...except in most cases they gave them a raise.

Q: Now isn't it your professional opinion that a JYD or a Thunderbolt Patterson could draw a larger crowd that a Lex Luger or a Sid Vicious?

A: Well, I can only say that the past tells me that JYD has drawn large crowds....sell outs.....in various parts of the country. Personally I know that. A guy like Thunderbolt

WCW 102075

A:  From May '91 until November of '91....November 22 or 23,
    something like that.

Q:  Now prior to your becoming a booker with WCW, can you tell
    me how many blacks you understood were on contract with WCW,
    prior to May of 1991?

A:  I think four would be about it.  There might have been one
    two more.  I'm thinking Teddy Long, Butch Reed, Ron Simmons
    and Ranger Ross I think at that time might have been under
    contract, or he had been prior to that.

Q:  Now once you became booker you said that you signed Junkyard
    Dog.  Were there any other blacks that you signed?

A:  Well no, I said that I don't know about a contract, because
    I didn't personally negotiate any contract.  I negotiated a
    verbal commitment on my part.  Whether that translated to a
    written contract later on or even at that time, I don't
    know.  But I brought in JYD.  I tried to bring in Tony
    Atlas.

Q:  What happened when you tried to bring in Tony Atlas?

A:  Everybody just nixed the idea.  He had been in a lot of
    trouble.  He was another unpredictable commodity, and I
    think again the comment against was something like "What do
    you owe these people, anyway?"

Q:  Had you ever wrestled with or signed Tony Atlas prior to
    your association with the WCW?

A:  I started Tony Atlas.  My brother Gene and myself...we
    started Tony Atlas.  He's from Roanoke, Virginia.....one of
    the toughest kids that I've ever run into.  In all the years
    that I wrestled we only started about three people.  We only
    introduced two that I can think of....one being Tony
    Atlas....that we introduced to wrestling, so we were rather
    selective over a period of 20 years.  Tony Atlas, in my
    estimation, was probably one of the.....he was a draw very
    much like Thunderbolt Patterson.....very much like Junkyard
    Dog.  He had the ability to talk.  He looked good.  He fit
    the mold that WCW seemed to want....that is the Superman
    type of mold.....the body builder.  Tony Atlas was a body
    builder before Lex Luger knew how to put his pants on.  Tony
    Atlas was a legitimately strong individual as well.  He did
    demonstrations where he would bench press 500 pounds and so
    forth and so on.....and he was a legitimate guy.  He was
    also the kind of guy that I could work with.  I took him to
    the Children's Hospital and did community service type
    things that I thought were important to help wrestling and
    to help Tony Atlas become popular in wrestling, and he was
    willing to do it.  He was just....he was, I thought, an

outstanding individual, and he would have contributed an awful lot to wrestling. At that point the argument couldn't be made, like Junkyard Dog, that he was heavy, because he wasn't. They couldn't make the argument that he was old, because he wasn't. They couldn't make any argument that would go against him, so I could only draw my own conclusion, and that was they just didn't want Tony Atlas; and I guess I can go further to say that I would assume that it had to be because he was black. If there was another reason, I don't know what it would be. But in any event, we never got Tony Atlas.

Q:   Were there any other blacks that you attempted to introduce?

A:   Thunderbolt Patterson.

Q:   What happened with Thunderbolt Patterson.

A:   I just ran into a lot of crap all the time. I had Thunderbolt show up every week I think for three months. I hope he'll remember better than I do. I'm not quite certain the length of time. For somewhere in the neighborhood of like three, maybe four months, I had Thunderbolt Patterson come to the TV tapings. I had him on occasion do an interview or two. Every time I did that the word got back to the office...Jim Heard...in such a way that it was brought to me the next day or whatever....wanting to know what in the world I intended to do with the guy and so forth and so on, and I just made it very low key then for Thunderbolt, and I explained to him many times that it's real tough. I said just take it easy and maybe we can work this doggone thing out and maybe I can finally get you into a position where we can try to draw some money with you, either by having you in the ring or by having you manage somebody in the ring, which was the choice, or by putting you in a position, which I suggested several times, where you would be involved directly in our management in a way where we could help to promote wrestling through the black community, and let Thunderbolt Patterson, who was well known in the black community in cities all over the country, work in that capacity to encourage black participation. We had a deal set up for him to go to the.....or I should say I had an idea set up for Thunderbolt to attend the black tenants association, which was taking place in Washington, D.C., and it would have cost WCW say a thousand dollars. That would have been way more than was necessary for the plane ticket, hotel, the whole works, to attend this meeting, which I think lasted two or three days, which I thought could have done a lot of elbow rubbing, etc. with the intention of following that up by going to black mayors all around the country and black officials, politicians or whatever and try to put wrestling back on the map and try to get communities and those people interested in wrestling again through black participation, by bringing blacks in, not only to wrestle,

but by having blacks in management and to show that things
had changed, that Turner, who is the humanitarian as we now
know....the man of the decade....was trying to change things
that had happened in the past....to include
segregation.....to include the Ku Klux Klan and all that
crap.  Thunderbolt Patterson used to say it's a new day,
it's a new day, and we tried to expound on that to show that
this was in fact a new day, and that was our idea....that
was our theory....that we would be able to go to the
officials at WCW.....Jim Heard let's say in this
case.....and convince him that would be something that would
on paper sell and would in fact could become reality.  It
could make a significant change.  Whether Heard actually
felt that way or anybody else felt that way, or for that
matter, whether I felt that way in terms of making some kind
of a sociable economic change.....I'm not trying to be that
damn goody goody....but I could see where a person could
make money out of it.  I could see where business could be
improved, and I was all for it.  So when that idea was
presented, the same thing.  What do you owe the guy?  Just
comments that indicated that I was treading on thin ice.

Q:    Who made those comments?

A:    Well it was kind of general feeling, but primarily it would
      be Jim Heard.

Q:    Were there any other black wrestlers besides Junkyard Dog,
      Tony Atlas and Thunderbolt Patterson, that you tried to
      introduce during that time period of May '91 through
      November of '91?

A:    Yeah, there were quite a few, and I'm sure that I could just
      about name them.  I can think of Abdullah the Butcher, Pez
      Whatley, Ranger Ross, who was, I think, out at that time,
      and I would see him frequently looking for employment.
      Something had happened in there, and I didn't even know what
      it was.  I was really busy so I can't......I'm not quite
      sure.  But I just had an overall view of the situation,
      which was to promote and utilize black wrestlers because we
      weren't doing business, because we didn't have the black
      wrestlers and the population in terms of the wrestling body
      that I thought was necessary in order to bring business back
      to a comfortable level.

Q:    Now during the time that you served as the booker, what was
      the average salary of a white wrestler?

A:    I couldn't tell you what the average salary was.  I can tell
      you what I thought some of the salaries were.....Lex Luger
      at $500,000 and Sting I think at $350,000 and Rick Flair at
      probably $700,000 or $750,000.  They were white.  I think
      the Steiners were probably promoted later on at about
      $250,000 a piece.  Sid Vicious was in the range of $180,000

I think I told you, and then he was raised to $250,000.  I
think the Freebirds and Brian Pillman and those people were
probably making around $104,000.  To my knowledge all the
white wrestlers, save one, made in excess of $100,000.  The
once exception would have been Tommy Rich, and my
understanding there was he was making $1,500.00 a week.  The
black wrestlers, I don't know what they were making.  I
thought Ranger Ross was making like at $100,000 or $104,000.
Simmons and Reed I thought were making somewhere between
$104,000 and $150,000.  Teddy Long I thought was like at
$104,000, and that takes care of all the black wrestlers.

Q:  Now Butch Reed and Ron Simmons at one point were the heavy
    weight champions.

A:  Tag champions.

Q:  Tag champions.  Do you know the average salary for two white
    males when they held the heavy weight tag team championship
    with the WCW?

A:  Well I don't know who had the tag.....I guess the Steiners
    did.  At one time I think there were probably some _____
    there in terms of salaries....if, in fact, Simmons and Reed
    were making $150,000.  The Steiners, I think, also held
    those titles, and I think they were making $150,000.  But
    I'm quite certain as of now that the Steiners are making
    $100,000 more.  Arn Anderson was there, and he started at
    about $150,000, but if I'm not mistaken I think his salary
    has provision for a wage increase for something like
    $200,000 after the first year and $250,000 in the final
    year.  I don't know that those provisions existed for Ron
    Simmons or Butch Reed, and of course, Butch Reed is no
    longer there.  I know they wrestled Sting.  I know they
    wrestled Luger.  I know they wrestled Flair and Arn, and I
    know they wrestled a lot of other white people who without
    question were making more money than Ron Simmons and Butch
    Reed.

Q:  Now as a booker, how were you paid?

A:  I was an employee.  I had no contract.  I was paid $250,000
    a year.

Q:  Were you paid a straight base salary at $250,000 a year?

A:  Yeah.

Q:  Were you to receive any commissions based on the gross
    revenue at the event?

A:  The deal with Heard was in his office.  Prior to my becoming
    a booker I was given an appearance fee or talent fee I think
    they called it....one or the other.....interchangeably

probably....for any participation in any matches, and we did the one thing with the Black Scorpion where I was the whole thing, and they agreed to pay me then for all appearances and they agreed to pay me for all pay-per-view events. Since I was the once that booked it, since I was the once that put the talent in the thing, and I was responsible for making it work, it was only right in my opinion, and they agreed, that I would get a percentage, because later on I found out that they had offered something like $50,000 for each show that Sid Vicious might appear in or that Rick Flair might appear in.  They were just going to give him fifty grand.  Now that's what I was told by Heard.  It kind of let it slip when we were arguing about my deal.  So since I was the one that would orchestrate what Rick Flair would do and provide everything that would enable him to be in that show, and the same thing as far as Sid Vicious was concerned, and they could pick up fifty by just doing what I told them to do, I didn't find it too difficult to imagine that my compensation might be a little bit more, as it always had been in years past, because a booker was considered to be the glue that put everything together.... well, more than the glue.  He was the glue and he was the parts and he was the man that wrote, directed, produced....everything....and that was the way it used to be.  He used to have the ability to hire, fire, and so forth and so on, and I was told that I would have one year to turn this thing around.

Q: Who told you that you had one year?

A: Jim Heard.

Q: And that year commenced in May of '91?

A: It commenced in May of '91 and ended in November of '91.

Q: It was your understanding that it was to run until April of '92?

A: It should have run until May 1 of '92.

Q: And in fact you remained the booker until...

A: I was actually there....the first two months....May....it was nothing to do with me or anything.....I started out as a booker, but things had already been in the works by the previous people.  So there was discussion at that point because the business was still horrible, and there was discussion at that point....I said well, you know, I need a grace period here because certainly this May thing isn't mine, and part of June wasn't mine.  I was making up the TV's for May and June, but they weren't going to be played until the latter part of June, because we were like four to six weeks ahead.  So I said we won't be able to see what I'm

able to do until six weeks down the road. All I'm doing is
just cleaning up all the crap that's been thrown my way. So
when we got to July, August, September, October and
November, I booked such things as the Clash in September,
the July Bash, and the Halloween Havoc in October. The
Clash turned out to be the best numbers they had. It was a
classic example of how things should be. August
revenues....my understanding was the August revenues were in
excess of $1,000,000. Revenues now on a monthly basis are
probably $250,000 - $300,000. The numbers went as high as a
seven two if I remember right on the Clash in September.
The Halloween Havoc....Heard badmouthed me and told
everybody before....the personal crap. He told me when I
talked about getting my money for pay-per-view, he said that
was the worst show they ever had so I should just hide my
head in shame and walk out the damn door. It turns out that
that was the best pay-per-view they ever had, but still
there was no money forthcoming. Anyway....that period of
time was the best that they've had as far as numbers as
concerned, as far as revenues are concerned, as far as pay-
per-view things are concerned. When the five months got
over, because I think I argued vociferously, if that's the
word I can use, for different things that I thought should
be done to a make it right. I think he just got tired of
listening to me and just decided that they didn't need me,
and then after that we can draw our own conclusions as to
why.

Q:  Now for the pay-per-view, did you have any idea how much
    money you thought you were entitled to?

A:  I'm from the old school, and in the old school there were
    no set figures, you know. If a person treated you right,
    you worked for them. If a person didn't treat you right,
    you walked away. A lot of things were done on handshakes.
    In fact, there were no contracts back then. You walked in
    and you say, well, I'm gonna work blah, blah, blah, and once
    again you had an idea what the house was....they wouldn't
    have to tell you....the house was $20,000. If I
    was_____, I could expect that I would make somewhere
    between 6, maybe 7, 8 percent of that figure. When I'd get
    my pay check and I could compute what 6% of
    $20,000.....1,200 bucks.....if I'd get 1,200 bucks I was
    happy. If I got 1,300 bucks I was happy. If I got 1,100
    bucks, I wasn't going to argue about it. If I got 800 bucks
    I'd go in and argue. I'd say something. To hell with this
    thing....hold it....what's going on here. Then they might
    tell me their story, whatever it might be. If it sounded
    plausible, like there were extra guys on the doggone card,
    or if we had unusual expenses, you might just swallow it and
    say okay, live and let live, and we all got to get along.
    So when you say did I anticipate anything out of the pay-
    per-view. All I could do was say that I would anticipate
    that whatever they had offered completely to somebody, that

WCW 102081

I had to be entitled to at least to that.  And if they
offered that to several people, well then it kind of gets
screwed up because if there were ten people and they were
all offered $50,000, I wouldn't reasonably say I should get
$500, but I'll tell you when I first took the job I didn't
know what some of the other wrestlers were making, and when
I found out and found out that Flair was making $700 or $750
and Luger $500, I seriously, based on the old days, said
well, the booker always makes more, because the booker was
responsible for putting that guy in that position to make
that money, and so I was going to go with the argument and
say, I'll settle for the same as Luger's got - $500.  Well
shoot, they'd have laughed me right out of the deal.  So I
said okay, $250, and they went for $250.  But there again
the $250 was to be sliced with the pay-per-view, which in my
estimation could have brought it up to something
significantly better that $250.

