# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 19 2003

LUTHER D. THOMAS, Clerk

By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CLAUDE PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO. 1:01-CV-1152-CC |
| | ) | |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) | |
| TURNER SPORTS, INC., TURNER | ) | |
| ENTERTAINMENT GROUP, INC., and | ) | |
| TURNER BROADCASTING SYSTEM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff Claude Patterson's Response to Defendants' Motion
for Summary Judgment fails to raise any disputed issue that would
require denial of Defendants' motion. Instead, Patterson seeks to
create the false appearance of a jury question by misrepresenting
facts, making unsubstantiated assertions, contradicting his own
prior testimony and relying on documents and alleged statements
that are time-barred and that have **no relationship whatsoever** to
Patterson's own claims. Patterson's assertions of discrimination
are baseless -- each of his claims fails as a matter of law.

Patterson's race discrimination claims fail because: (1) most
of the actions allegedly taken by WCW that Patterson contends
support his claims for discrimination are barred by the applicable
statute of limitations; (2) Patterson was not qualified for the

creative writing opportunities that he claims he was denied; (3) Patterson has not established that similarly-situated whites were given the positions on the creative team about which he complains; and (4) Patterson has not established that he was subjected to a racially hostile work environment at WCW.

In an attempt to salvage his unsubstantiated individual claims, Patterson misrepresents his efforts at seeking opportunities with WCW and references numerous irrelevant statements allegedly made by WCW employees in relation to WCW wrestlers or trainees. Patterson's one-size-fits-all approach to establishing intentional race discrimination, which is based solely on unsupported, self-serving assertions, reliance upon inadmissible testimony, and misleading attempts to unfairly portray WCW as an evil entity, is unavailing and does not salvage Patterson's discrimination claims.[1]

Patterson's state law claim for intentional infliction of emotional distress fails because, by Patterson's own admission, he bases this claim entirely on the same facts as his discrimination claim, which is insufficient to establish an intentional infliction claim under Georgia law.

---

[1] Defendants are also entitled to summary judgment on Patterson's age discrimination claim because Patterson does not even seek to proffer any evidence in support of this claim or establish that there is any genuine issue for trial.

Because the undisputed evidence of record demonstrates that Patterson cannot establish all of the essential elements of his claims, Defendants' Motion for Summary Judgment should be granted as to all of Patterson's claims.

ARGUMENT AND CITATION OF AUTHORITY

**I.   PATTERSON'S CLAIMS BASED ON EVENTS OCCURRING PRIOR TO MAY 4, 1999 ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.**

Patterson's discrimination claims arise only as a result of: (1) WCW allegedly denying Patterson **one** position as a wrestler manager in the "1994-1995 timeframe" and (2) WCW allegedly denying Patterson's **single** request for a position as head of the creative team in 1999.  Despite Patterson's vague and unsubstantiated assertions that he sought unspecified positions with WCW on "various occasions" (Patterson Br. at 3), any claim of discrimination that arises based upon conduct that allegedly occurred more than two years prior to the filing of this lawsuit is barred by the statute of limitations applicable to § 1981 claims. See Butler v. Matsushita Comm. Indus. Corp. of U.S.A., 203 F.R.D. 575 (N.D. Ga. 2001).  Because Patterson filed this action on May 4, 2001, any claims based on events prior to May 4, 1999 are barred as a matter of law.  Id.  Specifically, Patterson's claim that WCW failed to hire him as a wrestler manager in the "1994-1995 timeframe" is untimely.

Although Patterson attempts to mask his time-barred failure to hire claim by citing reams of irrelevant facts and evidence, Patterson never disputes that his claim that WCW failed to hire him as a wrestler manager occurred outside of the relevant statutory period. Rather, Patterson conclusorily asserts that this untimely failure to hire claim is saved by the continuing violation doctrine. Patterson's assertion is frivolous.

The continuing violation doctrine does not give a second chance to an individual who allows a legitimate claim to lapse. National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2072 (2002). Discrete discriminatory acts, such as a failure to hire, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. Because each "discrete discriminatory act starts a new clock for filing charges," any failure to hire claim by Patterson based upon conduct that occurred prior to May 4, 1999 is time-barred and fails. Id.

Patterson's assertions that the continuing violation doctrine should apply because WCW never conducted a formal application procedure in which it considered Patterson for the wrestler manager position, and because Patterson was never notified that he would not receive the position, do not save his claim. (Patterson Br. at 18-19). This is because Patterson's own testimony contradicts his arguments and conclusively establishes that his 1994-1995 claim is

4

time-barred.   Patterson acknowledged in his deposition that Eric

Bischoff communicated to Patterson WCW's rejection of him as a

wrestler manager in 1995.   (Patterson Dep. at 93-94).   Moreover,

when Patterson was asked during his deposition whether "he knew

then [in 1995 when he was rejected for the position] that he was

being discriminated against," Patterson emphatically replied, "Yes.

What do you think?   That was very obvious wasn't it?"   (Id.)   Thus,

by Patterson's own admission, **he believed in 1995** that he had been

rejected for a position and that he allegedly had been

discriminated against.   Patterson's proposed rationale for applying

the continuing violation doctrine in his case thus collapses under

the weight of his own testimony and dooms his claim.[2]

    Because Patterson's claim that WCW failed to hire him as a

wrestler manager in the 1994-1995 timeframe is barred by the

applicable statute of limitations, only his claim that WCW failed

to hire him as head of the creative team in 1999 may be considered

---

[2] Patterson's reliance upon Alexander v. Local 496, 177 F.3d 394
(6th Cir. 1999), is misplaced.   In Alexander, the Sixth Circuit
held, in a class action lawsuit, that the continuing violation
doctrine may be applied to save untimely discrimination claims of
certain plaintiff class members, where the employer uses
established employment policies to further a pattern and practice
of discrimination.   See id.   However, since Alexander was decided,
the Supreme Court has held that, regardless of whether an alleged
discriminatory action is taken in furtherance of an alleged
discriminatory policy, such action must fall within the limitations
period to be actionable.   National Railroad, 122 S. Ct. at 2072.
Because WCW rejected Patterson for a wrestler manager position in
1995, his failure to hire claim is untimely and fails.

in analyzing Patterson's claims of discrimination. As demonstrated below in Section II, this claim also is baseless.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED ON PATTERSON'S § 1981 CLAIM.

As to Patterson's remaining § 1981 failure to hire claim, Patterson has not presented and cannot present any evidence of discriminatory conduct against him by WCW. In fact, the undisputed evidence of record establishes that Patterson was not hired for the head position on the creative team in 1999 because he was not **qualified for the position**. Because Patterson is unable to articulate a cogent analysis of his failure to hire claim under **any** legal theory, Patterson makes much of the fact that race discrimination may be established using one of a number of methods: the direct evidence method, the McDonnell Douglas proof scheme, or by showing a pattern and practice of discrimination through the use of statistics and anecdotal evidence. However, Patterson has failed to establish a discriminatory failure to hire under *any* of these theories.

### A. Patterson Has Failed To Present Direct Evidence Of Discrimination.

Patterson claims to possess direct evidence of discrimination, but then proceeds to recite random and inadmissible testimony, undistinguished by time, place or context, relating to comments allegedly made by Terry Taylor, Eric Bischoff, Arn Anderson, and

Jody Hamilton, none of which have any relationship whatsoever to Patterson or his claims. (Patterson Br. at 3-13). Recognizing this disconnect, Patterson attempts to shoehorn this irrelevant and incompetent testimony into the direct evidence framework by claiming that it is evidence "of a fundamental belief that African-Americans, as a class, were not as suited for the wrestling business as Caucasians." (Patterson Br. at 28). None of the testimony Patterson cites supports this conclusory statement. (Patterson Br. at 3-6; 9-13). Further, Patterson has not presented any evidence that could possibly serve as direct evidence of discrimination against **him**. In fact, the statements to which Patterson points in support of his claim have no connection whatsoever to Patterson's individual discrimination claims, are time-barred as a matter of law, or allegedly were made by WCW employees who lacked decision-making authority.

For example, as purported direct evidence of discrimination, Patterson points to an alleged statement by Eric Bischoff **in 1995**, in which Bischoff allegedly told Patterson that WCW did not need "niggers." (Patterson Br. at 4). Even assuming, arguendo, that Bischoff in fact made this statement (which Bischoff denies), this statement is not "direct evidence" of discrimination against Patterson and has no bearing whatsoever on Patterson's claims.

First, Bischoff purportedly made this statement **six years** before Patterson filed a claim of discrimination, and any claim of discrimination based on this statement is therefore barred by the applicable statute of limitations. See Alexander v. Fulton County, GA, 207 F.3d 1303, 1346 (11th Cir. 2000).

Second, this alleged statement **from 1995** in no way establishes that Bischoff made any decisions relating to Patterson being hired or considered for head of the creative team **in 1999.** "Isolated or stray comments . . . completely unrelated to the challenged employment action do not constitute direct evidence of discrimination." Plaisance v. Travelers Ins. Co., 880 F. Supp. 798, 810 (N.D. Ga. 1994), aff'd, 56 F.3d 1391 (11th Cir. 1995). In fact, the uncontroverted evidence of record establishes that Bischoff was no longer employed with WCW at the time that Patterson sought the creative position. (Bischoff Dep. at 51).

Patterson also relies on irrelevant statements allegedly made by Joseph Hamilton, Arn Anderson, and Terry Taylor as purported "direct evidence" of discrimination against Patterson. (Patterson Br. at 3-13; 26-28). Again, none of these alleged statements have any bearing on Patterson's claims because there is no evidence that Hamilton, Anderson, or Taylor was involved in any way in WCW's decision not to hire Patterson to head the creative team in 1999, or that any of these individuals took any adverse action against

Patterson with regard to employment opportunities with WCW. See
Standard, 116 F.3d at 1330 (establishing that racist remarks by
non-decisionmakers do not constitute direct evidence of
discrimination); Plaisance, 880 F. Supp. at 810. Because Patterson
has failed to establish "the requisite nexus between the alleged
[statements] and the defendants' decision" not to hire him as head
of the creative team, he has failed to offer direct evidence of
discrimination. Williams v. Mead Coated Bd., Inc., 836 F. Supp.
1552, 1571 (M.D. Ala. 1993), aff'd, 41 F.3d 668 (11th Cir. 1994).