Q:    During your six months as a booker did they pay you based
      on an annual salary of a quarter of a million dollars a
      year?

A:    Yes.

Q:    Mr. Anderson, let me just ask you some housekeeping
      questions now.  Have you given this statement based on your
      own personal knowledge?

A:    Yes, I have.

Q:    Has anyone promised or induced you in any way to give this
      information.

A:    No.

Q:    Are you presently under the influence of any drugs or
      alcohol?

A:    No.

Q:    Have you given this statement on what you believe to be the
      truth as it relates to your employment with the NWA and the
      WCW?

A:    Yes, I have.

Q:    That concludes the statement of Olie Anderson.

Q:    This is a continuation of the statement of Olie Anderson.
      Could you please give us your opinion as it relates to who's
      really behind taking a wrestler and helping him to ascend to
      the ranks of Heavyweight Champion or Television Champion?

A:  Going back, it used to always be the booker or the owner of
    the territory as such that would be able to determine who
    was going to be what.  With the acquisition by Turner it
    became even more pronounced that the ability to make a star
    was with the position of either the booker or whoever it was
    that was running the organization.  In this case it would
    have been like Jim Heard.  You just took a body and did
    whatever you wanted to do.

Q:  Can you tell us about the facts or circumstances that led up
    to Ron Simmons and Butch Reed becoming the Tag Team
    Heavyweight Champions.

A:  Well, I think there was a period there in the summer or so
    of '91 where there was some concern.  Some of the black
    wrestlers.....Rocky King was rumored to being
    upset...unhappy with his situation in the wrestling
    world....not making enough money or whatever.  The rumor was
    pretty much that he may be attempting to make some kind of a
    legal problem as a result of racial discrimination or
    whatever, and we then made black tag team of Ron Simmons and
    Butch Reed.  Somewhere in that time period we made them the
    World Tag Team Champions, and as Heard said, this should
    prove that we're not discriminatory.  This should prove that
    we've taken a black team and we've made them champion so
    that they wouldn't have any bitch from a racial point of
    view.....not using blacks and not making them champion.

Q:  So it's your opinion that that was done to pacify the black
    community such that they would believe that the WCW did not
    discriminate against black wrestlers?

A:  Yeah, I would say so.



**TURNER BROADCASTING SYSTEM, INC.**
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366

**GINGER S. McRAE**
Assistant General Counsel
(404) 827-3113
Telecopy (404) 827-1995

April 8, 1992

Ms. Lois S. Madison
Investigator
Equal Employment Opportunity Commission
Citizens Trust Building, Suite 1100
75 Piedmont Avenue, N.E.
Atlanta, GA   30335

Re:   Robert L. Ross v. World Championship Wrestling, Inc.
      EEOC Charge No. 110920735

Dear Ms. Madison:

This letter is in response to your request for a position
statement and certain other information with respect to the
referenced Charge.  This response is provided with the
understanding that all information and documents will be kept
confidential.

I. Position Statement

World Championship Wrestling, Inc. ("WCW") is a company which
promotes matches between professional wrestlers for viewing by
live and television audiences.  WCW associates professional
wrestlers under various arrangements to perform in its matches.
None of these wrestlers is employed by Respondent.  Some of them
are associated by the event and others are associated over a
longer term for a larger number of events.

Charging Party is a professional wrestler who performed
services for Respondent at various times.  He first worked for
Respondent from February 1989 to April 1990.  He performed
services pursuant to a verbal agreement for $2,000.00 bi-weekly.
The decision to associate Charging Party for this period was made
by Jim Herd, Respondent's Executive Vice President at the time.
Of course, Mr. Herd was aware Charging Party is black.  Charging
Party made no complaints of race discrimination at the end of
this initial association with Respondent.

In late 1990 or early 1991, Charging Party approached
Respondent about again using him as a wrestler.  He had adopted

WCW 102084

the professional name "Ranger Ross", and portrayed himself as
loosely connected with the military to take advantage of the
Persian Gulf War and the current popularity of people and things
associated with the military.  Mr. Herd was interested in this
idea and thought it might play well to Respondent's audience.  He
therefore agreed to a contract to use Respondent's services for a
six-month term, to expire July 14, 1991.  The agreement entered
into by Charging Party and Respondent is attached as Exhibit A.
It is entitled "WCW Freelance Wrestler/Independent Contractor
Agreement" and clearly sets forth that Charging Party is an
independent contractor.  Charging Party explicitly acknowledged
this fact in signing the contract.  He agreed that the commitment
was for a definite term of six months.  He agreed that he, not
Respondent, was fully responsible for all taxes owed by him on
compensation for his services and that he was not entitled to the
benefits provided by WCW to its employees.

The agreement signed by Charging Party did not limit his
ability to work elsewhere.  He provided his own costumes and
makeup in performing as "Ranger Ross".  Charging Party performed
and was paid through July 14, 1991.  Respondent fully performed
its contractual obligations to him.  At the end of his term, he
was told by Mr. Herd, who had associated Charging Party on both
occasions, that "Ranger Ross" had not achieved a satisfactory
level of success with WCW's audiences and WCW was not interested
in signing him to a new contract.  Charging Party and a number of
white wrestlers whose achievement of success with audiences also
had been unsatisfactory ceased services for Respondent in the
summer of 1991.[1]

It is clear that Charging Party was not an employee covered
by Title VII of the Civil Rights Act of 1964.  42 U.S.C. §
2000e(f); Mathis v. Standard Brands Chemical Industries, 10 FEP
cases 295 (N.D. Ga. 1975).  Although, as is customary in the
industry, Respondent gave Charging Party direction as to the
ultimate outcome of his matches, the details of his performance
were left to him.  He supplied his own professional name and
persona, and accompanying costumes and makeup.  The agreement
between the parties clearly specified that Charging Party was an
independent contractor and Charging Party freely acknowledged
that fact in signing the agreement.  The agreement allowed
Charging Party the freedom to work elsewhere.  He did not receive
the benefits provided by Respondent to its employees.  The
industry has consistently treated professional wrestlers such as
Charging Party as independent contractors.  All these facts are
indicative of an independent contractor situation.  Cobb v. Sun
Papers, Inc., 673 F.2d 337 (11th Cir.), cert. denied, 459 U.S.
874 (1982).

---

[1]Charging Party was asked to and agreed to perform for one
event on September 5, 1991.

-2-

WCW 102085

Assuming for purposes of argument only that Charging Party was an employee, it is clear he was not discriminated against in any way. Mr. Herd made the decision to use Charging Party's services on both occasions. Mr. Herd also made the decision not to offer a new contract when Charging Party's contract expired in July 1991. When such a short time passes between such actions, and the same manager is involved in both decisions, a claim of racial animus in the discharge, but not in the hire, is irrational and does not support any finding of intentional discriminations. **Proud v. Stone**, 945 F.2d 796 (4th Cir. 1991).

Moreover, as stated above, a number of white wrestlers were released in the summer of 1991. A list of those individuals is attached as Exhibit B. A number of black wrestlers and other performers worked for WCW at this time and were retained. They are Curtis Hughes, Teddy Long, Sylvester Ritter and Ronald Simmons. All these individuals still perform for WCW. Obviously, race was not a criteria for the releases in the summer of 1991. Rather, it was based on purely business reasons.

Further, it is clear that race was not a factor in Charging Party's compensation. There are no scales or ranges of compensation for wrestlers. The compensation a wrestler or other performer receives in each case is wholly dependent on negotiation between the parties. Obviously, Respondent strives to negotiate as low an amount as possible and the wrestler seeks to get as much money as possible. The resulting amount depends on the wrestler's stature in the industry, his bargaining skills, Respondent's economic capacity at the time, Respondent's bargaining skills and many other factors. White wrestlers similar to Charging Party made comparable amounts. Thus, Rick Jones was paid five $250.00 per event and worked about five times every week, a total of $1,250.00, an amount less than Charging Party. Richard Slater earned $300.00 per event for about five events per week, or about the same as Charging Party. Matt Osburne made $3,000.00 every two weeks, the same as Charging Party, who made $1,500.00 per week. Charging Party's wage claim is without merit.

## II. Response to Charge

1. As explained and supported in Section I, Charging Party performed as an independent contractor from January 15, 1991 through July 14, 1991 pursuant to a written agreement. As set forth above, compensation of wrestlers is individually negotiated and is the result of many factors, and therefore comparisons to other wrestlers have little value. However, as shown above, Charging Party's earnings were about the same as or more than several white wrestlers.

2. Charging Party was told WCW was not interested in signing a new contract with him due to his lack of success during the

-3-

WCW 102086

term of his agreement, as explained above.  Respondent cannot admit or deny the second sentence of this paragraph; however, as also explained above, each wrestler's compensation is individually negotiated and comparisons are not especially meaningful.

   3.  Respondent denies that it discriminated against Charging Party in any way.

## III.  Response to Request for Information

   1.  Information shown on the Charge is correct.

   2.  See Section I above.

   3.  Charging Party was an independent contractor, as explained in Section I, and written rules, policies and procedures for employees did not apply to him.  With respect to independent contractors such as Charging Party, it is up to the manager to decide whether and when to use their services.

## Discharge

   1.  As explained fully in Section I, Charging Party was not "discharged".  Respondent complied in every way with its agreement with Charging Party, set forth in Exhibit A. Respondent opted not to enter a new agreement with Charging Party, as it had every right to do.  The agreement did not contemplate any extension and Respondent was under no obligation to offer one.  Jim Herd, then Respondent's Executive Vice President, white, made the decision not to enter a new agreement with Charging Party in conjunction with discussions with his assistants.  Charging Party had no personnel file.  The independent contractor agreement is attached as Exhibit A and documents regarding Charging Party's compensation are attached as Exhibit C.

   2.  Because Charging Party was an independent contractor, not an employee, and was not "discharged", Respondent objects to this request.

   3.  See response to 2 above.

   4.  See response to 2 above.

   5.  See response to 2 above.  But see Exhibit B for a list of white wrestlers released in the summer of 1991.

## Additional Questions

   1.  a.  See Exhibit A.

-4-

WCW 102087

b.  See Exhibit C.  Charging Party was paid in accordance with Respondent's and the industry practice for paying performers.  Thus, he received a "draw" of $100.00 at the time of the event and a "talent event fee", or an allocation of the gross revenues of an event to an individual based on his position on the "card", according to industry practice.  The balance between these amounts and Charging Party's contractual compensation was paid on a bi-weekly basis.  This system of payment is not typical of payments to employees who are generally paid the same amount on a regular schedule.

c.  See Exhibit A.

d.  See Exhibit C.  Such taxes were not withheld.

e.  No benefits were provided.

f.  Charging Party was covered under a separate policy applicable only to wrestlers.

g.  Charging Party was told his contract was expiring and that WCW was not interested in a new agreement.

h.  The agreement did not restrict Charging Party's freedom to work elsewhere.

i.  Charging Party could not delegate his wrestling duties.

j.  Respondent does not understand this question; however, Charging Party supplied his own costumes and makeup.

## IV. Conclusion

As fully set forth above, Charging Party's Charge is completely without merit for two reasons.  First, he was an independent contractor not covered by Title VII.  Charging Party assented to and never challenged this arrangement, which is followed throughout the professional wrestling industry.  He should not be able to claim now that he was an employee.

Second, even assuming for purposes of argument only that Charging Party was an employee, Respondent chose not to enter a new contract with Charging Party due to business reasons having to do with his failure to achieve a satisfactory level of success as a wrestler and not at all with race.  A number of white wrestlers met the same fate during the summer of 1991.  Other black wrestlers have continued to perform for WCW.  While working for Respondent, Charging Party suffered no discrimination in compensation.  Compensation was a subject of individual negotiation and depended on a number of factors, none of them related to race.

-5-

WCW 102088

Charging Party's Charge is without merit.  Respondent requests that the Commission promptly issue a finding of no reasonable cause.

Sincerely,

*Ginger S. McRae*

Ginger S. McRae
Assistant General Counsel

GSM:lwt

\mcrae\letters\madison.rsp/lwt

-6-

WCW 102089

**EXHIBIT A**

**World Championship Wrestling, Inc. Freelance**
<u>Wrestler/Independent Contractor Agreement</u>

    1.  I, <u>Robert Ross, Jr.</u>           (<u>Ranger Ross</u>),
              Name                   Ring Name

agree to perform services for World Championship Wrestling, Inc. ("WCW") as requested by WCW at the rate of $1,500.00 per week for the period of January 15, 1991 through July 14, 1991.  I understand that I shall be entitled to such compensation only if I appear and complete the services requested by WCW for such event and in the manner requested by WCW.

    2.  I understand and agree that I perform such services as an independent contractor and not as an employee of WCW.  I agree that I shall be fully responsible for taxation of the amounts paid to me by WCW as compensation for my services and that WCW  shall bear no responsibility for such taxation.  I agree that I am not entitled to the benefits provided by WCW to its employees.  I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

    3.  I understand that if I am injured inside the ring and within the crowd barriers at an event while performing services for WCW pursuant hereto, as determined by the schedule of physicians provided by WCW, WCW shall assume responsibility for medical expenses directly related to such injury through and according to its respective insurance program.  I understand that I will be paid only for events for which I was scheduled at the time I was injured and only if WCW's doctor certifies that the injury prevents me from wrestling and I appear at the event for interviews and other tasks as requested by WCW (unless I am unable to appear as certified by WCW's doctor); provided, however, that such payment shall be reduced by payments other than those for medical treatment to which I may be entitled under WCW's insurance or otherwise.  I understand I will not be paid for events for which I might have been scheduled while I am injured.