## B. Patterson Cannot Establish Race Discrimination Under The McDonnell Douglas Framework.

### 1. Patterson Has Not Established A Prima Facie Case Of Failure To Hire.

Patterson cannot prove race discrimination under the McDonnell
Douglas framework because Patterson cannot establish that he was
otherwise qualified for the creative staff position that he sought,
or that such a position was available, which are essential elements
of his prima facie case of discriminatory failure to hire. The
record is devoid of any competent evidence that Patterson was
**qualified** for the position about which he complains. Further, the
uncontroverted evidence demonstrates that the position was filled
at the time Patterson pursued the opportunity.

As Defendants explained in their Initial Brief, demonstrated
knowledge of the professional wrestling creative process and

demonstrated creativity in developing, writing, promoting, and/or producing professional wrestling storylines were essential prerequisites to receive opportunities to lead the creation and writing of televised wrestling programming for WCW.  (Mem. of Law in Support of Defs.' Mot. for S.J. (hereinafter "Initial Brief") at 14).  WCW also explained that Patterson was not qualified to receive any such opportunity in 1999 for several reasons.  First, Patterson had been far-removed from the wrestling industry for almost **fifteen years** at the time that he sought a position as the head of WCW's creative team, and the business had changed drastically during the years of Patterson's separation from the wrestling industry.  For example, unlike when Patterson was a successful professional wrestler, in the late 1990s when Patterson sought to become WCW's creative head, WCW no longer relied on regional promotions; rather, WCW relied heavily on nationally televised events and promotions to garner revenue.  (Bischoff Dep. at 14-15; 157-58; Myers Aff. ¶ 4).  Patterson had no familiarity with this aspect of the wrestling business, and J.J. Dillon was aware of that fact when he informed Patterson during a lengthy telephone conversation that WCW would not be able to hire him as head of the creative team.  (Dillon Dep. at 206-09).

Second, Patterson was not qualified to serve as head of the creative team because he had **never** been involved in the creative

side of scripting and writing wrestling events **in any capacity**.
(Dillon Dep. at 207, 211, Exh. 54).  More importantly, the
uncontroverted evidence of record establishes that Patterson had no
experience whatsoever creating, promoting, or writing <u>televised
wrestling programs</u>, let alone television programs at the level of
sophistication of WCW's programs in 1999.  (Id.)

Even if Patterson had been qualified to handle such a
position, there is no evidence that WCW was seeking or had
available any such position at the time Patterson spoke with J.J.
Dillon in 1999.  In fact, only shortly before Patterson's telephone
discussion with Dillon, WCW had contracted with an individual
(Vince Russo) from a rival wrestling organization, who had
significant, on-point experience and a successful track record in
writing television programming, to lead the creative writing team.[3]
(Patterson Dep. at 98; Russo Dep. at 15, 23-26; 48).  Thus, WCW had
no need to consider Patterson for a position that was already
occupied by someone with vastly more qualifications and experience
than Patterson had (which was none).  Because Patterson has failed
to establish that he was in any way qualified for the type of
position that he was seeking or that any such position was

---

[3] Ed Ferrara, who also worked as a creative writer with Russo at
WCW's rival organization prior to coming to WCW, came to WCW to
serve as Vince Russo's assistant.  (Russo Dep. at 59).

available, Patterson cannot establish a prima facie case of discrimination.

In an apparent acknowledgment of his inability to establish his prima facie case, Patterson now belatedly claims for the first time in his Response Brief that he would have accepted any position with WCW (Patterson Br. at 17), and argues that because WCW used an informal process for selecting wrestlers, he is entitled to recover for alleged discrimination regarding positions for which he never applied or communicated any interest to WCW decision-makers. (Patterson Br. at 18). Patterson's generalizations are unsupported by the facts and misstate applicable law. First, despite Patterson's recent assertions to the contrary, the uncontroverted evidence of record establishes that Patterson **only** sought positions with WCW as a wrestler manager outside of the limitations period, and sought **only** one position with WCW as head of the creative team. (First Amended Compl. ¶¶ 50-63; Patterson Dep. at 75, 84, 92, 95-99; Dillon Dep. at 206-09). Patterson's after-the-fact attempts to contradict and supplement the record evidence with his own self-serving assertions are at best disingenuous, and cannot create an issue of fact for summary judgment. See Van T. Junkins & Assocs. v. U.S. Indus., 736 F.2d 656, 656 (11th Cir. 1984) (holding that a party cannot create an issue for summary judgment with an affidavit that contradicts prior testimony without giving any valid

explanation); First Union Discount Brokerage Servs., Inc. v. Milos,
744 F. Supp. 1145, 1152 (S.D. Fla. 1990) (explaining that a party
is required to raise issues promptly and cannot raise an argument
for the first time in opposition to a motion for summary judgment).

Second, Patterson's assertion that WCW somehow had a duty to
consider him for positions for which he had not even applied and in
which it had no reason to know that Patterson had an interest is
nonsensical and contrary to established law.  See Huchzermeyer v.
AT&T Communications, 746 F. Supp. 99, 102 (N.D. Ga. 1990)
(explaining, in a case in which an employer had no formal
application process, that the plaintiff had met the application
requirement of his prima facie case because, although the plaintiff
never formally applied for the position at issue, he had "clearly
indicat[ed] his interest" in the position to the employer).  The
law does not impose upon WCW or any other employer the impossible
burden of considering individuals who have expressed no interest in
applying, or who have no affiliation whatsoever with the
organization, for positions within the organization.  See id.
Patterson's assertion to the contrary is a futile attempt to
circumvent the requirement of establishing all elements of his
prima facie case, and fails entirely.

Patterson has also failed to make out a prima facie case of
discriminatory failure to hire because he cannot establish that

"similarly situated or less qualified" individuals were hired for the position about which he complains.  See Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1308 (M.D. Fla. 2002).

Patterson summarily argues that he was somehow similarly-situated to certain Caucasian members of the creative team, such as Kevin Sullivan, Terry Taylor, Jimmy Hart, Ric Flair, and Vince Russo, because he, like some of the individuals to whom he points, enjoyed a successful and long-lived career as a professional wrestler into the 1980s.  (Patterson Br. at 7).  Patterson's reliance upon his own self-serving and subjective opinion that he was similarly-situated to these individuals is unavailing.  See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000) (explaining that an employee's "own opinions about his . . . qualifications do not give rise to a material factual dispute")(quoting Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Svcs., 165 F.3d 1321, 1329-30 (10th Cir. 1999), cert. denied, 528 U.S. 815, 120 S. Ct. 53 (1999)); see also Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983) (instructing that an employee's subjective belief does not establish a jury issue)). Despite Patterson's conclusory assertions, Patterson's previous success as a wrestler years ago does not establish that he was qualified to be a member of WCW's creative team, much less the **head** of that team.

Patterson does not dispute that he had been away from the wrestling business for **fifteen years** and had **no experience** with creating, promoting, or writing for a nationally televised program. Patterson has not pointed to anyone who was a member of WCW's creative team during the time that he purportedly sought a creative team position who had been detached from the wrestling industry for over a decade or who had no previous creative writing experience. In fact, all of the staff members on WCW's creative team to whom Patterson points either had creative writing or promotional experience prior to becoming members of the creative team, or began working on the creative team at the same time that they were wrestling professionally with WCW. (Russo Dep. at 23-26; Hart Dep. at 13-33; Taylor Dep. at 31-45; Sullivan Dep. at 9-17).

Because Patterson cannot establish the essential requirement of his prima facie case that he was qualified for either the position he sought as head of the WCW creative team, or for any other position on the creative team, his claim fails.[4]

---

[4] In a blatant mischaracterization of Defendants' position, Patterson asserts that WCW refused to offer him a position on the creative team because he was an "old-timer." (Patterson Br. at 6). There is no evidence to support this assertion. Rather, the record evidence establishes that Patterson did not receive such a position because he was not qualified, and because WCW had recently contracted with Vince Russo to fill the very position that Patterson sought. (Russo Dep. at 15, 48). In any event, in light of the fact that he does not offer any evidence in support of his age discrimination claim, Patterson's vague reference to his age is

## C.  **Patterson Cannot Establish A Pattern Or Practice Claim.**

Patterson mistakenly argues that he can somehow establish a
pattern and practice of discrimination and that the Court should
therefore presume that WCW discriminated against each plaintiff,
including him.  (Patterson Br. at 23).  Patterson's argument is
baseless.  Patterson cannot point to any practice undertaken by WCW
or any pattern existing at WCW that even appears to have or show a
discriminatory effect on anyone, including him.

Patterson repeatedly argues in support of his pattern and
practice claim that all of the decision-makers at WCW were white
and used informal methods to promote **wrestlers**.  (Patterson Br. at
1, 8, 15).  Patterson, however, was not seeking a position as a
wrestler.  He was seeking a position as head of the creative team.
WCW's methods of promoting wrestlers have no bearing on Patterson's
claims.

Whether WCW used "informal" methods is also irrelevant to
Patterson's claim.  The Eleventh Circuit has unequivocally held
that "'[n]o matter how medieval a firm's practices, no matter how
high-handed its decisional process, no matter how mistaken the
firm's managers, the [law] does not interfere.'"  Fletcher, 2000 WL
33231616, at *8 (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d
1466, 1470 (11th Cir. 1991)).  Given this standard, WCW's

irrelevant, and any age discrimination claim fails as a matter of
law.

consistent use of race-neutral criteria in making decisions, no matter how informal its process, simply does not establish a pattern and practice of discrimination.  Moreover, the mere fact that many of WCW's decisionmakers were white does not establish a discriminatory pattern or practice.  Criminal Bd. Of Educ. Of Cairo School Dist. No. 1, 147 F.3d 533, 543 n.19 (7th Cir. 1998).