    4.  I agree that all programs, recordings and work product in connection with which I perform services and my contributions thereto (the "Works") shall belong solely and exclusively to WCW.  To the extent that such Works are considered contributions to collective works and/or parts or components of audio-visual works, I agree that the Works shall be considered "works made for hire" under the U.S. Copyright Act of 1976, as amended.  To the extent that such Works are deemed otherwise, I assign to WCW all rights, title and interest in and to the copyright of such Works.

WCW 102090

5. I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3. I have read this Agreement and understand its terms. I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
           Signature

_____
           Date

1 - 9 - 91

Independent Contractor

_____
           Signature

_____
           Date

9 Jan 1991

-2-

WCW 102091

**EXHIBIT B**

| NAME | RING NAME | DATE RELEASED | RACE |
|------|-----------|---------------|------|
| Carline, Gary | Rip Morgan | August 1991 | White |
| Colley, Randy | Moon Dog | August 1991 | White |
| Gibson, Robert | Reuben Cain | August 1991 | White |
| Gray, George | One Man Gang | September 1991 | White |
| Haynes, William | Black Blood<br>Bill Jack Haynes | August 1991 | White |
| Humperdink, Oliver | John Sutton | August 1991 | White |
| Jones, Rick | Black Bart | August 1991 | White |
| Keown, Wayne | Dutch Mantell | August 1991 | White |
| Murdock, Richard | Dick Murdock | August 1991 | White |
| Reininghaus, Kenny | Jack Victory<br>Russian Assassin | August 1991 | White |
| Ross, Robert | Ranger Ross | July 1991 | Black |
| Slater, Richard | Dick Slater | August 1991 | White |
| Smith, Mike | Sam Houston | August 1991 | White |
| Spivey, Danny | Danny Spivey | June 1991 | White |

**EXHIBIT C**

WORLD CHAMPIONSHIP WRESTLING, INC.
TALENT PAY SUMMARY
1991


NAME: ROSS.JR.          , ROBERT

| EVENT DATE | CITY | STATE | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 1/30/91 | GAINESVILLE | GA | DRAW | (100.00) |
| 1/30/91 | GAINESVILLE | GA | TALENT EVENT FEE | 200.00 |
| 2/10/91 | ATLANTA | GA | AS PER CONTRACT | 2,800.00 |
| 2/24/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 2/26/91 | ATLANTA | GA | AS PER CONTRACT | 2,775.00 |
| 2/26/91 | ATLANTA | GA | TALENT EVENT FEE | 225.00 |
| 3/12/91 | ATLANTA | GA | AS PER CONTRACT | 2,850.00 |
| 3/12/91 | ATLANTA | GA | TALENT EVENT FEE | 150.00 |
| 4/07/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 4/21/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 4/24/91 | DOTHAN | AL | AS PER CONTRACT | 450.00 |
| 4/24/91 | DOTHAN | AL | DRAW | 0.00 |
| 4/24/91 | DOTHAN | AL | TALENT EVENT FEE | 150.00 |
| 4/25/91 | PANAMA CITY | FL | AS PER CONTRACT | 450.00 |
| 4/25/91 | PANAMA CITY | FL | DRAW | 0.00 |
| 4/25/91 | PANAMA CITY | FL | TALENT EVENT FEE | 150.00 |
| 4/26/91 | VALDOSTA | GA | DRAW | (100.00) |
| 4/26/91 | VALDOSTA | GA | TALENT EVENT FEE | 150.00 |
| 4/27/91 | JEKYLL ISLAND | GA | AS PER CONTRACT | 900.00 |
| 4/27/91 | JEKYLL ISLAND | GA | DRAW | 0.00 |
| 4/27/91 | JEKYLL ISLAND | GA | TALENT EVENT FEE | 150.00 |
| 4/28/91 | COLUMBIA | SC | AS PER CONTRACT | 450.00 |
| 4/28/91 | COLUMBIA | SC | TALENT EVENT FEE | 150.00 |
| 5/16/91 | RICHMOND | VA | AS PER CONTRACT | 1,350.00 |
| 5/16/91 | RICHMOND | VA | DRAW | (100.00) |
| 5/16/91 | RICHMOND | VA | TALENT EVENT FEE | 150.00 |
| 5/17/91 | WASHINGTON | DC | AS PER CONTRACT | 1,350.00 |
| 5/17/91 | WASHINGTON | DC | LICENSE FEE | (20.00) |
| 5/17/91 | WASHINGTON | DC | TALENT EVENT FEE | 150.00 |
| 6/02/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/16/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/30/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 7/14/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 9/05/91 | AUGUSTA | GA | DRAW | (100.00) |
| 9/05/91 | AUGUSTA | GA | TALENT EVENT FEE | 250.00 |

TOTAL PAY 1991     35,830.00

Add Back Draws     420.00

9-5-91 Payment     36,250.00
                   (250.00)

                   36,000.00

0 - %

35,830.00+
    420.00+
 36,250.00%

9-5-91
        36,250.00+
        250.00-

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1990

| | | REFLEX AMOUNT | EVENTS WORKED |
|---|---|---|---|
| 18–Dec–89 | 31–Dec–89 | 2,000.00 | 7 |
| 01–Jan–90 | 14–Jan–90 | 2,000.00 | 9 |
| 15–Jan–90 | 28–Jan–90 | 2,275.00 | 11 |
| 29–Jan–90 | 11–Feb–90 | 2,000.00 | 3 |
| 12–Feb–90 | 25–Feb–90 | 2,000.00 | 9 |
| 26–Feb–90 | 11–Mar–90 | 2,000.00 | 9 |
| 12–Mar–90 | 25–Mar–90 | 2,000.00 | 4 |
| 26–Mar–90 | 08–Apr–90 | 2,000.00 | 7 |
| 09–Apr–90 | 22–Apr–90 | 2,000.00 | 2 |
| | | 3.63  WRESTLERS RIGHTS | |
| | | 0.84  WRESTLERS RIGHTS | |
| | | $18,275.00 | 61 |

0 • *

1990   18,275·00+
1989   43,003·46+
       61,278·46*

WCW 102094

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1989

| | | REFLEX AMOUNT | | EVENTS WORKED |
|---|---|---|---|---|
| 27–Feb–89 | 12–Mar–89 | 450.00 | | 3 |
| 13–Mar–89 | 26–Mar–89 | 1,850.00 | | 13 |
| 27–Mar–89 | 09–Apr–89 | 2,000.00 | | 12 |
| 10–Apr–89 | 23–Apr–89 | 2,000.00 | | 2 |
| 24–Apr–89 | 07–May–89 | 2,000.00 | | 5 |
| 08–May–89 | 21–May–89 | 2,000.00 | | 3 |
| 22–May–89 | 04–Jun–89 | 2,775.00 | | 14 |
| 05–Jun–89 | 18–Jun–89 | 2,752.00 | | 5 |
| 19–Jun–89 | 02–Jul–89 | 2,000.00 | | 3 |
| 03–Jul–89 | 16–Jul–89 | 2,400.00 | | 11 |
| | | 0.46 | MDSE SALES | |
| 17–Jul–89 | 30–Jul–89 | 2,000.00 | | 6 |
| 31–Jul–89 | 13–Aug–89 | 2,000.00 | | 6 |
| 14–Aug–89 | 27–Aug–89 | 2,000.00 | | 5 |
| | | 1.00 | MDSE SALES | |
| 28–Aug–89 | 10–Sep–89 | 2,000.00 | | 7 |
| 11–Sep–89 | 24–Sep–89 | 2,000.00 | | 3 |
| 25–Sep–89 | 08–Oct–89 | 2,000.00 | | 2 |
| 09–Oct–89 | 22–Oct–89 | 2,000.00 | | 1 |
| 23–Oct–89 | 05–Nov–89 | 2,000.00 | | 5 |
| 06–Nov–89 | 19–Nov–89 | 2,000.00 | | 4 |
| 20–Nov–89 | 03–Dec–89 | 2,775.00 | | 14 |
| 04–Dec–89 | 17–Dec–89 | 2,000.00 | | 7 |
| | | $43,003.46 | | 131 |



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## DECLARATION OF CLAUDE PATTERSON

STATE OF GEORGIA
COUNTY OF FULTON

    Claude Patterson gives the following Declaration under
penalty of perjury and states as follows:

1.

    One of the positions which I believe that I was extremely
well-qualified to fill at WCW was a position as a Booker.  A
Booker is one of the persons who helps create and script the
wrestling events.  The Booking Committee at WCW was made up of
many former successful wrestlers such as myself.

2.

    I am aware that Kevin Sullivan was one of WCW Bookers from
1995 though the end of WCW.  I remember that Kevin Sullivan was
a wrestler with Georgia Championship Wrestling as well as
Florida Championship Wrestling.  Although I do not recall the
specific date, I recall that he began wrestling in the early
eighties.  I also recall that he wrestled with a famous wrestler
named Mark Lewelyn.

3.

    I am also aware that Dusty Rhodes, the American Dream, was
a member of the Booking Committee at WCW.  I remember Dusty
Rhodes arriving in the early seventies.

4.

    In the early seventies, I also recalled Ric Flair arriving
on the wrestling scene.  I am aware that Flair became a Booker
at WCW.

5.

    I remember Paul Orndorff beginning in the late seventies or
early eighties.  Orndorff was never in my class as a wrestler as
I was higher on the card and was considered a much better and
more famous wrestler than Orndorff.  Nevertheless, even though I
was a more successful wrestler than Orndorff, he became a Booker
and head trainer at WCW.

6.

I am aware that Arn Anderson became a member of WCW's Booking Committee and also worked as an agent.  I remember Ole and Gene Anderson bringing in Arn Anderson in the eighties.

7.

I am aware that Ole Anderson became a member of the WCW Booking Committee.  I remember wrestling against Ole Anderson going way back into the early seventies.  I recall as a tag team partner with Jerry Brisco, beating Gene Anderson and Ole Anderson for the title.

8.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Claude Patterson

_____
Executed on (Date)



# EXHIBIT / ATTACHMENT

# AA

**(To be scanned in place of tab)**



THE AMERICAN DREAM
# DUSTY RHODES
Profi

Profile
News Flash
Events
Academy
Biography
Photos
Guest Columnist
Sound Off
Links
History
Dustyisms
Sponsors
Videos
TCW Team
Store
Home

## Professional Summary:

### Virgil Riley Runnels Jr.
### Birth Date: October 12
### 6'3" 289+ lbs

Over 30 years experience in the highly competitive field of Professional Wrestling.

Currently known both nationally and worldwide as one of the most recognizable names in history of the sport.

**Three time National Wrestling Alliance (NWA) Heavyweight Champion**

**January-1983 - December-1988:**
Jim Crockett Promotions/National Wrestling Alliance (NWA) Charlotte, North Carolina; Ser Director/Producer of Wrestling Operations; Professional Wrestler--held various titles. Prod and Created Pay Per View Specials, wrote their story lines and scripts from music intro to end. Produced all other television specials. Booked all wrestling matches for the different Town/City locations, as well as for television events. Created various other television spec Oversaw all new wrestling talent providing them with theme music, costume design, stage names, etc.

**January-1989 through November 1st, 1999:**
Turner Broadcasting Systems (TBS)/World Championship Wrestling (WCW) Atlanta, Geor Executive Producer and Head of Creative Development, Casting and Character Developm Produced and created Pay Per View Specials, wrote the story lines and scripts from intro r to the end. Produced all other television specials. Booked all wrestling matches for the diff Town/City locations, as well as for television events. Created various other television spec Oversaw all new wrestling talent; gave them musical themes, costume design, stage name Previously head of Creative Development, Casting and Character Creations.1991 Creation included Dustin Rhodes, El Gigante, Stunning Steve Austin, Johnny B. Badd and many m 1992-1993 creations included 2 Cole Scorpio, Cole Twins, Harlem Heat, and many more. Experience in the movie entertainment business includes co-starring roles in movies inclu The Wrestler, Stagecoach, Paradise Park and Burk's Law (CBS Series). Directed, Wrote a Produced over 350 hours of new programming for TBS and Syndication since 1985. From 1993, received average ratings on TBS of 2.5, nationally on cable/Saturday Night. Receive rating, nationally on cable/TBS specials 4 times a year. Television color commentator for V Championship Wrestling (WCW) including specials such as Pay Per View events and Clas Champions for TBS. National spokesperson including commercials for Mellow Yellow, Sta Headache Powders, Make-A-Wish Foundation and various other charities as well; also as: car dealerships. Personal appearances and concert participation with Willie Nelson and D; Allen Cole. Over 15 years directing & producing television for Wrestling Operations

Currently not wrestling but forming a new wrestling entertainment franchise under his Turn Entertainment, Inc. as TurnBuckle Championship Wrestling (TCW). Will be having local wr

events in Georgia, Alabama and Tennessee as **"The American Dream Tour 2000"**

Copyright © StarInsider.com



# EXHIBIT / ATTACHMENT

## BB

**(To be scanned in place of tab)**



## Ric Flair's Background

Richard Fliehr was born in Minnesota on February 25, 1949. He grew up there and went on to play offensive guard in college at Minnesota.

Ric Flair debuted in professional wrestling in the AWA in 1972, after being trained by the legendary Verne Gagne. After about 2 years in the AWA, Flair left for the NWA. In 1975, Flair and a few other wrestlers were in a plane crash somewhere in North Carolina. Flair's back was broken in the crash, but he returned to the ring the next year.