Patterson also attempts to rely on "statistics" which he contends show "conclusively that WCW's practices were discriminatory."  (Patterson Br. at 30).  These conclusory assertions are insufficient to establish any pattern or practice of discrimination at WCW and represent yet another unavailing attempt by Patterson to camouflage the meritless nature of his individual claims with irrelevant "evidence."  Patterson has not presented any competent evidence with respect to the number of African-American or white applicants who actually sought **creative team positions** and/or opportunities at WCW, nor as to the percentage of such applicants who were even minimally qualified for such positions. See Howard v. BP Oil Co., Inc., 32 F.3d 520 (11th Cir. 1994) (explaining that statistical evidence is irrelevant in a § 1981 race discrimination case where the plaintiff fails to present evidence as to the number of minorities who actually applied and were rejected and evidence of the success rate of equally-qualified white applicants).  Instead, Patterson has relied upon uneducated

guesses which purport to represent WCW's hiring practices with
respect to **wrestlers** to support his claim.  Because Patterson
allegedly sought a position as head of the creative team, the
"statistics" to which Patterson points bear no relationship
whatsoever to Patterson's allegations of discrimination and are
meaningless.  See Brown v. American Honda Motor Co., 939 F.2d 946,
952 (11th Cir. 1991) (explaining that allegations of a numbers
disparity without an "analytic foundation" are "meaningless").

In apparent recognition of the lack of evidentiary value of
Patterson's alleged "statistics" on WCW's hiring practices for
wrestlers, not to mention the lack of any "statistics" at all with
regard to non-wrestling, creative positions, Patterson again
attempts to resuscitate his fatally flawed discrimination claim by
asserting that WCW never hired any African-Americans for management
or creative staff positions.  This assertion does not salvage
Patterson's claim.  "To say that very few blacks have been selected
by [WCW] does not say a great deal about [WCW's] practices unless
we know **how many blacks have applied** and failed and compare that to
the success rate of **equally qualified** white applicants."  Id. at
952 (emphasis added); see also Hawkins v. Ceco Corp., 883 F.2d 977,
985 (11th Cir. 1989) (evidence that plaintiff was only African-
American salaried employee for a ten-year period is irrelevant

without comparative evidence), cert. denied, 495 U.S. 935 (1990).[5]
Given that Patterson's proffered statistics and conclusory
assertions prove nothing, his claim that his alleged "expert's"
statistical findings and meaningless assertions about WCW's hiring
practices somehow demonstrate "conclusively that WCW's practices
were discriminatory" (Patterson Br. at 30) is baseless.[6]

### D.   Patterson Cannot Establish A Hostile Work Environment Claim.

In a disjointed and confusing effort to establish his hostile
work environment claim, Patterson inexplicably cites to a number of
cases addressing the standard for **pattern and practice claims,**
without any discussion or rational legal argument to support
Patterson's apparent attempt to connect the two unrelated claims.
Patterson then proceeds to recite testimony that has nothing to do
with him or his claims.  For example, Patterson claims that his
work environment was hostile because "[t]he word 'nigger' and other
racial slurs were standard staples of the WCW lexicon from the

---

[5] Even if Patterson had offered probative statistical evidence, the
Supreme Court has cautioned that general determinations as to the
composition of a defendant's labor force are of limited usefulness
"as to an individual's hiring [or promotion] decision, particularly
in the presence of an otherwise justifiable reason" for the
decision.  McDonnell Douglas, 411 U.S. at 805 n. 19.

[6] Furthermore, because the statistical evidence and conclusions
proffered by Patterson lack any basic competence or evidentiary
value, as established by Defendants' expert report (attached hereto
as Ex. A), Defendants intend to file a Daubert motion to exclude
Plaintiff's expert report in its entirety.

executive ranks at TBS's offices to the trainers at the Power Plant." (Patterson Br. at 9). However, these assertions are undermined by the uncontroverted evidence of record. Moreover, it is undisputed that **Patterson never wrestled or trained at the Power Plant, and that he never worked in TBS's executive offices**. Patterson's reliance on such "evidence" in support of his claim is frivolous and abusive.

Regardless of Patterson's attempts to support his individual claim with irrelevant allegations, to sustain a claim for a hostile work environment under § 1981, a plaintiff must have performed services on behalf of the defendant or have had some working relationship with the defendant during the two-year period prior to filing his lawsuit. See Shields v. Fort James Corp., 305 F.3d 1280, 1282-83 (11th Cir. 2002)(finding that the purpose of a § 1981 hostile work environment claim is to protect an independent contractor who has contracted to do work for an employer from a hostile work environment, and to afford the contractor all of the "benefits, privileges, terms, and conditions of the contractual relationship"). It is undisputed that Patterson did not perform any services for or with WCW at any point after May 4, 1999. Because Patterson did not perform any services for WCW within the applicable statutory period, Patterson's hostile work environment claim fails. See id.

Also, because Patterson did not perform any services for WCW within the required statutory period, he cannot establish that **he personally** was subjected to any hostile treatment.  Patterson "can hardly contend that his environment was racially hostile if he did not experience the alleged hostility."  Dixon v. Young, 2000 WL 33224515, *6 (N.D. Ga. Sept. 21, 2000).  Accordingly, Patterson's hostile environment claim fails.  Id.[7]

**V.  PATTERSON CANNOT ESTABLISH AN EMOTIONAL DISTRESS CLAIM.**

Patterson does not dispute that there is anything other than WCW's alleged discrimination that purportedly caused him emotional distress.  Therefore, for the reasons stated in Defendants' Initial Brief, summary judgment should be entered on this claim.  (See Initial Br. at 16-18).

### CONCLUSION

For all of the foregoing reasons as well as the reasons explained in more detail in Defendants' Initial Brief, Defendants' Motion for Summary Judgment on all of Patterson's claims asserted in this action should be granted, and all of Patterson's claims should be dismissed.

---

[7] Patterson's Title VII claims fail for the same reasons that Patterson's § 1981 claims fail.  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)(explaining that "both Title VII and Section 1981 have the same requirements of proof and use the same analytical framework").

This 19th day of March, 2003.

TROUTMAN SANDERS LLP

JOHN J. DALTON
Georgia Bar No. 203700
ERIC A. RICHARDSON
Georgia Bar No. 233873
JAMES A. LAMBERTH
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

**CERTIFICATION**

Pursuant to Local Rule 7.1(D), I certify that this Reply Memorandum has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 19th day of March, 2003.

Eric A. Richardson
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

**Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in Walker, *et al. v.* World Championship Wrestling, Inc., *et al.***

David W. Peterson, PhD
Peopleclick, Inc.
Two Hannover Square, 9th Floor
Raleigh, NC  27601
(919) 645-2800

November 19, 2002

Lisa Grant Harpe, PhD, and Murray S. Simpson, PhD
contributed to the formulation and writing of this report.

**Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in Walker *et al. v.* World Championship Wrestling, Inc., *et al.*

1. Peopleclick, Inc. is retained by counsel for the defendants to assist with statistical aspects of the cases filed by plaintiffs against World Championship Wrestling, Inc., Turner Sports, Inc., Turner Entertainment Group, Inc. and Turner Broadcasting System, Inc. We respond here to a report submitted by plaintiffs' expert, Dr. David W. Rasmussen.[1] In his report, Dr. Rasmussen claims to provide evidence that World Championship Wrestling, Inc. (WCW) treated African Americans differently than it treated other applicants and contractors with respect to hiring and pay. Having reviewed his report, we conclude that Dr. Rasmussen establishes neither that WCW hired wrestlers in a discriminatory fashion, nor that WCW paid its wrestlers in a manner that discriminated against African Americans. These conclusions rest on Dr. Rasmussen's failure to produce statistical comparisons that focus on the treatment of African Americans relative to other similarly situated applicants and contractors, and to his erroneous application of several statistical models.[2]

**Dr. Rasmussen's Hiring Analysis**

2. Disparate treatment of African Americans occurs when an employer intentionally treats African Americans differently from similarly situated non-African Americans. For example, disparate treatment occurs when an employer requires only African Americans to take a hiring test or when an employer applies different hiring standards for a given position depending on the race of the applicant. In investigating hiring discrimination in these lawsuits, the question of interest is whether WCW treated African-American applicants for wrestler positions differently from other similarly situated applicants. To address this question, one should compare the racial composition of the pool of qualified applicants for wrestler positions to the racial composition of the people hired as wrestlers from that pool. In this way, the hiring choices made by WCW can be contrasted with the range of alternatives reasonably available to it to determine whether its decisions were systematically unfavorable to African Americans.

---

[1] Dr. Rasmussen's report is in Plaintiffs' Rule 26 (a)(2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, filed in the United States District Court for the Northern District of Georgia (Atlanta Division).

[2] Throughout our report, we generally do not contest the correctness of the data on which Dr. Rasmussen relied in conducting his analyses, or the correctness of his summaries of those data, for we have at present no way of verifying either. To the extent that Dr. Rasmussen's underlying data are incorrect or incomplete, inferences drawn from them may be unreliable.

3. Dr. Rasmussen fails to do a direct comparison of new hires to applicants in two important respects. First, instead of using applicants, he uses various estimates of the racial composition of the labor market from which he presumes WCW might reasonably be expected to draw its wrestlers. Second, instead of using new hires in the comparison, he uses all persons retained as wrestlers by WCW as of any time during the period 1996 – 2000. The result is a comparison that does not illuminate the issue of whether WCW treated African-American applicants any differently than it treated other similarly qualified applicants. Furthermore, taking account of the uncertainty in Dr. Rasmussen's labor market estimates, one finds that the racial composition of the wrestlers retained by WCW during 1996 – 2000 is consistent with Dr. Rasmussen's labor market estimates, and consequently this corrected analysis provides no cause to believe that race had anything to do with WCW's hiring decisions. These points are amplified in turn below.