Early NWA Years

Flair's first title in the NWA was the U.S. Heavyweight Title. He won it from Bobo Brazil in September of 1977. He lost the U.S. Title later that that year, but then teamed up with Greg "The Hammer" Valentine to win the NWA World Tag Team Titles. Th ey beat Ole and Gene Anderson in November of 1977 for the titles. They were stripped of the titles early in 1978. In May of that same year, Flair defeated Mr. Wrestling to capture the U.S. Title for a second time. On December 18, 1978 Ricky Steamboat won the U.S. Title from Flair in Toronto, but Flair won it back from Steamboat on April 1, 1979.

Then on August 12, 1979 in Greensboro, NC, Flair recaptured the World Tag Team Titles with Blackjack Mulligan. After they won the titles from Paul Jones and Baron Von Raschke, Flair vacated U.S. Title so he could concentrate on the tag team scene. The very next month, Jones and Von Raschke won the tag titles back from Flair and Mulligan. This would be the last time "The Nature Boy" held a tag team title. Now, with Flair concentrating mainly on singles competition, he won the U.S. Heavyweight Title for the fourth time. He defeated Jimmy "Superfly" Snuka on April 19, 1980 in Greensboro, NC to begin this title reign. On July 26, in Charlotte, NC, Flair lost the title to Greg "The Hammer" Valentine, but regained it from his former partner on November 24 in Greeneville, SC. On January 27, in Raleigh, NC, Rowdy Roddy Piper put an end to Ric's fifth U.S. Title reign.

---

The NWA World Heavyweight Championship

On September 17, 1981 history was made. Ric Flair defeated Dusty Rhodes in Kansas City, Missouri to win the NWA World Heavyweight Championship. This was just the beginning of the now famous Flair/Rhodes feud. Dusty was suspended from the NWA in late1982 o r early 1983. Then a masked man, known as the Midnight Rider, came onto the scene (who everyone knew was Rhodes). The Midnight

Rider won the title from Flair on February 9, 1983. When the President of the NWA told the Midnight Rider to remove the mask, the title was re turned to Ric Flair. Then, on June 8, 1982, Harley Race defeated Flair for the World Title in St. Louis, Missouri.

On November 24, 1983, the NWA held the first ever Starrcade in Greensboro, North Carolina. It was here, where Flair won the NWA Title for the second time from Harley Race. During an International tour, on March 21, 1984, Race regained the title in New Zealand. But, just two nights later, Flair won the World Title for a third time by defeating Race in Singapore.

At a show in Irving, Texas, Flair lost the Championship to Kerry Von Erich on May 6, 1984. Just a few weeks later, on May 24, Flair regained the title during their tour of Japan. This time, Flair kept the World Title for over two years. Then, on July 25, 1986, Flair's long time nemesis, Dusty Rhodes, defeated Ric in Greensboro, North Carolina. After holding the title for only 13 days, Rhodes lost the title to Flair on August 7 in St. Louis, Missouri. The Nature Boy's fifth title reign lasted a little over a year. Then on September 25, 1 987, Ron Garvin won the title in Detroit, Michigan. It took Flair only two months to regain the title from Garvin. He started his sixth title reign in Chicago, Illinois on November 26, 1987.

After holding the World Title for a little more than a year, Ricky "The Dragon" Steamboat ended Flair's sixth title reign on February 20, 1989 in the same city where he started it, Chicago, IL. On May 7, at Wrestle War '89, Flair won the title back from Steamboat in Nashville, Tennessee. After this match, Terry Funk attacked The Nature Boy. Flair was out of action for about 6 months, after Funk piledrove him through a time keeper's table. Flair returned to battle Funk and the rest of Gary Hart's stable. Not able to take them on alone, Flair recruited Sting, Ole and Arn Anderson to reform the 4-Horsemen.

The Horsemen battled Hart's men on many occasions, almost always coming out on top. After they had taken care of Hart's stable, the NWA Championship Commitee awarded Sting a shot at the World Title. The Horsemen confronted Sting, and told him to refuse the title shot or leave the Horsemen. When he refused, and demanded the match, the Horsemen warned him to watch his back. Soon there after, Sting was sneak attacked in the locker rooms and had a seriously damaged knee. When Sting returned to the ring, at the 1990 Great American Bash (July 7), he won the World Heavyweight Championship in Baltimore, Maryland.

---

The Formation of World Championship Wrestling

On January 11, 1991, Ric Flair defeated Sting to win the World Title for the eighth time. This wrestling organization the left the NWA and formed World Championship Wrestling. Flair was then recognized as the first WCW Heavyweight Champion of the World, taking place of his NWA World Title. While touring Japan, Flair lost to Tatsumi Fujinami on March 21 in controversial fashion. The decision was later reversed and the WCW Title returned to Flair, but World Championship Wrestling recognized Fujinami as the NWA champion. On May 19, 1991, Flair won the NWA Title for the ninth time by defeating Fujinami in St. Petersburg, Florida. After a conflict with Virgil Runnels (who we know as Dusty Rhodes), the top booker for WCW at that time, Flair signed a contract with the World Wrestling Federation in mid-1991. After doing this, he was stripped of both the WCW and the NWA World Titles. This was the first time the NWA Title had ever been vacant.

---

## The World Wrestling Federation Title

Flair entered the WWF, taking his World belt with him (he owned it at the time), proclaiming himself to be the real World Heavyweight Champion. He took on Bobby "The Brain" Heenan as his executive consultant and Mr. Perfect as his trainer. Eventually, Flair sold his belt back to WCW. After a couple of controversial WWF Title changes between the Undertaker and Hulk Hogan, the President of the WWF declared the title vacant and announced that the winner of the 1992 Royal Rumble would be the new WWF World Heavyweight Champion.

The Royal Rumble was held in Albany, New York on January 19, 1992. After drawing number three, Flair proved why he has been called "the 60-minute man". Flair outlasted the other 29 WWF superstars (eliminating the British Bulldog, Big Boss Man, Randy Savag e & Sid Justice) to win the Royal Rumble and the WWF World Title for the first time. He w as in the ring for just over an hour, setting the record for the longest time in the ring in a Royal Rumble. He held the title until April 5 that same year, when he lost to "Macho Man" Randy Savage in Indianapolis, Indiana.

In Hershey, PA, Flair won the title back from Savage on September 1, 1992 with a little help from newcomer Razor Ramon. He held the title for just over a month, when Bret "The Hitman" Hart defeated him on October 12. After this, Mr. Perfect and Ric Flair had a dispute and split up. Fla ir and his new discovery, Razor Ramon, had a series of matches with Mr. Perfect and Savage. This feud eventually led to a loser leaves WWF match between Flair and Perfect. Flair lost this match and made his way back to World Championship Wrestling.

---

### Flair returns to WCW



4-Horsemen, 4-Life

When Flair returned to World Championship Wrestling, Barry Windham, former partner in the 4-Horsemen, held the NWA Title and Big Van Vader was the WCW champion. Flair first went after the title which he had held nine times before, the NWA W orld Title. He won it from Barry Windham in Biloxi, Mississippi on July 18, 1993 for his tenth and final NWA title reign. He then lost it to Rick Rude in Houston, Texas on September 19 of that same year. In September of 1993, the NWA Title became known as WCW International World Title. Flair had several rematches with Rude, but was never able to beat him for the title due to disqualification finishes.

Ric Flair then got into a feud with Big Van Vader, which led to their big match at Starrcade 1993. Flair p ut his career on the line against Vader's World Title. On December 27, in front of his hometown audience, Flair defeated Vader to win the WCW Title for the second time. Then on June 23, 1994, "The Nature Boy" beat Sting for the WCW International World Tit le in Charleston, South Carolina. This was the first time Flair won the International World Title, but this match unified the two titles into the World Championship Wrestling Heavyweight Title. Flair kept the WCW Title until he was defeated by Hulk Hogan on July 17, 1994 in Orlando, Florida.

Flair and Hogan had a series of matches, leading to Flair putting his career on the line for a shot at the World Title. Hogan defeated Flair in this very controversial match. Flair reappeared on the scene, managing Vader during his feud with Hogan early i n 1995. Because of Flair's constant interference in

Hogan's matches, he asked the WCW Executive Commitee to reinstate Flair as an active wrestler.

After Vader was defeated by Hogan at the Bash at the Beach '95, Flair c ame into the ring and verbally attacked Vader. Arn Anderson, Ric's long time friend, came to Flair's aid when Vader started to attack. This led to a handicap match at the Clash of the Champions - Ric Flair & Arn Anderson vs. Vader. Vader defeated Flair/Anderson, getting the pin on Arn. Flair was furious that they had lost and verbally attacked his best friend.

---

The New 4-Horsemen



Over the next few months we were brought to believe that Flair and Anderson's longtime friendship had come to an abrupt end. At Fall Brawl '95, we saw the first match between "The Nature Boy" and "The Enforcer". This match was a see-saw battle. When it appeared that Flair was about to apply the figure-four, Brian Pillman came to the ringside area and jumped on the apron. Flair wen t over and punched Pillman. Brian retaliated by kicking Flair in the head with his cowboy boot, setting up Flair for the DDT. Over the next month, Flair begged Sting to be his partner against Anderson and Pillman. After fighting them alone, Sting saw that Flair was a man of his word. The match was signed for Halloween Havoc.

Early that evening, Flair was supposedly attacked by Arn and Brian. When it came time for the match, Sting came to the ring alone. Sting controlled the beginning of the match but, as time went on, Anderson and Pillman took control. Then the crowd erupted as "The Nature Boy" came running down the aisle in his street clothes, with his head bandaged. When Sting was able to get to his corner and make the tag, Flair entered the ring, ran off of the ropes and nailed his partner. They triple-teamed Sting and left him lying in the ring. On their way back to the locker rooms they did an interview with Mean Gene, stating that the Horsemen were back!

---

The Road Back to the Title

At Starrcade 1995, in Nashville, Tennessee, the WCW Championship Committee decided to have a triangle match of the top contenders (the winner getting a title shot immediately after). The match was set...the winner of Sting vs. Lex Luger vs. Ric Flair woul d receive the shot a t Randy Savage's World Title. Flair started the match against Sting, then battled against Luger. Then trapped between Sting and Luger, Flair tagged in Sting to fight his best friend. Nearing the end of the match, Luger got Sting in the Human Torture Rack. When Lex lifted Sting, the ref was hit and knocked out. Flair came into the ring, clipping the knee of Luger from behind, knocking his opponents out onto the floor. Flair helped the referee up and he gave them the ten-count.

Jimmy Hart came down to ringside and offered to be in Flair's corner during the World Title match. Flair accepted. Flair and Savage battled back and forth, until the Macho Man got Jimmy Hart's megaphone. He nailed Flair on the head and climbed the ropes. He nailed a bloody Ric Flair with the flying elbow. As Jimmy Hart distracted the referee, Pillman, Chris Benoit (the newest member of the Horsemen), and Anderson entered the ring. "Double A" nailed Savage with a foreign object, and laid Flair on top for the pin. Flair was now the WCW Heavyweight Champion of the World for the third

time.

At the January, 1996 Clash of the Champions, Hogan and Savage surprised everyone with the appearance of Woman and Miss Elizabeth. Woman turned on them that night, another set up by the Horsemen. On the January 22 edition of Monday Nitro, Savage won the World Title back from Flair in Las Vegas, NV. A rematch was scheduled for Superbrawl VI, in St. Petersburg, Florida, in a steel cage. Flair came to the ring with Woman, and Savage with Elizabeth. Late in the match, Woman had Savage and the referee distracted at one side of the cage. Flair walks over to the door, to Miss Elizabeth, who gives him her high-heel shoe. Flair nails Savage and gets the pin. He leaves the ring with the World Title, Woman, and Elizabeth. Flair's fourth title reign lasted until April 22, 1996, when the Giant defeated him on Monday Nitro in Albany, Georgia.

---

1996 to Present

On Monday Nitro, Ric Flair taunted and flirted with Deborah McMichael (wife of former Chicago Bear Steve McMichael) for weeks. After this, and verbally attacking McMichael himself on several occasions, McMichael recruited Kevin Greene of the Carolina Panthers to help him battle the 4-Horsemen. The match was set - Flair & Anderson vs. McMichael & Greene.

McMichael & Greene were accompanied to the ring by Randy Savage and their wives. Flair & Anderson were accompanied by Benoit, Elizabeth & Woman (Pillman left WCW after a dispute with booker, Kevin Sullivan). About halfway through the match, Liz and Woman chased Deb orah & Greene's wife back to the locker rooms. As Kevin Greene was in the ring getting pummeled by the Horsemen, Liz and Woman came back to the ring along with Deborah McMichael. Deborah was carrying a briefcase which she handed to her husband on the outs ide of the ring. Steve opened it to find a 4-Horseman T-shirt and it was full of money. About that time Greene was crawling to the corner to get the tag. McMichael looked at his friend, looked at the money, then nailed Greene with the briefcase. Flair got the pin, then the 4-Horsemen pounded on Greene and Savage, and left them lying helpless in the ring.

Soon thereafter, Flair was awarded a shot at the U.S. Heavyweight Title. On July 7, 1996, in Daytona Beach, Florida, Ric Flair defeated Konnan to win the U.S. Title for the sixth time. All of this happened just about the same time that Scott Hall & Kevin Nash started the New World Order. The Horsemen were given the chance to destroy the NWO in the WARGAMES, but Sting & Luger asked to be part of the team so t hey could help in defeating NWO before it got too strong. Benoit and McMichael agreed to step down and let Sting and Luger be on the team. Then, at Fall Brawl, after Sting came down and entered the ring, he left his three teammates to fight four men. Luger eventually gave up and the Horsemen were cost the win because of Sting & Luger.