*Dr. Rasmussen Does Not Study Applicants*

4. Unable to identify the pool of individuals who applied for wrestler positions during his period of analysis (1996 – 2000), Dr. Rasmussen bases his statistical analysis on several estimates of the racial composition of applicants for wrestler positions under the tacit assumption that the group of individuals attending WCW's Power Plant wrestling school either constitutes the entire qualified labor force from which WCW did or should draw its wrestlers, or else that the group provides an adequate indication of the racial composition of that labor force. For this purpose, Dr. Rasmussen relies on (i) subjective estimates by certain people of the percentage of African Americans who attended WCW's Power Plant training school, and (ii) a list of persons identified by WCW as having trained at the Power Plant school during the period 1996 – 2000. Dr. Rasmussen augments his statistical analysis with some additional observations based on (iii) the percentage of African Americans in occupations he considers similar to wrestling. As shown below, none of these sources provide a reliable estimate of the racial composition of WCW's qualified labor pool.

5. *Subjective Estimates of Power Plant Trainees.* In Table 1 of his report, Dr. Rasmussen lists the percentages of African Americans at WCW's Power Plant training school subjectively estimated by five individuals. These estimates are diverse, ranging from a low of 10% to a high of 40%. Dr. Rasmussen identifies by name the five people who provided these subjective estimates, but he indicates nothing about their qualifications to make such estimates,

about the question to which they were responding, about the basis for their estimates, about whether they might be motivated either to over- or under-estimate the representation of African Americans, or about the period of time to which the estimates pertain — all issues that affect the reliability of these estimates.

6. *List of Power Plant Trainees.* Dr. Rasmussen also bases an estimate of the racial composition of Power Plant trainees on a list he identifies as Exhibit B to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. This he claims is a list "by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996 – 2000 period." He asserts that 13.4% (or 11 out of 82) of the people on this list are African American. Leaving aside issues related to the completeness and accuracy of the list, we note that (i) the 13.4% is, unlike the subjective estimates discussed above, objective – its basis is explicit and one can address its reliability by examining the reliability of the data on which it is based, and (ii) to the extent that the list is not synonymous with the pool of applicants from which WCW might reasonably be expected to hire its wrestlers, the 13.4% estimate is prone to error of various types.

7. Consider first the objectivity of the 13.4%. The list to which Dr. Rasmussen refers apparently names 82 people, and by some process yet unknown to us, a race has been associated with each name on that list. Apparently, each name on the list was at some point considered individually, and a determination made as to the race of that person. Such a process, if done carefully, with accurate information, and applied to a comprehensive list, will yield a much more reliable estimate of the racial composition of the wrestler trainees at the Power Plant than will the offhand or subjective guesses of the sort on which Dr. Rasmussen first relies. Thus, the 13.4% is facially much more compelling an estimate of the racial composition of Power Plant trainees than are any of the subjective estimates.

8. Consider next the approximate nature of the 13.4% estimate. It may fail to be a reliable indication of the labor market from which WCW might reasonably be expected to draw its wrestlers for a variety of reasons. First, WCW may draw its wrestlers not only from the Power Plant, but from other sources as well. Second, the list on which Dr. Rasmussen relies may be incorrect or incomplete. Third, the list may contain some people who are not qualified to wrestle for WCW.

9. In any event, it is likely that the 82 people on the list are at best just a portion or sample of the people constituting the labor market from which WCW might reasonably be expected to draw. As such it is subject to sampling error, the kind of error that occurs when calculations are based on just a portion of the total population of interest. In the present case, the total population of interest is the collection of people interested in and qualified to provide services as wrestlers with WCW. Even if this sample were chosen from the target population perfectly in accord with statistical sampling protocols, sampling error will almost surely cause the proportion of African Americans in the sample to differ somewhat from that in the target population.

10. When the sample is drawn in accord with acceptable statistical practice, the magnitude of the sampling error can be characterized in the form of a confidence interval. A confidence interval reflects the margin of error associated with an estimate. For example, a survey of voters may indicate that 48% of voters favor a particular bond offering, with a 3% margin of error. This means that while 48% of the people surveyed favor the bond, the actual percentage of the total population which favors the bond is uncertain, but quite likely (usually 95% likely) to be in the range of 48% − 3% = 45% up to 48% + 3% = 51%. This range, from 45% up to 51%, is called the 95% confidence interval for the percentage of voters favoring the bond. In the present cases, the 95% confidence interval for the representation of African Americans within the target population extends from 6.9% to 22.7%.[3] That is, while 13.4% of the people in the sample of 82 wrestlers are African American, that sample could reasonably have been drawn from a population that is anywhere from 6.9% to 22.7% African American. Hence, if the representation of African Americans among newly hired wrestlers were anywhere in the range of 6.9% to 22.7%, no statistical inference of hiring discrimination would be raised.[4]

---

[3] This confidence interval is based on exact left- and right-tail binomial probabilities. There is a simpler calculation often used in practice that yields an approximate 95% confidence interval. In this case that approximate interval runs from 6.0% to 20.8%.

[4] To anticipate a point made later in this report, we note that according to Dr. Rasmussen, 7.5% of the people who wrestled for WCW during 1996 – 2000 were African American. Since 7.5% falls within the range of 6.9% to 22.7%, there is no statistical indication that, relative to their representation in the Power Plant, African Americans were underrepresented among WCW's wrestlers.

11. *Similar Occupations.* Dr. Rasmussen augments his labor market estimates by considering occupations he considers similar to wrestling. He notes that professional football and basketball require athleticism, speed and the ability to follow a scripted sequence of events. He further notes that the percentage of African Americans in professional football (67%) and basketball (80%) is much larger than the subjective estimates (10% – 40%) of their representation in the WCW training school, his objective estimate (13.4%) of their representation, or the percentage (7.5%) of African Americans among the wrestlers under contract with WCW at some time during 1996 – 2000. Although athletic ability is required of professional football players, professional basketball players and professional wrestlers, the type and amount of public speaking, acting and performing and the type of scripted events that must be followed by the participants differ substantially. Whereas in professional football and basketball, teams focus their athletic abilities on winning within the rules of the game, the focus of professional wrestling is not to win but rather for individual wrestlers to entertain. The script in basketball and football is a plan for scoring; whether or not the plan works is a function of luck and the ability of the players. In wrestling, the winner is foreordained; that is part of the choreography. The job of the wrestlers is to act out that script in the most authentic and entertaining fashion, rather like a ballet. While this requires athleticism, it also requires individual stage presence, the ability to create an artificial and consistent persona, and the ability to act. These are qualities generally not required of a good football or basketball player. There is no particular reason why the racial composition of people interested in and qualified for professional football or basketball teams should match that of people interested in and qualified for retention as wrestlers with WCW.

### Dr. Rasmussen Does Not Study New Hires

12. The data available to Dr. Rasmussen apparently do not permit him to determine the number or racial composition of people awarded contracts as wrestlers by WCW during the period 1996 – 2000. In lieu of this information, Dr. Rasmussen uses the entire group of 232 people who, at any time during 1996 – 2000, had a wrestling contract with WCW and were paid. In effect, Dr. Rasmussen presumes that the number and racial composition of WCW's wrestler workforce over this period are synonymous with those of the new hires over this period.[5] Thus,

---

[5] As the source of his workforce information, Dr. Rasmussen relies on a list of people he identifies as Exhibit A to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. It is our

Dr. Rasmussen's hiring analysis reduces to a comparison of WCW's wrestler workforce over the 1996 – 2000 period to the trainees at its Power Plant wrestling school. This is two significant steps removed from a comparison of wrestlers newly hired by WCW to the pools of applicants from which those new hires were selected, and as a consequence Dr. Rasmussen's analysis fails to shed light on whether, among similarly qualified applicants, African Americans were hired in the same proportions as others.

13. One point is abundantly clear – the 232 wrestlers in the WCW workforce were not all hired from the pool of 82 trainees at the Power Plant because 232 is larger than 82. Hence the labor market from which the 232 wrestlers were recruited consists of more than just the Power Plant trainees during 1996 – 2000, or else the list of 82 is incomplete, or perhaps both. Dr. Rasmussen's use of the entire workforce in lieu of new hires overlooks several difficulties, described next.

14. *Failure to Distinguish New Contracts, Renewal Contracts and Existing Contracts.* Dr. Rasmussen characterizes Exhibit A, a spreadsheet containing names of wrestlers and various dollar amounts of pay, as listing the wrestlers under contract with WCW between 1996 and 2000.[6] Some of these wrestlers may be "new hires" in the sense of signing their first contract with WCW sometime between 1996 and 2000. Others may have signed multi-year contracts prior to 1996, and their appearance in Exhibit A reflects either on-going service under an existing contract or a contract renewal, but not a "new hire." Almost surely, WCW's decision-making process for (i) selecting new wrestlers differs from the process for (ii) renewing prior contracts and the process for (iii) honoring contracts currently in effect. Dr. Rasmussen makes no allowance for these differences. Instead, he mistakenly treats the entire workforce – those who were newly hired during 1996 – 2000, those whose contracts were renewed during that time and those whose pre-1996 contracts spilled over into the period – all as though they were newly hired during that time. The use of WCW workforce statistics in this manner overstates the number of new hire decisions actually made by WCW during the 1996 – 2000 period, and is an unreliable guide to the racial composition of the people hired as wrestlers during this time.

---

understanding that this list does not contain information about the races of the people named, and that the information about race on which Dr. Rasmussen relies comes from one or more of the plaintiffs in these cases.
[6] Plaintiffs' Rule 26(a) (2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, page 4.

15. *Failure to Account for Prior Experience and Success.* Exhibit A lists a number of people who were "publicly famous in entertainment industries other than wrestling before they became involved with WCW."[7] Among these are David Arquette, Karl Malone, Dennis Rodman and Reggie White. Dr. Rasmussen labels these four individuals "disputed," and excludes them from several of his analyses. His decision to exclude them is tacit recognition that their prior experience and success is relevant and should be a consideration in deciding which African American and non-African American wrestlers should be compared to one another in a hiring study. Other wrestlers listed in Exhibit A may have prior experience and success with wrestling organizations other than WCW or with WCW itself. Dr. Rasmussen does not account for these differences in prior experience and success in any of his studies, thus failing to compare wrestlers similarly situated with respect to their prior experience and success.