Flair held on to the U.S. Title for four months, until he received a shoulder injury while facing Kensuki Sasaki in Japan. In a lame attempt to make the NWO look stronger, Bischoff made it appear that Flair was attacked by the NWO on Monday Nitro. On television, He still claims that the NWO put Flair out of wrestling. Because of this injury, Flair had to vacate the U.S. Title in November of '96.

Flair had surgery to repair his shoulder and has been rehabilitating for the last three months. On the March 10 edition of Monday Nitro, during Piper's interview, the Horsemen came out and confronted Piper. Flair asked Piper to take the Horsemen as his pa rtners at Uncensored and Piper accepted. Now Piper, McMichael, Benoit & Jarrett will be the Independent team in the 12-Man match. After this match, Flair came out on Nitro, saying that Piper dropped the ball. It now appears that instead of getting his deserved shot at Hogan, he will b e stuck in a pointless feud with Roddy Piper. Let's hope that WCW thinks on this one and gives Flair a clean win over Hogan before he has to retire.

At Slamboree, in Charlotte, Ric Flair made his return to the ring. He, Roddy Piper & Kevin Greene (of the Carolina Panthers) faced Kevin Nash, Scott Hall & Syxx. In this match, Flair was in his old form. He started the match and dominated while he was in the ring. NWO took control for a few minutes, but Flair/Piper/Greene ended up on top. The match ended by Fl air applying the figure-4 on Hall, Piper applied the sleeper on Nash, and Greene powerslammed Syxx. On Nitro the next night, Flair agreed to wrestle Syxx one on one. During the match, the NWO attacked Flair. The Horsemen had been kicked out of the buildin g earlier that night, so Flair was left helpless. After the beating, Nash said he wouldn't rest until he put Flair and Piper out of wrestling. The next week on Nitro, Hall and Nash came out and said they wanted to defend the Tag Team Titles against Flair an d Piper. This match happened at The Great American Bash. During the match Flair chased Syxx back to the locker room, leaving Piper alone to be defeated by Hall and Nash.

When confronted by Piper on Nitro, Flair told him the decision he made was best for Piper, himself, and the team. The next week, Piper questioned Flair again. This time, it not only brought Flair to the ring, but also Benoit and McMichael. When Mongo and Benoit confronted Piper, The Hot Rod attacked the 2 men, leaving Flair to choose between the Horsemen or his friend. Flair went after Piper, and was knocked down...when he did his famous beg in the corner...keeping Piper distracted long enough for Mongo to nail him with the briefcase. Benoit applied the Crippler Crossface while Flair and Mongo stomped away at Piper's head. As Nitro went to a commercial, the Horsemen were leaving the ring...and Piper was out. After weeks of each member being on their own, this appears to be the rebirth of The Four Horsemen.

# Where will the Horsemen go from here?????



# EXHIBIT / ATTACHMENT

# CC

**(To be scanned in place of tab)**

# Terry Taylor







**This website is dedicated to Terry Taylor, one of the greatest athletes ever in the world of professional wrestling.**

*Real name:  Paul W. Taylor, III*

*Birthdate:  August 12, 1955 (Leos are SPECIAL people!)*

*Terry Taylor's "theme song"was...* ■ *...Freeze Frame (by the J. Geils Band)! :-)*

The first time I ever saw Terry in action was back in the early 80s through Mid-South Wrestling.  I was immediately impressed with his style.  IMO, his athletic ability outshown any others in the area. I could never say enough about how I feel towards this man!! He was most definitely the best athlete Mid-South had to offer. IMO, not only did he make a name for himself, he made a name for Mid-South :-) What a shining star! Granted Mid-South was around before TT came on the scene, but the stars were just not as bright *grin* Sorry Ted DiBiase, Paul & Terry Orndorff, Junk Yard Dog, "Hacksaw" Jim Duggan, Steve Williams, Terry Allen, The Freebirds, The Midnight Express, and yes, even The Rock & Roll Express (my very favorite tag team from MS -- I love ya, Robert & Ricky, but.....TT won hands down *grin*)!

I refer to the Mid-South/UWF era as "The Glory Days" and how I miss them!

Everything about those days was great. "Cowboy" Bill Watts, Grizzly Smith, Jim Ross, Randy Anderson, Carl Fergie, Reeser Bowden, and Boyd Pierce ruled!

Memories.......

In the fall of '85, Terry left our area for a short time to join the NWA. His fans were extremely happy to have him return to our area again!!! Not only was he a top face in the MS/UWF, I heard tell that he was also a top booker!

Terry visited World Class Wrestling for a time between UWF and WWF during which time he held the Texas Heavyweight Title from February 26, 1988 to his departure, as well as the tag team title with Iceman Parsons. I heard rumors that he ended up feuding with Kevin VonErich. I would have loved to have seen this! Dang! We didn't get the program over here :-((((( Kevin was awarded the title after Terry left that federation -- on July 4.

Terry went on to the WWF from there where he teamed up with Bobby Heenan and became "The Red Rooster" *grin* and was winning match after match. He seemed unstoppable :-) Despite the cocky attitude and his villanous style, I still loved him. Okay, I admit it -- the gimmick was not all that great (not nearly as bad as some I've witnessed); but, overlook the gimmick and take a real hard look at the athlete. WOW!!!! What a SUPERB technical wrestler! I do not remember him as "The Red Rooster" (even though he was cuter than sin!!), I remember the athlete behind the character, Terry Taylor :-) It really breaks my heart when someone bad mouths this beyond excellent athlete because of that gimmick. It was just a gimmick for goodness' sake! :-) Like it or not, **the gimmick worked** and drew tons of heat! People remember Terry Taylor :-)

In my eyes, no other single wrestler was greater. Watching Terry's greatest maneuver (the "five-arm", aka the forearm) was such a thrill. He is the master!!! I look back on my videos of so many of his matches and now I know why he suffers with terrible knees :-( Terry Taylor was a man of MANY moves from the famous five arm to sunset flips to suplexes to clothes lines to drop kicks to reverse atomic drops to the flying chicken wing and the cock of the walk (which, by the way, is now Sting's famous "Scorpion Death Lock" and Brett Hart's "Sharp Shooter"!!!!) to name a few; and when he was in the ring, there was never a dull moment. Quite the master of many great moves! More times than not, you never knew what he was going to do to his opponent next.   Watching him move was always a huge high for me.

Yes, most definitely, Terry Taylor's ring skills were the best of anyone else!  He was also excellent on the microphone; and let me not forget how good looking he is! :-) Oh, what a great "six pack" he had!!!  :-) This man had it all!  Second to his athletic abilities, he exhibited first rate CLASS!!!!  :-)

After he left Heenan's clutches (what a great show that was when Terry turned on that

moron -- Heenan plays such a great one, too, even today *grin*) and doned the red rooster comb on his head, I loved him even more :-) Once again, the gimmick was not so great, but the wrestler was better than ever before! I've read where some people claim Bobby Heenan made Terry do this, but my vintage videos prove otherwise. Terry didn't don the red comb till after he came down on Heenan and left the stable.

Terry blew a knee out in Summer Slam and needed arthroscopic surgery while in WWF but came back fighting hard :-)

The feud between Terry and Steve Lombardi (The Brooklyn Brawler) was a classic!

Terry went to the NWA/WCW upon leaving there, and I was really glad to see him back in this area of the country :-) Since I didn't have much choice in tv viewing, I chose NWA/WCW over WWF as it wasn't so much "show"; and they seemed to book more scientific wrestlers and not put on as much as WWF did :-(

Terry continued to shine ever so brightly and was soon ranked in the top 10, winning one match after another. His feud with Arn Anderson for the World Television Title was a classic...going the time limit with Arn Anderson several times, once Anderson pile drove Taylor AFTER the bell. Interference by Butch Reed and Company prevented Taylor from beating Anderson in a following match up for the title (Taylor won by DQ).

No matter where Terry Taylor was utilizing his skills in the ring, he was always a HUGE fan favorite. Thousands upon thousands of fans were always shouting his praises throughout his career -- yes, even as "The Red Rooster"! What an excellent athlete!!!!!!

Sometimes life isn't always fair! People get busy and move on, leaving their passions by the wayside on occasion. I did eventually grow extremely tired of the "show" and just gave up on wrestling totally. I regret it now since I missed so much of what happened to my favorite single wrestler :-( I never saw "Terrence Taylor" of the York Foundation (where he tagged with greats Tommy Rich and Ricky Morton), "The Taylor Made Man", or "Dr. Feel Good". Did I miss anything?? :-( I would have loved to see Terry in a mask!!! *g*

I think Terry Taylor is probably the most under-rated single wrestler ever; and I think it's sad that there aren't any websites dedicated to him. I found mention here and there but nothing really specific (as of 5-98).

I feel lucky to have seen him for so many years in person. I had lots of personal photos (one where he looks directly at me and sticks his tongue out when I said "Smile, Terry". I guess he wasn't in the mood to smile that night! (That was the first and ONLY time I ever approached him, too!!!!!) and others outside of the ring, like when the center was evacuated due to a bomb threat and he stood around talking to fans and

drinking a Diet Dr. Pepper); and I treasured them :-)  I also had photos I purchased from before I started following him (one was without blond hair -- hmmmm.....I love that blond hair!!!!).

I just treasure the superior athlete he is and wanted to create a small tribute to him.

Here are the titles he has held (There may be more but this is all I have found; and as far as I know, he never held a title in WWF or WCW. Special thanks go out to those who provided this information!!!!) -- most definitely a TRUE CHAMPION:

*NWA NATIONAL TELEVISION CHAMP*
**August, 22, 1980, Atlanta, GA**

*NWA WORLD JUNIOR HEAVYWEIGHT CHAMP*
**June 7, 1981, Roanoke, VA**

*SOUTHERN HEAVYWEIGHT CHAMP*
**November 29, 1982, Memphis, TN**

*SOUTHERN HEAVYWEIGHT CHAMP*
**February 14, 1983, Memphis, TN**

*MIDSOUTH TELEVISION CHAMP*
**June 16, 1984, New Orleans, LA**

*AWA INTERNATIONAL HEAVYWEIGHT CHAMP*
**December 30, 1984, Memphis, TN**

*MID-SOUTH TELEVISION CHAMP*
**January 2, 1985, Shreveport, LA**
**(Vacant on 3/13/85 when Taylor wins North American Heavyweight Title)**

*MID-SOUTH NORTH AMERICAN HEAVYWEIGHT CHAMP*
**March 13, 1985,  Shreveport, LA**

*AWA INTERNATIONAL HEAVYWEIGHT CHAMP*
**July 15, 1985, Memphis, TN**

*NWA NATIONAL HEAVYWEIGHT CHAMP*
**September 9, 1985, Atlanta, GA**

*UNIVERSAL TELEVISION CHAMP*
**May 25, 1986, Tulsa, OK**

*UNIVERSAL TAG TEAM CHAMP*
**With Jim Duggan, December 27, 1986,  Ft. Worth, TX**

**(Vacant on 1/23/87 after Duggan loses "loser-leaves-UWF" match to One Man Gang)**

*UNIVERSAL TAG TEAM CHAMP*
**With Chris Adams,  February 2, 1987, Ft. Worth, TX**
**(Defeated Sting & Rick Steiner in tournament final)**

*UNIVERSAL TELEVISION CHAMP*
**September 2, 1987, Lafayette, LA**

*TEXAS HEAVYWEIGHT CHAMP*
**February 26, 1988, Dallas, TX**
**(Title vacant 7-4-88 following Taylor's departure from WC.)**

*WORLD CLASS TAG TEAM CHAMP*
**With Iceman Parsons, 1988**

*NWA US TAG TEAM CHAMP*
**With Greg Valentine, February 17, 1992, Rock Hill, SC**

*BCW CAN-AM TAG TEAM CHAMPIONSHIP*
**With Cyrus, October 10, 2001, Oldcastle, ON, CANADA**

# *UPDATES/COMMENTS:* (Last updated 01-6-03)

# *INTERVIEWS/ARTICLES:* (Last updated 01-08-03)

# *PHOTOS:* (Updated 12/11/01)

# *LINKS:* (Updated 01/08/03)

# *WHO AM I?:* (Updated 12/05/02)

**If you have any memories to share of Terry Taylor's career, *please sign the guestbook.***

**Sign My Guestbook**  **View My Guestbook**

**E-mail can be sent to Terry Taylor's #1 Fan** (remove the "nospam" tag for e-mail to work)

**View Page Stats**
See who's visiting this page.



Feel free to save my banner and link to my site,
but please **DO NOT** pirate from these pages.
All of my content and my graphics are my copyright!

*This site was created May 23, 1998. Last updated January 8, 2003!*

**DISCLAIMER: This is NOT an "official Terry Taylor site"!**



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

# Kevin Nash Biography
**By Melissa Archer; The Official Website of Kevin Nash**
**(Copyright 2000 - 2002, Melissa Archer and WebKat. All rights reserved)**

"It was destiny…"

On July 9, 1959, Kevin Scott Nash made his debut into the world. The wrestling stars of that time included Lou Thesz, Bruno Sammartino, and Pat O'Connor, and professional wrestling was a long way from the sports-entertainment production it is now. Cable pay-per-view, Hummer vehicles and the Nitro girls were decades removed from the suburbs of Detroit, Michigan. In 1959, most American homes had black-and-white televisions; the average car cost less than $2,000 and the Barbie doll was the new and daring idea!

Was Kevin Nash destined to become a wrestling Superstar? In a 1997 newspaper interview, Kevin is quoted as saying, "It was destiny…I should have known I was going to be a wrestler. It fits my personality."

But was destiny already leading Kevin down its path? Shaping the boy who would become the man?