*Dr. Rasmussen Uses Inappropriate Statistical Models*

16. In Table 2 of his report, Dr. Rasmussen compares the racial composition of 228 WCW wrestlers to each of a variety of benchmarks, expressing each disparity as a number of standard deviations based on a binomial probability model. As an analysis of new hires, this comparison is misleading for reasons already given above, including the uncertainty of the labor market estimates and the uncertainty of the composition of the people about whom hiring decisions were made during the 1996 – 2000 period. There is an additional error inherent in Table 2 that serves to inflate the numbers of standard deviations, namely the presumption in the statistical calculations that there were 228 (or, in Part B of Table 2, 232) hiring decisions. While there may have been 228 (or 232) wrestlers on the payroll during those years, the number of hiring decisions made by WCW during that time was almost surely well less than that, due to contracts already in place as of the beginning of that period. Were there, say, only a quarter of that number of actual new hire decisions made during that time period, the numbers of standard deviations shown in Table 2 would be cut approximately in half. In particular, the composition of the new hires would be found, by Dr. Rasmussen's analysis, to be well less than two standard deviations away from his 13.4% benchmark, and hence to provide no indication that African-Americans were hired by WCW in disproportionately small numbers.

---

[7] Declaration of Bobby Walker, dated November 7, 2002.

17. In his Table 3 analysis, Dr. Rasmussen compounds this error. He presents a variation in which each of the 228 wrestlers included in his Table 2 is purportedly replicated by the number of years in which each received compensation during the period from 1996 through 2000. Thus, a person among the 228 who received compensation only in one year is counted once, a person who received payment in two years is counted twice, and so forth. In this fashion, the 228 individuals are multiplied up into a group of 681 "salary years." In Dr. Rasmussen's Table 3, the racial composition of this group of salary years is then compared to the benchmarks used in Table 2, again using a binomial probability model.

18. The binomial probability model is inapt for this purpose. One of the assumptions underlying this model is that each of the 681 salary years can reasonably be regarded as having been selected independently of all the others from a very large pool of salary years. But for an individual who has more than one salary year, it is quite obvious that the selection of the second and subsequent salary years derives from some pool other than the one from which that individual's first salary year was originally chosen; such decisions are ones of renewal rather than *de novo* selection. Indeed, for a wrestler who has a multi-year contract, there is no selection or renewal decision at all until the contract has run its course.

19. Dr. Rasmussen's method of analysis in Table 3 is a material misapplication of the binomial probability model, and should be accorded no evidentiary weight whatsoever.

*The Composition of WCW Wrestlers is Consistent with Dr. Rasmussen's 13.4% Estimate*

20. Dr. Rasmussen's hiring analysis comes down to a comparison of the representation of African Americans among the 228 (or, in his Table 2B, 232) WCW wrestlers to his estimate of the representation of African Americans in the labor pool from which he believes WCW should be expected to hire its wrestlers. As we discussed above, Dr. Rasmussen's most plausible estimate of the latter is that based on the list of 82 Power Plant trainees, namely 13.4%. As we also noted, there is a margin of error associated with that estimate because it is clearly not based on the entire labor market from which WCW hires. The margin of error from this source (and there are other possible sources of error, which could serve to widen this interval) runs from 6.9% to 22.7%. That is, based on the presumption that 11 out of 82 (13.4%) of the Power Point trainees are African American, it follows that the population from which these people

might be considered a representative sample is composed of African Americans to an extent somewhere in the range of 6.9% to 22.7%.

21. Dr. Rasmussen indicates that 17 of the 228 (7.5%) WCW wrestlers are African American (excluding the "famous ones," namely David Arquette, Karl Malone, Dennis Rodman and Reggie White). But since 7.5% lies within the range of 6.9% to 22.7%, there is no statistical indication here that African Americans have been hired in disproportionately small numbers. If one includes the "famous ones," the percentage rises from 7.5% to 8.6%, again well within the 6.9% to 22.7% confidence interval, again providing no support for the contention that African Americans received less than their fair share of wrestling jobs with WCW.

**Dr. Rasmussen's Pay Analysis**

22. Dr. Rasmussen contends that his report provides evidence of disparate treatment in pay by WCW to the disadvantage of African Americans. To address the merits of a disparate treatment claim concerning pay, one must identify a group of people similarly situated at some point in time in the past and compare the progression of their pay rates over time. Racial disparities in pay progression that cannot be explained by non-discriminatory factors, such as performance or generated revenue, would suggest disparate treatment in regard to pay decisions. Dr. Rasmussen does two analyses of pay. The first fails to produce a racial disparity that is statistically significant, and therefore provides no indication that African Americans were systematically paid less than other WCW wrestlers. His second analysis produces a statistically significant imbalance to the disadvantage of African Americans, but only because he misapplies a statistical test. When correct statistical models are applied to his data, they again produce no statistical indication that African Americans were systematically paid less than other WCW wrestlers. None of Dr. Rasmussen's pay studies identify wrestlers who were similarly situated with respect to their qualifications or past experience, nor do they account for non-discriminatory factors that may appropriately affect wrestlers' pay, such as talent, charisma, wrestling or athletic ability, or ability to generate revenue. These points are amplified below.

*Lack of Statistical Significance and Use of an Inappropriate Statistical Model*

23. Dr. Rasmussen asserts that there were ten wrestlers who, during the period from 1996 through 2000, earned $750,000 or more in a year, a group he calls "the salary elite." In all,

there were 29 instances ("salary years") in which these ten individuals earned $750,000 or more in a year during these five years. Dr. Rasmussen avers that since African Americans account for 7.5% of all salary years during this period, that "we expect that they should receive about that portion" of the 29 salary years in excess of $750,000, which works out to 2.18 salary years. He claims that in fact there were none,[8] and expresses the difference between 2.18 and 0 as a number of standard deviations, obtaining 1.18.

24. First, this result is not statistically significant. That is, the disparity between the expected number of 2.18 salary years and the actual number (according to Dr. Rasmussen) is within the range of variation one would reasonably expect of an employer that does not discriminate. Only if the disparity is greater than about two standard deviations is the inference raised that some factor other than chance may be contributing to the disparity. In this case, the disparity is only 1.18 standard deviations.

25. Second, Dr. Rasmussen has again misapplied the binomial probability model. That model rests on the assumption that the 29 salary years can reasonably be regarded as having been selected independently and at random from a large pool of salary years, 7.5% of which are associated with African Americans. But that is not a reasonable presumption for the same reasons discussed above in connection with Dr. Rasmussen's Table 3. A wrestler who is on a multi-year contract does not undergo "selection" in the years in which his contract assures him of retention. Thus, a wrestler who signs a contract assuring him of a salary in excess of $750,000 in 1997 and in 1998 makes only one deal with WCW that assures him two of Dr. Rasmussen's "elite" salary years, yet Dr. Rasmussen, through his use of the binomial model, counts that single transaction as two separate and independent negotiations. The binomial model is also inapt here because a wrestler who attains a salary level of $750,000 in one year is almost surely more likely to do it again the next year than is the typical wrestler who has never before attained that level. Yet the binomial model presumes that the attainment of a second or third elite salary year is no more probable than the attainment of the first. For these reasons, application of the binomial model in these circumstances produces unreliable results.

---

[8] For purposes of this analysis, Dr. Rasmussen leaves out the four "disputed" wrestlers, two of whom (Karl Malone and Dennis Rodman, both African American) were each paid more than $750,000 in one year.

*Faulty Statistical Reasoning and Another Use of an Inappropriate Statistical Model*

26.  Dr. Rasmussen's analysis of the relative amount of time it takes for a wrestler's pay to reach $600,000 is likewise based on a misapplication of statistical reasoning. In Table 5, Dr. Rasmussen indicates that there are two African American wrestlers (B. Huffman and L. Huffman) whose salaries reached $600,000, and that they achieved these salaries after the Huffmans each wrestled for WCW for three years during the period from 1996 through 2000. Dr. Rasmussen's Table 5 indicates that there were two non-African American wrestlers (Goldberg and S. Rechsteiner) who likewise attained a $600,000 pay level after wrestling for WCW for three years during 1996 through 2000. Finally, his table indicates that there are ten other non-African American wrestlers whose pay topped $600,000 in some year during 1996 – 2000, but these wrestlers all previously wrestled for WCW during this period for less than three years.

27.  Dr. Rasmussen analyzes these data using a sign test, and once again he has chosen the wrong statistical model for the situation. A sign test is a statistical procedure involving an analogy between a series of observed events that can be summarized as a sequence of plus and minus signs, and the results of tossing a fair coin a number of times in succession. Dr. Rasmussen notes that the three years associated with the two African American wrestlers is more than the number of years associated with ten of the non-African American wrestlers in Table 5, and that these differences can be interpreted as a sequence of minus signs. He concludes that the resulting sequence is "statistically significant with less than one chance in 100 that this could occur by chance alone." To obtain his sequence, he compares the Huffmans' three-year periods with the shorter period associated with each of ten other people in Table 5, noting that each such comparison produces a negative difference in numbers of years. Implicitly likening each of these ten comparisons to the toss of a coin, he then equates these results to a situation in which a coin tossed ten times in succession lands heads up every time. The probability of such an event, assuming the coin is fair, is less than one in 100, just as Dr. Rasmussen indicates, and so he concludes that it takes African American wrestlers statistically significantly longer to reach the $600,000 annual pay level than it does other wrestlers.[9]

---

[9] A probability of less than one in 100 is mathematically equivalent to an imbalance of more than 2.33 standard deviations. Hence, if this were a correct application of the sign test, it would have produced a result showing an imbalance in excess of two standard deviations. As noted in the text, it is not a correct application.

28. Several fallacies underlie this conclusion. First, Dr. Rasmussen does not account for the fact that there are also two non-African-American wrestlers (Goldberg and S. Rechsteiner) with whom, like the Huffmans, a three-year period is associated in his Table 5. He simply ignores these two wrestlers, though their numbers of years are identical to those of the Huffmans. This is clearly illogical and it biases the test in favor of a finding of statistical significance.