In his high school years, Kevin would go with his buddies and saw wrestlers like The Sheik, Bobo Brazil and Pampero Firpo. He had no inkling then that someday millions of fans would be screaming when "Big Sexy was in the House." The Michigan native cheered for his Detroit teams, and hockey, baseball, and basketball were the sports he followed. His future dreams were of playing on a pro basketball team. The rebellious personality demonstrated as an Outsider and Wolfpac member did not meet with appreciation in his younger years.

But the young Wolf was already asserting himself. His ways resembled that of the wolfcub.

There were times, before Kevin ran with the Wolfpac, that were more suited to an outsider or a wolf, but less than appreciated as a team player. Shooting hoops for Southgate's Aquinas High School earned him a career high of 16 points. He was on his way, the All-American Dream seemingly within reach, when he was recruited by the University of Tennessee basketball team. Kevin Nash became a starter for the UT Volunteers at center in 1979-80. He was described as a solid, hustling, and determined defensive player.

"It was time to move on," Kevin said, and move he did. He headed overseas, where for several years he played pro basketball for various European teams. Stateside, the Cleveland Cavaliers gave him a shot at training camp, but it was not to be. Kevin was waived. His basketball career ended in 1985, when he tore an anterior cruciate ligament in his knee on the basketball court in Germany.

During this period, unsure of what he wanted to do with his life, Kevin entered the United States Army where he served for two years, stationed in Giessen, Germany. He was assigned to the 202nd Military Police Company, and was known as Specialist Fourth Class Nash. Says Kevin, "The army taught me discipline, and the value of hard work."

Larger News

Multimedia

Interactive

Biography

Kevin's Forum

Nash's Domain

Fan Fun

Links Area

Site Map

F.A.Q.

All images and information contained in this website are copyrights of Kevin Nash. Any form of copying from this website is strictly prohibited unless specifically stated. See our stuff somewhere? Report it to






Case 1:15-cv-... Document... Filed 02/26/03    Page 326 of 346

















After his discharge, a bigger, stronger, bulked up Kevin Nash returned to the States. He had become as strong of body as he was of head. Those qualifications lead to jobs in bars and strip clubs as a bouncer. Dealing with scantily clad women and belligerent men... experience that would also come in handy in the future.

While working in Atlanta as a bouncer, the story goes that Dusty Rhodes discovered Kevin the bouncer and saw in him Kevin the wrestler. Nash went into the offices of Ted Turner's network, WTBS, looking for a job. "They told me I would be perfect for their wrestling shows," said Kevin, and he was enrolled at the Power Plant to train. The job of pro wrestler really appealed to Kevin Nash. "Where else can you piledrive a chief executive officer through a desk, and get away with it?" Nash said. "It's an escape. It's what every person would love to do once." At 6 ft. 11 in., and 300 lbs., he had the body. He had the attitude. He needed the gimmick.

Much later, when known as "Big Sexy", he said, "it's easy when you are being yourself. There's so much emotion involved in what we're doing." But it took Kevin a while to express himself through his character. The NWA was near its demise, having titles recently combined with the WCW. The federation was struggling against the industry giant, the WWF, and just as it took WCW a while to find its niche, Kevin struggled to find his.

One of his early appearances in the squared circle was with an orange Mohawk as a man named Steel of the tag team Master Blasters. Early in 1991, we were introduced to Oz; silver of hair but without the silver tongue much later associated with Kevin Nash. Oz was a wizard, dressed in green, and followed by a midget. It didn't take a house to land on him to be rid of this character...and as for Vinnie Vegas, a too-sweet gangster dressed pretty in pink, even being managed by friend Diamond Dallas Page didn't get Kevin the push and popularity he wanted. Vinnie Vegas worked the house show circuit for a time, and that gamble soon faded. As for Kevin, it was time to try his luck elsewhere... with another Vinnie.

Vince McMahon signed Kevin Nash with the World Wrestling Federation (WWF), and in 1993, Shawn Michaels, the Heartbreak Kid, acquired Kevin as his new bodyguard. Helping Michaels win the Intercontinental Title, and an impressive debut in the Royal Rumble the following year, Kevin began to come into his own. Big Daddy Cool and Diesel were his latest incarnations. Jet-black hair worked so much better than silver or orange, and the leather chaps were the right move towards a big and sexy image.

1994 was a great year for Kevin Nash. He proclaimed, "I think I've found my niche. I really enjoy this more than anything I've ever done. I've always been an extroverted person..." and this was "a dream job." His jackknife powerbomb made short work of his opponents. He made his mark in WWF championship history, with a 358 day reign as World Champion.

Defending his title against former tag-team partner Shawn Michaels, and against others such as Bret Hart and Davey Boy Smith, he was running amok through the WWF. The dangerous Diesel began attacking wrestlers and doing run-ins. Shawn Michaels and the Undertaker finally defeated him. It was time to move on

Nash's final match for the WWF was a steel cage match at Madison Square Garden. Diesel (Nash) and foe Shawn Michaels were joined in the ring by HHH and Scott Hall. Both Hall and Nash were departing the WWF. All close friends, they were over as enemies in the ring. They broke with the kayfabe tradition of playing to the marks, and embraced and said goodbye in the ring as









"themselves". This was unheard of in the business, and not appreciated by the WWF management. That moment of reality led to Kevin's new persona: playing Kevin Nash.

Returning to the WCW with Scott Hall, Kevin Nash made a bold statement. He announced he and Hall were "taking over" the WCW, and underscored this grand pronouncement by a powerbomb... to the executive VP Eric Bischoff, blasting his head right through a stage. It appeared that Nash meant business, and the nice guys would be finished off by the jackknife powerbomb. The heel turn of Hulk Hogan was a stunning moment, and the three introduced the New World Order.

The nWo became a very popular and profitable angle, and the WCW began to draw in more fans. New fans "discovered" wrestling, and old-school wrestling fans and defectors from other federations flocked to WCW events. The crowd turnouts, television ratings and pay-per-views ordered, along with merchandising numbers, continued to grow. So did the popularity of Kevin Nash.

The "Outsiders" shook up the WCW. The nWo split into two feuding factions; the new faction using the "Red and Black" and calling themselves the Wolfpac. Nash's success as a tag team with Scott Hall continued to draw. Syxx was inducted into "The Wolfpac", and they sought other members into the nWo. Ultimately, Buff Bagwell and Konnan were added to the faction. "Big Sexy" was the alpha wolf. Finally, Kevin Nash had come into his own.

Wrestling certainly suited Kevin's personality. All his talents and abilities, and all that he had experienced prior to this time, were apparent in "Big Sexy" the wrestler, and Kevin Nash, the man. He could work a crowd, and play on the humor and intelligence he possessed. He utilized the brains and brawn and outright rebellion that he'd exhibited back in his University days.

Nash won his inaugural World Title. With the help of Scott Hall, Kevin "Big Sexy" Nash reigned when he toppled the mighty Goldberg. At Kevin's hands, Goldberg suffered his first loss. Within days of that portentous moment at Starrcade '98, Nash gave his belt to Hollywood Hulk Hogan, symbolizing the unity and dominance of the New World Order once again.





May '99 saw Kevin reclaim the belt by defeating former friend Diamond Dallas Page. He held onto the belt for two months, then lost to Randy "Macho Man" Savage at Nitro of July 7th. That very Nitro saw Nash help Hogan defeat Savage for the belt. This interference by Nash lead to a conflict with Hogan, to be resolved at '99 Road Wild. It was a retirement match, and all expected Nash to conquer, driving the older Hogan to retirement. Instead, it was the younger Kevin who lost the match.

But the defeated wolf did not run off, submissive to the winner. Fans didn't see Nash for several months, but he wasn't really gone, just stalking the prey from afar and awaiting his opening. Establishing his dominance from behind the scenes, he was using his wit and cunning to cull the herd. Destiny may have lent a hand, as one by one wrestlers fell.

And Kevin waited and watched.

In May 2000, Kevin Nash defeated Jeff Jarrett and Big Poppa Pump and reclaimed the title. Rather than keeping it, he declared that it was rightfully held by Ric "Nature Boy" Flair, who had been stripped of the World Title due to medical problems.







The World Title changes hands, and was eventually held by Booker T. of Harlem Heat fame. With the help of Scott Steiner, Vince Russo, and Jeff Jarrett on guitar. Booker T was robbed of the title. The belt was Kevin Nash's once again, until Booker T regained it in a match against Nash in September 2000.

World Championship Wrestling was in a decline as 2000 came to a close, things were changing fast and the world was watching.

With the year 2001 came the shocking purchase of WCW by Vince McMahon of the World Wrestling Federation. Where did this leave Kevin?

The months that followed were quiet ones for Kevin Nash Fans. The remainder of 2001 saw a few television appearances, but not the regular sitings of Big Sexy in the ring that the fans were waiting so patiently for.

As 2002 came upon us, Kevin Nash became a free agent. He now could wrestler wherever he chose; if he chose to wrestle at all. The rumors started flying, the name dropping and hints were everywhere....

Fans were left wondering, yet again, what Kevin would do, and what he was up to now. Face or heel? Which alliances would hold, and which would crumble? What did the future hold for Kevin Nash?

But maybe that's how it's supposed to be, when you follow your destiny.

## Kevin's Stats

The following are the most recent physical and personal statistics for Kevin "Big Sexy" Nash. We will update this page as this info changes.

Real Name:
Kevin Scott Nash

Finishing Move:
Jack Knife Powerbomb

Height:
6' 11"

Nick Names:
Big Sexy
The Giant Killer
The Streak Ender
The Sexecutioner

Weight:
298

Birthdate:
July 9, 1959

Previous Characters:

Diesel
Vinnie Vegas
OZ
Blaster Master Steele

Pro Debut:
1990

Case 1:01-cv-01152-CC   Document 90   Filed 02/26/03   Page 329 of 346



©1998 - 2002 Kevin Nash. All rights reserved.
If making a purchase while visiting our website, you will be billed by Spartacus, Inc.

This website is protected by

**CYBERGUARDS**

Latest News | Multimedia | Interactive | Biography | Kevin's Forum | Nash Comic
Links Area | Fan Club | FAQ | Site Map

Websites by WebKai



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

You are here: Home>Wrestlers>**Paul Orndorff**



*Paul Orndorff*

**Where Wrestling's Regional History Lives!**

**Search Kayfabe Memories**

**Regional Territories** ›

This section contains monthly articles on over two dozen territories. To relive those wonderful days of old, click here.

**Wrestlers** ›

Enter this section for bios/profiles of various wrestlers from the regional days. To find more out about your favorite pro wrestler, click here.

**Stories** ›

This section contains stories from the pros themselves told exclusively to Kayfabe Memories. Want to know more as told from the wrestlers themselves? Click here.

**KM Polls and Results** ›

Click here to find the latest polls and their results.

**Old School Book Reviews** ›

Click here to find various book reviews from old school wrestlers.

**KM Links** ›

- David Stone



Very early in his career, Paul Orndorff won the prestigious North American Champion twice in 1978, winning and losing to and from "Big Cat" Ernie Ladd. Later that year, he competed in the Mid-Atlantic area. In December 1978, Paul teamed with Jimmy Snuka to win NWA World Tag Team Titles from Greg Valentine & Baron Von Raschke. They lost the belts to Baron Von Raschke & Paul Jones, April 28, 1979. Returning to Mid-South for a little while, Orndorff lost to Angelo Mosca Sr at a Superdome event on July 21, 1979. From there, Orndorff traveled to Alabama. In October of 1979, teamed with Dick Slater to win the Southeastern Tag Team Titles

In the summer of 1980, he began a feud with Ken Mantell in Mid-South. Mantell had a tradition of cutting opponents' hair. He even managed to give Orndorff an unwanted haircut. Orndorff went on to beat Mantell in a special match where Orndorff was awarded the right to use the infamous Freebird Hair-Removal Creme on Mantell's scalp. He continued his success by defeating Mantell in a rematch at the Mid-South Superdome Extravaganza August 1980 event. In November, Ernie Ladd and Leroy Brown injured Paul's brother Terry Orndorff while winning the Mid-South Tag Team Titles. Big brother Paul sought revenge, but he lost to Ladd in a "Lights out" match at the Mid-South Superdome Extravaganza November 1980.

Orndorff later returned to the Southeast Continental Area. There, he teamed up with Norvell Austin, who was then calling himself "The Junkyard Dog". They

**WHAT** *I*

**KM Replica M**

Click here to p quality replica masks of all yo old school masl wrestlers.

**KM Store** ›

**New look and products!!** Th now features p featuring the G well as some ot cool images. T new and to pur Shirts, ball cap: pads and more,

**KM Message E**

Want to chat w fans of regional This message b forums for over promotions. Cli

**KM Belt Galle**

This section cor extensive title ; gallery... image heavyweight, ta various regiona To view it, click

**Old School Ta** ›

Reviews of vari commercial tap: regional wrestli shows are avail section. To reac

For tons of links to old
school related sites, click
here.

### KM Micro Wrestlers ›

What are Micro
Wrestlers? Click here
to find out.

### KM Interviews... ›

Click here to read
exclusive interviews with
stars from the regional
territories.

### KM & Wrassle.net Present Can-Am Radio ›

In conjunction with
Wrassle.net KM presents
Can-Am Radio, featuring
streaming audio
interviews with some of
your favorite old-school
wrestlers. Click here to
listen!

View Guestbook

Sign Guestbook

www.kayfabememories.com
is © 2003 AtomDesigns. All
promotional art, characters,
logos and other depictions
are © their respective
owners. All Rights Reserved.

All contents save Wrestler
Stories are © Kayfabe
Memories.