29. Consider an extreme case. Suppose that Table 5 contained 300 (instead of just two) white wrestlers each with an associated period of three years. That would surely indicate that three years is the norm, that the two Huffmans fit squarely within the norm, and that there must be something unusual about the ten white wrestlers with whom fewer than three years are associated. One certainly could not logically discard those 300 white wrestlers from the analysis, but that is exactly what Dr. Rasmussen's procedure would do, and he would reach the same conclusion that he does in his report.

30. A second fallacy underlying Dr. Rasmussen's analysis is that he compares the two Huffmans as a single entity against each one of the non-African American wrestlers individually (except for Goldberg and S. Rechsteiner, who, like the Huffmans, have three years associated with them). There is no logical basis for this asymmetric method of comparison. Either the comparisons should involve all possible combinations of individuals, or else they should be between groups of individuals. There is no logical basis for the comparison on which Dr. Rasmussen bases his test of statistical significance.

31. A third fallacy behind Dr. Rasmussen's salary analysis is that it makes little allowance for the qualifications or experience the wrestlers may have had prior to 1996, or with employers since 1996. Dr. Rasmussen tacitly acknowledges that this consideration is important, because he does exclude from his analysis four people whose pay in at least one year exceeded $600,000, but whose careers are unusual. Two of these people, Karl Malone and Dennis Rodman, both African American basketball stars, signed on with WCW. Malone earned more than $600,000 in his first year (1998) and Rodman earned more than $600,000 in his second year (1999). But for their exclusion on the basis of their prior fame, they would have been accorded 0 years and 1 year, respectively, in Dr. Rasmussen's Table 5. Two other people, Terry Bollea ("Hulk Hogan") and Randy Poffo earned over $600,000 in 1996, and though they

-12-

appear in Dr. Rasmussen's Table 5, they are not counted in his sign test, possibly in recognition of their pre-1996 accomplishments. But some of the other wrestlers named in Table 5 may also have prior experience serving to distinguish them from others on the list. For example, 11 people[10] listed on Table 5 each received pay from WCW in 1996, suggesting that their careers with WCW may have predated 1996, and therefore that some or all of their numbers of years to attain the pay rate of $600,000 shown in Table 5 may be understated.[11] As a result, Dr. Rasmussen's comparisons of the numbers of years wrestlers took to be paid at least $600,000 in a year shown in that table are not a reliable indication of differences in treatment based on race.

32. A proper analysis of the data in Dr. Rasmussen's Table 5 reveals that there is no statistically significant difference in the pattern of years associated with African Americans from that associated with the other wrestlers on the list. One such analysis notes that two out of twelve, or 16.7%, of the non-African American wrestlers are associated with three years, and asks how likely it is that the only two African-American wrestlers, consistent with such odds, would both be assigned three years. The answer to that question is one chance in 36, which equates to an imbalance of 1.91 standard deviations. This being less than two standard deviations, it raises no suggestion that race played a role in its creation.

33. Another such analysis, based on ranking the wrestlers in accord with their numbers of associated years, produces a racial imbalance of 1.51 standard deviations.[12] Again this difference, being less than two standard deviations, is of such small magnitude that it is within the range conventionally attributed to chance, and does not raise the inference that African American wrestlers on the list have, as a group, been treated any differently than the non-African Americans.

---

[10] Steven Borden, Page Falkinburg, Richard Fliehr, Bill Goldberg, Scott Hall, Booker Huffman, Lash Huffman, Kevin Nash, Lawrence Pfohl, Scott Rechsteiner and Roderick Toombs.

[11] Page Falkenburg's number of years is in fact understated. Falkenburg is shown in Table 5 as having waited one year to get to $600,000, but in fact he was paid in 1996 and 1998 (though not 1997), and then he surpassed the $600,000 level in 1999. This would seem to qualify him for at least a "2" in Table 5's Time-to-$600,000 column.

[12] This type of analysis is called a rank sum test. It is a well-known and widely accepted form of analysis, and it is applicable to the present circumstances.

34. As with his misapplications of the binomial probability model noted previously, Dr. Rasmussen has failed with his sign test to match a fact situation properly to its statistical abstraction. Such technical failures cause his probability and statistical significance calculations to be unreliable, and improperly grounded in the methods and procedures of science. These technical failures are quite distinct from issues related to the completeness and correctness of his data and the relevance to this litigation of the issues he investigates.

**Conclusion**

35. Dr. Rasmussen's analyses are far removed from the types that permit a convincing indication of disparate treatment in hiring and pay. Instead of comparing new hires to applicants, he compares the entire group of WCW wrestlers to trainees at the Power Plant wrestling school. Instead of comparing the rates of pay or pay advancement for wrestlers similarly situated at some point in time, he analyzes the "salary years" and a dubious measure of time-to-salary of a so-called "salary elite." Thus, his comparisons have little or no connection to the issues of interest in these cases.

36. Correcting Dr. Rasmussen's several statistical modeling errors, and taking account of the uncertainty in his labor force estimates, one finds that his studies, properly interpreted, provide no statistical indication that African Americans were treated any differently by WCW than were other similarly situated applicants and contract wrestlers.

David W. Peterson
November 19, 2002

-14-

**Sources**

Declaration of Bobby Walker, dated 11/07/2002

Second Amended Complaint in the matter of Bobby Walker v. World Championship Wrestling, Inc, and Turner Sports, Inc., dated April 27, 2001

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of J. Steve Hicks, dated 06/26/2002

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of Statistician, dated 08/02/2002

Plaintiffs' Second Amended Supplemental Response to Initial Disclosures Providing Expert Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), dated 11/06/2002

Excel spreadsheet labeled Wrestler Earnings.xls

**Retention Terms**

David W. Peterson is retained through Peopleclick, Inc. which bills his time on this project at the hourly rate of $390.

**Publications and Qualifications**

Dr. Peterson's resume, listing his publications and professional affiliations is attached.

**Previous Testimony**

A list of cases in which Dr. Peterson has testified at trial or by deposition since January 1, 1996 is attached.

David W. Peterson

DAVID WEST PETERSON

1942 Rock Rest Road                                          Home:  919-542-6937
Pittsboro, North Carolina 27312                              Office:  same

Personal:  Born 1940, U.S.
           Married, two children


Higher Education:

          B.S., University of Wisconsin at Madison, 1962        )
          M.S., Stanford University, 1963                       )
          Ph.D., Stanford University, 1965                      )Electrical Engineering


Employment History:

| | |
|---|---|
| 1960 | Engineering Trainee, General Electric Company |
| 1961-62 | Research Assistant, Computer Laboratory, Department of Electrical Engineering, University of Wisconsin |
| 1962-63 | Member, Technical Staff, Hughes Aircraft Company |
| 1963-65 | Research Assistant, Systems Laboratory, Stanford University |
| 1965-67 | Mathematician and Hybrid Simulation Project Officer, U.S. Army Electronics Command, Fort Monmouth, NJ |
| 1967-70 | Assistant Professor of Quantitative Methods, Northwestern University Graduate School of Management |
| 1970-73 | Associate Professor of Managerial Economics and Decision Sciences, Northwestern University Graduate School of Management |
| 1971-72 | Research Fellow, International Institute of Management, Berlin |
| 1973 | Visiting Lecturer, Systems Engineering, University of Illinois at Chicago Circle (spring quarter) |
| 1973-84 | Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1979-2000 | President, PRI Associates, Durham, NC |
| 1982-86 | Senior Lecturer, Duke Law School |
| 1984-89 | Adjunct Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1989-94 | Adjunct Professor, Institute for Statistics and Decision Sciences, Duke University, Durham, NC |
| 2000-02 | Senior Vice President, Peopleclick, Inc., Raleigh, NC |

David W. Peterson

Various consulting activities undertaken for the U.S. Public Health Service, U.S. Army Electronics Command, and numerous private corporations, law firms and governmental agencies.

Languages:

English (native)
German (working knowledge)
Some French, Russian and Chinese

Professional Memberships:

Institute for Electrical and Electronic Engineers
Econometric Society
The Institute of Management Sciences
The American Statistical Association

Professional Publications:

Numerous technical articles published in internationally circulated journals, treating topics in the theory and application of mathematical modeling in areas such as radio propagation, control of economic systems, optimization of static and dynamic systems, statistical decision making, the measurement of employment opportunity equality, and the detection of computer code theft.

Professional Speaking Engagements:

Technical papers read at meetings of the IEEE Man, Systems and Cybernetics Group, the Econometric Society, The Institute for Management Sciences and the American Statistical Association. Many semi-technical engagements in the U.S., Europe and the Middle East, generally pertaining to mathematical modeling applications in management. Speaker at numerous seminars for lawyers dealing with statistical applications in litigation.

Long Term Professional Interest:

To be involved in the analysis of situations of a managerial, economic or engineering nature, requiring a carefully chosen blend of mathematics and computation. This involvement may be in the form of performing the analysis, teaching others to perform it, or supervising others as they perform it. A combination of the three would be ideal.

David W. Peterson

Amplifying Remarks:

While at Stanford University I was involved in a project whose chief aim was to analyze radar return data to discriminate among different types of vehicles entering the atmosphere. Problems of primary concern in this project were data processing speed and discrimination accuracy.

While at Fort Monmouth I was involved in two major types of activities. The first was the construction and analysis of models describing very-low-frequency electromagnetic propagation in the earth-atmosphere-ionosphere system and in the lithosphere. The first-named involved the construction of a model and the estimation of its parameters using data gathered as part of the project. The second-named was primarily a theoretical study. Both resulted in professional publications.

The second major project with which I was associated was the simulation of various helicopter fire control systems on a large scale hybrid computer. In this project I was responsible for the construction of a model of a fire control computer, for the stochastic subroutines associated with the simulation, and for various subroutines involving the generation of certain artificial images for the benefit of the pilot. The system simulated was comprehensive in that it included the pilot and a gunner (both of them live) and a cockpit with a visual display consisting of a television-scanned terrain belt on which were superimposed artificially-generated data relating target size and location to the trajectories of tracer rounds. The challenge in this task was to simulate the aircraft flight dynamics, the tracer round trajectories and the feel of the aircraft on the pilot and co-pilot controls, to within acceptable tolerances, subject to limitations on computer memory and computational speed.