Website designed and
maintained by AtomDesigns
© 2003 . If you experience
any problems with this site or
have any questions, please
contact the Webmaster.

defeated Dennis Condrey & Randy Rose, the eventual
first edition of the Midnight Express (which would
eventually include Austin himself), for the Southeast
Continental Tag Team Titles. Paul Orndorff came back
to Mid-South ... only to oversleep on the day of his title
shot against North American Champion The Grappler.
When substitute Jake Roberts took the belt from The
Grappler, Orndorff went berzerk. His obession with the
belt cost him his popularity with the fans. He demanded
a title shot, and beat Jake for his third North American
Title at the Superdome on July 4, 1981.  More...

here.

### KM Auctions ›

Bid once, bid tv
sorts of cool ite
days when terri
the wrestling sc
here to check o
up for auction a

### KM Hall of Fan

Kayfabe Memor
own Hall of Fan
upon by KM's v
be a part of the
Click here.



The Mag
Fo




Website designed &



Thanks for



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

# Ole Anderson

**Stats**
**Tag Teams:** Four Horsemen with Ric Flair, Arn Anderson, & Sid Vicious; Four Horsemen with Ric Flair, Arn Anderson, & Sting; Four Horsemen with Ric Flair, Arn Anderson, & Tully Blanchard; Minnesota Wrecking Crew with Arn Anderson

One of the founding members of the Four Horsemen.

Helped Ric Flair & Arn Anderson break then-Television champion Dusty Rhodes' leg, resulting in a vacation of the title.

Interfered on Ric Flair's behalf against Junkyard Dog at Clash of the Champions XI.

A member of the WCW Hall of Fame.

Father of Bryan Anderson.

**Titles held**

- NWA Atlantic Coast Tag Team title: With Gene Anderson. Defeated Johnny Weaver & George Becker (4/70). Lost to Paul Jones & Nelson Royal (9/22/70).
- NWA Florida Tag Team title: With Ron Garvin. Won in a tournament final (7/2/71). Lost to *Australians* (Larry O'Dea & Ron Miller) (8/5/71).
- NWA Florida Television title: Defeated Jack Brisco (12/16/71). Lost to Bob Roop (12/23/71).
- NWA Mid-Atlantic Televsion title: Defeated James J. Dillon in a tournament final to become the first champion (1973). Lost to Danny Miller.
- NWA Atlantic Coast Tag Team title: With Gene Anderson. Defeated Johnny Weaver & Art Neilson (1973). Lost to Thunderbolt Patterson & Jerry Brisco (1973).
- NWA Atlantic Coast Tag Team title: With Gene Anderson. Defeated Thunderbolt Patterson & Jerry Brisco (1973). Lost to Sandy Scott & Nelson Royal (1973).
- NWA Eastern States Heavyweight title: Defeated Jerry Brisco (1973). Lost to Jerry Brisco (1973).
- NWA Mid-Atlantic Tag Team title: With Gene Anderson. Won title in 1974.
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Robert Fuller & Bob Armstrong (5/31/74). Lost to Tim Woods & Mr. Wrestling II (8/2/74).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Tim Woods & Harley Race in a match where Race was paid $10,000 for defending Mr. Wrestling II's half of the Tag Team titles (8/16/74). Lost to Mr. Wrestling I & II (9/6/74).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Mr. Wrestling I & II (9/20/74). Lost to Buddy Colt & Roger Kirby (11/1/74).
- NWA Mid-Atlantic Tag Team title: With Gene Anderson. *Defeated Paul Jones & Tiger Conway Jr.* (1975). Vacated 1975.
- NWA World Tag Team titles. With Gene Anderson. Won titles. Lost to Wahoo McDaniel & Rufus R. Jones (3/76).
- NWA World Tag Team titles. With Gene Anderson. Defeated Wahoo McDaniel & Rufus R. Jones (3/76). Lost to Mr. Wrestling & Dino Bravo (1976)
- NWA World Tag Team titles. With Gene Anderson. Defeated Mr. Wrestling & Dino Bravo (7/76). Lost to Ric Flair & Greg Valentine (12/25/76).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Tom Jones & Porkchop Cash

(9/10/76). Lost to Mr. Wrestling I & II (1/14/77).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Mr. Wrestling I & II (3/77). Lost to Mr. Wrestling & Thunderbolt Patterson (4/29/77).
- NWA World Tag Team titles. With Gene Anderson. Defeated Ric Flair & Greg Valentine (5/8/77). Lost to Dick Slater & Dusty Rhodes (9/77).
- NWA World Tag Team titles. With Gene Anderson. Defeated Dick Slater & Dusty Rhodes (1977). Lost to Ric Flair & Greg Valentine (10/30/77).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Mr. Wrestling & Thunderbolt Patterson (6/77). Lost to Tommy Rich & Tony Atlas (1977).
- NWA Georgia Tag Team title: With Gene Anderson. Defeated Tommy Rich & Tony Atlas (1977). Lost to Tommy Rich & Stan Hansen (8/77).
- NWA Georgia Tag Team title: With Jacques Goulet. Defeated Tommy Rich & Stan Hansen (12/13/77). Lost to Mr. Wrestling II & Tony Atlas (2/78).
- NWA Georgia Tag Team title: With Lars Anderson. Defeated Mr. Wrestling II & Tony Atlas (3/78). Lost to Thunderbolt Patterson & Tommy Rich (3/31/78).

- NWA Georgia Television title: Won title 1978. Lost to Thunderbolt Patterson (1978).
- NWA Georgia Tag Team title: With Ivan Koloff. Defeated Thunderbolt Patterson & Tommy Rich (6/78). Lost to Thunderbolt Patterson & Tony Atlas (6/23/78).
- NWA Georgia Tag Team title: With Ivan Koloff. Defeated Thunderbolt Patterson & Tony Atlas (7/78). Vacated 11/78.
- NWA Georgia Tag Team title: With Ivan Koloff. Defeated Jack & Jerry Brisco (1/19/79). Lost to Rufus R. Jones & Norvell Austin (4/25/79).
- NWA Georgia Television title: Defeated Thunderbolt Patterson (3/2/79). Lost to Bob Armstrong (1979).
- NWA Georgia Tag Team title: With Ivan Koloff. Defeated Tommy Rich & Wahoo McDaniel (6/8/79). Lost to Tommy Rich & Stan Hansen (7/2/79).
- NWA Georgia Tag Team title: With Ivan Koloff. Defeated Tommy Rich & Stan Hansen (8/31/79). Lost to Tommy Rich & Crusher Lisowski (8/31/79)
- NWA Georgia Tag Team title: With Ernie Ladd. Defeated Tommy Rich & Crusher Lisowski (10/5/79). Lost to Masked Superstar & Austin Idol (11/25/79).
- NWA Georgia Tag Team title: With Jerry Brisco. Given Jack Brisco's half of the titles (1980). Lost to Ivan Koloff & Alexi Smirnoff (1980).
- NWA Southeastern Heavyweight title: Defeated Karl Kox (4/13/80). Lost to Karl Kox (1980).
- NWA Georgia Tag Team title: With Lars Anderson. Defeated Ivan Koloff & Alexi Smirnoff (6/8/80). Lost to Assassins (6/16/80).
- NWA World Tag Team titles. With Gene Anderson. Defeated Paul Jones & Masked Superstar (5/1/81). Vacated due to injuried Gene recieved in October '81 (12/81).
- NWA World Tag Team titles (unofficial). With Stan Hansen. Won vacant titles in a tournament final (2/82). Title vacated (1982).
- NWA National Tag Team title: With Thunderbolt Patterson. Defeated Long Riders (Scott & Bill Irwin) (1/11/85). Vacated when Patterson & Anderson split.
- NWA National Tag Team title: With Arn Anderson. Defeated Thunderbolt Patterson & Manny Fernandez to determine the new champions. Title abandoned 2/86.

## Pro Wrestling Illustrated Achievement Awards

- Second Runner-Up Manager of the Year 1990
- Third Runner-Up Tag Team of the Year 1982 (with Stan Hansen)

- Tag Team of the Year 1977 (with Gene Anderson)
- First Runner-Up Tag Team of the Year 1976 (with Gene Anderson)
- Tag Team of the Year 1975 (with Gene Anderson)

## PWI 500 Rankings

- 1991: #319

## Major Matches (NWA/WCW)

11/29/84: (Starrcade) With Keith Larsen, lost to Ivan & Nikita Koloff

7/6/85: (Great American Bash) With Arn Anderson, successfully defended the National Tag Team titles against Buzz Sawyer & Dick Slater

11/28/85: (Starrcade) With Arn Anderson, defeated U.S. National Tag Team champions Wahoo McDaniel & Billy Jack Haynes

7/1/86: (Great American Bash Tour) With Arn Anderson, lost a cage match to Road Warriors (Hawk & Animal)

7/9/86: (Great American Bash Tour) With Arn Anderson, lost a cage match to Dusty Rhodes & Hawk

7/23/86: (Great American Bash Tour) With Arn Anderson, battled to a double-disqualification with Rock 'n' Roll Express (Robert Gibson & Rick Morton)

7/25/86: (Great American Bash Tour) With Arn Anderson & Tully Blanchard, lost a cage match to Dusty Rhodes & Road Warriors

8/2/86: (Great American Bash Tour) With Arn Anderson, lost a bunkhouse match to Rock 'n' Roll Express

11/28/86: (Starrcade) With Arn Anderson, lost to World Tag Team champions Rock 'n' Roll Express

4/10-11/87: (Crockett Cup) Defeated Bubba Rogers in a non-tournament match

7/2/87: (Great American Bash Tour) With Ric Flair, Arn Anderson, & Lex Luger, lost to Superpowers (Dusty Rhodes & Nikita Koloff) & Road Warriors

7/31/87: (Great American Bash Tour) With Ric Flair, Arn Anderson, Lex Luger, & War Machine, lost a war games match to Super Powers, Road Warriors, & Paul Ellering

2/6/90: (Clash of the Champions X) With Ric Flair & Arn Anderson, defeated Great Muta, Dragon Master, & Buzz Sawyer in a cage match

2/25/90: (Wrestle War) With Arn Anderson, lost to World Tag Team champions Rick & Scott Steiner. He was pinned by Rick.

[To the Index]



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**



web hosting ◆ domain names ◆ email addresses ◆ related sites

# The Arn Anderson Biographical Page

- **Height:** 6'1"
- **Weight:** 263 lbs.
- **Birthday:** 09/20/58
- **Bicep:** 19"
- **Chest:** 56"
- **Thigh:** 29"
- **Hometown:** Minneopolis, Minnesota
- **Patned Finishers:** ~~Gourdbuster~~, DDT, Spinebuster
- **Favorite Tag Team:** Midnight Express
- **Nickname:** Double A, The Enforcer
- **Favorite Wrestler:** Ric Flair
- **Favorite Partner:** Tully Blanchard
- **Injuries:** Neck, Groin
- **Favorite Actor:** Jack Nicholson
- **Favorite Movie:** *One flew Over the Cuckoo's Nest*
- **Favorite Band:** Led Zepplin
- **Favorite TV Show:** *Married with Children*
- **Favorite Song:** Stairway to Heaven
- **Favorite Food:** Grilled Seafood
- **Greatest Match:** Original War Games
- **Favorite Clothes:** Blue Jeans
- **Favorite Color:** Black?
- **Favorite Car:** Mercedes
- **Favorite Finisher:** Gourdbuster
- **Toughest Opponent:** Ric Flair
- **Most Embarassing Loss:** Losing TV Title against the Renegade
- **Currantly Living at:** Charlotte, North Carolina
- **Wrestling Debute:** January, 1982
- **First Opponent:** Bob Armstrong (lost)
- **Announced Retirement:** August 25th, 1997



# Classical Arn Anderson Matches

- Wahoo MacDaniel via. Gourdbuster
- The Great Muta via. Spinebuster
- Tully Blanchard def. Arn via. Slingshot Suplex
- Tully Blanchard via. Gourdbuster
- Dusty Rhodes def. Arn via. Bionic Elbow
- Dusty Rhodes via. DDT
- Tom Zenk via. Spinebuster Slam
- Johnny B. Badd via. DDT
- The Renegade def. Arn via. Backbreaker
- Hulk Hogan via. Shoe to the Head
- Larry Zbyszko via. DDT of DOOM
- Larry Zbyszko def. Arn via. Checkmate
- Johnny B. Badd via. Spinebuster

Arn Anderson. The Enforcer. Double A. The names bring an image to mind, the image of the true warrior, the professional's professional wrestler. When I decided to a tribute to this man, I wondered what would be fitting, as this man deserves as much, if not more, attention and praise than any other professional wrestler. Arn personifies a professional wrestler in my opinion. As he once said, "I just wear a pair of wrestling trunks and a pair of wrestling boots. Plain and simple. What you see is what you get. No Hollywood here...once you take off

the costume, now you've gotta win the match. And there's winners and there's losers...my performance speaks for itself. My credibility is based on my performance nightly over a long period of time." Those words speak volumes. Unlike many of his present day cohorts, Arn has never needed a special gimmick or costume to get himself over. His actions in the ring an on the mike make Arn one of our generation's greatest pro grapplers. I only hope, that my words, and the contents of these pages, can come close to paying the tribute this man deserves.