At Northwestern I taught courses in mathematical programming, elementary probability and statistics, computer programming and applications, and optimal control to graduate students in management, attracting some students from economics, computer science and industrial engineering.

My research interests have been in establishing a logical-mathematical foundation for information theory, and the construction and analysis of dynamic econometric models. A year spent at the International Institute of Management in Berlin enabled me to bring to publishable form the results of several investigations in these areas, as well as to make personal and professional acquaintances in several European and Middle Eastern communities.

While at Duke my activities in the early years were directed toward improving the quality and volume of research of junior faculty, to developing an expanded Ph.D. program, to revising the MBA curriculum, and to exploring and developing bases on which GSBA faculty and students can interact with faculty and administrators in various departments outside the GSBA. I developed a special interest in the application of statistical methods to the measurement of the equality with which an employer extends employment opportunities to employees of differing ages, sex or ethnicity. These activities led to several publications, speaking engagements and consulting assignments, and to the formation of PRI Associates.

A - 3

David W. Peterson

Other work experience includes:

a.  the formulation of a plan for a national health data information center, and for its process of creation

b.  the design of a computer-based inventory management system for a $50M per year mail-order firm

c.  the provision of statistical advice to researchers studying the effects on costs and services of a merger of nine hospitals in Arizona

d.  the provision of criticism, advice and encouragement to researchers establishing a methodology for evaluating the effects of different types of care extended to elderly Americans

e.  consultation with legal teams on the structuring of statistical data presented at judicial proceedings involving employment discrimination

f.  formation of PRI Associates, Inc., providing statistical consultation services on matters pertaining to the use of statistical methods in litigation, and on matters related to software development

David W. Peterson

Bibliography:

1.  Ilt--Inverse LaPlace Transform, IBM 1620 Digital Computer Program, IBM Program
    Information Department Library File Number 6.0.164, September, 1964.

2.  Discriminant Functions--Properties, Classes, and Computational Techniques, Ph.D. thesis,
    Rept. SU-SEL-021, Technical Report 6761-2, Stanford Electronics Laboratories, Stanford,
    California, April 1965.

3.  A Theorem on Decision Boundaries, *Proceedings of the 12th Annual Conference of Army
    Mathematicians*, Dartmouth College, Hanover, New Hampshire, June 22-23, 1966 with K.
    A. Belser.

4.  A Method of Finding Linear Discriminant Functions for a Class of Performance Criteria,
    *IEEE Transactions on Information Theory*, IT-12, No. 3, July, 1966, pp. 380-387, with R. L.
    Mattson.

5.  A Theorem on Single Sample Confidence Intervals, 13th Annual Conference of Army
    Mathematicians, Fort Monmouth, New Jersey, June 7-8, 1967. Also, *Proceedings of the
    IEEE*, Vol. 55, No. 9, September 1967, pp. 1637-1638, (Correspondence).

6.  The Mathematics of Information--A Critique, paper read at the U.S. Army Electronics
    Command Advanced Planning Briefing and Technical Symposium, Fort Monmouth, New
    Jersey, March 7, 1968.

7.  A Model for Electromagnetic Propagation in the Lithosphere, *Proceedings of the IEEE*, Vol.
    56, No. 5, May 1968, pp. 799-804, with F. H. Schwering and S. B. Levin.

8.  A Proposed Method for Predicting the Phase Behavior of a VLF Radio Signal, *Journal of
    Atmospheric and Terrestrial Physics*, Vol. 31, 1969, pp. 225-232.

9.  Using the Maximum Principle and a Hybrid Computer for Production Planning, with Robert
    R. Gann, *Proceedings of the American Institute for Decision Sciences Meeting*, New
    Orleans, Louisiana, October 1969.

10. Some Convergence Properties of a Nearest Neighbor Decision Rule, Record of the IEEE
    Systems Science and Cybernetics Conference, October, 1968, San Francisco, also *IEEE
    Transactions on Information Theory*, Vol. IT-16, No. 1, January 1970, pp. 26-31.

11. A Stabilizing Transformation for Numerical Solution of Maximum Principle Problems, with
    R. Gann, *IEEE Transactions on Automatic Control* (correspondence), Vol. 15, No. 6,
    December 1970, pp. 686-687.

A - 5

David W. Peterson

12. A Sufficient Maximum Principle, *IEEE Transactions on Automatic Control* (correspondence), February 1971, Vol. 16, No. 1, pp. 85-86.

13. Optimal Control and Monetary Policy, with E. M. Lerner, *International Economic Review*, Vol. 12, No. 2, June 1971.

14. The Response of Prices and Income to Monetary Policy: An Analysis Based Upon a Differential Phillips Curve, with E. M. Lerner and E. J. Lusk, *Journal of Political Economy*, Vol. 19, No. 4, July/August 1971, pp. 857-866.

15. Equitability in Multi-Agent Dynamic Systems: The Case of Two Agents and Four States, presented at the European Econometric Society Meeting, Barcelona, September 1971, published in revised form in the *Nigerian Journal of Quantitative Economics*, Vol. 1, No. 1, March 1975, pp. 33-58.

16. Equitability in Multi-Agent Dynamic Systems: The Case of m Agents and nm States, *Proceedings of the Joint Conference on Major Systems*, Sponsored by IEEE Systems, Man and Cybernetics Group and by ORSA, Anaheim, California, October 1971.

17. Comments on "Economics of Information Systems," by Jacob Marschak, in *Frontiers of Quantitative Economics*, M. Intriligator, ed., North-Holland Publishing Company, Amsterdam, 1971, pp. 107-108.

18. The Economic Significance of Auxiliary Functions in Optimal Control, presented at the Econometric Society North American Meeting, August 1971, *International Economic Review*, Vol. 14, No. 1, February 1973, pp. 1-19.

19. A Review of Constraint Qualifications in Finite Dimensional Spaces, *SIAM Review*, Vol. 15, No. 3, July 1973, pp. 639-654.

20. Some Relationships Between Hierarchical Systems Theory and Certain Optimization Problems, with Y. M. I. Dirickx and L. P. Jennergren, presented at the IEEE Systems, Man and Cybernetics Group Conference, Washington, D. C., October 1972; *IEEE Transactions on Systems, Man and Cybernetics*, Fall 1973.

21. On Sensitivity in Optimal Control Problems, *Journal of Optimization Theory and Applications*, Vol. 13, No. 1, January 1974, pp. 56-73.

22. Toward a Mathematical Definition of Information, *Proceedings of the Sixth Annual Southeastern Symposium on System Theory*, February 1974.

23. On Dynamic Behavior of the Regulated Firm, with James Vander Weide, presented at the Econometric Society Winter Meetings, 1974, revised March 1975.

David W. Peterson

24. Transferring Ideas from Engineering to the Social Sciences, *Proceedings of the IEEE*, Vol. 63, No. 3, pp. 354-359, March 1975.

25. Trader-Commodity Parity Theorems, with D. Graham, P. Jennergren, and R. Weintraub, *Journal of Economic Theory*, Vol. 12, No. 3, June 1976.

26. A Note on the Optimal Investment Policy of the Regulated Firm, with J. H. Vander Weide, *Atlantic Economic Journal*, Vol. IV, No. 3, Fall 1976, pp. 51-55.

27. A Strategy which Maximizes the Geometric Mean Return on Portfolio Investments, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 23, No. 10, June 1977, pp. 1117-1123.

28. A Monte Carlo Investigation of Characteristics of Optimal Geometric Mean Portfolios, with Steven F. Maier and James H. Vander Weide, invited paper, presented at a joint session of the Econometric Society and the American Finance Association Winter Meeting, 1974, revised and published in the *Journal of Financial and Quantitative Analysis*, June 1977, pp. 215-233.

29. Quadraticity and Neutrality in Discrete Time Stochastic Linear Quadratic Control, with Carole Aldrich, *Automatica*, Vol. 13, 1977, pp. 307-312.

30. The Coordination of Short-Run Decision Making with Long-Range Planning, with D. Loughridge and W. Damon, *Omega*, Vol. 4, No. 6, 1977, pp. 1-12.

31. On the Estimation of the Racial and Sexual Composition of the Labor Force Available to an Employer, in *Perspectives on Availability*, Equal Employment Advisory Council, August 1978.

32. A Review of Direct Sufficiency Conditions in Optimal Control Theory, with J. Zalkind, *International Journal of Control*, Vol. 28, No. 4, 1978, pp. 589-610.

33. An Analytic Framework for Evaluating Rolling Schedules, with K. Baker, *Management Science*, Vol. 25, No. 4, April 1979, pp. 341-351.

34. *Use of Statistics in Equal Employment Opportunity Litigation*, with Walter B. Connolly, Jr., New York Law Journal Seminars Press, February 1980 (1982, 1983, 1985, 1987, 1988, 1989, 1991, 1992, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001).

35. Pitfalls in the Use of Regression Analysis for the Measurement of Equal Employment Opportunity, *Journal on Policy Analysis and Information Systems*, Vol. 5, No. 1, March 1981, pp. 43-65.

36. An Empirical Bayes Estimate of Market Risk, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 28, No. 7, July 1982, pp. 728-737.

David W. Peterson

37. Measurement Error, Regression and Equal Employment Opportunity, in *Statistical Evidence of Discrimination*, D. H. Kaye and M. Aickin, eds., Marcel Dekker, New York, 1986.

38. Measuring Pass-Fail Employment Test Impact Disparities, presented at the joint National Meeting of ORSA/TIMS, October 1982.

39. A Regression Specification Test Based on Observation Exchanges, presented at the American Statistical Association meetings, August 1984, Philadelphia, PA. Revised June 1985.

40. *Law and Contemporary Problems*, Vol. 46, Autumn 1983, No. 4, Special Editor for the Symposium on Statistical Inference in Litigation.

41. Data Acquisition and Analysis, in *Statistical Evidence in Litigation*, David W. Barnes and John Conley, Little, Brown, Boston 1986.