Born September 20, 1958, Arn made is professional wrestling debut in January 1982. After some time spent earning his stripes, Arn began to make one of the greatest impacts on pro wrestling in the summer of 1985. It was then that his "cousin" Ole Anderson, who at the time was NWA National Tag Team Champions with Thunderbolt Patterson, informed Thunderbolt that Ole was going to bring in his cousin, Arn, to be his new partner. After disposing of Thunderbolt in the soon to be famous Horsemen way, Ole and Arn joined forces to be the new Minnesota Wrecking Crew. In due time, Ole and Arn joined forces with the Nature Boy Ric Flair and Tully Blanchard, who brought along his manager, James J Dillon to form the Four Horsemen, a name JJ coined. Their mid-80's battles with the likes of Magnum TA, Dusty Rhodes, Barry Windham, Jimmy & Ronnie Garvin, and a multitude of others firmly established the Horsemen as the most hated and despised stable in pro wrestling. Not always at the forefront, Arn began to slowly take control as the Enforcer of this group; always there to protect Ric Flair and his heavyweight gold whenever the moment called for it. This was his sacrifice, never out for personal glory; Arn always made sure that the belt remained where it belonged. As long as the Flair held the belt, then the Horsemen held it, and as a primary member, so did Arn.

Gold did find it's way around Arn's waist on more than one occasion. In January 1986, Arn defeated Dusty Rhodes to garner his first major title, the TV Championship Belt. Over the years, Arn would acquire this particular belt three more times; in January 1990 when he beat The Great Muta, in January 1991 where his victory over Tom Zenk made a three-peat and then lastly, in January 1995 with a win over Johhny B. Badd. But, and I find this apropos, Arn probably got a lot of notoriety as a member of the World Tag Team Champions. His first stint holding a belt of this nature occurred on September 29, 1986, when along with his partner, Tully Blanchard, and some unrequested assistance from the Midnight Express, they defeated the Rock 'n' Roll Express to win the belts. After losing the belts, Arn and Tully regained them in April of 1988 by defeating Barry Windham and Lex Luger. By December of that same year, Arn and Tully had joined the WWF, by far, the most popular of the wrestling organizations at the time, and called themselves the Brainbusters. During their stint there, Arn and Tully captured the WWF World Tag Team Belts with a victory over Demolition. Finally, in 1990, Arn returned home, back to what was now called World Championship Wrestling. In September 1991, Arn, along with new partner Larry Zbyszko, captured the tag straps by winning the tag team tournament with a defeat of Rick Steiner and Bill Kazmaier in the finals. Then, in January of 1992, Arn again won the tag belts, and again, with a new partner, Bobby Eaton. This time they beat Ricky Steamboat and Dustin Rhodes, now the infamous Goldust. Arn's latest reign as Tag Team Champ came in August 1993, when along with yet another new partner, Paul Roma, they defeated Steve Austin and Brian Pillman. It is fitting of this man, that he could and did win the tag straps so many times and with so many different partners. The one constant always remained the same, Arn Anderson was a part of the winning team.



**Back to Trademark Finishers**

You Are Fan ▮▮▮▮▮ Since 10/9/99 times.

**FORTUNECITY**
**web hosting** • **domain names**
Powered by **Ampira**

**Back to Trademark Finishers**



# EXHIBIT / ATTACHMENT

## HH

(To be scanned in place of tab)



Wrestling News, Analysis and Commentary

**Want to make this site a better place?**

News -/- Recaps -/- Columns -/- Features -/- Reference -/- Archives -/- Interact -/- S

# tions

**MAIN PAGE**

**NEWS**
Ticker
Daily Onslaught

**RECAPS**
RAW
SmackDown!
NWA-TNA
PPV
Heat
Excess
Jakked/Metal
Byte This
Other

**COLUMNS**
SK Rants
2 Out of 3 Falls
Devil's Due
The Little Things
Smarky Awards
Timeline
The Mac Files
Circa
Title Wave
Sq'd Circle Jerk
Obtuse Angle
TWiFW

**FEATURES**
Interviews
Year in Review
Monday Wars
Road to WM

**REFERENCE**
Title Histories
Real Names
PPV Results
Smart Glossary
Birthdays

**ARCHIVES**

**INTERACT**
Polls/Ratings
Message Boards
Live Chat

**SITE INFO**

CIRCA
# Black History Month:
# Pro Wrestling's Black Stars, Part 2

*February 12, 2002*

**by Denny Burkholder**
**Exclusive to OnlineOnslaught.com**

This is Part 2 (of 4) in Circa's look at the history of black performers in pro wrestling, in recognition of Black History Month in the United States. If you missed the first installment highlighting the pioneering black pro wrestlers of the late1800s and the early twentieth century, just click the link at the bottom of this column.

While the men in Part 1 broke the barrier for black performers when racism and segregation were still major roadblocks to success, the following wrestlers stormed the gates and became superstars themselves in the 1960s and 1970s.

## The 1960s & 1970s

### ABDULLAH THE BUTCHER

One of the most bloodthirsty and sadistic wrestlers in the history of the business, Abby (Larry Shreeve) has been wowing crowds and inflicting brutality on opponents since 1958. With forks, pencils, chairs, and anything else he can grab, he has made mincemeat out of some of the biggest names in wrestling.

The mammoth "Madman from the Sudan" is legendary in the U.S., Canada, Puerto Rico and Japan for his classic battles with the likes of Bruiser Brody, The Sheik, Dusty Rhodes, and Carlos Colon. A hardcore wrestling icon, Abby was what hardcore wrestling fans flocked to while guys like New Jack were still in elementary school.

After an amazing 44 years in the business, Abdullah the Butcher still wrestles occasionally. When he's not tenderizing the scalps of his opponents with kitchen utensils, Abdullah enjoys digging into a hot meal at his restaurant in Georgia.

### ERNIE LADD



The L
Zelda
Nintenc
New $4

PROM
DISC
Nintenc

Grand
Rocksta

Poker
Nintenc

Comr
Conqu
Electror

Poker
Sappl
Nintenc

Sony
Sony C
(Pnce
Priva

Case 1:01-cv-11152-CC    Document 90    Filed 02/26/03    Page 344 of 346

Contact
OO History



Hi
Even $1 can help
keep OO alive!

**Click to Give**
fully refundable

amazon honor system
Learn more



amazon.com.

If you attend a live
show, or have any
other news for us, just
send an e-mail to this
address! We'd also
love to hear from you if
you've got suggestions
or complaints about
the site... let us have
it!



Got
a minute?



amazon.com.

Sex, Lies, and
Headlocks

Used $10.00!

(Prices May Change)
Privacy Information

Standing an imposing 6'9" and weighing 325 lbs., "Big Cat" Ernie Ladd was a two-sport star, excelling in both pro football and wrestling. Ladd played professionally for the San Diego Chargers, Houston Oilers and Kansas City Chiefs in the 1960s before leaving football for the improved financial opportunity (believe it or not) of pro wrestling. In 1966, Ladd was the highest paid lineman in the NFL, at the same time he was making his mark as a main event wrestler.

Initially teaming with Bobo Brazil, Ladd soon turned on Brazil and began an impressive run as an arrogant, outspoken heel. With the size and athletic ability to back up his boasts, Ladd earned his first world title shot against NWA kingpin Lou Thesz in 1963 after only two years as a pro.

Though Ladd never won a major world title, he spent the 70s terrorizing the best of the NWA and WWF, including Bruno Sammartino, Gene Kiniski, Andre the Giant and Gorilla Monsoon. Many of the top babyfaces in wrestling felt the wrath of Ladd's taped thumb to the throat - a gimmick he borrowed from "Crazy" Luke Graham.

"I had a great enjoyment for wrestling," Ladd said in a Circa interview last February. "The people are matters of feet away from you. You can entertain people close-up. You can look at them, in people's eyes. In a football stadium, the people sitting up in the crow's nest, you can never see them up there. Let alone, you can't see the people in the front row seats because you're too focused on the football field. But as a wrestler, the people at ringside, you can look in their eyes and see the anger, and the frustration, and the joy. That's everything. And as a wrestler, it's your job to raise the level of intensity, to raise the level of joy, and it takes a rare professional to be able to do these things. And I was very good at it."

Ladd retired from wrestling in 1984, and has recently helped out on the successful U.S. presidential campaign of George W. Bush.

## THUNDERBOLT PATTERSON

Thunderbolt Patterson was a big star in southern wrestling promotions from the 1960s through the 70s and 80s, particularly the NWA and Georgia. Although Patterson held the Georgia TV title in 1979, he was much more accomplished in the tag ranks, winning multiple titles with partners such as Tony Atlas, Jerry (or "Gerald") Brisco, and Tommy Rich.

Those familiar with the genesis of the original Four Horsemen group in the NWA in 1985 will recall that Thunderbolt Patterson was the first wrestler ever double-crossed by the Horsemen (which, in a way, is an honor in itself). Patterson and Ole Anderson were the NWA National tag team champs at the time, until Ole swerved T-Bolt by making Arn Anderson his new partner and joining Tully Blanchard and Ric Flair as the Horsemen.



O
hea

RAW Sa
Wra

RAW I
Circle

Heat
D'Partu

OO: D'L
Valenti

Crashi
Remen

Video R
Ir

SD! Re
th

Obtuse
We

NWA-T
(and I

OO: R
Perfect

SPECIA
Hart on

Smarkie
!

RAW Re
Gone...

RAW S
Coach

OO: Bi
Jones'

Heat R
Yo

OO:





WWE - Hardy
Boyz - Leap
of Faith

Used $15.99!

(Prices May Change)
Privacy Information

**Apparel**
& Accessories



**Apparel**
& Accessories



Week

Crashi
YOU G

SPECIA

NWA-Th

The Ob
G

OO: V

OO RA
Zilla V

RAW S



> LE.

**Earn**
**a new**

Swerves aside, T-Bolt was not in the company of men like Flair, Anderson, and Brisco by accident. He was indeed a top-notch superstar, leaving behind scores of satisfied fans wherever he performed.

## PORKCHOP CASH

Porkchop Cash made his presence felt in the 1970s and 1980s as a predominantly tag team wrestler in NWA territories. Cash broke out in 1974 and 1975 by winning the NWA America's tag titles with Manny Soto and S.D. Jones, respectively. Cash also enjoyed tag title reigns with Jay Youngblood, King Parsons, Ken Timbs, Gorgeous George Jr. and Troy Graham (as Jimmy Hart's original Bruise Brothers duo in Memphis in 1982). He also won the occasional singles title, including the NWA America's title in 1974 and the Central States title in the 1980s. Cash is now retired.

## ROCKY JOHNSON

Rocky Johnson, who has recently fallen into the shadow of his "electrifying" son, The Rock, was a phenomenal talent in his own right. With a killer physique and sharp-edged sideburns (sound familiar?), Johnson was a hit with female fans. But he was all business in the ring.

The elder "Rock" made his ring debut in 1964. In the mid-70s, Johnson was a top-ranked contender to the NWA world title, getting numerous title shots at champs such as Terry Funk and Harley Race. As Sweet Ebony Diamond (under a mask) in 1981, he held the NWA TV title. Johnson's WWF tenure peaked with a tag team title reign with Tony Atlas in the early 1980s. Those who angered "Soul Man" Johnson, who was also a former boxer, usually caught a smackdown from one of the stiffest right hands in the business.

Today, Johnson is retired from wrestling and living in Davie, Florida.

## KAMALA

Kamala stands 6'7", and has reportedly weighed anywhere between 350 and 400 lbs. He debuted in 1974 and worked under the moniker "Sugarbear Harris" before finding his niche as Kamala. The Ugandan Giant has mixed it up with the biggest and best, including classic matches with Andre the Giant, Magnum T.A., The Von Erichs, Hulk Hogan and many others. Kamala was wild and unpredictable in his prime, making him a feared opponent for any babyface to grapple with.

Younger fans might remember Kamala most for his early-1990s stint in the WWF as a babyface managed by Slick, or from a brief 1995 WCW tenure as a heel adversary to Hulk Hogan. Kamala has wrestled sporadically in the past few years, including a return to the WWF for the Wrestlemania X-7 gimmick battle royal in 2001.

## CHARLIE COOK

Charlie Cook was a top babyface in Florida Championship Wrestling in the late 1970s and the 1980s. He aligned himself with the likes of Mike Graham and Barry Windham against veterans like Dory Funk, and newcomers such as David Von Erich, Jake Roberts, and Roddy Piper. Florida was a hotbed for pro wrestling during this period, hosting a large number of soon-to-be-legends and promising rookies. Charlie Cook was an integral part of Florida wrestling during this exciting period.

## SONNY KING

Sonny King was a babyface in the early-1970s WWWF. He tasted gold in May 1972 when he and Chief Jay Strongbow wrested the WWWF tag team titles away from Baron Scicluna and King Curtis.

King also made the NWA rounds, winning the Southern tag titles with Frank Morrell in 1980. Unfortunately, King would suffer a serious injury due to a stabbing incident outside the Charlotte Coliseum in North Carolina in early 1982. He was able to return to wrestling in Memphis later in the year, where he served as manager for The Samoans and Arn Anderson, among others.

Some of the wrestlers listed in the "Pioneers" section were active through the 1970s as well - in fact, some were active the whole decade, and some are still active to this day in some capacity. The latter half of the 1970s saw the ring debuts of a new crop of black wrestlers who would go on to become some of the biggest stars of the 1980s.

*[Note: This tribute is by no means an exhaustive list of every black performer in pro wrestling's long and storied history. Exclusions are unintentional and were not done out of spite, but rather in the interest of keeping this already-large column to a respectable size. I apologize in advance for any omissions, and I welcome your feedback.]*

---

**Circa's Tribute to Pro Wrestling's Black Stars**
**Pt.1, the Pioneers -/- Pt. 2, the 60s & 70s -/-**
**Pt. 3, the 80s -/- Pt. 4, the 90s and Beyond**

---

**E-MAIL DENNY**
**BROWSE THE CIRCA ARCHIVES**




Harry Potter and The Chamber of Secr...
Daniel Radcliffe
New $17.97!
40% off


Sweet Home Alabama
Andy Tennant
New $13.80!
35% off


The Bourne Identity
Matt Damon
New $12.99!
35% off