42. Trial by Regression:  Detecting and Measuring Disparate Treatment in Employment Discrimination Litigation, presented at the American Statistical Association meetings, August 1986, Chicago, IL.

43. The Role of Experts in Software Infringement Cases, with John M. Conley, *Georgia Law Review*, Vol. 22, No. 2, Winter 1988, pp. 425-468.  Reprinted in *Computer Law & Practice*, Vol. 5, No. 3, pp. 99-110 (Part 1) and Vol. 5, No. 4, pp. 147-153 (Part 2).

44. Court-Imposed Methodological Constraints:  An Employment Discrimination Example, with John M. Conley, presented at the American Statistical Association meetings, August 6-9, 1990.

45. The Employment Discrimination Case of Bayes v. Fisher, presented at the Second International Conference on Forensic Statistics, Arizona State University, Tempe, AZ, May 19-21, 1993.

46. When Ethical Systems Collide:  The Social Scientist and the Adversary Process, with John M. Conley, in Kniffka, Hannes, *Recent Developments in Forensic Linguistics*, Peter Lang, Frankfurt am Main, 1996, pp. 345-358.

47. Review of Daniel L. Rubinfeld's Reference Guide on Multiple Regression in the Federal Judicial Center's 1994 Reference Manual on Scientific Evidence, *Jurimetrics*, Vol. 36, No. 2, Winter 1996, pp. 213-216.

48. Science of Gatekeeping:  The Federal Judicial Center's New Reference Manual on Scientific Evidence, with John M. Conley, *North Carolina Law Review*, Vol. 74, No. 4, April 1996, pp. 1183-1223.

David W. Peterson

49.  Pay Discrimination Models, *Journal of Forensic Economics*, Vol. 12, No. 2, Spring/ Summer 1999, pp. 111-124.

50.  Of Cherries, Fudge and Onions:  Science and its Courtroom Perversions, with John M. Conley, *Law and Contemporary Problems*, Vol. 64, No. 4, Autumn 2001, pp. 213-240.

51.  In Quest of the Perfect P-Value, *Journal of Forensic Economics*, forthcoming.

David W. Peterson

Newsletter Articles:

1. Measurement of Age Discrimination, *Personnel Research Report*, Vol. 1, No. 1, July 1981.

2. Measurement Error, Regression, and Equal Employment Opportunity, *Personnel Research Report*, Vol. 1, No. 2, October 1981.

3. Notes on Statistical Proof: Rebuttal and Cumulative Impact, *Personnel Research Report*, Vol. 1, No. 3, January 1982.

4. Age Profiles and Workforce Reductions: Some Basic Relationships, *Personnel Research Report*, Vol. 2, No. 1, July 1982.

5. Statistical Models and Employer Discretion, *Personnel Research Report*, Vol. 2, No. 2, October 1982.

6. Binomial v. Hypergeometric Employee Selection Models, *Personnel Research Report*, Vol. 2, No. 4, April 1983.

7. Preponderance of Evidence, P-values and Standard Deviations, *Personnel Research Report*, Vol. 3, No. 1, October 1983.

8. Age Patterns in Employee Flow, *Personnel Research Report*, Vol. 3, No. 2, April 1984.

9. Testing the Plausibility of A Regression, *Personnel Research Report*, Vol. 3, No. 3, July 1984.

10. Workforce Reductions: A Time for Preventive Statistics, *PRI Report*, Vol. 4, No. 3, October 1985.

11. Data Acquisition for Litigation (Part 1 & II), *PRI Report*, Vol. 5, No. 1, April 1986, Vol. 5, No. 3, March 1987.

12. Underutilization: The Small Group and Large Group Problems, and a Proposed Solution to Both, *PRI Report*, Vol. 5, No. 2, July 1986.

13. Calculating Mitigated Lost Earnings, *PRI Report*, Vol. 5, No. 4, June 1987.

14. Using Computers to Prepare Evidence, *PRI Report*, Vol. 6, No. 1, October 1987.

15. Samples, Populations and the Whole Universe, *PRI Report*, Vol. 6, No. 2, July 1988.

16. Lost Future Income: Calculating Expected Present Values, *PRI Report*, Vol. 6, No. 3, October 1988.

A - 10

David W. Peterson

17. Detecting Discrimination in Peremptory Challenges, *PRI Report*, Vol. 6, No. 4, December 1990.

18. One Tail or Two? Or Does it Really Matter?, *PRI Report*, Vol. 7, No. 1, June 1991.

19. The Worst of Ten is Pretty Bad, *PRI Report*, Vol. 8, No. 1, July 1997.

20. Standard Deviation Calculations: A Refinement for Small Numbers, *PRI Report*, Vol. 8, No. 3, May 1998.

21. What Does a Regression Analysis Really Show?, *PRI Report*, Vol. 8, No. 4, November 1998.

22. Compensation Analysis à la OFCCP, *PRI Report*, Vol. 9, No. 2, March 2000.

23. Compensation Analysis: Accounting for Employer Latitude in Setting Pay, *The Report*, Vol. 1 No. 1, February 2001.

24. A Regression Example for Those Who Still Believe in it, *The Report*, Vol. 1 No. 3, August 2001.

25. Normal Equivalent Standard deviations, *The Report*, Vol. 1 No. 4, March 2002.

## Cases in which David W. Peterson has Testified at Trial or by Deposition

### Cases Involving Testimony Since January 1, 1996

| Case Name | Depo or Trial | Date | Venue |
|---|---|---|---|
| Albers *v.* Provident Mutual Life Insurance Co., *et al.* | Deposition | 3/13/02 | Telephone |
| Allen, *et al.* *v.* Entergy & AP&L | Deposition | 1/30/97 | Little Rock, AR |
| American Cyanamid *v.* Impact Profiles *v.* Phoenix Marketing Group | Deposition Trial | 7/25/95 4/30-5/1/98 | New Jersey |
| Bayless *v.* Hallmark Marketing, Inc. | Deposition | 11/1/99 | Durham, NC |
| Bleimehl *v.* Eastman Kodak Company 4-93-CV-30802 | Deposition Trial | 5/4/96 5/20/96 | Telephone USDC SD IA Des Moines, IA |
| Bryant *et al.* *v.* Food Lion 2-90-0505-1 | Deposition Trial | 3/2/93 5/29/97 | Columbia, SC USDC D SC Charleston SC |
| Burns, *et al.*, *v.* Control Data Corporation | Deposition | 5/23/96 | Washington DC |
| CMAC *v.* Robert F. deCastro, Inc. *et al.* 97-0514 | Deposition Trial | 8/17/98, 9/1/98 11/10/98, 11/12/98 | Metairie, LA USDC ED LA New Orleans |
| Colunga *v.* Hercules *et al.* 89-C-954B | Trial | 3/21/97 | USDC D UT Salt Lake City |
| Cromartie *et al.* *v.* Hunt *et al.* CV-104-H2 | Deposition Trial | 9/20/99 12/1/99 | Raleigh, NC USDC Raleigh |
| Daniel *v.* Entergy, *et al.* | Deposition | 9/5/00 | |
| Dyer *et al.* *v.* Publix Super Markets, Inc. | Deposition | 4/15, 19, 20/98; 5/5/98 | |
| Evers *et al.* *v.* University of Cincinnati, C-1-95-259 | Deposition Trial | 5/15/96 6/7/96 | Cincinnati, OH. USDC SD OH Judge Weber |
| Hamblin, *et al.* *v.* Alliant Techsystems | Deposition | 9/16-17/98 | |
| Holly Mathers *et al.* *v.* Northshore Mining Co. | Deposition | 6/24/02 | Raleigh, NC |

| | | | |
|---|---|---|---|
| Hoops, *et al. v.* Elk Run Coal Company | Deposition | 2/1, 3, 7/00 | Charleston, WV |
| Kovacevich *v.* Kent State University | Deposition | 5/31/01 | Raleigh, NC |
| Leal *v.* Baptist Health System | Deposition | 9/15/98 | San Antonio |
| McManus *v.* Washington Gas Light Co. 90-3169 (RCL) | Trial | 8/14/96 | USDC DC Judge Lambert |
| Miller *v.* Aristech, 94-1921 | Trial | 1/13/98 | USDC WD PA |
| Nolin *et al. v.* Orange Co. | Deposition | 1/6/97 | Durham, NC |
| Replacements, Ltd. *v.* SKC, Inc. | Deposition | 8/10/99 | Greensboro NC |
| Robert McLaughlin *v.* Rhone-Poulenc Ag Company, Inc. *et al.* | Deposition | 6/8/00 | Durham, NC |
| Shapira *v.* Lockheed Martin Energy Systems, Inc. | Deposition | 9/19/97 | Durham, NC |
| United States *ex rel.* Brett Roby *v.* The Boeing Company | Deposition | 2/8/00 | Washington DC |
| Wales *et al. v.* Jack M. Berry, Inc. | Trial | 5/22/98 | Tampa, FL |
| Wilfong, *et al. v.* Rent A Center | Deposition | 10/31/01 | St. Louis, MO |

B - 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAUDE PATTERSON,                         )
                                          )
              Plaintiff,                  )
v.                                        )    CIVIL ACTION FILE
                                          )    NO. 1:01-CV-1152-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., TURNER               )
ENTERTAINMENT GROUP, INC., and            )
TURNER BROADCASTING SYSTEM, INC.,         )
                                          )
              Defendants.                 )

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this ***DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT*** upon the interested parties by hand delivery to:

          Cary Ichter
          Charles J. Gernazian
          Michelle M. Rothenberg-Williams
          MEADOWS, ICHTER & BOWERS, P.C.
          Fourteen Piedmont Center
          Suite 1100
          3535 Piedmont Road
          Atlanta, GA  30305

This 19th day of March, 2003.

          _____
          Eric A. Richardson
          TROUTMAN SANDERS LLP
          Suite 5200, Bank of America Plaza
          600 Peachtree Street, N.E.
          Atlanta, GA  30308-2216
          (404) 885-3000

1125235_6.DOC